**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL J. BYNUM and CANADA HOCKEY LLC d/b/a EPIC SPORTS, | § § § | |
| Plaintiffs, | § § | Civil Action No. 4:17-cv-00181 |
| vs. | § § | |
| TEXAS A&M UNIVERSITY ATHLETIC DEPARTMENT; TEXAS A&M UNIVERSITY 12TH MAN FOUNDATION; BRAD MARQUARDT, in his individual capacity; ALAN CANNON, in his individual capacity; and LANE STEPHENSON, in his individual capacity, | § § § § § § § § | Jury Trial Demanded |
| Defendants. | § | |

**PLAINTIFFS' SUPPLEMENTAL AND AMENDED RESPONSE IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK
OF JURISDICTION AND FAILURE TO STATE A CLAIM**

i

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... ii

I.      Introduction ............................................................................................................... 1

II.     Factual Background ................................................................................................... 3

       A.     Plaintiffs are the owners and holders of the copyright on the *12th Man* Book, including the Gill biography ....................................................... 3

       B.     Defendants stole Plaintiffs' copyrighted work as part of their "12th Man" promotional campaign ........................................................................ 4

III.    The Athletic Department is neither the State nor an "arm of the State."  It is an independent commercial enterprise that is not entitled to sovereign immunity under the Eleventh Amendment ............................................................................. 6

       A.     The Athletic Department is not the State, for purposes of sovereign immunity, because it is organized and operates as an independent commercial enterprise. ........................................................................... 6

            1.     The Athletic Department's corporate structure, finances, and business operations are separate and distinct from the University. ............ 6

            2.     The University's rules do not apply to the Athletic Department. ............... 8

            3.     The Athletic Department receives no public funds.................................... 8

            4.     The Athletic Department is a de facto profit-making subsidiary of the University, capable of being sued apart from the University. ............. 10

            5.     The Athletic Department is made up of, at least in part, a private, non-governmental entity ..................................................................... 10

       B.     The Athletic Department cannot be viewed as an "arm-of the State" of Texas for purposes of sovereign immunity ............................................. 11

            1.     Arm-of-the-state status requires a function-by-function test .................... 12

            2.     This case does not implicate the core governmental functions of either the State or the University ....................................................... 13

IV.    The Athletic Department's asserted sovereign immunity defense does not shield it from Plaintiffs' copyright claims. ..................................................................... 17

       A.     The states waived their immunity to copyright claims in the plan of the Convention. ................................................................................................ 18

B.    Congress has validly abrogated the states' immunity for copyright claims to enforce the Due Process Clause of the Fourteenth Amendment ......................21

    1.    Plaintiffs have alleged an actual constitutional violation .........................23

    2.    The Fifth Circuit's holding in Chavez has been undermined by subsequent experience ..............................................................................25

C.    The CRCA validly enforces the Privileges and Immunities Clause of the Fourteenth Amendment .......................................................................27

    1.    Federal copyrights are "privileges and immunities of citizens of the United States" ...............................................................................28

    2.    Congress acted within its power when abrogating sovereign immunity for direct violations of the privileges and immunities clause...........................................................................................30

V.    Sovereign immunity does not bar Plaintiffs' Takings claims.............................................32

A.    Plaintiffs' Takings claim under the Texas Constitution is not barred by sovereign immunity and may be pursued in this Court because the requirements for diversity jurisdiction have been satisfied. .................................32

B.    Sovereign immunity also does not bar Plaintiffs' federal Takings claim under the Fifth and Fourteenth Amendments of the U.S. Constitution. ...............33

VI.    The Athletic Department has waived sovereign immunity by its conduct. .......................35

VII.    Qualified Immunity..........................................................................................................38

A.    Standard of review ...............................................................................................38

B.    Individual Defendants Brad Marquardt and Alan Cannon are not eligible for qualified immunity because they are not State employees .............................39

C.    The Individual Defendants cannot be shielded from liability because their actions were objectively unreasonable in light of clearly established law. ..........39

    1.    The rights that Plaintiffs have alleged have been violated are clearly established under the law. ..............................................................40

    2.    In light of such clearly established law, the Individual Defendants actions were objectively unreasonable.......................................................44

        a.    The Individual Defendants were aware at all times of Plaintiffs' copyright. .......................................................................44

        b.    The Individual Defendants intentionally removed

Plaintiffs' copyright notice, provided false attribution, and published a near verbatim copy of Plaintiffs' work ......................46

c.      The Individual Defendants' actions are not "fair use" ..................47

d.      The Individual Defendants' actions subsequent to the unauthorized copying and publishing of Plaintiffs' work confirm that their actions were not objectively reasonable ..........51

VIII.   Texas state law cannot grant the Individual Defendants immunity against claims asserted under federal law ...............................................................53

IX.     Plaintiffs have sufficiently alleged claims of direct copyright infringement, contributory copyright infringement, and DMCA violations against the Individual Defendants. ..............................................................................54

A.      Standard of review ......................................................54

B.      Direct Copyright Infringement .........................................55

C.      Contributory Copyright Infringement ..................................56

D.      DMCA violations .......................................................59

CONCLUSION ...........................................................................60

CERTIFICATE OF SERVICE ...........................................................62

# INDEX OF AUTHORITIES

**Page(s)**

## CASES

*Alabama v. Pugh*,
438 U.S. 781 (1978)..................................................................................................35

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
166 F.3d 772 (5th Cir. 1999) ...................................................................................56

*Alden v. Maine*,
527 U.S. 706 (1999)..................................................................................................19

*Am. Geophysical Union v. Texaco Inc.*,
802 F.Supp. 1 (S.D.N.Y.1992), *amended* (Oct. 26, 1992), *aff'd*, 37 F.3d 881,
*order aff'g, amended and superseded*, 60 F.3d 913 (2d Cir. 1994)........................49

*Am. Tobacco Co. v. Werckmeister*,
207 U.S. 284 (1907)..................................................................................................28

*Ashcroft v. alKidd*,
563 U.S. 731 (2001)..................................................................................................51

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................55, 56

*U.S. ex rel. Barron v. Deloitte & Touche, L.L.P.*,
381 F.3d 438 (5th Cir. 2004) ...................................................................................13

*Bazan v. Hidalgo Cty.*,
246 F.3d 481 (5th Cir. 2001) ...................................................................................40

*Bd. of Trustees of the Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001)..................................................................................................23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................55, 56

*Black v. Panola Sch. Dist.*,
461 F.3d 584 (5th Cir. 2006) ...................................................................................14

*Blatchford v. Native Village of Noatak*,
501 U.S. 775 (1991)..................................................................................................19

*Brumfield v. Hollins*,
551 F.3d 322 (5th Cir. 2008) ...................................................................................38

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)...........................................................................................47

*Campinha-Bacote v. Bleidt*,
   No. H-10-3481, 2011 WL 4625394 (S.D. Tex. Oct. 3, 2011) ........................... *passim*

*Carter v. City of Philadelphia*,
   181 F.3d 339 (3d Cir. 1993)...............................................................................12

*Catalina Dev., Inc. v. County of El Paso*,
   121 S.W.3d 704 (Tex. 2003)...............................................................................36

*Central Virginia Community College v. Katz*,
   546 U.S. 356 (2006)..................................................................................... *passim*

*Chavez v. Art Publico Press*,
   59 F.3d 539 (5th Cir. 1995) ..........................................................................25, 40

*Chavez v. Art Publico Press*,
   157 F.3d 282 (5th Cir. 1998) ..............................................................................25

*Chavez v Arte Publico Press*,
   204 F.3d 601 (5th Cir. 2000) ........................................................................ *passim*

*Chi., Burlington & Quincy R.R. Co. v. City of Chicago*,
   166 U.S. 226 (1897).......................................................................................24, 33

*City of Boerne v. Flores*,
   521 U.S. 507 (1997)............................................................................................22

*City of Dallas v. Albert*,
   354 S.W.3d 368 (Tex. 2011)...............................................................................37

*City of Dallas v. VSC, LLC*,
   347 S.W.3d 231 (Tex. 2011)...............................................................................34

*City of New Braunfels v. Carowest Land, Ltd.*,
   432 S.W.3d 501 (Tex. App.—Austin, 2014) ......................................................37

*Clark v. Tarrant County*,
   798 F.2d 736 (5th Cir. 1986) ..............................................................................14

*College Savings Bank v. Florida Prepaid Postsecondary Educ. Exp. Bd.*,
   527 U.S. 666 (1999)............................................................................................37

*Corfield v. Coryell*,
   6 F. Cas. 546 (E.D. Pa. 1823) (Washington, J.)............................................28, 29

*Darby v. Pasadena Police Dept.*,
    939 F.2d 311 (5th Cir. 1991) ...............................................................16

*Doe v. Lawrence Livermore Nat. Lab.*,
    65 F.3d 771 (9th Cir. 1995), *rev'd on other grounds*,
    519 U.S. 425 (1996) ...............................................................12

*Earles v. State Bd. of Certified Pub. Accountants of Louisiana*,
    139 F.3d 1033 (5th Cir. 1998) ...............................................................13

*Edelman v. Jordan*,
    415 U.S. 651 (1974) ...............................................................13

*El Dorado Land Co., L.P. v. City of McKinney*,
    395 S.W.3d 798 (Tex. 2013) ...............................................................32

*Elder v. Holloway*,
    510 U.S. 510 (1994) ...............................................................38

*Federal Sign v. Texas Southern University*,
    951 S.W.2d 401 (Tex. 1997) ...............................................................36

*Feist Publications, Inc. v. Rural Telephone Services Company, Inc.*,
    499 U.S. 340 (1991) ...............................................................49, 50

*First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*,
    482 U.S. 304 (1987) ...............................................................33, 34, 35

*Fitzpatrick v. Bitzer*,
    427 U.S. 445 (1976) ...............................................................17, 21

*Flagg v. Stryker Corp.*,
    647 F. App'x 314 (5th Cir. 2016) ...............................................................56

*Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*,
    527 U.S. 627 (1999) ...............................................................26, 31

*Fox Film Corp. v. Doyal*,
    286 U.S. 123 (1932) ...............................................................28

*Frederick L. Allen & Nautilus Prods., LLC v. Cooper*,
    No. 5:15-CV-627-BO, 2017 WL 1102618 (E.D.N.C. Mar. 23, 2017) ...............................................................26

*Gen. Servs. Com'n. v. Little-Tex Insulation Co., Inc.*,
    39 S.W.3d 591 (Tex. 2001) ...............................................................32

*Gen. Universal Sys. v. Lee*,
    379 F.3d 131 (5th Cir. 2004) ...............................................................55

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
   313 F.3d 305 (5th Cir. 2002) ........................................................................55

*Guzman v. Hacienda Records, LP*,
   No. 6:13-CV-41, 2015 WL 789113 (S.D. Tex. Feb. 24, 2015) .........................................42, 59

*Hale v. King*,
   642 F.3d 492 (5th Cir. 2011) ........................................................................23

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982).............................................................................40, 44

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
   471 U.S. 539 (1985).............................................................................48, 49

*Haywood v. Drown*,
   556 U.S. 729 (2009)..........................................................................3, 53, 54

*Hess v. Port Auth. Trans-Hudson Corp.*,
   513 U.S. 30 (1994)..............................................................................13

*Holt v. Town of Stonington*,
   No. 3:09-cv-2069, 2010 WL 2595127 (D. Conn. June 23, 2010) ...........................................32

*Interplan Architect, Inc. v. C.L. Thomas, Inc.*,
   No. 4:08-CV-03181, 2009 WL 6443117 (S.D. Tex. Nov. 13, 2009) ................................42, 60

*ITSI TV Productions, Inc. v. Agricultural Associations*,
   3 F.3d 1289 (9th Cir. 1993) ........................................................................16

*John G. and Marie Stella Kennedy Memorial Foundation v. Mauro*,
   21 F.3d 667 (5th Cir. 1994) ........................................................................35

*Jones v. Tubal-Cain Hydraulic Sols., Inc.*,
   No. 4:16-CV-01282, 2017 WL 1177995 (S.D. Tex. Mar. 30, 2017) ................................54, 55

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*,
   677 F.2d 1045 (5th Cir. 1982) ........................................................................54

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*,
   12 F.3d 527 (5th Cir. 1994) ........................................................................54

*U.S. ex rel. King v. Univ. of Texas Health and Sci. Ctr.-Houston*,
   No. 12-20795, 544 Fed. Appx. 490 498 (5th Cir. Nov. 4, 2013).............................................15

*Kitchen v. Dallas Cty., Tex.*,
   759 F.3d 468 (5th Cir. 2014) ........................................................................38

*Koch v. Texas General Land Office*,
   273 S.W.3d 451 (Tex. App.—Austin 2008, pet. denied)........................................34

*Lane v. First Nat'l Bank of Boston*,
   687 F. Supp. 11 (D. Mass. 1988), *aff'd*, 871 F.2d 166 (1st Cir. 1989).......................39, 40, 41

*Lenoir v. U.T. Physicians*,
   491 S.W.3d 68 (Tex. App.—Houston [1st Dist.] 2016, pet. denied)......................................10

*Manders v. Lee*,
   338 F.3d 1304 (11th Cir. 2003) ................................................................................12

*McClendon v. City of Columbia*,
   305 F.3d 314 (5th Cir. 2002) ...................................................................................38

*McClure v. Biesenbach*,
   402 F.Supp.2d 753 (W.D. Tex. 2005).......................................................................32

*McCullough v. Johnson*,
   No. 7:05-CV-058-R, 2007 WL 3406753 (N.D. Tex. Nov. 14, 2007) ....................................33

*McMillan v. Monroe County*,
   520 U.S. 781 (1997)................................................................................................12

*Meeropol v. Nizer*,
   560 F.2d 1061 (2d Cir. 1977)...................................................................................49

*Meza v. City of Port Isabel*,
   No. B-16-137, 2016 WL 7852530 (S.D. Tex. Dec. 5, 2016), *adopted*,
   B-16-137, 2017 WL 235010 (S.D. Tex. Jan. 19, 2017)...............................................39

*Mongrue v. Monsanto Co.*,
   249 F.3d 422 (5th Cir. 2001) ...................................................................................32

*Murphy v. Millennium Radio Group, LLC*,
   650 F. 3d 295 (3d Cir. 2011)...............................................................................42, 43

*NCAA v. Yeo*,
   171 S.W.3d 863 (Tex. 2005)....................................................................................10

*Nevada Dept. of Human Resources v. Hibbs*,
   538 U.S. 721 (2003)...............................................................21, 27, 28, 30

*Oddo Dev. Co. v. City of Leawood, Kansas*,
   No. 08-2616-JWL, 2009 WL 975139 (D. Kan. Apr. 9, 2009)...............................................32

*Osburn v. Denton County*,
   124 S.W.3d 289 (Tex. App.—Fort Worth 2003, pet. denied) ................................................32

ix

*Overton v. JPMC Chase Bank*,
   No. H-09-3690, 2010 WL 1141417 (S.D. Tex. Mar. 20, 2010) ...............................................55

*Parden v. Terminal R. of Ala. Docks Dept.*
   388 U.S. 184 (1964) ...............................................................................................................37

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) .................................................................................................................13

*Presidio Bridge Co. v. Presidio County*,
   726 S.W.2d 212 (Tex. App.—El Paso 1987, no writ) ...........................................................35

*Regents of the University of California v. Doe*,
   519 U.S. 425 (1996) ...............................................................................................................12

*Reyes v. Rite-Way Janitorial Serv., Inc.*,
   H-15-0847, 2015 WL 5565882 (S.D. Tex. Sept. 21, 2015) ...................................................55

*Richard Anderson Photography v. Brown*,
   852 F.2d 114 (4th Cir. 1988) ........................................................................................3, 53, 54

*Richardson v. McKnight*,
   521 U.S. 399 (1997) ...............................................................................................................39

*Ridha v. Texas A&M Univ. Sys.*,
   No. 4:08-CV-2814, 2009 WL 1406355 (S.D. Tex. May 15, 2009) ..................................38, 44

*Rodriguez v. Tex. Com'n on the Arts*,
   199 F.3d 279 (5th Cir. 2000) .......................................................................................17, 18, 19

*Saenz v. Roe*,
   526 U.S. 489 (1999) ....................................................................................................28, 29, 30

*Searl v. School-Dist. No. 2*,
   124 U.S. 197 (1888) ...............................................................................................................32

*Seminole Tribe v. Florida*,
   517 U.S. 44 (1996) .................................................................................................................35

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
   81 F.2d 49 (2d Cir. 1936) .......................................................................................................48

*SK Finance SA v. La Plata County, Bd. of Comm'rs*,
   126 F.3d 1272 (10th Cir. 1997) .............................................................................................32

*Skelton v. Camp*,
   234 F.3d 292 (5th Cir. 2000) ..................................................................................................12

*Slaughter-House Cases*,
    83 U.S. 36 (1872) .................................................................................29, 30

*Smith v. Lutz*,
    149 S.W.3d 752 (Tex. App.—Austin 2004, no pet.) ...............................32

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ...............................................................................56

*Stanley v. Israel*,
    843 F.3d 920 (11th Cir. 2016) ...............................................................12

*State v. BP America Prod. Co.*,
    290 S.W.3d 345 (Tex. App.—Austin 2009, pet. denied).......................34

*State v. Holland*,
    221 S.W.3d 639 (Tex. 2007).................................................................32

*Steele v. City of Houston*,
    603 S.W.2d 786 (Tex. 1980).............................................................34, 35

*Suncoast Post-Tension, Ltd. v. Scoppa*,
    No. 4:13-CV-3125, 2014 WL 12596472 (S.D. Tex. July 17, 2014) ......56

*T.O.F.C., Inc. v. United States*,
    231 Ct. Cl. 182, 683 F.2d 389 (Cl.Ct.1982) .........................................33

*Texas Natural Resource Conservation Comm'n v. IT-Davy*,
    74 S.W.3d 849 (Tex. 2002)...................................................................36

*Texas Southern University v. State Street Bank & Trust Co.*,
    212 S.W.3d 893 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)...........36, 37

*United States v. Georgia*,
    546 U.S. 151 (2006)..................................................................... *passim*

*United States v. Texas*,
    143 U.S. 621 (1892)...............................................................................19

*Urban Developers LLC v. City of Jackson*,
    468 F.3d 281 (5th Cir. 2006) .................................................................32

*Vault Corp. v. Quaid Software Ltd.*,
    847 F.2d 255 (5th Cir. 1988) .................................................................54

*Venable v. La. Workers' Comp. Corp.*,
    740 F.3d 937 (5th Cir. 2013) ...................................................................6

*Vulcan Materials Co. v. City of Tehuacana*,
   238 F.3d 382 (5th Cir. 2001) ...................................................................32

*Walker v. Jefferson County Bd. of Educ.*,
   771 F.3d 748 (11th Cir. 2014) .........................................................12, 14

*Williams v. Dallas Area Rapid Transit*,
   242 F.3d 315 (5th Cir. 2001) ...................................................................15

*Wyatt v. Cole*,
   504 U.S. 158 (1992)..................................................................................39

## CONSTITUTION, STATUTES, AND RULES

U.S. Const. Art. I, § 8 ..................................................................... 19-20, 29

U.S. Const. Art. I, § 8, cl. 4.....................................................................18

U.S. Const. Art. I, § 8, cl. 8.....................................................................19

U.S Const. Art. VI, cl. 2...........................................................................53

U.S. Const., Fifth Amend..........................................................24, 33, 34, 35

U.S. Const., Eleventh Amend. ........................................................ *passim*

U.S. Const., Fourteenth Amend. ..................................................... *passim*

17 U.S.C. § 101..........................................................................................3

17 U.S.C. § 106.................................................................................41, 47

17 U.S.C. § 107.......................................................................................47

17 U.S.C. § 201(b)...............................................................................3, 50

17 U.S.C. § 301(a) ..................................................................................54

17 U.S.C. § 410(c) .............................................................................4, 55

17 U.S.C. § 501.............................................................................22, 41, 47

17 U.S.C. §§ 501- 504 .............................................................................41

17 U.S.C. § 501(a) ..................................................................................22

17 U.S.C. § 511(a) .............................................................................22, 54

17 U.S.C. § 1202.............................................................................42, 59

17 U.S.C. § 1202(a) ............................................................................41

17 U.S.C. § 1202(c) .......................................................................42, 59

28 U.S.C. §1332...............................................................................32

Act of Feb. 15, 1819, ch. 19, 3 Stat. 481, 481 ...................................21

Rev. Stat. § 711 para. 5 ....................................................................21

Fed. R. Civ. P. 12(b)(1)..............................................................6, 17, 31

Fed. R. Civ. P. 12(b)(6)....................................................32, 39, 54, 55

Tex. Const. Art. VII, § 18(d) ..............................................................8

Tex. Const. art. I, § 17 ..................................................................32, 33

Tex. Civ. Prac. & Rem. Code § 101.001, *et. seq.* ("Texas Tort Claims Act") ......................53, 54

Tex. Civ. Prac. & Rem. Code § 101.106(f) .....................................54

Tex. Educ. Code, Chapter 87 ...........................................................10

## OTHER AUTHORITIES

Berger, Eric, *The Collision of the Takings and State Sovereign Immunity Doctrines*, 63 Wash. & Lee L. Rev. 493, 525 (2006) ..............................34

Caputo, James F., *Copy-*Katz*: Sovereign Immunity, the Intellectual Property Clause, and Central Virginia Community College v. Katz*, 95 Geo. L. J. 1911, 1930 (2007) ..............................................................................20

Constitutional Rights Foundation, *Intellectual Property*, 23 Bill of Rights in Action, no. 4 (Winter 2008)..............................................................20, 21

Donner, Irah, *The Copyright Clause of the U.S. Constitution: Why Did the Framers Include It With Unanimous Approval*, 36 Am. J. L. Hist. No. 3, 361-62, 370-74 (July 1992)..............................................................20

The Federalist No. 43, (J. Cooke ed. 1961). .....................................20

The Federalist No. 81 (J. Cooke ed. 1961). ................................18, 19

HistoryofCopyright.org, *Copyright Clause and First Copyright Law*, http://www.historyofcopyright.org/pb/wp_fe548a29/wp_fe548a29.html (visited Jan. 15, 2018)..............................................................20

H. R. Rep. No. 1476, 94th Cong., 2d Sess. 129 (1976) ....................20

Parchomovsky, Gideon & Stein, Alex, *Intellectual Property Defenses*, 113
    Colum. L. Rev. 1483, 1487 (2013) .........................................................................21

Plaintiffs Michael J. Bynum ("Bynum") and Canada Hockey LLC d/b/a Epic Sports (collectively "Plaintiffs") oppose the Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim (Dkt. No. 34 (the "Defs.' Mot.")) filed by Defendants Texas A&M University Athletic Department (the "Athletic Department"), Brad Marquardt ("Marquardt"), Alan Cannon ("Cannon"), and Lane Stephenson ("Stephenson") (Marquardt, Cannon, Stephenson, collectively, the "Individual Defendants") (the Athletic Department and Individual Defendants, collectively, the "Defendants").[1]

## I.  **Introduction**

This case presents important issues of first impression regarding intellectual property rights, constitutional law, and sovereign immunity that have far-reaching implications.  Major college athletics have become a multi-billion dollar industry.  Many college athletic departments (like A&M's Athletic Department) are fully self-sustaining, profit-making enterprises.  The Athletic Department has secured its own intellectual property rights and used them to raise hundreds of millions of dollars to build facilities, remodel its football stadium (at a cost of more than $450 million), and recently to hire a new head football coach with a contract reportedly worth $75 million.  A&M has vigorously enforced its trademark rights against others, including filing high-profile lawsuits against the NFL's Seattle Seahawks and Indianapolis Colts, accusing those team of unlawfully using the "12th Man" trademark.  Nevertheless, when the Athletic Department was caught red-handed, stealing Plaintiffs' copyright for a book regarding E. King Gill, the student-athlete on whom the 12th Man legend was based, the Athletic Department has

---

[1] Defendants' Motion to Dismiss challenges the claims pleaded in Plaintiffs' First Amended Complaint.  On January 8, 2018, Plaintiffs filed a motion for leave to file their Second Amended Complaint.  (Dkt. No. 61).  Among other things, the proposed Second Amended Complaint adds factual allegations against the Individual Defendants, some of which are in response to the Defendants' pending motion.  Although the Texas A&M University 12th Man Foundation has opposed Plaintiffs' motion for leave, the other Defendants do not oppose that motion.  Nevertheless, because the motion for leave has not yet been granted, this Response focuses on the allegations in Plaintiffs' live complaint, which is the First Amended Complaint.

attempted to avoid all liability for its infringement, claiming it has sovereign immunity.

The Athletic Department's immunity claims are based primarily on the Fifth Circuit's decision in *Chavez v Arte Publico Press*, 204 F.3d 601 (5th Cir. 2000).  There are several independent reasons why *Chavez* does not apply here, including:  (a) the Athletic Department, as a self-sustaining business and profit center, is not an "arm of the State" entitled to sovereign immunity, (b) this case raises constitutional questions regarding the waiver of immunity that were not addressed in *Chavez*, including whether immunity was waived in the "plan of the convention,"[2] for claims alleging (as here) actual violations of the Fourteenth Amendment's Due Process Clause,[3] or through the Privilege and Immunities Clause of the Fourteenth Amendment,[4] and (c) the history of state infringements of copyrights has undermined the factual foundation on which *Chavez* was based, showing that state infringement was not an isolated occurrence as the Fifth Circuit believed at the time of *Chavez*.  Moreover, *Chavez* does not address the scope of immunity against takings claims under the U.S. and Texas Constitutions; Texas courts repeatedly hold that the State enjoys no such immunity against takings claims.  Thus, Plaintiffs' claims against the Athletic Department should be allowed to proceed on the merits.

The Individual Defendants plea of qualified immunity similarly fails.  Because the Athletic Department is not an arm of the State, the employees of the Athletic Department are not entitled to the benefits of sovereign immunity because they are not employed by the State or an arm of the State.  Regardless, their claims to qualified immunity fail on the merits because copyright protections are clearly established law and the intentional re-typing and distribution of

---

[2]The Supreme Court recognized that state sovereign immunity may be waived in the "plan of the convention" in *Central Virginia Community College v. Katz*, 546 U.S. 356, 373 (2006), a case decided after *Chavez*.
[3]In *United States v. Georgia*, 546 U.S. 151 (2006), a case decided after *Chavez*, the Supreme Court held that Congress had the authority to create private rights of action against the states for claims rising to the level of an actual constitutional violation.
[4]The Fifth Circuit did not reach the merits of this issue in *Chavez*.  *See* 204 F.3d at 608.

someone else's copyrighted work while removing all identifying information for the holder of the copyright is objectively unreasonable.  Plaintiffs' claims against the Individual Defendants should also be allowed to proceed on their merits.

The Individual Defendants' attempt to invoke state law immunities also fails under the Constitution's Supremacy Clause.  States lack the authority to grant exemptions or immunities from claims created by federal law.  *See Haywood v. Drown*, 556 U.S. 729, 736-37 (2009); *Richard Anderson Photography v. Brown*, 852 F.2d 114, 122-23 (4th Cir. 1988).

## II.   Factual Background

### A.   Plaintiffs are the owners and holders of the copyright on the *12th Man* Book, including the Gill biography

In 1997, Bynum hired Whit Canning, a well-known sportswriter for the Fort Worth Star-Telegram, on a work-for-hire basis to use Bynum's research and write a biography of Gill, which Bynum planned to include in his *12th Man* book. (Am. Compl. ¶ 24.)  Over the course of a decade, Bynum spent over 1,500 hours of time researching, writing, and editing his *12th Man* book.  (Am. Compl. ¶¶ 25-26.)  Since the Gill biography was specially commissioned on a work-made-for-hire basis for use in the *12th Man* book, upon the biography's creation, Bynum is and remains both the author and copyright owner of the entire *12th Man* book, including the Gill biography.  (Am. Compl. ¶ 69.)  *See also* 17 U.S.C. § 101 ("work made for hire"); 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright").  Pursuant to a publishing agreement with Bynum, Epic Sports, the publishing imprint of Canada Hockey LLC, owns the exclusive rights to publish the *12th Man* book and the Gill biography. (Am. Compl. ¶ 71.)

3

The *12th Man* book containing the Gill biography is subject to U.S. Copyright Registration Nos. TXu002020474 and TXu002028522. (Am. Compl. ¶ 70.) At the time of registration the *12th Man* book was (and remains) unpublished. (Am. Compl. ¶¶ 5, 70.) Bynum's registration constitutes prima facie evidence of the validity of Bynum's authorship and copyright ownership of the *12th Man* book and the facts stated in the certificate. 17 U.S.C. § 410(c). Under the copyright laws, Defendants could not just take and use Bynum's work for Defendants' own profit without permission.

**B.      Defendants stole Plaintiffs' copyrighted work as part of their "12th Man" promotional campaign**

Defendants' theft of Plaintiffs' copyrighted material was no "accident," as Defendants would have this Court believe. It was an intentional and deliberate step in furtherance of the Athletic Department's long-running and lucrative strategy of aggressively protecting and promoting its treasured 12th Man narrative.

The legend of the "12th Man" dates back to the 1922 Dixie Classic football game and Texas A&M student-athlete E. King Gill. (Am. Compl. ¶ 21). That legend has since become the identity of the Athletic Department and the fan base that supports its teams. (Am. Compl. ¶ 22).

The Athletic Department has sought to monetize, and has profited greatly from, its 12th Man narrative. A massive fundraising organization was formed based on it—The 12th Man Foundation—which, during the 2011-2015 tax years, generated in excess of $500 million in donations to financially support the Athletic Department. The Foundation's website states:

> Just as E. King Gill, the original 12th Man, once came out of the crowd to stand ready to help his team, our fans can still literally help our performance on the field by supporting the 12th Man Foundation. You won't be asked to sweat it out on the field, but your tax-deductible financial support will propel the Aggies to even greater heights.

(Am. Compl. ¶ 37; Am. Compl. Ex. I.)

4

The Athletic Department recognizes the immense value of its 12th Man narrative.  And, as such, it has aggressively sought to protect its cash cow in the years since it officially registered the "12th MAN" trademark in 1990.  The Athletic Department boasts that it has fought over 550 cease-and-desist actions since registration, including two separate federal court actions against the National Football League's Seattle Seahawks and Indianapolis Colts.  (Am. Compl. ¶ 22).

The Athletic Department's efforts regarding its revered 12th Man seem to have no boundaries.  In this case, the Athletic Department, which at the time of the alleged unlawful conduct was in the midst of various trademark disputes over the "12th Man" trademark and a $450 million capital campaign to renovate its football stadium, which it calls the "Home of the 12th Man," intentionally and deliberately misappropriated Plaintiffs' copyrighted material in its efforts to promote and protect the 12th Man brand at all costs.  (Am. Compl. ¶ 22).

Specifically, the Athletic Department and Individual Defendants, having previously obtained copies of a draft of Plaintiffs' copyrighted *12th Man* book: (1) re-typed its text; (2) intentionally removed Plaintiffs' copyright mark; (3) replaced Plaintiffs' copyright mark with the false designation, "special to Texas A&M Athletics," thus rebranding the work as its own; and (4) redistributed the misappropriated work on its website and via links to hundreds of thousands of Twitter followers and e-newsletter subscribers, all in the hopes of reaping (and no doubt actually reaping) millions of dollars in donations.  (Am. Compl. ¶¶ 40-56).  Thereafter, when confronted, the Athletic Department brazenly *admitted* that, "[w]ith the Seattle Seahawks and their 12th Man getting a lot of attention in the NFL, ***[Plaintiffs' copyrighted] story was an important part of our strategic plan*** to show Texas A&M is the true owner of the 12th Man." (Am. Compl. ¶ 58.)  And at all times since, Defendants have sought to shield themselves from any liability for their egregious and unlawful conduct with their misplaced claims of immunity.

III. **The Athletic Department is neither the State nor an "arm of the State."  It is an independent commercial enterprise that is not entitled to sovereign immunity under the Eleventh Amendment.**

This is a case of first impression.  No Texas or Fifth Circuit precedent has analyzed the potential immunity of modern day, corporate athletic departments that operate independently from their universities and the universities' educational missions.  And no federal precedent has considered the effect on state sovereign immunity of a state constitutional and statutory regime like the one in Texas that explicitly prohibits an athletic department from receiving public funds.  Defendants' motion under Fed. R. Civ. P. 12(b)(1), arguing that Plaintiffs' claims are barred by the doctrine of sovereign immunity, should not be granted unless it "appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction" over the defendants.  *Venable v. La. Workers' Comp. Corp.,* 740 F.3d 937, 941 (5th Cir. 2013).

     A. **The Athletic Department is not the State, for purposes of sovereign immunity, because it is organized and operates as an independent commercial enterprise.**

Although the Athletic Department has not taken the formal steps of incorporating, as shown below, it should be viewed and treated as an entity separate from the University.

     *1.* ***The Athletic Department's corporate structure, finances, and business operations are separate and distinct from the University.***

The allegations in this case focus solely on the unlawful conduct of the Athletic Department and its employees.  Plaintiffs allege that the Athletic Department directed its staff to gather information in order to promote its 12th Man narrative for the purpose of soliciting the massive donations the Athletic Department uses to fund its existence and operations.  (Am. Compl. ¶ 39.)  The Athletic Department's operational and financial independence from the University is critical to the determination of the jurisdictional issues in this case.

The Athletic Department is a highly profitable business, and its operations are separate and distinct from the University and its educational mission.  During the 2015-2016 athletic year, the Athletic Department made a profit of $57,286,676 on $194,388,450 in revenues.[5]  This healthy profit margin (29.47%) is due in part to the State's deliberate decision to separate the Athletic Department's operations from the University's educational mission, and the Athletic Department's efforts to mirror the organizational structure of for-profit entities.

Unlike any other "department" of the University—but similar to a business—the Athletic Department has its own Business Office, Human Resources Department, Marketing Department, Information Technology Department and Compliance Department.[6]  It also has its own executives, including a Chief Financial Officer, Business Operations Manager, Human Resources Director, and Marketing Director. The University's website, in fact, while listing each department within the University and their faculty, does not list the Athletic Department or any of its employees; rather, to find any information about the Athletic Department or its staff, one must venture to a separate website that is dedicated exclusively to the Athletic Department.[7]  As would be expected for any for-profit enterprise, the Athletic Department website (unlike the University's) is littered with advertisements from Pepsi, Learfield, Rudy's Country Store and Bar-B-Q, Raising Cane's, Muscle Milk, and other sponsors.[8]

In addition to being structured like a business, the Athletic Department also operates like a for-profit business. To build its brand recognition—and ultimately to drive sales and

---

[5] Texas A&M University Athletics Department, Statement of Revenues and Expenses, Year Ended August 31, 2016, attached as Exhibit A.

[6] *Compare Staff Directory*, 12th Man, http://www.12thman.com/staff.aspx *with* Texas A&M University Division of Human Resources & Organizational Effectiveness Home Page, https://employees.tamu.edu; Texas A&M University Division of Marketing & Communications Home Page, http://marcomm.tamu.edu; Texas A&M University Division of Information Technology Home Page, https://it.tamu.edu; Texas A&M University Risk and Compliance, https://urc.tamu.edu/compliance/ (all last visited Nov. 16, 2017).

[7] *Compare* Texas A&M University Faculty by Department, http://www.tamu.edu/faculty-staff/directory.html *with* 12th Man Home Page, http://12thman.com (last visited Nov. 16, 2017).

[8] 12th Man Home Page, http://12thman.com (last visited Nov. 16, 2017).

donations—the Athletic Department has a Productions Department, Event Management Department, and Media Relations Department.[9] These departments improve accessibility for, and services offered to, customers who are fans of the Athletic Department's teams.  Finally, the Athletic Department has a separate budget and profit and loss statement from the University, and it is subject to its own independent audits, both internal and external.[10]

### 2.    *The University's rules do not apply to the Athletic Department.*

The University's Rules and Standard Administrative Procedures do not apply to the Athletic Department.  The Athletic Department governs itself, and has its own policies and procedures, whereas the section titled "Athletics" in the University's Rules and Standard Administrative Procedures is empty and contains no rules or procedures.[11]

### 3.    *The Athletic Department receives no public funds.*

The Athletic Department operates on annual revenues of nearly $200 million dollars, none of which comes from the State or other public dollars.  Texas law has long mandated this arrangement: The Texas Constitution prohibits use of bonds to pay for athletic facilities at public universities, Tex. Const. Art. VII, § 18(d), and a standing rider in Texas appropriations statutes provides that "no educational and general funds appropriated may be used for the operation of intercollegiate athletics."[12]  Like its private sector competition in the sports entertainment industry, the Athletic Department does not receive a single dollar of public funds.[13]

---

[9] *Staff Directory*, 12th Man, http://www.12thman.com/staff.aspx.

[10] *See, e.g.*, Report of Independent Accountants, Year Ended August 31, 2016, TAMUATH16-000112-134, attached as Exhibit B.)

[11] *Compare Athletic Department Policies & Procedures Manual*, (contents attached as Exhibit C). *with University Rules and SAPs*, Texas A&M University Risk and Compliance, http://rules.tamu.edu/TAMURulesAndSAPs. aspx?AspxAutoDetectCookieSupport=1#18 (last visited Nov. 16, 2017).

[12] *See, e.g.*, General Appropriations Act, Art. III, Special Provisions Relating Only to State Agencies of Higher Education § 9 (Sept. 30, 2015); see also attached Ex. B.

[13] *See* Ex. B at p.3 (noting the Athletic Department receives no direct state or other government support); see also Frequently Asked Questions, 12th Man Foundation, https://www.12thmanfoundation.com/membership/faq (last visited Nov. 16, 2017) ("The Athletic Department at Texas A&M University is 100% self-supporting . . . TAMU Athletics receives no funding from the State of Texas.").

In addition to its annual revenue from ticket sales, media rights, Southeastern Conference revenue sharing, and other licensing agreements, the Athletic Department is funded further by a private nonprofit entity, the 12th Man Foundation, which is unaffiliated with the State of Texas.[14] The 12th Man Foundation's FAQ page on its website explains why the Athletic Department needs private support:

> **The Athletic Department at Texas A&M University is 100% self-supporting**, so all private gifts contribute directly to the needs of our student-athletes, coaches and staff. **TAMU Athletics receives no funding from the State of Texas**. Gifts to the 12th Man Foundation are used to fund the TAMU Athletic Department's needs. The Foundation provides a venue through which loyal alumni, fans and friends can give financial support to the Athletic Department and receive all current tax benefits allowed by the IRS. Private support enables Texas A&M Athletics to increase its standing, in both athletics and academics, over competing universities beyond what can be accomplished with annual revenue from ticket sales, media rights and other licensing agreements.
>
> Contributions to the 12th Man Foundation benefit every student-athlete and every Aggie sports team through scholarship, construction and maintenance of athletic facilities, and programs that enhance academic, athletic, and life skills for our student-athletes. Contributions from alumni and fans support championship athletics at Texas A&M University.[15]

Importantly, the 12th Man Foundation's website notes that its contributions "fund the … Athletic Department's needs," not the University's needs.[16] The 12th Man Foundation operates independently from the University.[17] (Am. Compl. ¶ 9.) It has reported five-year total revenues of $509,695,304 in its tax returns for the tax years of 2011 to 2015, and, as of June 30, 2015, had total assets of $293,575,803.

---

[14]https://www.12thmanfoundation.com/membership/faq (last visited Jan. 12, 2018).
[15]*Id.* (emphasis added).
[16]Id.
[17]The University's Board of Regents is not involved in oversight of the 12th Man Foundation. *See Board of Trustees*, 12th Man Foundation, https://www.12thmanfoundation.com/about-us/trustees-board (last visited Nov. 16, 2017) (noting that the 12th Man Foundation Board of Trustees—which does not include any Members of the University's Board of Regents—governs all business conducted by the foundation).

Finally, funds allocated to the Athletic Department are not used to teach any courses in the University's educational programs and are not used to employ any professors.[18] Nor does the Athletic Department offer any courses. Texas Courts have long distinguished between educational and athletic interests in higher education. *See NCAA v. Yeo*, 171 S.W.3d 863, 870 (Tex. 2005) (holding that students have a protected liberty interest in their education, but do not enjoy such protection for athletics). Such a distinction should be drawn in this case between the educational programs of the University, and the non-educational, business-related functions of the Athletic Department that are funded entirely by private funds.

4. *The Athletic Department is a de facto profit-making subsidiary of the University, capable of being sued apart from the University.*

Contrary to the Defendants' suggestion, the Athletic Department is not like an unincorporated division of a corporation that cannot be sued. It is, in almost every way, a separate profit-making subsidiary (created by the University) that operates independently from the University. Subsidiary entities created by a State university are not shielded by the university's immunity. *See Lenoir v. U.T. Physicians*, 491 S.W.3d 68, 77-82 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (holding that a clinic—which was a wholly-owned subsidiary of a university's health science center—was not entitled to immunity).[19]

5. *The Athletic Department is made up of, at least in part, a private, non-governmental entity*

In addition, the Athletic Department is, at least in part, comprised of an actual private, non-government entity: Texas A&M Ventures, LLC, a Missouri limited liability corporation affiliated with Learfield Communications, LLC. A comparison of the staff page on the Athletic Department's website and on the Texas A&M Aggies page of Learfield Communication's

---

[18]No athletic staff members are listed as professors on the University's staff directory.
[19]Like the physician clinic in *Lenoir*, the Athletic Department is not listed among the institutions in the Texas A&M University System. *See* TEX. EDUC. CODE, Chapter 87.

website, reveals that eight persons described as "staff" of the Athletic Department are also employed by "Learfield Texas A&M Ventures."[20] This symbiotic relationship between Athletic Department staff and its for-profit business partner—described by Texas A&M Ventures as a "long-term partnership"—further demonstrates that the Athletic Department is, in actual practice, an entity separate from the University.

*      *      *

For all the foregoing reasons, at this stage of the litigation, the Athletic Department's Motion to Dismiss pursuant to Federal Rule 12(b)(1) must be denied.  There are clearly enough facts supporting Plaintiffs' position that the Athletic Department operates as an independent entity from the University, with a business mission that is distinct from the University's educational mission, and thus cannot be viewed as "the State" and shielded from liability for its egregious unlawful conduct pursuant to the doctrine of sovereign immunity.

**B.      The Athletic Department cannot be viewed as an "arm-of-the State" of Texas for purposes of sovereign immunity**

If the Court determines that the Athletic Department is not a distinct entity from the University, the Court should substitute the University for the Athletic Department as a defendant, but separate the Athletic Department from the University when conducting its Eleventh Amendment arm of the state analysis, because, among other things, the claims in this case are entirely unrelated to the University's core mission, and instead relate solely to the unlawful conduct of the Athletic Department and its employees.

---

[20]*Compare* Staff Directory (listing Greg Gilmer, Jeff Huebel, Warren Ables, Brandon Kretz, Tyler Smith, Madison Harker, Andrew Wampler and Jarret Moore as staff of the Athletic Department); *with* Texas A&M Ventures, http://www.learfield.com/partner/texas-a-m-ventures/ (last visited Nov. 16, 2017) (listing all of those individuals as employees of Texas A&M Ventures).

1.     ***Arm-of-the-state status requires a function-by-function test***

The determination of whether a state-created entity or actor is an "arm of the state" for Eleventh Amendment immunity purposes is not an all-or-nothing proposition.  *See McMillan v. Monroe County*, 520 U.S. 781, 785-86 (1997).   Instead, a "function-by-function" approach should be used to assess immunity.  *See Stanley v. Israel*, 843 F.3d 920, 925 (11th Cir. 2016). "Whether [an entity] is an 'arm of the [s]tate' must be assessed in light of the particular function in which the [entity] was engaged when taking actions out of which liability is asserted to arise." *Walker v. Jefferson County Bd. of Educ.*, 771 F.3d 748, 757 (11th Cir. 2014) ((*quoting Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003)).   Thus, for example, a district attorneys' office could be entitled to immunity for some functions, such as prosecuting individuals for the public good, while not being entitled to immunity for other actions.  *See Carter v. City of Philadelphia*, 181 F.3d 339, 351-52 (3d Cir. 1993).

In *Doe v. Lawrence Livermore Nat. Lab.*, the Ninth Circuit recognized that a state university "is an enormous entity which functions in various capacities and which is not entitled to Eleventh Amendment immunity for all of its functions."  65 F.3d 771, 775 (9th Cir. 1995). While the Supreme Court overruled the judgment in *Doe* on other grounds, the Court found it was "[not] necessary to decide whether there may be some state instrumentalities that qualify as "arms of the State" for some purposes but not others."  *Regents of the University of California v. Doe*, 519 U.S. 425, 428 n.2 (1996).  As post-*Doe* decisions illustrate, the function-by-function approach is the correct analysis for arm-of-the-state immunity cases.  *See, e.g., Walker*, 771 F.3d at 757 (holding a school board was not an arm of the state for "employment-related decisions.").

The Athletic Department (or the University) bears the burden of proving that it is an arm of the state entitled to immunity.  *See Skelton v. Camp*, 234 F.3d 292, 297 (5th Cir. 2000).  Here, because the infringing conduct occurred solely within and under the oversight of the Athletic

Department, by Athletic Department employees, neither the Athletic Department, nor the University, are entitled to arm of the state protection under the Eleventh Amendment.

### 2. *This case does not implicate the core governmental functions of either the State or the University*

Applying the arm-of-the-state analysis to the function of running a self-sustaining profit-making athletic organization, it is clear that that neither the Athletic Department nor the University are entitled to immunity.  The Eleventh Amendment bars suits in which a state is the "real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984).  Simply being a political subdivision of a state or state agency, however, is not enough. *Earles v. State Bd. of Certified Pub. Accountants of Louisiana*, 139 F.3d 1033, 1036 (5th Cir. 1998) (citing *See Edelman v. Jordan,* 415 U.S. 651, 667–68 n. 12, (1974)).  The issue is whether the entity "in effect, stands in the shoes of the state itself." *Earles,* 139 F.3d at 1036.

There is no "simple litmus test" to determine whether an entity is an arm of the state for Eleventh Amendment immunity purposes.  The most salient factor is the source of the entity's funding.  The Supreme Court recognizes that "the impetus for the Eleventh Amendment" was "the prevention of federal-court judgments that must be paid out of a State's treasury." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994). For that reason, "the vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations." *Id.* (collecting cases); *see also U.S. ex rel. Barron v. Deloitte & Touche, L.L.P.*, 381 F.3d 438, 440 (5th Cir. 2004) (noting that because "[t]he Eleventh Amendment exists mainly to protect state treasuries," an entity's funding "is the weightiest factor" in determining if it is an arm of the state).  The Athletic Department is a uniquely clear case. Not only does it receive its funding entirely from private sources, but state law prohibits the use of state funds to pay its expenses. (*See* Ex. B.)  Moreover, a crucial component is whether the state would be liable for a judgment

13

against the defendant.  *Black v. Panola Sch. Dist.*, 461 F.3d 584, 597 (5th Cir. 2006).  Here, because the Athletic Department is prohibited from using state funds for its expenses, an award against the Athletic Department would not result in damages being paid by the state.  Finding that the Athletic Department is an arm-of-the-state when it receives no state funds would be a drastic departure from precedent, and would ignore the most critical factor of the arm-of-the-state test.

Additional factors to consider in the arm-of-the-state analysis include: (1) whether the state statutes and case law view the entity as an arm of the state; (2) the entity's degree of local autonomy; (3) whether the entity is concerned primarily with local, as opposed to statewide, problems; (4) whether the entity has the authority to sue and be sued in its own name; and (5) whether it has the right to hold and use property. *Clark v. Tarrant County*, 798 F.2d 736, 744-45 (5th Cir. 1986).  When interpreting an entity's status as an arm of the state, the assessment must be made by looking at the specific conduct at issue in the litigation for which liability is asserted. *Walker*, 771 F.3d at 757.

Here, the Athletic Department makes no showing whatsoever that it is an arm of the state entitled to immunity under the Eleventh Amendment.  Instead, in a single sentence, it states only that "Texas A&M University is an agency of the State of Texas." (Defs.' Mot. p.6.) Such conclusory assertions devoid of factual support and evidence are insufficient to obtain dismissal on sovereign immunity grounds.

First, no Texas statute provides that a state university's athletic department is an arm-of-the-state.  There is also no Fifth Circuit case law holding that a state university's athletic department is an arm-of-the-state.

Second, as indicated by the staffing of the Athletic Department, the Athletic Department has significant autonomy.  An entity that has purely local control over day-to-day operations is not an arm of the state, even if the state has some oversight over the entity's operations. *Williams v. Dallas Area Rapid Transit*, 242 F.3d 315, 321 (5th Cir. 2001).  In its Motion to Dismiss, the Athletic Department states that University policy demonstrates that the University "is *expected* to exercise meaningful oversight of the activities of its athletic department . . ." (Defs.' Mot. at 3-4) (emphasis added).  This expectation fails to explain how exactly the University *exercises* oversight.  Given the significant staffing and business departments of the Athletic Department, it seems clear the Athletic Department controls its own day-to-day operations.  At the very least, the Plaintiffs must have thorough discovery to determine the extent of actual oversight and control exerted by the University over the Athletic Department.

The third additional factor focuses on whether the entity acts on the benefit and welfare of the state as a whole, or for the special advantage of local inhabitants. An entity that acts for the benefit of residents of a city and the surrounding community is only concerned with local concerns. *Id.* at 321-22.  Here, the Athletic Department is only concerned with local problems.  It only acts on behalf of Aggie athletes, alums, and fans.  It certainly does not act on behalf of the state as a whole, which includes a large population loyal to other universities or professional teams that compete with Texas A&M and the Athletic Department.

Fourth, for all the reasons set forth above, the Athletic Department can be viewed as a separate entity capable of being sued in its own name.  By filing suit against the Athletic Department, the Complaint alleges the Athletic Department has authority to sue and be sued.  Explicit authority from the legislature is not necessary to prove an entity has the ability to sue and be sued.  *See U.S. ex rel. King v. Univ. of Texas Health and Sci. Ctr.-Houston*, No. 12-

20795, 544 Fed. Appx. 490 498 (5th Cir. Nov. 4, 2013) (unreported) (copy attached as Exhibit D).  Rather, a servient agency of a political entity can be sued when the servient agency has been granted jural authority. *See Darby v. Pasadena Police Dept.*, 939 F.2d 311, 313 (5th Cir. 1991). As explained above, the University has granted significant independence to the Athletic Department such that it should be treated as a separate and distinct entity.

Finally, the Athletic Department uses many multi-million dollar facilities (which have cost over $750 million in the last 20 years) that have been built, used, and maintained, primarily for Texas A&M athletics.  Significantly, the Texas Constitution and statutes prohibit use of state bonds or appropriations to finance the development of these properties.

*        *        *

The Ninth Circuit's decision in *ITSI TV Productions, Inc. v. Agricultural Associations*, 3 F.3d 1289 (9th Cir. 1993), provides an illustration of how governmental entities are not entitled to immunity for copyright infringement when they are sued for using another's work for non-central governmental functions.  In that case, the plaintiff filmed and broadcast horse races that were used by the California State Fair and Exposition ("Cal. Expo") without the plaintiff's permission.  *Id.* at 1291.  The Cal. Expo was created by the State, with its funds held by the State Treasury.  *Id.* at 1293.  Nevertheless, the Cal. Expo generated all of its own revenues, and (like the Athletic Department), it could not draw on state funds to pay its expenses.  *Id.*  The Cal. Expo was also not engaged in central governmental functions—it was setting up and running state fairs.  *Id.*  The Ninth Circuit concluded that the Cal. Expo was not an arm of the state.

Similarly, the Athletic Department has its own funds, cannot draw on state revenues, and it is not engaged in central governmental functions.  When all of these factors are considered, the Court should conclude that the Athletic Department is not an arm of the state of Texas, and

therefore, that it is not entitled to Eleventh Amendment Immunity.  Defendants' motion under Federal Rule 12(b)(1) should be denied.

## IV.   The Athletic Department's asserted sovereign immunity defense does not shield it from Plaintiffs' copyright claims.

Even if the Athletic Department could claim the States' sovereign immunity, that immunity would not shield it from Plaintiffs' claims under the federal Copyright Act. State sovereign immunity must yield in two distinct circumstances.   First, the states simply do not have sovereign immunity in areas, such as bankruptcy, where they surrendered their immunity "in the plan of the Convention." *Central Virginia Community College v. Katz*, 546 U.S. 356, 373 (2006). In these areas, no abrogation statute is necessary. As explained below, copyright claims are analogous to bankruptcy claims, and are therefore not subject to state sovereign immunity defenses.

Second, Congress may abrogate the states' immunity under Section Five of the Fourteenth Amendment. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Although the Fifth Circuit rejected Congress's attempt to abrogate state immunities to copyright claims under the Due Process Clause, *see Chavez v. Arte Publico Press*, 204 F.3d 601, 603 (5th Cir. 2000) and *Rodriguez v. Tex. Com'n on the Arts*, 199 F.3d 279, 280-81 (5th Cir. 2000), those precedents do not bar Plaintiffs' claims here. Post-*Chavez* decisions by the Supreme Court have made clear that abrogation is permissible where, as here, plaintiffs allege an actual constitutional violation. *United States v. Georgia*, 546 U.S. 151 (2006). Moreover, *Chavez* and *Rodriguez* relied heavily on a lack of evidence that states frequently violate copyrights.  But, here, Plaintiffs can document more than one hundred fifty (150) lawsuits, either filed or brought to judgment, occurring after the Fifth Circuit's decisions in these two cases. Finally, *Chavez* expressly declined to consider whether Congress might abrogate state immunities on the ground that state infringements violate

the Privileges and Immunities Clause of the Fourteenth Amendment. Plaintiffs here *do* advance that argument, which is a question of first impression.

**A.      The states waived their immunity to copyright claims in the plan of the Convention.**

The Athletic Department's claim that sovereign immunity bars Plaintiffs' copyright claim relies entirely on the Fifth Circuit's decisions in *Chavez* and *Rodriguez*. (*See* Defs.' Mot. p. 6.) Both cases rejected arguments that Congress had abrogated the states' sovereign immunity by statute. *See Chavez*, 204 F.3d at 603; *Rodriguez*, 199 F.3d at 280. Both were decided prior to the Supreme Court's decision in *Katz*.

In *Katz*, the Supreme Court made clear that abrogation—where Congress passes a statute purporting to override the states' immunity—is not the only question. In considering whether states could be sued in bankruptcy cases, the Supreme Court stated that "[t]he relevant question is not whether Congress has 'abrogated' States' immunity in proceedings to recover preferential transfers…. The question, rather, is whether Congress' determination that States should be amenable to such proceedings is within the scope of its power to enact 'Laws on the subject of Bankruptcies.'" *Katz*, 546 U.S. at 379.[21] That was because the Court found "that States agreed in the plan of the [Constitutional] Convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to 'Laws on the subject of Bankruptcies.'" *Id.* at 377 (quoting U.S. Const. Art. I, § 8, cl. 4).

*Katz*'s reference to "the plan of the Convention" invoked Alexander Hamilton's famous discussion of state sovereign immunity in Federalist 81. Hamilton wrote, that sovereign immunity "is now enjoyed by the government of every State in the Union. Unless, therefore,

---

[21]*See also Katz*, 546 U.S. at 361 (noting that although the Court had granted *certiorari* to determine whether a provision of the Bankruptcy Code purporting to abrogate state sovereign immunity was valid, "we are persuaded that the enactment of that provision was not necessary to authorize the Bankruptcy Court's jurisdiction over these preference avoidance proceedings").

there is a surrender of this immunity in the plan of the convention, it will remain with the States." The Federalist No. 81, at 548-49 (J. Cooke ed. 1961).[22] This principle that the states waived immunity in certain categories of cases by ratifying the Constitution is the reason, for example, that states may not assert their immunity in suits brought by the United States government.[23]

*Katz* broke new ground, however, by stating that certain of Congress's enumerated powers in Article I embody similar waivers; hence, *Katz* held that there simply is no immunity in bankruptcy cases because Congress's bankruptcy powers involve such a waiver.[24] The question in the present case is whether Plaintiffs' copyright claims fall into a similar category. Plaintiffs submit that they do. Congress's enumerated power "[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries," U.S. Const. Art. I, § 8, cl. 8, is structurally similar to Congress's power over bankruptcy. Because the Fifth Circuit decided *Chavez* and *Rodriguez* six years before *Katz*, whether the states waived their immunity from copyright powers in the plan of the convention is a question of first impression in this Court.

The *Katz* court considered three categories of evidence about the Bankruptcy Clause. First, it noted that state courts had issued conflicting decrees in bankruptcy cases prior to the Constitution, and it concluded that "there was general agreement [among the Framers] on the importance of authorizing a uniform federal response to the problems presented in [these cases]." *Katz*, 546 U.S. at 369. Second, early federal bankruptcy legislation not only created uniform federal substantive rules, but also empowered the federal courts; in particular, it enabled them to

---

[22]*See also Alden v. Maine*, 527 U.S. 706, 713 (1999) (noting that states retain their sovereign immunity "except as altered by the plan of the Convention or certain constitutional Amendments"); *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991) (stating that a State is not "subject to suit in federal court unless it has consented to suit, either expressly or in the 'plan of the convention'").
[23]*See United States v. Texas*, 143 U.S. 621, 646 (1892).
[24]*See Katz*, 546 U.S. at 378 (holding that, "[i]n ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in [bankruptcy] proceedings").

order the release of a federally-discharged debtor from state imprisonment for debt.  *Id.* at 373-77. Finally, the Court emphasized that the exercise of bankruptcy jurisdiction "does not, in the usual case, interfere with state sovereignty even when States' interests are affected." *Id.* at 370.

These factors strongly suggest that the Copyright Clause involves a similar waiver of states' sovereign immunity.[25] James Madison argued that the Copyright Clause was necessary because "[t]he States cannot separately make effectual provisions" for copyrights and patents.[26] Before the Constitution was adopted, twelve out of thirteen colonies had adopted their own copyright statutes, but it was necessary for an author to travel to each colony in order to obtain protection for his work.[27]  A national copyright law was needed to solve this cumbersome and unacceptable burden that authors previously faced.[28]   The states not only acquiesced in conferring power over intellectual property on the national government, but also gave up their own preexisting authority over those subjects.[29]   Hence, the legislative history of the 1976 Copyright Act concluded that "[o]ne of the fundamental purposes behind the copyright clause of the Constitution ... was to promote national uniformity and to avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in the separate courts of the various states."[30] Similarly, federal copyright laws have emphasized the importance of a

---

[25]*See* James F. Caputo, *Copy-*Katz*: Sovereign Immunity, the Intellectual Property Clause, and Central Virginia Community College v. Katz*, 95 Geo. L. J. 1911, 1930 (2007) (collecting evidence that "the Framers understood the Intellectual Property Clause to embody a tacit waiver of state sovereign immunity similar to the one the *Katz* court found in the Bankruptcy Clause").

[26]The Federalist No. 43, (J. Cooke ed. 1961).

[27] See Irah Donner, The Copyright Clause of the U.S. Constitution:  Why Did the Framers Include It With Unanimous Approval, 36 Am. J. L. Hist. No. 3, 361-62, 370-74 (July 1992).

[28] *Id.* at 362, 372, 374.

[29] *See generally* Constitutional Rights Foundation, *Intellectual Property*, 23 Bill of Rights in Action, no. 4 (Winter 2008), available at http://www.crf-usa.org/bill-of-rights-in-action/bria-23-4-a-the-origins-of-patent-and-copyright-law; HistoryofCopyright.org, *Copyright Clause and First Copyright Law*, http://www.historyofcopyright.org/pb/wp_fe548a29/wp_fe548a29.html (visited Jan. 15, 2018)

[30]H. R. Rep. No. 1476, 94th Cong., 2d Sess. 129 (1976).  *See generally* Constitutional Rights Foundation, Intellectual Property, 23 Bill of Rights in Action, no. 4 (Winter 2008), available at http://www.crf-usa.org/bill-of-rights-in-action/bria-23-4-a-the-origins-of-patent-and-copyright-law; HistoryofCopyright.org, Copyright Clause and First Copyright Law, http://www.historyofcopyright.org/pb/wp_fe548a29/wp_fe548a29.html (visited Jan. 15, 2018)

federal judicial forum. Congress granted the federal district courts jurisdiction over copyright claims in 1819—56 years prior to granting those courts *general* jurisdiction over all federal questions.[31] And since 1873, that jurisdiction has been exclusive of the courts of the states.[32] Finally, copyrights suits—like bankruptcy claims—do not significantly interfere with state sovereignty. *Katz* emphasized the *in rem* nature of bankruptcy jurisdiction as posing a minimal threat to state sovereignty. *See Katz*, 546 U.S. at 369-70. Similarly, "intellectual property rights are rights *in rem* that avail against the rest of the world"[33] —hence the historical need to replace state protections, good only within each state's borders, with a uniform and exclusive system of national copyright.[34] And copyright suits—unlike the suits to recover state debts or enforce state bonds that gave rise to the Eleventh Amendment—are unlikely to pose the threat of government insolvency that has motivated most of the Supreme Court's sovereign immunity jurisprudence.[35] Pursuant to *Katz*, this Court should hold that state sovereign immunity does not bar Plaintiffs' copyright claims, because, like bankruptcy claims, the states waived their immunity as to copyright claims in the plan of the convention.

### B.   Congress has validly abrogated the states' immunity for copyright claims to enforce the Due Process Clause of the Fourteenth Amendment

The Athletic Department also enjoys no sovereign immunity because Congress validly abrogated the State's immunity by statute, under Section Five of the Fourteenth Amendment. Congress may abrogate state immunity when it acts to enforce the Fourteenth Amendment, so long as it clearly states its intent to do so. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976);

---

[31]*See* Act of Feb. 15, 1819, ch. 19, 3 Stat. 481, 481.
[32]Rev. Stat. § 711 para. 5.
[33]Gideon Parchomovsky & Alex Stein, *Intellectual Property Defenses*, 113 Colum. L. Rev. 1483, 1487 (2013).
[34] *See also* Constitutional Rights Foundations, *supra* (suggesting that "[t]he intellectual property clause was unanimously approved and passed without debate" because the Framers wished to remedy "the weakness of the state system that required inventors and writers to make multiple applications").
[35] *See also* Constitutional Rights Foundations, *supra* (noting broad support for federal copyright protections in the states in the early Republic).

*Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 726 (2003). Congress clearly subjected the states to suit in copyright cases in the Copyright Remedy Clarification Act (CRCA): "[a]ny State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person . . . for a violation of any of the exclusive rights of a copyright owner." 17 U.S.C. § 511(a); *see also* 17 U.S.C. § 501(a).

The only question is whether the CRCA is a valid exercise of Congress's power to enforce the Fourteenth Amendment. Most cases to consider the CRCA's validity—including the Fifth Circuit's decision in *Chavez*—have evaluated it as "prophylactic" legislation.  Congress may pass prophylactic "legislation which deters or remedies [Fourteenth Amendment] violations . . . even if in the process it prohibits conduct which is not itself unconstitutional," so long as "there [is] a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 518-20 (1997). The Fifth Circuit held in *Chavez* that the CRCA was *not* valid prophylactic legislation, relying on the fact that not all copyright violations are also constitutional violations and criticizing the legislative record before Congress for failing to take this into account.

*United States v. Georgia*, 546 U.S. 151 (2006), confirms that abrogation may also occur in a second, more straightforward way. As Justice Scalia explained:

> While the Members of this Court have disagreed regarding the scope of Congress's "prophylactic" enforcement powers under § 5 of the Fourteenth Amendment . . . no one doubts that § 5 grants Congress the power to "enforce . . . the provisions" of the Amendment by creating private remedies against the States for *actual* violations of those provisions…. This enforcement power includes the power to abrogate state sovereign immunity by authorizing private suits for damages against the States.

22

546 U.S. at 158-59.

The Fifth Circuit has read *Georgia* to uphold abrogation legislation, like the CRCA, whenever a plaintiff alleges an actual constitutional violation: "If the State's conduct violated both [the statute] and the Fourteenth Amendment, [the statute] validly abrogates state sovereign immunity." *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011). On the other hand, "[i]f the State's conduct violated [the statute] but did not violate the Fourteenth Amendment, the court must then determine 'whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid'" as prophylactic legislation under the congruence and proportionality test. *Id.* (quoting *Georgia*, 546 U.S. at 159).

Plaintiffs here are entitled to proceed under the CRCA's abrogation of state sovereign immunity because (1) Plaintiffs have alleged an *actual* constitutional due process violation under *United States v. Georgia*, and (2) the CRCA is valid prophylactic legislation, notwithstanding *Chavez*, because the current record of state infringements demonstrates the Act is congruent and proportional to deprivations of property without due process of law.

### 1.    *Plaintiffs have alleged an actual constitutional violation*

The Supreme Court's decision in *United States v. Georgia*, 546 U.S. 151 (2006)—decided six years after *Chavez*—makes clear that the present claim falls outside *Chavez*'s scope. *Georgia* involved a suit under Title II of the Americans with Disabilities Act, which generally prohibits discrimination against persons with disabilities. The Court had previously held that Title II was *not* valid prophylactic legislation, because many claims of disability-based discrimination would not involve unconstitutional state conduct. *See Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001). But in *Georgia*, the plaintiff—a prison inmate—alleged state actions that not only violated the ADA, but that the lower courts found to be an actual violation of the Eighth (and Fourteenth) Amendments. The Supreme Court concluded that "insofar as Title II creates a

private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Georgia*, 546 U.S. at 159.

Plaintiffs in the present case have alleged that the Athletic Department's conduct violated the Constitution in at least two ways:  (1) the Athletic Department intentionally took Plaintiffs' copyrighted work without providing due process before the taking, which is a direct violation of the Fourteenth Amendment's Due Process Clause, and (2) the Athletic Department took Plaintiffs' property rights without providing just compensation after the taking, which is a violation of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment's Due Process Clause *See Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897).  Plaintiffs have alleged, in other words, an *actual* constitutional violation of the Fourteenth Amendment. Under *Georgia*, it is irrelevant whether state copyright infringements are *always* or mostly intentional, or whether state laws sometimes provide remedies. The critical point is simply that *this* claim falls within the scope of both the Copyright Act and the Fourteenth Amendment.  Here, Plaintiffs' allegations are sufficient to allege an actual constitutional violation in this particular case of copyright infringement. That is sufficient, under *United States v. Georgia*, to validate the CRCA's abrogation of the state's sovereign immunity with respect to Plaintiffs' claims, and warrants the denial of Defendants' Motion to Dismiss.

*United States v. Georgia* is an intervening Supreme Court decision that compels a different outcome in this case than was reached in *Chavez*.  Indeed, *Chavez* was a very different case than this one.  As explained in the original *Chavez* decision, that case involved alleged copyright infringement based on the defendants allegedly exceeding a license to publish the plaintiff's

work under a contract that the plaintiffs admitted was ambiguous. *Chavez v. Art Publico Press*, 59 F.3d 539, 547 (5th Cir. 1995). *Chavez* did not involve actions that were clearly in violation of the plaintiff's rights—*i.e.* an actual constitutional violation.

### 2. The Fifth Circuit's holding in Chavez has been undermined by subsequent experience

Not only is this case different than *Chavez* because an actual constitutional violation is involved, *Chavez*'s conclusion that the CRCA's abrogation of state immunity was not congruent and proportional to a constitutional wrong was based on three perceived deficiencies in the CRCA's legislative record. First, and most important, *Chavez* relied heavily on the alleged absence of a significant number of reported violations of copyrights by state governments. *See Chavez*, 204 F.3d at 605-06. In its 1998 *Chaviz* decision, the Fifth Circuit relied on the "absence of caselaw authority over the past 200 years dealing with enforcement of copyrights in federal courts against the states," going so far as to suggest that "there has been no claim against the states in federal court." 157 F.3d 282, 288 (5th Cir. 1998). By 2000, the Fifth Circuit noted that the Copyright Office had found "no more than seven incidents of State copyright infringement," and that "the testimony before Congress worried principally about the *potential* for future abuse." *Id.* at 606. Based on those findings, the Court found that concerns regarding actual or potential copyright violations by the state were insufficient to sustain the CRCA.

In the nearly 18 years since *Chavez*, the "potential" for abuse has become reality. In Exhibit E, Plaintiffs have identified 154 cases in which state actors have been sued for copyright infringement. The number of copyright cases filed against states since 2000 is more than an order of magnitude greater than the number that *Chavez* found inadequate. *Chavez*'s conclusion that the CRCA responds to an insufficient pattern of constitutional violations is thus ripe for reexamination. Not surprisingly, other courts considering the copyright abrogation issue more

25

recently have reached a very different conclusion. Based on the substantial number of infringement suits filed since *Chavez*, the Eastern District of North Carolina, for example, recently upheld the CRCA's abrogation provisions. That court noted that "the amount of suits filed against allegedly infringing states in recent years, even despite little chance of success, demonstrates the extent of the issue." *Frederick L. Allen & Nautilus Prods., LLC v. Cooper*, No. 5:15-CV-627-BO, 2017 WL 1102618, at *5 (E.D.N.C. Mar. 23, 2017). Given the likelihood that decisions like *Chavez* have deterred legal challenges to state infringements, the actual instances of state violations are likely much higher.

*Chavez* also relied on two other perceived problems with the CRCA and its legislative record: the potential availability of state law remedies for copyright infringement, and the Copyright Act's imposition of liability for merely negligent infringement. *See Chavez*, 204 F.3d at 606-07. Because the Due Process Clause has been held not to apply to negligent deprivations or where state law remedies are available, *see Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 642-45 (1999), the Fifth Circuit Court of Appeals rightly noted that—in principle—state conduct might violate the Copyright Act without also violating the Constitution. *See Chavez*, 204 F.3d at 605-07. The Fifth Circuit also found that Congress had not produced adequate evidence that these theoretical discontinuities between the Act and the Constitution would turn out to be inconsequential in practice. *See id.* Hence, *Chavez* found the CRCA not "congruent and proportional" to violations of the Fourteenth Amendment. *Id.* at 607-08. These conclusions are likewise ripe for reexamination in light of subsequent experience.

The cases in Exhibit E allege intentional acts of infringement by state governmental entities, and state remedies do not appear to have been available in those cases. It is true, as *Chavez* emphasized, that in principle an act of copyright infringement may violate the Copyright Act but

*not* the Constitution because the infringement is merely negligent, or because state law provides an adequate remedy after the fact. But the mere possibility of these scenarios *in theory* does not render the CRCA not "congruent" or "proportional" unless these scenarios actually occur in a significant number of cases. The question is not whether one can imagine copyright infringements that would not violate the Constitution, but rather whether the greater proportion of such infringements *in reality* involve unconstitutional state conduct.

As the cases in Exhibit E show, the reported instances of actual state infringement are generally intentional. And although a state could, in theory, provide adequate remedies for infringements, they do not. One need not criticize the *Chavez* court for giving states the benefit of the doubt, or for waiting to see how things would play out. *But after nearly two decades of subsequent experience, it is appropriate to now reexamine the actual record.* When this is done, it is more than clear that the CRCA's abrogation of state sovereign immunity is necessary to remedy unconstitutional deprivations of intellectual property by state government entities.

### C.     The CRCA validly enforces the Privileges and Immunities Clause of the Fourteenth Amendment

Even if the CRCA is not a valid means of enforcing the Due Process Clause, it may still be upheld under the Privileges and Immunities Clause ("PI Clause").[36] The *Chavez* Court did not reach the question whether abrogation was appropriate under the PI Clause because that issue had not been raised in the district court. Thus, this is an open issue in the Fifth Circuit.

The Privileges and Immunities Clause unequivocally states that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const., Amdt. 14, § 1. So whereas due process claims require an analysis of intent and remedies, state denial of a privilege or immunity of national citizenship always creates an

---

[36] It is well-established that Congressional abrogation may be valid under one provision but invalid under another *See, e.g.*, *Hibbs*, 538 U.S. 721, 727 (2003).

actual constitutional harm.  It is "easier for Congress to show a pattern of state constitutional violations" when addressing rights subject to heightened scrutiny—such as the PI Clause.  *See Hibbs*, 538 U.S. at 735; *see also Saenz v. Roe¸* 526 U.S. 489, 504 (1999) (holding "[n]either mere rationality nor some intermediate standard of review should be used to judge the constitutionality of a state rule that" violates the PI Clause).

Federal copyrights—unlike state law property rights—satisfy even the narrowest definition of "privileges and immunities of citizens of the United States," and are therefore protected from state abridgment under the Fourteenth Amendment.  Congress thus validly exercised its authority to "remedy and deter" unconstitutional state conduct when it abrogated sovereign immunity for copyright infringement under § 5 of the Fourteenth Amendment.

### 1.   *Federal copyrights are "privileges and immunities of citizens of the United States"*

*Saenz* explored the meaning of "Privileges and Immunities" as used in Article IV of the Constitution and understood at the time of the founding, concluding that " 'fundamental' rights protected by the Privileges and Immunities Clause include 'the right of a citizen of one state to pass through, or to reside in any other state.'"  *Saenz*, 526 U.S. at 501 n.14 (citing *Corfield v. Coryell*, 6 F. Cas. 546 (E.D. Pa. 1823) (Washington, J.) (riding circuit)).  The cited passage from *Corfield* interpreted "Privileges and Immunities" to include not only a right to travel but also "the right to acquire and possess property of every kind."  *Corfield*, 6 F. Cas. 546.  Because the Supreme Court has long held that copyrights constitute "property,"[37] the "right[s] to acquire and possess" and to "take, hold and dispose of" copyrights are undeniably within the scope of

---

[37]*See, e.g.*, *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The production to which the protection of copyright may be accorded is the property of the author."); *Am. Tobacco Co. v. Werckmeister*, 207 U.S. 284, 291 (1907) (an author's "property in copyright is the creation of the Federal statute passed in the exercise of the power vested in the Congress by [the Patent and Copyright Clause].").

28

"privileges and immunities" as originally established in Article IV of the Constitution and understood by the Framers and earliest sessions of Congress.

In the *Slaughter-House Cases*, the Supreme Court narrowed the scope of the PI Clause by holding that it does not furnish a basis for vindicating rights secured by state law.  83 U.S. 36, 78-79 (1872).  Rather, the Court concluded that the PI Clause included only those rights "which owe their existence to the Federal government, its National character, its Constitution, or its laws," *id.* at 79, as well as those which "depend[] on the Federal government for their existence or protection." *Id.* at 77.  The PI Clause therefore must include "fundamental" rights—such as those outlined in *Corfield* and cited in *Saenz*—"which owe their existence to the Federal government, its National character, its Constitution, or its laws."

A federal copyright squarely fits this definition.  While falling within the scope of *Corfield*'s "right to acquire and possess property of every kind," a federal copyright undeniably "owes [its] existence to the Federal government, its National Character, its Constitution, or its laws" and "depends on the Federal government for its existence and protection."  This places copyrights firmly within *Slaughter-House*'s narrow understanding of "privileges or immunities" under the Fourteenth Amendment.  It also differentiates copyrights from the majority of property rights—which are creatures of state law—that are excluded from protection.

Importantly, copyrights are also distinct from other Article I rights created by Congress, as they pre-dated, and were explicitly contemplated by, the Constitution.  *See* U.S. Const. Art. I, § 8 (empowering Congress to secure to authors "the exclusive Right" to their writings); Federalist No. 43 (J. Madison) ("The copyright of authors has been solemnly adjudged in Great Britain to be a right of common law.").  Like the right to travel in *Saenz*, federal copyrights fit cleanly within the "class of rights which the federal government was 'created to establish and

29

secure.'" *Slaughter-House*, 83 U.S. at 76; *see also* Section IV.A, *supra*; The Federalist No. 43 (J. Madison) (the States "cannot separately make effectual provision for either patents or copyrights."). The refusal of individual states to recognize (or honor) federal copyrights would interfere with the right to travel recognized in *Saenz*, as states may not penalize citizens by forcing them to exchange their federally-imbued property rights for their equally fundamental right to "pass through, or reside in" any individual state. *Saenz*, 526 U.S. at 505 (states may not impose penalties on the right to travel). Because federal law creates relatively few property rights of its own, recognizing those rights as privileges and immunities of U.S. citizenship would have only a limited impact on other areas of law.

### 2. *Congress acted within its power when abrogating sovereign immunity for direct violations of the privileges and immunities clause*

The validity of enforcement legislation under Section Five generally turns on the level of scrutiny applicable under the constitutional principle that is being enforced. *See Hibbs*, 538 U.S. at 735-36. In *Saenz*, the Supreme Court said that "[n]either mere rationality nor some intermediate standard of review should be used to judge the constitutionality of a state rule that discriminates" against a privilege or immunity, and "[t]he appropriate standard may be more categorical than [strict scrutiny] but it is surely no less strict." *Id.* at 504. Because the CRCA targets direct infringement of the PI Clause—which is protected by heightened scrutiny—Congress' findings identifying state violations are not only entitled to maximum deference, but are sufficiently detailed to justify abrogation under any level of scrutiny. Moreover, those findings are now buttressed by an extensive subsequent record of state infringements. Hence, Congress was well-within its authority to remedy and deter ongoing and future violations of the Fourteenth Amendment when it abrogated sovereign immunity under the CRCA.

From the perspective of the PI Clause, the CRCA is not "prophylactic" legislation, as *every* copyright infringement violates a privilege or immunity of national citizenship. It is therefore unnecessary to determine whether its remedies are "proportional and congruent" to the targeted injury. *See Georgia*, 546 U.S. at 158-59. But even if the test applies, the CRCA surely satisfies it. Unlike the Due Process Clause, the PI Clause does not require intent or inadequate process as an element of constitutional harm; as a result, the Privileges and Immunities ground avoids the congruence and proportionality problems noted in *Florida Prepaid* and *Chavez*. Because the CRCA's remedy simply proscribes unconstitutional state action without imposing additional substantive burdens on the states, it is both congruent and proportional to its goal of remedying and deterring violations of the PI Clause.

*     *     *

For the reasons discussed above, Plaintiffs' Motion to Dismiss under Federal Rule 12(b)(1) based on sovereign immunity should be denied.  No abrogation statue is necessary, because the states waived their immunity to copyright claims in the plan of the Constitutional Convention. Nevertheless, Congress also validly abrogated the states' immunity in the CRCA pursuant to its power to enforce the Due Process Clause of the Fourteenth Amendment, where, as here, Plaintiffs have alleged an actual constitutional violation, and because, based on subsequent experience, the CRCA can be viewed as valid prophylactic legislation.  Finally, Congress's abrogation of the states' immunity in the CRCA is a valid enforcement of the Privileges and Immunities Clause of the Fourteenth Amendment.

## V.     Sovereign immunity does not bar Plaintiffs' Takings claims.

### A.     Plaintiffs' Takings claim under the Texas Constitution is not barred by sovereign immunity and may be pursued in this Court because the requirements for diversity jurisdiction have been satisfied.

Plaintiffs allege that the Athletic Department's unlawful actions constitute a taking of Plaintiffs' property without adequate compensation in violation of Section 17, Article 1, of the Constitution of the State of Texas.  (Am. Compl. ¶¶ 108-13.)   The Athletic Department, in its Motion to Dismiss, does not challenge the sufficiency of these allegations under Rule 12(b)(6); rather, it asserts that sovereign immunity bars this claim as well.  (Defs.' Mot. p.6-7.)   But it is well-established that sovereign immunity does not shield the State from an action for compensation under the takings clause of the Texas Constitution.  *See Gen. Servs. Com'n. v. Little-Tex Insulation Co., Inc.*, 39 S.W.3d 591, 598 (Tex. 2001); *El Dorado Land Co., L.P. v. City of McKinney*, 395 S.W.3d 798, 801 (Tex. 2013); *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007); *Smith v. Lutz*, 149 S.W.3d 752, 760 (Tex. App.—Austin 2004, no pet.); *Osburn v. Denton County*, 124 S.W.3d 289, 293 (Tex. App.—Fort Worth 2003, pet. denied).

It is also well-established that the traditional rules of diversity jurisdiction apply to state law takings claims.  *See Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 385-86 (5th Cir. 2001) ("[A] plaintiff may bring a state law takings claim in federal district court if the traditional requirements for diversity jurisdiction are fulfilled."); *Mongrue v. Monsanto Co.*, 249 F.3d 422, 426 n.4 (5th Cir. 2001) ("Federal district courts may hear state takings claims in diversity.").[38] Here, Plaintiffs have properly alleged, and there in fact exists, complete diversity between the parties under 28 U.S.C. §1332.  (Am. Compl. ¶¶6-13.)   And because sovereign immunity *does*

---

[38]*See also Urban Developers LLC v. City of Jackson*, 468 F.3d 281, 304 n.16 (5th Cir. 2006); *McClure v. Biesenbach*, 402 F.Supp.2d 753, 758-59 (W.D. Tex. 2005); *SK Finance SA v. La Plata County, Bd. of Comm'rs*, 126 F.3d 1272, 1276 (10th Cir. 1997); *Oddo Dev. Co. v. City of Leawood, Kansas*, No. 08-2616-JWL, 2009 WL 975139, at *2-3 (D. Kan. Apr. 9, 2009); *Holt v. Town of Stonington*, No. 3:09-cv-2069, 2010 WL 2595127, at *6 (D. Conn. June 23, 2010); *Searl v. School-Dist. No. 2*, 124 U.S. 197, 200 (1888).

*not* bar Plaintiffs' state takings claim, even if the Athletic Department is considered an arm of the State, Plaintiffs' state takings claim is a valid and properly pleaded claim that can be pursued in this Court under its diversity jurisdiction.  Accordingly, the Athletic Department's Motion to Dismiss must be denied at least with respect to Plaintiffs' state takings claim under Section 17, Article 1, of the Constitution of the State of Texas.

> **B.      Sovereign immunity also does not bar Plaintiffs' federal Takings claim under the Fifth and Fourteenth Amendments of the U.S. Constitution.**

The Fifth Amendment's Takings Clause reads, "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.[39]   The Supreme Court recognized that the Takings Clause mandates a compensatory remedy in *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304 (1987). The Court rejected the argument that the Fifth Amendment "is only a limitation on the power of the Government to act, not a remedial provision." *Id.* at 316 n.9. The Court found it "clear that it is the Constitution that dictates the remedy for interference with property rights amounting to a taking." *Id.*

*First English*'s statements regarding a state's sovereign immunity were not necessary to that decision, but the Supreme Court's reading of the Fifth Amendment makes both textual and functional sense. *See, e.g.*, *McCullough v. Johnson*, No. 7:05-CV-058-R, 2007 WL 3406753, at *6 (N.D. Tex. Nov. 14, 2007) (relying on *First English* in rejecting Texas's invocation of state sovereign immunity to bar a Takings claim); *T.O.F.C., Inc. v. United States*, 231 Ct. Cl. 182, 683 F.2d 389, 393 (Cl.Ct.1982) ("[Plaintiff's takings] claim, in and of itself, raises no question as to our jurisdiction since the Fifth Amendment is an express waiver of sovereign immunity"). To be sure, most takings litigation involves municipalities and other political subdivisions that lack the

---

[39]The Takings Clause binds the states through the Due Process Clause of the Fourteenth Amendment. *See Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897). And the Fifth Circuit has acknowledged that copyrights are a form of property entitled to constitutional protection. *See Chavez v. Arte Publico Press*, 204 F.3d 601, 605 n.6 (5th Cir. 2000). The Athletic Department has not disputed this point.

State's sovereign immunity. But applying sovereign immunity in cases where the state government has appropriated private property for public use would effectively gut the Fifth Amendment's guarantee. As one commentator has observed,

> The main point of the Takings Clause is to limit the government's power of eminent domain, frequently by forcing the government to pay for private property it takes, even when it would prefer not to. If the government could bar suits for just compensation, the Takings Clause would be stripped of much meaning.[40]

The Athletic Department's assertion of sovereign immunity as a defense to Plaintiffs' federal takings claim is thus not only inconsistent with the plain text of the Takings Clause and considered statements by the Supreme Court, but it would render the Takings Clause a dead letter whenever state agencies expropriate private property.

As we have noted already, the Supreme Court's reading of the Takings Clause in *First English* dovetails with the Texas Supreme Court's understanding of similar language in the state constitution's takings clause: both clauses trump state immunity and mandate a compensatory remedy. Hence, the Texas Supreme Court has explained that "[t]he Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for the taking, damaging or destruction of property for public use." *Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980). Texas courts have generally construed the state constitution's Takings Clause as congruent with the federal one;[41] and several state courts of appeal have explicitly treated the state's waiver of immunity as extending to Takings claims under *both* the state and federal constitutions. *See, e.g.*, *State v. BP America Prod. Co.*, 290 S.W.3d 345, 363 (Tex. App.—Austin 2009, pet. denied); *Koch v. Texas General Land Office*,

---

[40]Eric Berger, The Collision of the Takings and State Sovereign Immunity Doctrines, 63 Wash. & Lee L. Rev. 493, 525 (2006).

[41]*See City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 252 n.10 (Tex. 2011) ("The takings clauses in the United States and Texas Constitutions are comparable, though worded differently, and so Texas courts have looked to federal jurisprudence for guidance on the constitutionality of a taking.")

273 S.W.3d 451, 457 (Tex. App.—Austin 2008, pet. denied); *Presidio Bridge Co. v. Presidio County*, 726 S.W.2d 212, 213 (Tex. App.—El Paso 1987, no writ). These courts have read holdings like *Steele* as authoritative constructions of the State's waiver of immunity in *both* federal and state takings cases.

The Athletic Department's brief offers no analysis in support of its position. Instead, the Athletic Department simply lumps the Takings claim in with Plaintiffs' other claims, citing only one Fifth Circuit case, *John G. and Marie Stella Kennedy Memorial Foundation v. Mauro*, 21 F.3d 667, 674 (5th Cir. 1994), for the proposition that "the Eleventh Amendment" bars "a Fifth Amendment inverse condemnation claim brought directly against the State." The Fifth Circuit's opinion did not explain this conclusion, and the only case that it cited—*Alabama v. Pugh*, 438 U.S. 781 (1978)—did not involve or discuss Fifth Amendment Takings claims. Nor did the court of appeals address either the text of the Fifth Amendment or the Supreme Court's interpretation of that text to override state sovereign immunity in *First English*. Finally, *Kennedy Memorial Foundation* did not consider whether the Texas Constitution should be read as waiving immunity for *all* Takings claims.

The law of state sovereign immunity has changed in extensive and complex ways since *Kennedy Memorial Foundation* was decided in 1994; all of the Rehnquist Court's major decisions on the issue, from *Seminole Tribe v. Florida*, 517 U.S. 44 (1996), through *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006), occurred after the Fifth Circuit's decision.  This Court should reject the Athletic Department's assertion of immunity as inconsistent with the Fifth and Fourteenth Amendments.

**VI.**   **The Athletic Department has waived sovereign immunity by its conduct.**

The Supreme Court of Texas has long recognized that, although immunity is usually only waived by the Legislature, "[t]here may be other circumstances where the State may waive its

immunity by conduct." *Federal Sign v. Texas Southern University*, 951 S.W.2d 401, 408 n.1 (Tex. 1997). Texas Courts construe this doctrine narrowly. All of the reported decisions refusing to find waiver have involved contractual claims against governmental entities, and in that area Texas courts have generally deferred to the Texas legislature, which has established a comprehensive statutory scheme governing government contract disputes. *See Texas Natural Resource Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 857 (Tex. 2002) (plurality opinion). Yet even for contractual claims, the Court has suggested that government conduct may cause a waiver of immunity where "a government agency … chiseled a contractor just because it could get away with doing so," *id.* at 861 (Hecht, J., concurring in the judgment), or where the government sought to "profit unfairly at [plaintiff's] expense." *Catalina Dev., Inc. v. County of El Paso*, 121 S.W.3d 704, 706 (Tex. 2003).

Consistent with that teaching, the Houston Court of Appeals found waiver by conduct in *Texas Southern University v. State Street Bank & Trust Co.*, 212 S.W.3d 893 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).   There, Texas Southern University entered into negotiations to lease plant equipment from a contractor, whom it then "lured" into a lease agreement "with false promises that the contract would be valid and enforceable." *Id.* at 908. After accepting the full value of the contractor's performance, TSU "then disclaimed any obligation on the contract by taking the position that the contract was not valid after all," *id.*, resulting in a $13 million windfall for the University.  Emphasizing that the Texas Supreme Court's decision in *Catalina* "clearly establishes that the court will evaluate the waiver-by-conduct exception to sovereign immunity on the facts of each case, not as a categorical matter or bright-line rule," *id.* at 907, and noting that the "Texas Supreme Court has never addressed a waiver-by-conduct   exception   argument   faced   with   the[se]   'extraordinary   factual

circumstances,'" the Houston Court of Appeals held that TSU could no longer invoke sovereign immunity, as its conduct was so blatantly inappropriate that it must be deemed to have waived that defense. *Id.* at 907-08.[42]

If the waiver-by-conduct doctrine applies anywhere, it must apply here. The Athletic Department's treatment of Plaintiffs and their copyrighted material is even more egregious than TSU's conduct in *State Street*. The Athletic Department's theft of Plaintiffs' copyrighted materials was no "accident." It was the latest step in the Athletic Department's long-running and lucrative strategy of aggressively protecting the "12th Man" trademark while promoting the 12th Man narrative to solicit hundreds of millions of dollars in donations. The Athletic Department requested Plaintiffs' copyrighted materials under the guise of a potential book publishing negotiation in 2006 and illegally copied the copyrighted draft of Plaintiffs' 12th Man book, and later in 2010, when presented with the opportunity to view an updated version of the 12th Man book, made a second illegal copy. Then—without providing Plaintiffs with any compensation—the Athletic Department simply rebranded that work as its own and re-distributed it via links to 300,000-plus Twitter followers, plus 77,000 TAMU Times subscribers, and tens of thousands on

---

[42]Texas's "waiver-by-conduct" doctrine is distinct from the doctrine of implied or "constructive" waiver rejected in *College Savings Bank v. Florida Prepaid Postsecondary Educ. Exp. Bd.*, 527 U.S. 666, 676-87 (1999) (overruling *Parden v. Terminal R. of Ala. Docks Dept.*, 377 U.S. 184 (1964)). Federal law imposed the doctrine of constructive waiver on the states; waiver-by-conduct is instead a function of the State's own authority to define the scope of the immunity it will assert. *City of Dallas v. Albert*, 354 S.W.3d 368, 374 (Tex. 2011) (discussing prior waiver-by-conduct decisions as involving "modify[cation] and abroga[tion]" of "the common law doctrine of governmental immunity"); *City of New Braunfels v. Carowest Land, Ltd.*, 432 S.W.3d 501, 521 (Tex. App.—Austin, 2014) ("If this notion of 'waiver' of immunity 'by conduct' has any current viability, it has lived on within the rubric not of whether sovereign or governmental immunity has been waived, per se, but in the threshold determination whether immunity applies in the first place."). It would be anomalous for a federal court to hold the state immune in a situation where, under Texas law, the state's immunity does not exist. Moreover, under Texas separation of powers law, the state *courts* remain the last word on the boundaries of the state's immunity, even though the legislature controls waiver of that immunity in cases where it would otherwise exist. As the Texas Supreme Court has explained, waiver-by-conduct goes to "the boundaries of sovereign immunity [that] are determined by the judiciary," rather than "waivers of sovereign immunity . . . [that] must generally be found in actions of the Legislature." *Albert*, 354 S.W.3 at 374; *see also Carowest Land*, 432 S.W.3d at 521-22 ("Although [the Texas Supreme Court] defers to the Legislature to determine when and how immunity should be *waived*, the Texas Supreme Court has explained that the applicability and parameters of immunity *in the first instance* remain a matter of the common law and, thus, squarely within judicial rather than legislative prerogatives.") (emphasis in original).

the Athletic Department's websites to advance its own "12th Man" Fundraising Campaign. These actions were neither a simple mistake nor a misunderstanding.  The Athletic Department intentionally *removed* Bynum's copyright mark from the materials prior to distribution, and deliberately *replaced* Bynum's copyright with the false designation "special to Texas A&M Athletics," demonstrating a willful intent to claim ownership of Bynum's property.  It then redistributed the misappropriated work to hundreds of thousands of its adoring fans.  Moreover, the Athletic Department has admitted that, "[w]ith the Seattle Seahawks and their 12th Man getting a lot of attention in the NFL, *the story was an important part of our strategic plan* to show Texas A&M is the true owner of the 12th Man," and thereby generate additional fundraising over the brand's increased media exposure.  (Am. Compl. ¶ 58.)

There is, moreover, no alternative remedial scheme for copyright claims as there is for contract claims; hence, the primary reason that Texas courts have been reluctant to find waiver-by-conduct does not apply to this case. Given that, and in the face of such egregious circumstances, the Athletic Department must not be allowed to hide behind sovereign immunity.

## VII.   Qualified Immunity

### A.   Standard of review

Qualified immunity is a question of law. *Elder v. Holloway*, 510 U.S. 510, 516 (1994).  If a defendant claims qualified immunity, the burden shifts to the plaintiff to establish the inapplicability of that defense. *Kitchen v. Dallas Cty., Tex.*, 759 F.3d 468, 476 (5th Cir. 2014) (citing *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)). When, as here, qualified immunity is asserted in a motion to dismiss, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for objective legal reasonableness." *Ridha v. Texas A&M Univ. Sys.*, No. 4:08-CV-2814, 2009 WL 1406355, at *6 (S.D. Tex. May 15, 2009) (citing *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)). In considering whether there is qualified

immunity, "the inquiry focuses not on the defendants' actions, but on the right allegedly violated." *Lane v. First Nat'l Bank of Boston*, 687 F. Supp. 11, 16 (D. Mass. 1988), *aff'd*, 871 F.2d 166 (1st Cir. 1989).

To survive a claim of qualified immunity—raised in a motion to dismiss under Federal Rule 12(b)(6)—the plaintiff must have pled "specific facts that, if proved, would overcome the individual defendant's immunity defense; complaints containing conclusory allegations, absent reference to material facts, will not survive motions to dismiss." *Meza v. City of Port Isabel*, No. B-16-137, 2016 WL 7852530, at *6 (S.D. Tex. Dec. 5, 2016), *report and recommendation adopted*, No. B-16-137, 2017 WL 235010 (S.D. Tex. Jan. 19, 2017).

### B.  Individual Defendants Brad Marquardt and Alan Cannon are not eligible for qualified immunity because they are not State employees

The Individual Defendants' qualified immunity defense fails as a matter of law.  As explained in Section III above, the Athletic Department is neither the State nor an arm-of-the State.  Thus, the Individual Defendants, Marquardt and Cannon—as employees of the Athletic Department—must be treated as employees of a private party who are not entitled to qualified immunity doctrine. *See, e.g., Wyatt v. Cole*, 504 U.S. 158, 167-69 (1992) (private parties are not entitled to qualified immunity); *Richardson v. McKnight*, 521 U.S. 399, 402-412 (1997) (same). Indeed, the conduct at issue (*i.e.*, copyright infringement for financial gain) is not even a traditional government function.  *See Richardson*, 521 U.S. at 407-08 (explaining the purpose of qualified immunity is to protect the government's ability to perform its traditional functions).

### C.  The Individual Defendants cannot be shielded from liability because their actions were objectively unreasonable in light of clearly established law.

In this case, the Athletic Department and Individual Defendants (1) *removed* Plaintiffs' copyright mark from the materials prior to distribution, (2) *replaced* Plaintiffs' copyright with the false designation "special to Texas A&M Athletics," demonstrating a willful intent to claim

ownership of Bynum's property, and (3) *redistributed* the misappropriated work to more than 400,000 people.  Moreover, the Athletic Department has *admitted*—in a January 22, 2014 email from Brad Marquardt to Michael Bynum—that, "[w]ith the Seattle Seahawks and their 12th Man getting a lot of attention in the NFL, ***the story was an important part of our strategic plan*** to show Texas A&M is the true owner of the 12th Man," and thereby generate additional fundraising due to the brand's increased media exposure.  (Am. Compl. ¶ 58.)  The outright theft and redistribution of Plaintiffs' copyrighted work is an objectively unreasonable violation of established copyright and Digital Millennium Copyright Act (the "DMCA") laws.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Campinha-Bacote v. Bleidt*, No. H-10-3481, 2011 WL 4625394, at *3 (S.D. Tex. Oct. 3, 2011) (copyright infringement case (citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982))); *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489–90 (5th Cir. 2001).  The dispositive question is "whether an objectively reasonable official would understand that the alleged improper actions were unlawful."  *Bleidt*, 2011 WL 4625394, at *3 (citing *Chavez v. Arte Publico Press*, 59 F.3d 539, 547 (5th Cir. 1995).) In considering whether there is qualified immunity, the inquiry focuses not on the defendants' actions, but on the right allegedly violated.  *Lane v. First Nat. Bank of Boston*, 687 F.Supp. 11, 16 (D.Mass. 1988), *aff'd*, 871 F.2d 166 (1st Cir. 1989).

       *1.*       ***The rights that Plaintiffs have alleged have been violated are clearly established under the law.***

The Individual Defendants are named in the First and Second Causes of Action in the Amended Complaint, for direct and contributory copyright infringement, respectively.

Individual Defendant Marquardt is also named in the Fourth Cause of Action for violating the DMCA. Each of these rights are clearly established under the law.

The current Copyright Act, enacted in 1976 and effective since January 1, 1978, grants copyright owners, including Bynum, the exclusive rights to reproduce, distribute, publicly display, and publicly perform their copyrighted works. 17 U.S.C. § 106. Anyone who violates any of these exclusive rights is an infringer. 17 U.S.C. § 501. An aggrieved copyright owner may bring suit against any infringer to recover damages, obtain an injunction, or obtain an order requiring that the infringing materials be impounded and disposed. 17 U.S.C. §§ 501- 504.

Importantly, this Court and other courts that have considered the issue have determined that copyright protection is clearly established law.  S*ee Campinha-Bacote v. Bleidt*, WL 4625394, at *3 (S.D. Tex. Oct. 3, 2011) ("[T]he law of copyright protection is clearly established by statute and caselaw.") (internal quotation marks omitted)) (citing *Lane*, 687 F.Supp.  at 16).

Plaintiffs' claims under the DMCA are also clearly established statutory law. Enacted in 1998, the DMCA confers specific rights to authors and copyright owners. Section 1202(a) prohibits any person from, "knowingly and with the intent to induce, enable, facilitate, or conceal infringement" providing or distributing copyright management information that is false. 17 U.S.C. § 1202(a).  Similarly, Section 1202(b) prohibits the intentional removal or alteration of copyright management information as well as the distribution or performance of works of authorship "knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or … having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement …." Defendants argue that the law regarding typewritten "copyright management information" (also referred to as "CMI") is not clearly established by the plain text of the statute.  (Defs'. Mot.  p.20.)  However,

"Copyright management information" is a defined term under the DMCA that includes, among other things, the name of, and other identifying information about, the author and copyright owner of a work including the information set forth in a notice of copyright. 17 U.S.C. § 1202(c). There is nothing in the statutory definition that excludes CMI that is "typewritten." Courts, including this Court, have interpreted the definition of CMI broadly. In *Guzman v. Hacienda Records, LP,* No. 6:13-CV-41, 2015 WL 789113 (S.D. Tex. Feb. 24, 2015), this Court denied defendant's summary judgment motion to dismiss plaintiff's DMCA claim, finding that a jury could reasonably infer that the defendant had falsely portrayed himself to be the author of the song at issue by including his name underneath the song title on the album packaging. *See also Interplan Architect, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2009 WL 6443117, at *3 (S.D. Tex. Nov. 13, 2009) (concluding that the statutory definition of "copyright management information" "contemplates applicability to non-digital works as well."). Other courts have similarly rejected claims that CMI must be digital—whether as part of an "automated copyright protection or digital rights management system" as argued by the Individual Defendants— finding that "typewritten" CMI fits neatly within the statutory definition. In *Murphy v. Millennium Radio Group, LLC,* the Third Circuit agreed that the definition of "copyright management information" includes non-digital attribution:

> There is nothing particularly difficult about the text of § 1202…. Read in isolation, § 1202 simply establishes a cause of action for the removal of (among other things) *the name of the author of a work when it has been "conveyed in connection with copies of" the work*. The statute imposes no explicit requirement that such information be part of an "automated copyright protection or management system," as the Station Defendants claim. In fact, it appears to be extremely broad, with no restrictions on the context in which such information must be used in order to qualify as CMI. If there is a difficulty here, it is a problem of policy, not of logic. Such an interpretation might well provide an additional cause of action under the DMCA in many circumstances in which only an

> action for copyright infringement could have been brought
> previously. Whether or not this result is desirable, it is not absurd,
> as might compel us to make a more restrictive reading of § 1202's
> scope.

*Murphy v. Millennium Radio Group, LLC*, 650 F. 3d 295 (3d Cir. 2011) (emphasis added).

In short, for the reasons set forth above, Plaintiffs' claims for copyright infringement and DMCA violations are matters of clearly established law.

Finally, and importantly, to the extent University policies apply to the Individual Defendants, they are made aware of these established laws by the policies and guidelines of the University.[43]   For instance, the Texas A&M General Counsel's website includes links to University policy on intellectual property, which makes clear what the Department did was illegal.[44] Among other things, the intellectual property policy provides very specific guidelines for accepting intellectual property from third parties—including acceptance by the Board of Regents and execution of an assignment agreement.  (*See* Ex. F, at Section 2.9.)  Moreover, the University's own Engagement Guidelines direct users of social media to "respect copyright laws."  (Am. Compl. ¶ 51; Am. Compl. Ex. I.)  Listed as a "basic principle" to engaging in social media on behalf of or as a representative of the University or any of its entities is the following mandate: "Respect copyright laws and give credit to sources of written content, images and ideas you reference or use." (Am. Compl. ¶ 51; Am. Compl. Ex. I.)  The Engagement Guidelines further explain that employees must "[o]btain permission from the copyright owner before using copyrighted material such as original works of authorship including videos and images or literary, dramatic, musical, and artistic works.  Provide a link to the original material if possible."

---

[43]At the very least, these policies apply to Individual Defendant Stephenson who is an employee of the University.
[44] *See* http://policies.tamus.edu/17-01.pdf; see attached Exhibit F (including links to the U.S. Copyright office website).

(Am Compl. ¶ 51; Am. Compl. Ex. I.)  *None of these policies or guidelines were followed by the Individual Defendants.*[45]

### 2.     *In light of such clearly established law, the Individual Defendants actions were objectively unreasonable.*

Given that the rights that the Plaintiffs have alleged the Individual Defendants violated were clearly established, the only remaining issue is whether the Individual Defendants had "an objectively reasonable belief that they were in compliance with copyright law." *Bleidt*, 2011 WL 4625394, at *3.  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For the reasons set forth below, the Individual Defendants' assertions that they are protected by the doctrine of qualified immunity must fail because the Individual Defendants' conduct, as pled in the Amended Complaint, is objectively unreasonable in light of clearly established law.  *Ridha,* 2009 WL 1406355, at *6.  The Individual Defendants' arguments to the contrary are self-serving legal arguments that are not based upon facts alleged in the Amended Complaint.

### a.     *The Individual Defendants were aware at all times of Plaintiffs' copyright.*

The Individual Defendants were aware of Bynum and his ownership of the *12th Man* book.  In 2000 and 2001, Bynum met with the Athletic Department personnel, including Marquardt, an Associate Director of Media Relations, and Cannon, then, an Assistant Athletic Director for Media Relations. (Am. Compl. ¶ 25.)  Bynum informed Marquardt and Cannon of his research and work to develop the *12th Man* book in order to confirm certain facts about Gill's

---

[45]It is important to further note that each of the Individual Defendants is a senior official in either the Athletic Department media relations (Marquardt and Cannon) or University news information services (Stephenson) departments and therefore have a sophisticated working knowledge about intellectual property issues, including copyrights and trademarks.

athletic tenure at Texas A&M. *Id*. On prior occasions, Bynum has similarly contacted Athletic Department personnel, including Marquardt and Cannon, to confirm facts to be incorporated into his ten sports books about football in Texas, the Southwest Conference, and the Big 12 Conference and in the past had hired three members of the Athletic Department media relations staff to assist him with his research. *Id.*

On June 18, 2010, Bynum emailed Marquardt and Glen Johnson to ask for help with locating additional photographs for use in his *12th Man* book. *Id.* ¶ 28. Bynum attached to this email the 2010 draft of the *12th Man* book in PDF format for Marquardt's and Johnson's review. *Id*.; *see also* Am. Compl. Ex. C (which is a true and correct copy of the email and attachment from Bynum to Marquardt and Johnson dated June 18, 2010).) Bynum granted Marquardt and Johnson access to the 2010 draft of his *12th Man* book for their "review" only. (Am. Compl. ¶ 28; Am. Compl. Ex. C.) Bynum explained in his email that the attachment was "a draft version of the *12th Man* book on E. King Gill and Texas A&M football." (Am. Compl. ¶ 28; Am. Compl. Ex. C.) He also explicitly stated: "Please note that this is a work in progress and is not in final form yet." (Am. Compl. ¶ 28; Am. Compl. Ex. C.) Further, he noted that the photo credits in the draft had not been updated yet. (Am. Compl. ¶ 28; Am. Compl. Ex. C.) In addition, the cover of the 2010 draft of the *12th Man* book indicated that the book was "Edited by Mike Bynum" and included the logo of Epic Sports, Bynum's publishing imprint. (Am. Compl. ¶29; Am. Compl. Ex. C.)

The 2010 draft sent to Marquardt and Johnson included a prominent copyright notice on page six, indicating that Bynum's publishing imprint, Epic Sports, owned the copyright to the *12th Man* book and that no part of the book may be reproduced or used in any form or by any means without the permission of the publisher. (Am. Compl. ¶ 30.) Later, while finalizing his

draft of the *12th Man* book before its anticipated publication in Fall, 2014, Bynum emailed Marquardt as late as December 28, 2013, to ask a question about a former A&M football coach. (Am. Compl. ¶ 33.)  Marquardt replied on December 29, 2013, stating that he did not know the answer.  (Am. Compl. ¶ 33; Am. Compl. Ex. C.)

> b.     *The Individual Defendants intentionally removed Plaintiffs' copyright notice, provided false attribution, and published a near verbatim copy of Plaintiffs' work*

On January 22, 2014, only 25 days after his email exchange with Marquardt, Bynum learned that the Athletic Department had taken Bynum's copy of the unpublished Gill biography and reproduced and published a near verbatim copy of it as a feature story in the January 21, 2014, edition of the TAMU Times e-newsletter. (Am. Compl. ¶ 40; Am. Compl. Ex. H.)  That e-newsletter included a hyperlink to a page on the Athletic Department's website displaying the infringing copy of Bynum's Gill biography. (Am. Compl. ¶ 40; Am. Compl. Ex. H.)  Bynum later discovered that the infringing article had first appeared on the Athletic Department's website on January 19, 2014.  (Am. Compl. ¶ 41.)

Plaintiffs believe (and have alleged in their Amended Complaint) that Stephenson was responsible for featuring the infringing article at the top of the January 21, 2014, edition of the Texas A&M University Times e-newsletter (the "TAMU Times"), which was thereafter distributed to approximately 77,000 subscribers, and that he also placed it on the front page of the TAMU Times website. (Am. Compl. ¶¶ 40, 56–57, 77.)

Accordingly, and taking the facts as alleged in Plaintiffs' Amended Complaint as true, Plaintiffs have alleged that the Individual Defendants removed Plaintiffs' copyright notice, provided false attribution, reproduced, distributed, and displayed a near verbatim copy of the opening chapter of the *12th Man* book as an article without authorization of the copyright owner. Such actions violate the exclusive rights granted to Plaintiffs as the copyright owner and

exclusive licensee under the U.S. Copyright Act and constitute direct copyright infringement. 17 U.S.C. §§ 106, 501.

### c.    The Individual Defendants' actions are not "fair use"

Contrary to the Individual Defendants' protestations, the Individual Defendants cannot avoid liability by arguing that they were making a "fair use" of Plaintiffs' copyrighted work.[46] Although Defendants argue that the law of "fair use" is "not sufficiently settled" for a court to impose liability, their arguments on the merits all focus on why they believe Marquardt's conduct was reasonable in copying Plaintiffs' work.  When assessed in light of the controlling law, there is no doubt that the Individuals' actions were objectively unreasonable.

Defendants' fair use arguments begins on settled ground, by citing the four factors to consider when assessing fair use:  "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting 17 U.S.C. § 107).  The fact that a work is unpublished may also be considered as part of the analysis.  17 U.S.C. § 107.  No single factor is controlling.  *Campbell*, 510 U.S. at 584.

Although Defendants cite this clearly established law, they do not even attempt to address the allegations in the Amended Complaint when claiming fair use.  Defendants cannot create a fair use defense by ignoring the facts and allegations.

First, the purpose and character of Defendants' use was for commercial purposes, not educational use.  Defendants used Plaintiffs' work as an integral part of a coordinated campaign

---

[46]As presented, only Defendant Marquardt—the man who actually ordered his secretary to copy Plaintiffs' copyrighted work—argues that the fair use exception to liability applies to his actions.  (Dkt. 34 at 21-23).

to increase the value of the 12th Man brand and to raise hundreds of millions of dollars for the A&M Athletic Department.   (Am. Compl. ¶¶ 47 52, 64).   As discussed above, the Athletic Department, which uses the brand and stole Plaintiffs' work, is a stand-alone business and profit center.   This is not the case of a "nonprofit" educational institution using an article as part of a class, or of an author building upon a work as a source for a research memorandum.   This is a case about Defendants' stealing a work for commercial gain and profit.

Second, Defendants argue that they engaged in a "fair use" because they took "only a few pages in the Bynum book."   (Defs' Mot. at 22).   This ignores the key allegation that Defendants' actions in taking this *entire article*, which was approximately 40% of Plaintiffs' *12th Man* book, "destroyed Plaintiffs' prospects for a successful print run," resulting in Plaintiffs being unable to move forward with publishing the work that Bynum had spent over 1,500 preparing.   (Am. Compl. ¶ 5).   Defendants' argument also ignores settled law.

In *Harper & Rowe, Publishers, Inc., v. Nation Enterprises*, the Supreme Court considered whether *The Nation* magazine's publication of 300 words of a 200,000-word manuscript comprising President Ford's memoirs without authorization was fair use and thus not infringing in the context of a fair use analysis. The Supreme Court rejected *The Nation's* fair use arguments finding, among other things, that substantial similarity should be evaluated in qualitative terms as well as quantitative terms.

> [A] taking may not be excused merely because it is insubstantial with respect to the *infringing* work. As Judge Learned Hand cogently remarked, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (CA2), cert. denied, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936). Conversely, the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who

> seeks to profit from marketing someone else's copyrighted expression.
>
> …The Nation article is structured around the quoted excerpts which serve as its dramatic focal points…. In view of the expressive value of the excerpts and their key role in the infringing work, we cannot agree with the Second Circuit that the "magazine took a meager, indeed an infinitesimal amount of Ford's original language." 723 F.2d, at 209.

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 565–66 (1985) (holding that copying 300 words from President Ford's unpublished 200,000-word memoir was not fair use); *see also Meeropol v. Nizer*, 560 F.2d 1061, 1071 (2d Cir. 1977) (copyrighted letters constituted less than 1% of infringing work but were prominently featured).

Similarly, in another case, scientists copied entire articles out of scientific journals and then claimed that their identical copies were not infringing because the scientists had merely copied a "small fraction" of the copyrighted work when a single article was copied from a scientific journal comprised of several articles. The Court rejected this argument as "imaginative lawyering," concluding that the copying was not protected by the doctrine of fair use and therefore infringing. *Am. Geophysical Union v. Texaco Inc.*, 802 F.Supp. 1, 17 (S.D.N.Y.1992), *amended* (Oct. 26, 1992), *aff'd*, 37 F.3d 881 (2d Cir. 1994), *order aff'g, amended and superseded*, 60 F.3d 913 (2d Cir. 1994).

Third, Defendants try to justify their action because Plaintiffs' *12th Man* book compiled materials that were written by others, such as Whit Canning. Defendants claim that this diminishes Plaintiffs' copyright protections because the book is allegedly just a "compilation." Again, this ignores settled law. *Feist Publications, Inc. v. Rural Telephone Services Company, Inc.*, 499 U.S. 340 (1991) (relied on by Defendants), is a case addressing the scope of copyright protection for a compilation of factual information over which the author does not hold a copyright. *Feist* discusses the importance of originality to the author in the context of copyright

protection.  *Id.* at 346-47.  The key point Defendants are missing is that the article that was copied was Plaintiffs' original work, and not the unprotected work of someone else.  "In the case of a work made for hire, the employer or other person for whom the work was prepared [here, Bynum] is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright"  17 U.S.C. § 201(b).

Next, Defendants argue that they should have qualified immunity because they gave credit to Canning as the author of the article they unlawfully reproduced.  (Dkt. 34 at 22). Defendants recognize that this is "not legally a defense."  (*Id.*).  Moreover, Defendants ignore the fact that they never contacted Canning to discuss using the article, and thus they were not mislead or confused.  Whether Plaintiffs held the copyright (which they did) or Canning held rights in the work (which he did not), Defendants used the article without permission from anyone.  They even reproduced it while changing the byline, suggesting that the work was "special to" A&M, when in reality, the work was "special to" Bynum who paid for the work.

Finally, the fact that the Athletic Department originally obtained a copy of Plaintiffs' work through lawful means is irrelevant.  Having a secretary retype a work verbatim, thereby concealing its original source, is objectively unreasonable under any circumstance.  Moreover, being named in the credits of a work as a professional courtesy to thank others for their assistance does not given the identified license free license to steal and profit from a work they do not own.  Defendants' fair use arguments show a fundamental misunderstanding of copyright law, and mirror the cavalier attitude with which they unlawfully took Plaintiffs' work.

> d.   The Individual Defendants' actions subsequent to the unauthorized copying and publishing of Plaintiffs' work confirm that their actions were not objectively reasonable

The Individual Defendants argue that the contours of the rights that Plaintiffs' claim have been violated were not sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right."   (Defs.' Mot. p.21) (citing *Ashcroft v. alKidd,* 563 U.S. 731, 741 (2001).)  The Individual Defendants advance only legal arguments in support of this legal conclusion.  (Defs.' Mot. p.21-22.)  However, the facts alleged by Plaintiffs in the Amended Complaint support only one conclusion—that the Individual Defendants knew their actions were not objectively reasonable.

In response to an email from Bynum about the unauthorized reproduction of the Gill biography, Marquardt responded, calling the unauthorized publication an "incredibly coincidental mix-up" and "part of our strategic plan" and indicating that the story had now been removed from their website. (Am. Compl. ¶ 58; Am. Compl. Ex. N.)  Marquardt stated that he had come across a copy of the Gill biography in his drawer on yellowed paper and that he had asked his secretary to retype it.  (Am. Compl. ¶ 58; Am. Compl. Ex. N.)  A few days later, in response to a question from a co-worker if he had "anything on the 12th Man," Marquardt provided the story to the co-worker and that is how the story "found its way onto the Internet." (Am. Compl. ¶ 58; Am. Compl. Ex. N.)  In the same email, Marquardt also asked Bynum for permission to continue to post the story as an "excerpt" from the *12th Man* book with the following accompanying language:

> This is an excerpt to an upcoming book titled E. King Gill: The Life & Legend of Texas A&M's 12th Man. It will be published in September of 2014 to honor the 75th anniversary of Texas A&M's 1939 national championship season *by Epic Sports*." (or something similar…)

(Am. Compl. Ex. N (emphasis added).)

Importantly, when Bynum questioned Marquardt in the immediate aftermath of the unauthorized reproduction and distribution of the Gill biography, Marquardt at no time questioned whether Bynum was the copyright owner of the Gill biography (Defs.' Mot. p.22), or suggested that he believed that Whit Canning was the true author and owner (*id.*), or suggested that he believed the Athletic Department's unauthorized reproduction and repeated distribution and promotion of the critical opening chapter of the *12th Man* book may have been permitted by the doctrine of fair use or by license (*id.* p.21–23), or that Marquardt mistakenly believed that he was a co-author of the Gill biography because Bynum had given him an acknowledgement credit in the draft (*id.* p.22–23), or that the work was somehow entitled to less copyright protection since it was a compilation. (*id.* p.22)  Moreover, Marquardt at no time suggested that the section that he had his secretary _retype_ was not substantially similar to Bynum's *12th Man* book. (*id.*) Instead, Marquardt immediately acknowledged the error — sincerely apologizing for "this mix-up" and then, in the same email, proceeded to ask Bynum for permission to continue reproducing and distributing the Gill biography. (Am. Compl. ¶ 58.)

Any competent University media relations officer (such as Marquardt and Cannon) or news information director (such as Stephenson), when viewing Plaintiffs' copyrighted 12th Man story and noticing a byline of "by Whit Caning," would have asked: "do we have permission from the author or the copyright owner of the 12th Man work to reprint this story?"

No such permission was ever sought or given.

*     *     *

For the reasons stated herein, the Individual Defendants cannot be shielded from liability by Qualified Immunity as their actions in unlawfully removing Plaintiffs' copyright, replacing it

52

with a false attribution, and publishing the work without authorization, were objectively unreasonable in light of clearly established copyright law.

**VIII.**   **Texas state law cannot grant the Individual Defendants immunity against claims asserted under federal law.**

The Individual Defendants also argue that they are entitled to immunity under Texas law, most notably the Texas Tort Claims Act (the "TTCA"). (Dkt. 34 at 7-11), but Texas immunity law does not apply here.   Under the Supremacy Clause of the U.S. Constitution, "the laws of the United States … shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."   U.S Const. Art. VI, cl. 2.

In *Haywood v. Drown*, the Supreme Court applied the Supremacy Clause to hold that a state— New York—could not pass its own laws to grant immunity for state officials and employees against federal claims being asserted in New York courts.   556 U.S. 729, 736-37 (2009),   The Court observed:   "[t]hat New York strongly favors a rule shielding correction officers from personal damages liability and substituting the State as the party responsible for compensating individual victims is irrelevant." *Id.* at 737.   If a state lacks authority to immunize its officers or employees against federal claims asserted in state court subject to the jurisdiction and controls of the state's elected branches of government, a state certainly lacks the authority to grant immunity to state officials or employees against federal claims asserted in federal court.

The Fourth Circuit's decision in *Richard Anderson Photography v. Brown*, 852 F.2d 114 (4th Cir. 1988) confirms this point.   The Fourth Circuit rejected the argument that Virginia state law immunity could immunize state officials accused of copyright infringement, holding that the Copyright Act was the supreme law of the land, which controlled over any state law attempts to diminish its reach. *Id.* at 122-23.   "Any immunity for violation of rights [in the infringed]

materials would obviously diminish the scope of the Act's protection." *Id.* at 123.  Thus, "state

law cannot provide immunity to persons sued for violating the Copyright Act." *Id.* at 122.[47]

The Individual Defendants' attempt to use the Texas Tort Claims Act to shield them from

liability under the Copyright Act fails under the Supremacy Clause, *Haywood*, and *Richard*

*Anderson Photography.*[48]

## IX.   Plaintiffs have sufficiently alleged claims of direct copyright infringement, contributory copyright infringement, and DMCA violations against the Individual Defendants.

### A.   Standard of review

Defendants seek dismissal under Fed. R. Civ. P. 12(b)(6), arguing that the claims asserted

against the Individual Defendants should be dismissed for failure to state a claim.  A motion to

dismiss under Federal Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Jones v.*

*Tubal-Cain Hydraulic Sols., Inc.*, No. 4:16-CV-01282, 2017 WL 1177995, at *2 (S.D. Tex. Mar.

30, 2017) (Harmon, J.) (citing *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d

1045, 1050 (5th Cir. 1982)).   The "complaint must be liberally construed in favor of the

plaintiff," and "all reasonable inferences are to be drawn in favor of the plaintiff's claims, and all

---

[47]In *Richard Anderson Photography*, the Fourth Circuit also held that Radford University, an arm of the State of Virginia, was entitled to Eleventh Amendment immunity for the claims asserted against it.  852 F.2d at 118-20.  The Fourth Circuit's conclusion was based on a lack of clear language in the Copyright Act at that time purporting to waive immunity:  "we hold that the language of the Copyright Act considered as a whole, does not clearly and unequivocally indicate Congress's intent to create a cause of action for money damages enforceable against the states in federal court." *Id.* at 120.  Soon after the Fourth Circuit's decision, Congress adopted Section 511 of the Copyright Act to clearly and unequivocally states its intent to waive state immunity. *See* 17 U.S.C. §511 ("Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person …")
[48]The TTCA is also irrelevant to this matter because copyright claims cannot be brought under the TTCA. *See* Tex. Civ. Prac. & Remedies Code § 101.106(f) .  Defendants' argument that copyright violations are "torts" falling within the scope of the TTCA directly conflicts with the text of the Copyright Act, which provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright … are governed exclusively by this title" and "no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State."  17 U.S.C. § 301(a).  Thus, even if a copyright violation could be classified as a "tort"—a proposition the Individual Defendants offer no authority to support—Plaintiffs' copyright claims could not have been brought under the TTCA because "the Copyright Act preempts all legal and equitable rights that fall within the scope of copyright law." *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 538 n.24 (5th Cir. 1994) (citing *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 268–70 (5th Cir. 1988)).

factual allegations pleaded in the complaint must be taken as true." *Jones*, 2017 WL 1177995, at

*2 (citing *Overton v. JPMC Chase Bank*, No. H-09-3690, 2010 WL 1141417, at *1 (S.D. Tex.

Mar. 20, 2010)).

To survive a Rule 12(b)(6) motion to dismiss, a complaint need not include "detailed

factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint need

only "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This is satisfied when the plaintiff alleges enough

"factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.*

If a court decides a plaintiff's complaint fails to state a claim, it should generally give the

plaintiff at least one chance to replead before dismissing the action with prejudice. *Reyes v. Rite-*

*Way Janitorial Serv., Inc.*, H-15-0847, 2015 WL 5565882, at *2 (S.D. Tex. Sept. 21, 2015).

Here should the Court find that Defendants' Motion to Dismiss has merit under Federal Rule

12(b)(6), Plaintiffs respectfully request leave to amend, particularly insofar as the Court's ruling

may implicate additional constitutional arguments that require further briefing. *Cf. Great Plains*

*Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (noting

plaintiff failed to request leave to replead in district court).

## B.      Direct Copyright Infringement

Plaintiffs have pled sufficient facts that the Individual Defendants' acts constituted direct

copyright infringement. "To establish a claim for direct copyright infringement, a plaintiff must

prove that: (1) he owns a valid copyright and (2) the defendant copied constituent elements of the

plaintiff's work that are original." *Gen. Universal Sys. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004).

Bynum owns copyright in the entire *12th Man* book including its opening chapter. (Am. Compl.

¶ 69.)  His copyright registration is prima facie evidence of that ownership. 17 U.S.C. § 410(c).

Epic Sports has been granted the exclusive right to publish the *12th Man* book.  (Am. Compl. ¶ 71.)  Bynum has alleged that the Individual Defendants have reproduced without permission the Gill biography, which was the entire opening chapter of the *12th Man* book.  (Am. Compl. ¶ 5.)

Finally, when confronted with unauthorized reproduction, Marquardt apologized and asked for permission from Bynum to continue to reproduce and distribute the Gill biography as part of their 12th Man advertising campaign. (Am. Compl. ¶ 59; Am. Compl. Ex. N.)  The University's own policies mandated compliance with copyright by, among other things, requesting permission before using the work of others.  (Am. Compl. ¶ 51; Am. Compl. Ex. J.)  In short, Plaintiffs have sufficiently pled that the Individual Defendants committed direct copyright infringement, and the facts do not support the Individual Defendants' legal conclusions that they had an objectively reasonable belief that their conduct was in compliance with the law.

### C.      Contributory Copyright Infringement

"To establish a claim for contributory copyright infringement, a copyright owner must show that the defendant, (1) with knowledge of the infringing activity, (2) induces, causes or materially contributes to infringing conduct of another."  S*uncoast Post-Tension, Ltd. v. Scoppa*, No. 4:13-CV-3125, 2014 WL 12596472, at *4 (S.D. Tex. July 17, 2014) (citing *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999)).  Regarding the first element, a plaintiff need not show "actual knowledge" of the infringement; rather, a plaintiff need only show that the defendant had reason to know of the infringement.  *Scoppa*, 2014 WL 12596472 at *4 (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 487 (1984)).  For contributory infringement, the plausibility standard of *Twombly* and *Iqbal* "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements."  *Flagg v. Stryker Corp.*, 647 F. App'x 314, 316 (5th Cir. 2016) (internal quotation marks omitted).  For the reasons set forth below, Plaintiffs' allegations are facially

plausible to allow the Court to reasonably infer that the Individual Defendants are liable for contributory infringement, or at the very least, raise a reasonable expectation that discovery will reveal the necessary evidence supporting such liability.  Marquardt admits that he instructed his secretary to retype the Gill biography and provided a copy to a co-worker, just 25 days after Bynum's most recent email correspondence with Marquardt about Bynum's research for the *12th Man* book. (Am. Compl. ¶ 58; Am. Compl. Ex. N.)  Plaintiffs allege that Stephenson, through his role in the Athletic Department's Twitter account and e-newsletter, was aware of the efforts to establish the 12th Man brand for the Athletic Department and participated in such efforts.  (Am. Compl. ¶¶ 12, 54–55.) Given the connections between Bynum and the Athletic Department and the copyrighted book he was publishing, and Stephenson's role in support of the 12th Man brand, Plaintiffs' factual allegations regarding Stephenson's actions raise a reasonable expectation that further discovery would likely reveal, for example, the communications between Stephenson, the Athletic Department, and Marquardt regarding the Gill biography.

Defendants argue that Plaintiffs have asserted only that Defendant Cannon "approved" the distribution and display of the Gill biography.  (Defs.' Mot. p.17.)  Yet, as Associate Director of Media Relations for the Athletic Department, Cannon is responsible for the content of the articles posted on the Athletic Department's website.  (Am. Compl. ¶ 11.)  Taking the Plaintiffs' allegations as true, namely that Cannon was responsible for the media posted on the Athletic Department's website (which necessarily requires reproducing the copyrighted work), that such website included an unauthorized copy of the Gill biography, and that he approved the publication and distribution of the article, the Court has sufficient facts to infer that Defendant Cannon is liable for the conduct alleged.  (*See* Am. Compl. ¶¶ 11, 40, 76.)

The Individual Defendants' reliance on *Bleidt*, that a colleague's representation that materials are authorized is sufficient to support a finding for qualified immunity, is equally unavailing.  In *Bleidt*, one of the employees at issue testified that her supervisor had specifically told her that the infringing materials were authorized and relied on that representation.  *Bleidt,* 2011 WL 4625394 at *3.  No such record of similar conduct by the Individual Defendants is before the Court here.  Accordingly, the allegations in the Amended Complaint meet the applicable pleading standard, and, as such, the Defendants' Motion with respect to the contributory infringement claims against Stephenson should be denied.

Given Cannon's knowledge of Bynum's work and their earlier conversations and correspondence on the Gill biography, he could not have had an objectively reasonable belief that his actions were in compliance with copyright law.

The Individual Defendants also assert that there are no allegations that Cannon knew or had reason to know that the Gill biography was infringing.  (Defs.' Mot. p.17.)  To the contrary, Plaintiffs have alleged that Cannon was aware of Bynum's work on the *12th Man* book for many years and that the two had communications regarding its research.  (*See* Am. Compl. ¶ 25.) Taken as true, and along with the contacts between Defendants Marquardt and Stephenson throughout Plaintiffs' interaction with the Athletic Department, the Court can draw a reasonable inference that such contact would give a reason for Cannon to know that the Athletic Department's publication of the Gill biography was not authorized.  And again, none of the Individual Defendants ever thought to seek permission from the author or the copyright owner to reprint his story despite being senior officials in the media relations and news information services departments and despite such actions being a direct violation of the policies and guidelines of the Athletic Department.

Defendants' reliance on *Bleidt*, for the same reasons noted above, is unavailing. Additionally, Plaintiffs have sufficiently alleged that Cannon induced, caused, or materially contributed to the infringing activity through his promotion of the Gill biography on the Athletic Department's Twitter account and through his role as Associate Director of Media Relations for the Athletic Department. (Am. Compl. ¶¶ 11, 40, 52–53, 76.) Notably, Defendants argue only that Plaintiffs have failed to show the knowledge element in their claims of contributory infringement against Cannon. (*See* Defs.' Mot. p.18.) As a result, Plaintiffs have alleged sufficient facts for the Court to infer that Cannon is liable for the conduct alleged. With regard to the qualified immunity defense as it may apply here, for the reasons stated above, the Plaintiffs' rights are clearly established and a reasonable officer could not have had an objectively reasonable belief that his actions were in compliance with copyright law.

### D.    DMCA violations

In addition, Plaintiffs have alleged that the Gill biography was displayed on the Athletic Department website under a different title, "The Original 12th Man" with the following altered author byline, "by Whit Canning, special to Texas A&M Athletics," with no attribution to Plaintiffs. (Am. Compl. ¶¶ 3, 45, 48, 101-102.) These actions describe violations of the DMCA. 17 U.S.C. § 1202. In journalism, the phrase "special to" is commonly used to indicate that a piece was written exclusively for a newspaper, magazine, or other publication by a correspondent or freelancer who is paid for their story by the publisher. (Am. Compl. ¶ 45.) Plaintiffs allege that Marquardt intentionally removed the copyright notice and author information when he reproduced and published the Gill biography. (*See* Am. Compl. ¶¶ 4, 47–49, 72–74.) As noted above, Plaintiffs' rights under the DMCA—including whether such "typewritten" CMI is protected by the statute—are clearly established. 17 U.S.C. § 1202(c); s*ee also Guzman v. Hacienda Records, LP,* No. 6:13-CV-41, 2015 WL 789113, *3 (S.D. Tex. Feb.

59

24, 2015); *Interplan Architect, Inc. v. C.L. Thomas, Inc.*, No. 4:08-CV-03181, 2009 WL 6443117, at *3 (S.D. Tex. Nov. 13, 2009) (concluding that the statutory definition of "copyright management information" "contemplates applicability to non-digital works as well."). In light of those clearly established rights, and taking Plaintiffs allegations as true, a reasonable official could not have had an objectively reasonable belief that his actions were in compliance with copyright law. Accordingly, Marquardt is not entitled to qualified immunity.

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss.

Dated:  January 16, 2018                          Respectfully submitted,

                                                  /s/ Tim Johnson
                                                  **LOCKE LORD LLP**
                                                  Tim Johnson
                                                  S.D. Tex. No. 89
                                                    State Bar No. 10797650
                                                    tjohnson@lockelord.com
                                                  600 Travis Street, Suite 2800
                                                  Houston, Texas 77002
                                                  (713) 226-1200 (Telephone)
                                                  (713) 223-3717 (Facsimile)

                                                  **ATTORNEY-IN-CHARGE FOR
                                                  PLAINTIFFS MICHAEL J. BYNUM and
                                                  CANADA HOCKEY LLC d/b/a EPIC SPORTS**

OF COUNSEL:

**LOCKE LORD LLP**                                **BECK REDDEN LLP**
W. Scott Hastings                                 Joe W. Redden, Jr.
  S.D. Tex. No.  29932                              S.D. Tex. No. 2139
  State Bar No.  24002241                           State Bar No. 16660600
  shasting@lockelord.com                            jredden@beckredden.com
2200 Ross Ave., Suite 2800                        Owen McGovern
Dallas, Texas  75201                                State Bar No. 24092804
(214) 740-8000 (Telephone)                          omcgovern@beckredden.com
(214) 740-8800 (Facsimile)                        1221 McKinney St., Suite 4500
                                                  Houston, Texas 77010-2010
Nicholas P. Dickerson                             Phone: (713) 951-3700
  S.D. Tex. ID No. 1122160                        Fax: (713) 951-3720
  Texas State Bar No. 24068560
  ndickerson@lockelord.com
600 Travis Street, Suite 2800
Houston, Texas 77002
(713) 226-1200 (Telephone)
(713) 223-3717 (Facsimile)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on January 16, 2018, the foregoing document was electronically submitted with the Clerk of Court for the United States District Court, Southern District of Texas, using the electronic case filing system of the Court, and served on the attorneys of record via same.

*W. Scott Hastings*
W. Scott Hastings
