**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL J. BYNUM and CANADA HOCKEY LLC d/b/a EPIC SPORTS, | § § § | |
| Plaintiffs | § § | |
| v. | § § | Cause No. 4:17-cv-00181 |
| TEXAS A&M UNIVERSITY ATHLETIC DEPARTMENT; TEXAS A&M UNIVERSITY 12TH MAN FOUNDATION; BRAD MARQUARDT, in his individual capacity; ALAN CANNON, in his individual capacity; LANE STEPHENSON, in his individual capacity, | § § § § § § § § | |
| Defendants | § | |

## REPLY IN SUPPORT OF MOTION TO DISMISS

The Texas A&M Athletic Department, and individual defendants Brad Marquardt, Alan Cannon and Lane Stephenson (the "University Defendants") submit this reply in support of their Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim [Docket No. 34].

## <u>INTRODUCTION</u>

Undaunted by binding decisions from the Fifth Circuit Court of Appeals and the United States Supreme Court, Plaintiffs urge this Court to upend the federal judiciary's current approach to intellectual property claims brought against state agencies. Analyzing these arguments carefully and correctly requires that we first determine who are the correct parties to the lawsuit.

The lead defendant named by Plaintiffs in this case, the Texas A&M University Athletic Department, is an entity that Plaintiffs admit is an unincorporated department of Texas A&M University, with no separate legal existence. *See* Plaintiffs' Response in Opposition to Motion to Dismiss ("Resp. in Opp.") at p. 6 (acknowledging that the Athletic Department "has not taken the formal steps of incorporating"); First Amended Complaint at ¶ 8 (asserting that Texas A&M University Athletic Department is the "athletic department of Texas A&M University, a public university in the Texas A&M University System established by the State of Texas and based in College Station, Texas").   Entities like this cannot be named as parties in a federal lawsuit because they lack jural authority.  Federal courts around the country have dismissed similar claims against entities with no jural authority, including police departments not separately incorporated from the city they operate in, as well as schools or other entities that are not separately incorporated.  Mot. to Dismiss at pp. 4-5.

Plaintiffs' claims that they "must have thorough discovery" as to the "extent of actual oversight and control" over the Athletic Department, and that they have alleged "enough facts" so far, "at this stage of the litigation," to proceed against the Athletic Department, ignore the fact that the parties have already completed discovery on the issue of jural authority, including the resolution of a motion to compel brought by Plaintiffs.  Resp. in Opp. at pp. 11, 15.  No discovery requests

on this issue remain pending, and the existing evidence is more than sufficient for the Court to determine that the Texas A&M Athletic Department is not an entity with jural capacity to be sued.

In response, Plaintiffs have suggested that this Court could substitute in the correct defendant, Texas A&M University. Resp. in Opp. at p. 11. That action would be improper, however, as Texas A&M University is a state agency with sovereign immunity from suit. More pragmatically, perhaps, we should note that having the Court substitute in the University at this stage would be unnecessary, as Plaintiffs have already sought leave to file an amended complaint, which this Court has expressly held may be entertained following the ruling on the pending motions to dismiss. *See* Order on Plaintiffs' Motion for Leave to Amend Pleadings [Docket No. 74] (denying Plaintiffs' motion for leave to file, but without prejudice to re-filing "following the Court's ruling on the pending dispositive motions"; also noting that any deadline in the scheduling order for seeking leave to file will be extended accordingly).

While the University Defendants are not consenting to any proposed amendment at this point, and are certainly not consenting to have Texas A&M University named, particularly in light of its sovereign immunity from suit, the fact is that Plaintiffs will likely seek leave to amend in response to any dismissal of the Athletic Department, and will seek to name Texas A&M University instead. At

that point, the University would certainly respond to the complaint by asserting its sovereign immunity, and then would have to confront Plaintiffs' numerous attempts to argue for a waiver of immunity, including the direct attacks on *Chavez v. Arte Publico Press*, 204 F.3d 601 (5th Cir. 2000), *Rodriguez v. Tex. Com'n on the Arts*, 199 F.3d 279 (5th Cir. 2000), and *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627 (1999), as well as their arguments regarding the plan of the convention, *United States v. Georgia*, 546 U.S. 151 (2006), and any other theories they choose to raise.   Until such time as the correct parties are named, however, this analysis is premature.

With respect to the individual defendants, Plaintiffs' response fails to address the impact of *Meyers v. Texas*, 410 F.3d 236 (5th Cir. 2005) on the analysis of whether these individuals may be protected by the sovereign immunity of the state.  Plaintiffs also fail to address one of the most fundamental tenets of qualified immunity, which is that government employees cannot be held personally liable on the basis of respondeat superior, but instead must be held liable for their own conduct.   Alan Cannon and Lane Stephenson are plainly named because Plaintiffs perceive them to be in some chain of command related to the posting of materials on the Texas A&M University website.  Brad Marquardt is named because he is the sender of the email dated January 22, 2014, which forms the basis of most of the allegations in Plaintiffs' complaint.   *See* First Am. Compl. at Ex. N.

Being in the chain of command is not a basis for personal liability sufficient to overcome qualified immunity. The email itself demonstrates that Mr. Marquardt was not knowingly violating the law. Each of these defendants is entitled to dismissal.

## I. Jurisdictional discovery in this matter is complete, and the Athletic Department should be dismissed as a party.

On the issue of jural authority, the parties agreed to engage in discovery on that issue, and all of Plaintiffs' requests have been answered, or have had objections to those requests sustained by Magistrate Judge Francis Stacey. Numerous documents, including a sworn affidavit, and multiple types of documents from multiple sources have now been produced, all demonstrating the simple fact that the Athletic Department is a department of Texas A&M University, with no separate corporate existence.

### A. The evidence and documents produced in discovery demonstrate that the Athletic Department has no jural authority to be sued.

The state of the record in favor of a finding of no jural authority consists of the following evidence.

(1) Organizational charts showing the leadership structure of Texas A&M University, demonstrating that the Director of Athletics reports directly to the President of Texas A&M University. [Copies attached as exhibits to

the University Defendants' Motion to Dismiss, and Response in

Opposition to Plaintiffs' Motion for Leave to Amend (Docket No. 67)]

(2) Policies adopted by the Board of Regents of the Texas A&M University

System, directing its member institutions, including Texas A&M

University, to maintain "institutional control and oversight" over

intercollegiate athletics programs, and mandating that all money

generated by intercollegiate athletics be deposited in University accounts

and managed through the University.  [Copies attached to Mot. to

Dismiss]

(3)  A sworn affidavit from Scott Woodward, Texas A&M University's

Director of Athletics, stating under oath that the Athletic Department has

no corporate existence and is not a stand-alone organization; that the

Athletic Department serves important functions within Texas A&M

University related to serving University students and the wider

University community; that he is an employee of Texas A&M

University; that his salary and the salaries of other employees in the

Athletic Department are paid by Texas A&M University; that the

Athletic Department owns no property in its own name; and that he

reports directly to the President of Texas A&M University in discussing

his job performance.  [Copy attached to the University Defendants'

Response in Opposition to Plaintiffs' Motion to Compel (Docket No. 48)]

(4) Reports submitted by Texas A&M University to the National Collegiate Athletic Association (NCAA), providing certain metrics related to intercollegiate athletics programs at Texas A&M University, demonstrating that the salaries of those involved in intercollegiate athletics, including coaches and other staff, are paid by Texas A&M University.  [Copies attached to the University Defendants' Response in Opposition to Plaintiffs' Motion to Compel (Docket No. 48)]

(5) A deed to the property on which Kyle Field sits, dated June 21, 1871, documenting that the owner of the land is Texas A&M University, formerly known as the "Agricultural and Mechanical College of Texas".

(6)  Audit reports from Price Waterhouse Coopers evaluating the University's compliance with NCAA rules governing intercollegiate athletics, clearly stating that the reports are prepared for Texas A&M University.  [Copies attached as exhibits to the University Defendants' Response in Opposition to Plaintiffs' Motion for Leave to Amend]

(7) Copies of contracts related to athletics that are signed by various officers of Texas A&M University, including the Director of Purchasing, Vice President for Finance and Administration and the Provost and Executive

Vice President for Academic Affairs, on behalf of the President of Texas A&M University.  [Copies attached as exhibits to the University Defendants' Response in Opposition to Plaintiffs' Motion for Leave to Amend]

(8) Copies of University rules and policies governing the operation of the Athletics Department, including contract delegation policies, and policies regarding travel.  [Provided to Plaintiffs by reference to specific University rules listed in footnote 2 of the University Defendants' Response in Opposition to Plaintiffs' Motion for Leave to Amend, and also by reference to contract delegation authority, provided to Plaintiffs through Defendants' responses to Plaintiffs' request for documents No. 31, attached as exhibits to the University Defendants' Response in Opposition to Plaintiffs' Motion to Compel]

In opposition, Plaintiffs point to certain web pages from the Texas A&M University website, that they allege demonstrate that the "finances and business operations" of the Athletic Department are "separate and distinct from the University," and that the "University's rules do not apply to the Athletic Department."   Resp. in Opp. at pp. 6-7.  These assertions are flatly contradicted by the sworn statement of Scott Woodward, that he is an employee of Texas A&M University, and that his salary, as well as the salaries of all Athletic Department

employees are paid by Texas A&M University.  These assertions are further contradicted by documents demonstrating that the Athletics Department sits within the organizational structure of the University, not outside of it.  *See* Mot. to Dismiss, Ex. A.  With respect to finances, it is true that state-appropriated money may not be used to fund intercollegiate athletics programs at Texas A&M University, or indeed any other state university.  The documents produced to Plaintiffs demonstrate, however, that Texas A&M University exercises institutional control over the finances of the Athletics Department, and is in fact required by rules from the Board of Regents to do so.  Mot. to Dismiss at Ex. B; *see also* NCAA reports, prepared by Texas A&M University; Price Waterhouse Coopers audit reports, prepared for Texas A&M University, relating to Athletic Department operations and finances; contracts relating to the Athletic Department signed by Texas A&M University executives, up to and including on behalf of the President of Texas A&M University.

In the face of this evidence, even Plaintiffs have been forced to admit the basic fact that the Athletic Department has no separate corporate existence.  Resp. in Opp. at p. 6.

### B. <u>Delaying a ruling on jural authority would be improper and harmful to the Court's efforts to move this case forward.</u>

Plaintiffs' response seems to argue that the Court should delay a ruling on jural authority pending additional discovery or evidence.  Plaintiff, however, "has

the burden of proving subject matter jurisdiction by a preponderance of the evidence." *See Vantage Trailers, Inc. v. Beall Corp.,*  567 F.3d 745, 748 (5th Cir. 2009).  "In evaluating jurisdiction, the district court must resolve disputed facts without giving a presumption of truthfulness to the plaintiff's allegations." *Id.*

Here, the University Defendants assert that jurisdiction over the Athletic Department is improper because it is not an entity with jural authority to be sued. The evidence provided in support of this assertion is uncontroverted, and demonstrates clearly that the Athletic Department cannot meet the legal test for jural authority set out in *Darby v. Pasadena*, 939 F.3d 311 (5th Cir. 1991).  Mot. to Dismiss at pp. 4-5 (collecting cases).

Plaintiffs' citation to *Lenoir v. UT Physicians*, 491 S.W.3d 68 (Tex. App. – Houston [1st Dist.] 2016) proves the point clearly.  Plaintiffs correctly note that in *Lenoir*, a subsidiary entity created by a state university health system was held to not be entitled to assert sovereign immunity.  Resp. in Opp. at p. 10.  Plaintiffs claim that the Athletic Department is somehow like the entity in *Lenoir*, but *Lenoir* itself makes clear that the subsidiary entity addressed in that case had its own board of directors, as well as Articles of Incorporation and Bylaws.  491 S.W.3d at 87.  The Court in *Lenoir* even went to some lengths to articulate the precise inverse of Plaintiffs' arguments here – that simply because the subsidiary entity alleged that it was controlled by the university entity, it could not ignore the fact that it had

a separate corporate existence that the court was bound to recognize and respect. *Id.* at 87-88.  Here, the entity that Plaintiffs attempt to sue has no separate, corporate existence, and Plaintiffs have, after some discovery, been forced to admit as much.

Based on the evidence, the Athletic Department should be dismissed as a party.

## II. Plaintiffs' attempts to argue that Texas A&M University would not be entitled to immunity are creative, but unavailing.

In attempting to hold a state agency liable for copyright infringement, Plaintiffs have to acknowledge *Chavez v. Arte Publico Press*, 204 F.3d 601 (5th Cir. 2000), and *Rodriguez v. Tex. Com'n on the Arts*, 199 F.3d 279 (5th Cir. 2000), both of which hold squarely that Congress's attempt to abrogate state sovereign immunity for copyright claims against state entities violates the Constitution. These decisions are both based on *Florida Prepaid*, *supra,* which also remains good law, conducting an essentially identical analysis of abrogation under federal patent law.

In the face of this binding precedent, Plaintiffs offer a few different theories as to how they might avoid dismissal.  First, Plaintiffs suggest that Congress's attempt at abrogation in the Copyright Remedy Clarification Act (CRCA) was unnecessary, as state sovereign immunity for copyright claims was already abrogated in the "plan of the convention."  Resp. in Opp. at pp. 18-20.  Second,

Plaintiffs suggest that their case should proceed because they have alleged an "actual constitutional violation," which they argue should be permitted to proceed under *United States v. Georgia*.  Resp. in Opp. at pp. 23-24.  Third, Plaintiffs ask directly that this Court refuse to follow Chavez because its holding has been "undermined by subsequent experience."  Resp. in Opp. at pp. 25-26.  Fourth, Plaintiffs argue that even if abrogation could not be justified under the Fourteenth Amendment, that it could be justified under the privileges and immunities clause. Resp. in Opp. at pp. 27-30.

While these claims are new in this litigation, these theories have been around for some years now, and various courts have discussed and rejected these arguments.

### a.  <u>Plan of the convention arguments</u>

In *National Association of Boards of Pharmacy v. Board of Regents*, 633 F.3d 1297 (11th Cir. 2011) ("*NABP*"), the Eleventh Circuit Court of Appeals directly addressed the same "plan of the convention" argument brought forward here, based on an extension of the Supreme Court's reasoning in *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006).  The Court in *NABP* noted that in *Katz*, "the Supreme Court held that Congress may abrogate state sovereign immunity under the Bankruptcy Clause of Article I," and that here, the plaintiff "urges the Court to read *Katz* for the proposition that Congress may also abrogate

the States' sovereign immunity under the Copyright and Patent Clause in Article I." 633 F.3d at 1314.  In response, the court stated that *Katz* "cannot be extended that far," given that the "holding in *Katz* is carefully circumscribed to the bankruptcy context," and "cannot fairly be read to reach congressional authority under the Copyright and Patent Clause."  *Id*.  This analysis is surely right, as the analysis in *Katz* was "based upon the history of bankruptcy jurisdiction," not any overarching analysis of Congress's powers under Article I.  *Id.*

**b.  Claims of an "actual constitutional violation"**

Plaintiffs theory about proceeding on a claim of an "actual constitutional violation" similar to what the Supreme Court permitted in *United States v. Georgia*, 546 U.S. 151 (2006), was also addressed by the court in *NABP*.  *Id*. at 1316-18.  There, the plaintiff alleged that it had stated a claim for a violation of due process because its property was taken without the opportunity for a pre-deprivation hearing.  That is the same argument raised here, where Plaintiffs claim that the "Athletic Department intentionally took Plaintiffs' copyrighted work without providing due process before the taking."  Resp. in Opp. at p. 24.  The Court in *NABP* engaged in an extensive analysis of what is required to state a pre-deprivation due process claim, concluding that the plaintiff could not demonstrate that pre-deprivation process was feasible when the acts as alleged essentially constituted an unforeseeable tort.  633 F.3d at 1318.  "It is only when the purpose

of a state procedure is to effect the deprivation of a protected interest that pre-deprivation process becomes feasible – only then is the State in a position to foresee the deprivation." *Id.*  The Court also noted in a footnote that "it is unclear whether NABP's procedural due process claim actually falls under *Georgia*'s framework," because in *Georgia*, "the identical conduct that violated . . . [the federal statute] also violated the Eighth Amendment." *Id.* at 1316, n.32.  "Here, the action necessary to infringe a copyright is arguably distinct from the conduct constituting NABP's procedural due process claim," because copyright infringement occurs regardless of what process is afforded to the plaintiff. *Id.*  In light of all the other problems with plaintiff's claim, however, the Court did not pursue that issue further.

In this case, we also have the additional problem that Plaintiffs have not actually alleged a due process violation, either in the current live pleading, or in the proposed Third Amended Complaint, that Plaintiffs recently sought leave to file. Even in the response, Plaintiffs offer only the following statement regarding how Defendants' alleged conduct would violate due process: "the Athletic Department intentionally took Plaintiffs' copyrighted work without providing due process before the taking."  Resp. in Opp. at p. 24.  This bare statement is simply not enough to actually state a claim for an alleged violation of due process, much less a

basis on which to construct an entirely parallel path to *Chavez* for evading state sovereign immunity.

### c. __Abrogation based on the Privileges and Immunities Clause__

With respect to the arguments on the privileges and immunities clause, those arguments were raised in *Chavez*, and were rejected.  *Chavez*, 204 F.3d at 608.  In addressing these arguments, the Court noted that Chavez could have raised these arguments earlier, and that her reliance on the relatively recent Supreme Court decision issued in *Saenz v. Roe*, 526 U.S. 489 (1999), "asks more of this court than it should give," in light of the fact that the Supreme Court "has provided no guidance for its 'modern' interpretation of the [privileges and immunities] clause." *Id.*  While not an extensive analysis of this argument, the Court did explicitly reject it in favor of following *Florida Prepaid*, and finding that Congress's attempted abrogation of state sovereign immunity in the CRCA was unconstitutional.

These arguments were also raised and rejected in *Issaenko v. Univ. of Minnesota*, 57 F. Supp. 3d 985 (D. Minn. 2014).  The plaintiff in that case also tried to rely on *Saenz*, which had held that the Privileged and Immunities Clause did protect some aspects of a citizen's right to travel.  Id. at 1010.  Issaenko argued that *Saenz* could be used to justify Congress's abrogation of state sovereign immunity under the Privileges and Immunities Clause, rather than the Due Process Clause of the Fourteenth Amendment.  *Id.*   As the court in *Issaenko* noted,

however, changing the operative phrase in the Fourteenth Amendment from the Due Process Clause to the Privileges and Immunities Clause "does not avoid the problems identified by numerous courts with respect to Congress's authority under the Due Process Clause." *Id.* "In other words, in order to be a valid exercise of its Section 5 power, Congress must still have been able to identify constitutional violations by states -whether they be of the Due Process Clause or the Privileges and Immunities Clause – prior to passing remedial legislation." *Id.* Because multiple courts have already looked at this issue and determined that Congress did not "identify a pattern of states infringing copyrights in an unconstitutional manner and did not tailor the remedies in the CRCA to address any constitutional violations by states," courts have concluded that Congress acted unconstitutionally in passing the CRCA. *Id.*

### d. Chavez has been "undermined by subsequent experience"

With respect to the idea that *Chavez* is outdated, or should be reversed, Plaintiffs cite one decision from the Eastern District of North Carolina which does find, contrary to *Chavez*, that the CRCA validly abrogates state sovereign immunity for copyright claims. Resp. in Opp. at p. 26 (citing *Allen v. Cooper*, 244 F. Supp. 3d 525 (E.D.N.C. 2017)). That decision is currently on appeal to the Fourth Circuit, and may well be headed to reversal, given that the court in that case also took pains to point out its fundamental disagreement with *Hans v. Louisiana*,

134 U.S. 1 (1890), and the Supreme Court's entire approach to the Eleventh Amendment. *Id.* at 535.

As the opinion states, "the Court is convinced that the central holding found by *Hans* and its progeny- namely that the Eleventh Amendment embodies a general doctrine of state sovereign immunity that extend to federal question cases in federal court – is flawed and contrary to the fundamental nature and meaning of the Constitution." *Id.* The Court goes on to engage in a detailed review of the history and purpose of the doctrine of state sovereign immunity, and presents an interesting case for an approach to the Eleventh Amendment far different than any that has been embraced to date in the federal courts. *Id.* at 535-39. This decision, however, is hardly a basis for this Court to issue a ruling directly contradictory to binding precedent in this circuit.

In short, *Chavez* and *Rodriguez* are still good law, as is *Florida Prepaid*. Substituting Texas A&M University as a party to this suit would be improper, because the University is a state agency entitled to sovereign immunity.[1]

---

[1] Plaintiffs also argue in their response that their claims for an unconstitutional taking under the Texas Constitution and the United States Constitution are not barred by sovereign immunity. Resp. in Opp. at pp. 32-34. First, we should note that the takings claims are only raised by Plaintiffs in the alternative, as they are directly contradictory to the assertions made in their claims for copyright infringement that their chosen named defendant, the Texas A&M Athletic Department, is not a state actor. First Am. Compl. at ¶¶ 109, 115. Were the University to be named as a defendant on these claims, the arguments regarding immunity would be more complex, as there are various jurisdictional barriers to

### III.  The individual defendants are covered by state sovereign immunity under *Meyers v. Texas*.

Plaintiffs do not address *Meyers v. Texas*, 410 F.3d 236 (5th Cir. 2005), in their response, and focus instead on cases addressing the Supremacy Clause.  Resp. in Opp. at pp. 53-54.  Plaintiffs cite *Haywood v. Drown*, 556 U.S. 729 (2009), a case in which the Supreme Court applied the Supremacy Clause to strike down a New York statute that attempted to forbid suits against a particular class of state employee (correctional officers), brought against them in their personal capacity. The analysis in that case focused on determining whether New York's law could qualify as a "neutral rule of judicial administration."  *Id.* at 2114.  That case had nothing to do with sovereign immunity, or how that concept is defined under state law or the Eleventh Amendment.  *Meyers* does directly address that issue, and its mandate is clear: the contours of state sovereign immunity are protected by the Eleventh Amendment, but defined by state law.  *Meyers*, 410 F.3d at 253 ("Rather than require that the states adhere to a prescribed plan, the Court's decisions

---

pursuing both a federal takings claim and a state takings claim at the same time. *See generally San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323 (2005).  It may be the case that ultimately, Plaintiffs could be permitted to proceed in diversity against a state agency on a claim for a taking under the Texas Constitution, assuming they can make out a valid claim under state law, but would be barred by immunity from proceeding on a federal takings claim.  *See, e.g., John G. and Marie Stella Kennedy Memorial Found. v. Mauro*, 21 F.3d 667 (5th Cir. 1994).  In the event that Plaintiffs choose to name the correct party on these claims, these issues can certainly be addressed once that party is named and makes an appearance in the case.

envision a Constitution that affords the states discretion to waive or vary the nature and elements of their sovereign immunity.").

Similarly, the Fourth Circuit case cited by Plaintiffs relates to whether a state employee in Virginia could assert an immunity described as "discretionary function immunity as conferred by state law." *Richard Anderson Photography v. Brown*, 852 F.2d 114, 122-23 (4th Cir. 1988). The court in *Richard Anderson* held that the employee could not assert this type of immunity based on the Supremacy Clause. Here again, this case is not addressing the *Meyers* framework, in which the Eleventh Amendment is held to protect state sovereign immunity as the contours of that immunity are defined by state law. *Meyers* is the controlling Fifth Circuit precedent setting out this circuit's view on the scope of Eleventh Amendment immunity. Under *Meyers*, the Constitution "does not create state sovereign immunity or prescribe its scope." 410 F.3d at 252. Instead, "the law of each state determines the nature of its immunities." *Id.*

Because these individual defendants are covered by the sovereign immunity of the State of Texas, as defined by state law, they are also protected by the Eleventh Amendment. Mot. to Dismiss at pp. 7-11. No violation of the Supremacy Clause can occur when these defendants are in fact relying on the federal Constitution.

**IV. Plaintiffs' allegations are insufficient to overcome the individual defendants' qualified immunity.**

Plaintiffs' assertions regarding the individual defendants focuses extensively on the January 22, 2014, email exchange between Plaintiff Michael Bynum and Defendant Brad Marquardt that seems to be the origin of this lawsuit. First Am. Compl. at Ex. N. That email does nothing to connect Alan Cannon or Lane Stephenson to this dispute. In fact, what the email does is demonstrate that in real time, Mr. Marquardt was trying to explain to Mr. Bynum that there was a "mix-up," and that the University wanted to make the situation right. Far from being proof that Mr. Marquardt does not deserve the protection of qualified immunity, this email shows an employee who is protected by qualified immunity.

**A. Lane Stephenson**

Plaintiffs case against Lane Stephenson cannot survive scrutiny under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and this Court's other precedents on qualified immunity. In Plaintiffs' world view, Mr. Stephenson does not even work for the same entity as Mr. Marquardt and Mr. Cannon. *See* Resp. in Opp. at p. 39. Lane Stephenson is connected in no way to the allegedly damning email exchange between Mr. Marquardt and Mr. Bynum. First Am. Compl. at Ex. N. He is not alleged to have had any meetings with Mr. Bynum to discuss Mr. Bynum's book, or the Whit Canning article. Resp. in Opp. at p. 44 (alleging meetings with Bynum, Marquardt

and Cannon, but not Stephenson).  He is not alleged to have ever seen a copyright notice, and is not even alleged to have actually posted the allegedly infringing material on the website.  Mot. to Dismiss at pp. 14-15 (summarizing the only 3 substantive paragraphs of the complaint addressing Lane Stephenson).  Mr. Stephenson's only alleged wrong that Plaintiffs can identify is that he is allegedly "responsible" for the content that is posted to a particular portion of the Texas A&M website.  First Am. Compl. at ¶ 77.

Even taken as true, this allegation falls woefully short of what it would take to strip a state employee of his qualified immunity, and attempt to hold him personally liable for a violation of federal law.  While it is true that in some circumstances, federal law will permit government employees to be held personally liable for their own torts, even those committed while engaged in their jobs, personal liability can only be based on personal conduct.  *Iqbal*, 556 U.S. at 676 ("Based on the rules our precedents establish, respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.").

Plaintiffs allege no actual act that Lane Stephenson engaged in that violated federal copyright law, or indeed any law.  Plaintiffs' claims against him should be dismissed.

**B.  Alan Cannon**

As noted in the University Defendants' original Motion to Dismiss, "Alan

Cannon's name appears in Plaintiffs' complaint even less frequently than Mr.

Stephenson, with no substantive allegations regarding his alleged conduct

appearing in the body of the complaint at all."  Mot. to Dismiss at p. 17 (describing

the threadbare allegations specifically naming Alan Cannon).  In their response to

the motion to dismiss, Plaintiffs make multiple efforts to talk about "the individual

defendants" as a group, and then attribute to the group all of the conduct described

in Mr. Marquardt's email.  Resp. in Opp. at pp. 39-40, 44-45, 46-47.  This type of

generic reference to a group of defendants does not render these claims any less

subject to dismissal, and cannot expand the allegations beyond the actual text of

the email the complaint is referencing.  *See Hinojosa v. Livingston*, 807 F.3d 657,

684 (5th Cir. 2015) ("When the plaintiff's complaint uses blanket terms covering

all the defendants, by lumping them together . . . these allegations are properly

disregarded[.]"); *see also Del Castillo v. PMI Holdings North America, Inc*., 2015

WL 3833447, at *6 (S.D. Tex. 2015) ("A complaint does not satisfy the

requirements of *Iqbal* and *Twombly* by lumping together all defendants, while

providing no factual basis to distinguish their conduct.").

Alan Cannon is not alleged to have asked his secretary to type up anything,

or to have actually posted anything on a website.   He is named here not for

something that he personally did, but because Plaintiffs speculate that he must have been in the chain of command of events that led to the posting of the Whit Canning article.  First Am. Compl. at ¶ 76, 86 (alleging only that Cannon "approved" and "approved and encouraged" unauthorized distribution).   Personal liability for state employees comes about as a result of personal wrongdoing.  *Iqbal,* 556 U.S. at 676; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (in assessing qualified immunity, focusing on the particular actions taken personally by the individual official at issue).

Having the misfortune to be in a chain of supervisors when allegedly tortious conduct occurs is not enough.  The doctrine of qualified immunity enshrines this principle, and it should be applied here to dismiss Mr. Cannon.

### C. <u>Brad Marquardt</u>

Brad Marquardt is the sender of the email attached as Exhibit N to Plaintiffs' complaint, that Plaintiffs use as the centerpiece of their allegations against all defendants.  Based on this email, Mr. Marquardt is alleged to have committed copyright infringement, and also a violation of the DMCA, by asking his secretary to type up an article, and then not including the copyright notice in the typed-up version.  Resp. in Opp. at pp. 39-40.  In the University Defendants' motion to dismiss, we described how courts on split on whether actions taken with respect to a non-digital copyright notice are covered by the DMCA.  Mot. to

Dismiss at pp. 20-21.   Plaintiffs' response does not address this split among federal courts, except to point to a few cases on one side of this issue, holding that non-digital copyright notices are covered.   Resp. in Opp. at pp. 41-42.

The point, however, is not whether this Court would or would not ultimately agree that non-digital material is covered.   The point is that courts are split, and the state of the law at the time of the alleged violation was not "clearly established", such that we can hold an individual state employee personally liable for not following what the law eventually turned out to be.   *See Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011) (en banc) (noting that it is "unfair" to subject government officials to personal liability when "judges disagree on a legal question").   On this basis alone, Mr. Marquardt is entitled to qualified immunity on the DMCA claim, and this count against him should be dismissed.

With regard to the state of copyright infringement law, it is true that at some level of generality, it is "clearly established" that one person cannot copy material that is covered by a valid copyright belonging to someone else.   Resp. in Opp. at p. 41.   The relevant inquiry for qualified immunity, however, is to look at the facts and circumstances confronting the government employee at the time that he or she took the allegedly wrongful action.   *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting that in assessing qualified immunity, the question is whether "at the time of the challenged conduct, the contours of a right are

sufficiently clear that every reasonable official would have understood that what he is doing violates that right").  Viewed in that light, Mr. Marquardt cannot be said to have violated clearly established law when he found an article in his office, asked his secretary to type it up, and passed that typed version on to a colleague who had asked him for it.  Plaintiffs assert that "having a secretary retype a work verbatim, thereby concealing its original source, is objectively unreasonable under any circumstance."  Resp. in Opp. at p. 50.  This assertion simply does not accurately capture the "breathing room" granted by qualified immunity, which "protects all but the plainly incompetent, or those who knowingly violate the law."  563 U.S. at 742 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.").

Because Plaintiffs' allegations in the complaint are not sufficient to overcome Mr. Marquardt's qualified immunity, these claims should be dismissed.

## PRAYER

Defendants Texas A&M University Athletic Department, Brad Marquardt, Alan Cannon, and Lane Stephenson respectfully request that this Court dismiss all claims against them.

Dated: March 22, 2018

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

JOSHUA R. GODBEY
Division Chief
Financial Litigation and Charitable Trusts Division

_/s/ Melissa Mather_____
H. Melissa Mather
Assistant Attorney General
Financial Litigation and Charitable Trusts Division
P.O. Box 12548
Austin, TX 78711-2548
Telephone: (512) 475-2540
Facsimile: (512) 477-2348
Email: melissa.mather@oag.texas.gov

*Counsel for Texas A&M University Athletic Department,*
*Brad Marquardt, Alan Cannon and Lane Stephenson*

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2018, a true and correct copy of the foregoing Reply in Support of Motion to Dismiss was electronically served through the CM/ECF system on all counsel of record.

_/s/  H. Melissa Mather_
H. Melissa Mather