United States District Court
Southern District of Texas
**ENTERED**
March 29, 2019
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CANADA HOCKEY LLC; dba EPIC SPORTS, *et al*, | § § § | |
| Plaintiffs, | § | |
| VS. | § § | CIVIL ACTION NO. 4:17-CV-181 |
| TEXAS A&M UNIVERSITY ATHLETIC DEPARTMENT, *et al*, | § § § | |
| Defendants. | § § | |

## ORDER

Before the Court are Defendant Texas A&M 12th Man Foundation's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. No. 33) and Defendants Texas A&M University Athletic Department, Brad Marquardt, Alan Cannon, and Lane Stephenson's Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim (Doc. No. 34). Plaintiffs have filed Responses in Opposition (Doc. Nos. 40, 54, and 62). Defendants have filed Replies in Support (Doc. Nos. 43 & 77). Plaintiffs have filed a Sur-Reply (Doc. No. 89) and all parties have filed Supplemental Briefs (Doc. No. 93 & 94).

Upon careful consideration of the parties' arguments and applicable law, the Court hereby **GRANTS** Defendant Texas A&M 12th Man Foundation's Motion to Dismiss (Doc. No. 33) and **GRANTS in part** and **DENIES in part** the other Defendants' Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim (Doc. No. 34).

1

## I.      Background

This lawsuit arises out of the publication of an article on the University athletic website in January of 2014. The Defendants in this case include Texas A&M Athletic Department ("A&M Athletic Department"),[1] Texas A&M University 12th Man Foundation ("Foundation"), Brad Marquardt, Alan Cannon, and Lane Stephenson.[2] Plaintiffs allege (and Defendants do not dispute) that some of the Defendants published an article about the "12th Man" on the "official website for news about Aggie athletics." (Doc. No. 15 at 2). Plaintiffs contend that other Defendants either benefited from or encouraged this article's publication. Plaintiff, Michael Bynum ("Bynum") claims to own the copyright in the work that this article allegedly infringes, and alleges that he did not license or otherwise give permission for Defendants to use the material on its website. Defendants do not dispute these claims.

Bynum is an author and editor of sports history and memorabilia "coffee-table" books (Doc. No. 15 at 6). He acts as the primary researcher and editor for these books by collecting and reviewing primary documents and conducting interviews. (*Id.*). As a part of his editorial duties, Bynum often employs writers on a work-for-hire basis, providing the writers with his research and having them create pieces for inclusion in the book. (*Id.* at 7). Plaintiffs contend that Bynum occasionally purchases the right to reprint previously published content from these work-for-hire writers. (*Id.*). While Bynum has worked with other publishers in the past, Canada Hockey LLC (doing business as Epic Sports) is Bynum's own publishing company (and his co-plaintiff in this case). (*Id.*).

---

[1] The Court will refer to the Texas A&M Athletic Department as "A&M Athletic Department" or "Athletic Department," and will refer to Texas A&M University—who is not a named Defendant in this suit—as the "University."

[2] The latter three Defendants have been sued in their individual capacities.

Bynum has previously published books about A&M football. (*Id.*). Bynum alleges that he

first became intrigued by the 12th Man lore in 1980 while working on his first book with A&M,

*Aggie Pride*. (*Id.* at 8). Bynum was so intrigued that in the 1990s he selected the 12th Man story

as a topic for a forthcoming book. (*Id.* at 9). Plaintiffs describe the 12th Man story as follows:

> The University's now famous 12th Man tradition was inspired by the actions of E.
> King Gill at the 1922 football game known as the "Dixie Classic." Gill, a squad
> player for A&M's football team, who was already training with the university's
> basketball team, was up in the press box watching his team face the then top-ranked
> Prayin' Colonels of Centre College, when he was waved down to the sideline before
> halftime to suit up in case his injured team ran out of reserve players. Gill stood on
> the sideline, ready to play, for the remainder of the game.
>
> Today, the 12th Man tradition is a symbol of the Aggies' unity, loyalty, and
> willingness to serve when called upon to do so, and is woven into many aspects of
> life at A&M.

(*Id.* at 8). Plaintiffs allege that Bynum spent the next decade researching Gill and the 12th Man

story. (*Id.* at 9). As a part of this research, Bynum sifted through primary documents, visited

locations that he felt were significant to Gill's life, and conducted interviews with A&M Athletic

Department personnel. (*Id.* at 7, 9). Some of these interviewees included Brad Marquardt

("Marquardt"), an Associate Director of Media Relations, and Alan Cannon ("Cannon"), then, an

Assistant Athletic Director for Media Relations. Both are Defendants in the present suit. (*Id.* at 9).

Eventually, Bynum hired Whit Canning to produce a biography about Gill ("Gill Biography" or

the "work") that Bynum planned to use as the opening chapter to the forthcoming 12th Man book.

(*Id.*). The parties do not dispute that Bynum owns the copyright in the Gill Biography,[3] or that

Canning is the original author of the work.

Plaintiffs allege that Bynum asked at least two A&M Athletic Department personnel—the

former head of the Foundation and the 2006 editor of the Foundation's magazine—to proofread

---

[3] "Bynum is the copyright owner of U.S. Copyright Registration No. TXu002020474 for the 2010 draft of the *12th Man* book containing the Gill biography at issue." (Doc. No. 15 at 25).

drafts of the Gill Biography sometime in 2006. That same year, Bynum discussed a potential purchase agreement for the book with Jerry Cooper, a friend and former editor of the Foundation's magazine. (*Id.* at 10). Through Cooper, Bynum worked on solidifying a deal with the Association of Former Students of Texas A&M ("Association") and/or the 12th Man Foundation. Both the Association and the Foundation received these early drafts of Bynum's work, but ultimately, neither opted to sign a purchase agreement. (*Id.* at 10).

In mid-2010, Bynum emailed Marquardt asking for assistance locating additional photographs to include in the 12th Man book. (*Id.*). Bynum included a PDF draft of the book as an attachment to this email. (*Id.* at 10–11). Plaintiffs contend that this draft of the forthcoming book included the Gill Biography plus pictures and captions. (*Id.*). This PDF draft also contained copyright management information including Bynum's name, the copyright date, an indication that the copyright was owned by Epic Sports, and a statement that "[n]o part of this work covered by this copyright hereon may be reproduced or used in any form or by any means." (*Id.* at 12). Plaintiffs allege that Bynum continued to email Marquardt "as late as December 28, 2013," asking questions related to the book. (*Id.* at 14).

Bynum delayed publication of the book, planning to release it on the 75th anniversary of the 1939 championship season in the fall of 2014. (*Id.* at 13). Bynum and his publishing company executed a publishing agreement to this effect in November of 2013. (*Id.* at 13–14).

Plaintiffs allege that shortly thereafter, in January of 2014, "during the NFL playoffs, Texas A&M University, primarily through the A&M Athletic Department, launched a campaign to promote its ongoing claim that it is the true owner of the '12th Man,' not the Seattle Seahawks, who had qualified for the 2014 NFL playoffs and whose fan base calls itself the '12th Man.'" (*Id.* at 14).

4

Plaintiffs allege that as a result of this campaign the "A&M Athletic Department and the Foundation directed staff at the A&M Athletic Department, including at least Marquardt and Cannon, to find background information on Gill that could be used to promote the 12th Man story and solicit more donations." (*Id.* at 15). Then on January 22, 2014, Jerry Cooper emailed Bynum informing him that a "near verbatim copy" of the Gill Biography appeared as the feature story of the University's e-Newsletter, "which included a hyperlink to a page on the A&M Athletic Department Website displaying the infringing copy of Bynum's Gill Biography" (hereinafter, the "allegedly infringing work"). (*Id.* at 16).

Later that day, Bynum sent an email to Cannon and Marquardt informing them that they had published and distributed this "near verbatim copy" without his permission and demanding that the work be removed from the A&M Athletic Department Website. (*Id.* at 22). Marquardt responded, apologetically, stating:

> It was an incredibly coincidental mix-up on my part. I was cleaning my office, which you may recall is generally a cluttered mess. While going through files, I found a story of the 12th Man on some slightly yellowed 8.5x11 paper. I had no recollection of it [sic] origin. But I'm always seeking background info on the 12th Man especially since we joined the SEC and reporters aren't as familiar with the history of the 12th Man. I asked my secretary to key it in for me which she did. A few days after that, my co-worker asked if I had anything on the 12th Man. Coincidentally, I did and that's how a 16-year old story found its way on the internet.

(Doc. No. 15, Ex. N). In the email, Marquardt went on to ask whether Bynum would be willing to allow the Athletic Department to leave the allegedly infringing work on the website with attribution to Bynum and an explanation that it was an excerpt from Bynum's forthcoming book. (Doc. No. 15 at 22). Bynum refused. (*Id.*). The A&M Athletic Department removed the work from its website, but Plaintiffs contend that this takedown did not remedy the electronic distribution of the allegedly infringing work. (*Id.*). Plaintiffs allege that recipients of the University's e-Newsletter

5

(that hyperlinked to the allegedly infringing work) proceeded to re-share the link or re-distribute electronic copies of the work via email and various social media platforms. (*Id.* at 24).

Plaintiffs claim that Lane Stephenson ("Stephenson"), is the former Director of News and Information Services at the University. Plaintiffs allege that during the relevant time period, Stephenson was in charge of the University website and was responsible for the content in the e-Newsletter and the University's official Twitter account "@TAMU." (*Id.* at 5). Plaintiffs allege that Stephenson assisted Marquardt in distributing the allegedly infringing work by publishing the allegedly infringing work online and dispersing the hyperlink via email and Twitter.

Based on these actions, Plaintiffs accuse Defendants of direct and indirect copyright infringement, violations of the Digital Millennium Copyright Act, and unconstitutional taking of property without just compensation (in violation of the Fifth and Fourteenth Amendments of the United States Constitution, and under the Texas Constitution). The Athletic Department moves to dismiss these claims, asserting that Plaintiffs failed to state a claim. (Doc. No. 33). The remaining Defendants have also moved to dismiss on these grounds, and have also invoked sovereign and qualified immunity defenses. (Doc. No. 34). The Court will address each of these arguments in turn.

## II.      Legal Standards

### a.   Motion to Dismiss Standards

A defendant may file a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The court is not bound to accept factual assumptions or legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.* The court may also consider documents that a defendant attaches to a motion to dismiss, if the documents are "referred to in the plaintiff's complaint and are central to [the] claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 500 (5th Cir. 2000); *see also Johnson v. Wells Fargo Bank, NA*, 999 F. Supp. 2d 919, 926 (N.D. Tex. 2014).

A court must dismiss a suit for lack of subject matter jurisdiction under Rule 12(b)(1) where it lacks the statutory or constitutional power to adjudicate the case. FED. R. CIV. P. 12(b)(1); *see also Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). Where "a defendant makes a 'factual attack' upon the court's subject matter jurisdiction over the lawsuit [and] the defendant submits affidavits, testimony, or other evidentiary materials," the plaintiff is also "required to submit facts through some evidentiary method." *Paterson v.*

*Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (delineating the difference between a "facial attack" and a "factual attack" to subject matter jurisdiction in a motion to dismiss). In a "factual attack," the plaintiff also has the burden of proving by a preponderance of the evidence that the court has subject matter jurisdiction. *Id.* The party asserting jurisdiction bears the burden of overcoming the presumption that the cause falls outside the court's limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

    *b.  Direct Infringement Standard*

    Copyright infringement is prohibited by 17 U.S.C. § 501. Section 501 provides that the registered owner of any of the exclusive rights conferred under the Copyright Act (under 17 U.S.C. §§ 106–118) has a cause of action against any infringer of any of those rights. *See Richard Anderson Photography v. Brown*, 852 F.2d 114, 118 (4th Cir. 1988). In determining whether a defendant has violated § 501, courts follow a two-step direct infringement analysis. *Arnstein v. Porter*, 154 F.2d 464, 468 (2d. Cir. 1946); *Alcatel USA, Inc. v. DGI Tech., Inc.*, 166 F.3d 722, 790 (5th Cir. 1999). To survive a Motion to Dismiss on a direct infringement claim, a plaintiff must plead facts indicating that a defendant copied its copyrighted work, and that the plaintiff in fact owns the copyright. Where the plaintiff lacks evidence of actual copying, courts allow circumstantial proof, that is, a showing of defendant's access to the copyrighted work plus probative similarity between the copyrighted work and the alleged infringing material. *See Alcatel*, 166 F.3d at 790. Second, a plaintiff must also plead that the copyrighted work was improperly appropriated, in other words, the defendant took enough of the protectible components of the work to constitute appropriation. *Id.*

*c. Contributory Infringement Standard*

"One infringes contributorily by intentionally inducing or encouraging direct infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). For a contributory infringement claim to survive a Motion to Dismiss, a plaintiff must plead facts that show that the defendant, with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct of another. *DynaStudy, Inc. v. Houston Ind. Sch. Dist.*, 325 F. Supp. 3d 767, 775 (S.D. Tex. 2017) (citing *Alcatel*, 166 F.3d at 790).

*d. Vicarious Infringement Standard*

One infringes vicariously by "profiting from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930. Thus, vicarious liability requires some degree of supervisory authority over the direct infringer, as well as a direct financial interest in the infringing activity. *DynaStudy*, 325 F. Supp. 3d at 777.

*e. Digital Millennium Copyright Act Violations*

Finally, Plaintiffs allege that Defendants Marquardt and the A&M Athletic Department violated one of the provisions of the Digital Millennium Copyright Act ("DMCA"). 17 U.S.C. § 1202. The DMCA prohibits falsifying, removing, or altering "copyright management information." 17 U.S.C. § 1202 (a)–(b). As it relates to Plaintiffs' allegations in the present case, "copyright management information" includes:

> (1) The title and other information identifying the work, including the information set forth on a notice of copyright.
> (2) The name of, and other identifying information about, the author of a work.
> (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

17 U.S.C. § 1202 (c)(1)–(3).

The Court will now turn to Plaintiffs' claims against each named Defendant.

### III.    Analysis

#### a.   Claims Against the A&M Athletic Department

##### 1.   *Copyright and DMCA Violations*

Plaintiffs allege that the A&M Athletic Department is liable for direct copyright infringement and violations of the DMCA for its intentional infringement of the Gill Biography and for its removal and omission of copyright management information from the allegedly infringing work. (Doc. No. 15 at 24). Defendants respond arguing that the Athletic Department is not an entity that is capable of being sued; rather, it is a department within Texas A&M University. (Doc. No. 34 at 3). Accordingly, the University moves to dismiss under 12(b)(1). Defendants also contend that the University is immune from suit under the Eleventh Amendment and consequently, should not be substituted in lieu of the A&M Athletic Department. (*Id.* at 6). In response, Plaintiffs essentially ask this Court to find that the Athletic Department has the capacity to be sued, or else rewrite the law in a different way by finding that Congress abrogated the states' sovereign immunity for copyright claims.

Plaintiffs make an intriguing—although ultimately unavailing—argument for why the A&M Athletic Department is its own "independent commercial enterprise." (Doc. No. 62 at 6). Plaintiffs argue two main reasons why the Athletic Department should be treated as a commercial enterprise, separate from the University: (1) the Athletic Department's structure, finances, and business operations are distinct from the University's (this point is divided into three subpoints below) and (2) the Athletic Department cannot be viewed as an arm of the State.

First, Plaintiffs contend that the Athletic Department is structured like a business. (Doc. No. 62 at 6). Plaintiffs admit that the Athletic Department has not taken the "formal steps of incorporating," but argues that nonetheless, it has operational and financial independence from the

University. (*Id.*). In support, Plaintiffs allege that the Athletic Department, unlike any other department within the University, has its own business office and its own human resources, marketing, information technology, and compliance departments. (*Id.* at 7). The A&M Athletic Department even has its own Chief Financial Officer. (*Id.*). Plaintiffs also point out that the Athletic Department website is "littered with advertisements" from various big-name sponsors. (*Id.*).

Next, Plaintiffs argue that in addition to being structured like an independent business, the Athletic Department keeps its finances separate from the rest of the University. (*Id.* at 8). Plaintiffs characterize A&M Athletics as a "highly profitable business." (*Id.* at 6). "The Athletic Department operates on annual revenues of nearly $200 million dollars, none of which comes from the State or other public dollars." (*Id.* at 8). Indeed, section 18(d) of Article 7 of the Constitution of the State of Texas prevents "educational and general funds" from being appropriated to intercollegiate athletics. Rather than fund the athletics program with public dollars, Plaintiffs contend that the Athletic Department relies on its annual revenue from ticket sales, media rights, Southeastern Conference revenue sharing, licensing agreements, and private donations through the 12th Man Foundation. (*Id.* at 9). As such, Plaintiffs argue that the A&M Athletic Department is "a separate profit-making subsidiary (created by the University) that operates independently from the University." (*Id.* at 10).

Last, Plaintiffs also contend that the Athletic Department is "at least in part, comprised of an actual private, non-governmental entity: Texas A&M Ventures, LLC."[4] (Doc. No. 62 at 10). According to Plaintiffs, Texas A&M Ventures is a "Missouri limited liability corporation affiliated

---

[4] The Court notes that Texas A&M Ventures, LLC is not a party to this suit and has not been accused of any wrongdoing in this case.

with Learfield Communications, LLC." (*Id.*). Plaintiffs relate Texas A&M Ventures to the Athletic Department based on the overlap of eight "staff persons." (*Id.* at 11).

As a result of these "independent operations," Plaintiffs argue that the Athletic Department cannot be treated as an arm of the State under the "function by function" analysis set out it in *Clark v. Tarrant Cty.*, 798 F.2d 736, 744–45 (5th Cir. 1986) and its progeny (Doc. No. 62 at 14). These factors include " (1) whether the state statutes and case law view the entity as an arm of the state; (2) the entity's degree of local autonomy; (3) whether the entity is concerned primarily with local, as opposed to statewide, problems; (4) whether the entity has the authority to sue and be sued in its own name; and (5) whether it has the right to hold and use property." (*Id.*) (citing *Clark*, 798 F.2d at 744–45). Plaintiffs analyze the "business-like" functions of the Athletic Department, listed above, using the lens provided by *Clark* and its progeny and conclude that the Athletic Department does not "stand in the shoes of the state itself." (*Id.* at 12 –13 ) (citing *Earles v. State Bd. of Certified Pub. Accountants of Louisiana*, 139 F.3d 1033, 1036 (5th Cir. 1998)). Notably, Plaintiffs point out that while the "vulnerability of the State's purse [is] the most salient factor" in this analysis because of the unique financial independence enjoyed by the Athletic Department, the "State's purse" is likely not at issue. (*Id.* at 13) (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994)).

Nevertheless, the law compels a holding for Defendants; the A&M Athletic Department has no capacity to be sued. *See* FED. R. CIV. P. 17(b) (stating that a party's capacity to sue or be sued in federal court is determined by state law). In discussing jural authority, most courts contemplate whether a department of a city or county has been explicitly granted a "separate legal existence." *See , e.g.*, *Hartfield v. Houston Police Dep't*, No. H-11-4288, 2011 WL 6718795, at *2 (Dec. 21, 2011); *Johnson v. Miles*, No. 1:07cv507, 2008 WL 4524823, at *2 (E.D. Tex. Sept.

29, 2008) (quoting *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313 (5th Cir. 1991)).[5] Here, although the analysis turns on whether a department within a state entity has a "separate legal existence," under FED. R. CIV. P. 17(b), a similar analysis applies. There is no indication that the State of Texas has granted the A&M Athletic Department a "separate legal existence."

Defendants, in support of their argument that the Athletic Department is a part of the University and not its own separate entity, provide the Court with the University's organizational chart, which they argue "clearly delineates that the Director of Athletics reports to the President of the University, and does not lie outside the governing structure of the University as a whole." (Doc. No. 34 at 3; Ex. A). Defendants also provide policy statements from the A&M Board of Regents that specifically discuss the Board's expectation that the University "exercise meaningful oversight of the activities of its athletic department." (*Id.* at 4). Finally, Defendants provide an affidavit from Scott Woodward, the current Director of Athletics at the University, in which Woodward declares:

> The Athletic Department of Texas A&M University has no separate corporate existence, apart from its role as a department of Texas A&M University. The Athletic Department has no articles of incorporation, no corporate charter, and was not created by an act of the Texas Legislature, or by resolution of the. . . Board of Regents.

(Doc. No. 94, Ex. 3 ¶ 3). Defendants conclude that this evidence demonstrates that the Athletic Department is a part of the University and consequently lacks capacity to be sued as a separate entity. (*See id.*).

Although Plaintiffs list a number of reasons why the Athletic Department could be deemed independent (some appealing, some less so), the fact is that the Athletic Department is not separate. It is a part of the University, not a separate entity. As such, the A&M Athletic Department simply

---

[5] "In order for a plaintiff to sue a department of a city or county, that department must enjoy a separate legal existence . . . Unless the political entity that created the department has taken "explicit steps to grant the servient agency with jural authority," the department lacks the capacity to sue or to be sued." *Johnson*, 2008 WL 4524823, at *2 (quoting *Darby*, 939 F.2d at 313).

lacks capacity to be sued, and Plaintiffs have failed to meet their burden to prove jurisdiction. *See Kokkonen*, 511 U.S. at 377.

Typically, where the incorrect party was named in a suit, the correct party could be substituted under FED. R. CIV. P. 17. *See, e.g., Goldin v. Bartholow*, 166 F.3d 710, 721 (5th Cir. 1999) ("Under the Rules of Civil Procedure, a party is allowed, and strongly encouraged, to substitute the proper defendant when circumstances change so as to render the prior defendant not the real party in interest."). Here, however, the "correct party," the University, is an arm of the state, and has invoked a sovereign immunity defense under the Eleventh Amendment.[6]

Plaintiffs argue that sovereign immunity does not defeat their claims. To this point, Plaintiffs make another intriguing policy argument as to why sovereign immunity should not bar copyright claims against a state. (Doc. No. 62 at 17). Plaintiffs' argument is excerpted below:

> First, the states simply do not have sovereign immunity in areas, such as bankruptcy, where they surrendered their immunity "in the plan of the Convention." *Central Virginia Community College v. Katz*, 546 U.S. 356, 373 (2006). In these areas, no abrogation statute is necessary. As explained below, copyright claims are analogous to bankruptcy claims, and are therefore not subject to state sovereign immunity defenses. Second, Congress may abrogate the states' immunity under Section Five of the Fourteenth Amendment. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Although the Fifth Circuit rejected Congress's attempt to abrogate state immunities to copyright claims under the Due Process Clause, *see Chavez v. Arte Publico Press*, 204 F.3d 601, 603 (5th Cir. 2000) and *Rodriguez v. Tex. Com'n on the Arts*, 199 F.3d 279, 280-81 (5th Cir. 2000), those precedents do not bar Plaintiffs' claims here. Post-Chavez decisions by the Supreme Court have made clear that abrogation is permissible where, as here, plaintiffs allege an actual constitutional violation. *United States v. Georgia*, 546 U.S. 151 (2006). Moreover, *Chavez* and *Rodriguez* relied heavily on a lack of evidence that states frequently violate copyrights. But, here, Plaintiffs can document more than one hundred fifty (150) lawsuits, either filed or brought to judgment, occurring after the Fifth Circuit's decisions in these two cases.

(Doc. No. 62 at 17).

---

[6] Moreover, Plaintiffs have not asked (and, in fact, have steadfastly refused) to substitute the University.

In *Katz*, the case Plaintiffs use in support of this contention, the Supreme Court held that sovereign immunity did not bar an adversary proceedings brought by a Chapter 11 trustee to set aside alleged preferential transfers by a debtor to a state agency. 546 U.S. at 357. Plaintiffs specifically attempt to analogize the present case to *Katz* by stating that "there simply is no immunity in bankruptcy cases because Congress's bankruptcy powers involve such a waiver. . . [t]he question in the present case is whether Plaintiffs' copyright claims fall into a similar category," where Article 1, section 8 clause 8 of the United States Constitution (which enumerates Congress's power over intellectual property)[7] "is structurally similar to Congress's power over bankruptcy." (Doc. No. 62 at 19). This Court declines to paint with such a broad brush. Plaintiffs miss an important distinction between *Katz* and the case at hand; the Supreme Court was very careful to keep the holding narrow in *Katz*, repeatedly emphasizing the "*in rem*" nature of bankruptcy proceedings and the "*in rem*" jurisdiction of the bankruptcy courts. *Katz*, 546 U.S. at 378 ("In ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts."). Consequently, this Court declines to extend the holding of *Katz* to apply to copyright claims.

More importantly, the Fifth Circuit in *Chavez* answered this question concerning States' immunity from copyright suits, and rejected the Plaintiffs' position. *Chavez v. Arte Publico Press*, 204 F.3d 601, 603 (5th Cir. 2000). The court held that abrogation of a State's Eleventh Amendment sovereign immunity turns on an "express statement of intent" by Congress and a constitutionally valid exercise of power. *Id.* at 503 (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55

---

[7] "The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. Art. I, § 8, cl. 8.

(1996)). The court found that there had not been an express statement of intent or constitutionally valid exercise of power by Congress abrogating State sovereign immunity with regard to copyright actions. *Id.* at 607.[8] Plaintiffs ask this Court to disregard the Fifth Circuit's holding, arguing that when *Chavez* was decided, states were not in the habit of engaging in commercial, intellectual property-based enterprises as they are today. (*See* Doc. No. 62 at 17). Plaintiffs cite one hundred and fifty-four cases that have been filed since *Chavez* was decided, all of which represent situations where a government entity either had or could have asserted immunity against alleged copyright violations. (*Id.*; Ex. E).[9] Plaintiffs point out how the number of copyright cases against state actors has "ballooned" from seven cases pre- *Chavez* to one hundred and fifty-four since the *Chavez* decision in 2000. (*Id.*). While this increase may be a barometer demonstrating an increase in commercial activity by the States or an increase in litigation (especially in areas concerning intellectual property), or both, the increase itself does not tell the entire story. A survey of these cases demonstrates that less than five percent of the courts involved were willing to allow cases to proceed against state entities despite the Eleventh Amendment.[10] Despite these lopsided results, this Court is not unsympathetic to the reasoning behind the argument that once a State leaves the

---

[8] The *Chavez* case has a long, somewhat torturous history of vacated and remanded opinions stemming from Supreme Court opinions handed down while the suit was pending before the Fifth Circuit. *See Chavez v. Arte Publico Press*, 180 F.3d 674 (5th Cir. 1999) (per curiam) ("The court voted to hear this case en banc, thereby vacating the panel opinion. *See Chavez v. Arte Publico Press*, 139 F.3d 504 (5th Cir.), revised and superseded by 157 F.3d 282 (5th Cir.), reh'g granted and opinion vacated, 178 F.3d 281 (5th Cir.1998). While the case was awaiting oral argument, the Supreme Court decided *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666 (1999), and *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627 (1999). We now REMAND this case to the panel for reconsideration in light of these decisions.").

[9] Although Plaintiffs ask the Court to circumvent binding precedent, and this Court is of course bound by the Fifth Circuit precedent before it and ultimately declines to adopt their reasoning, the Court thought the Plaintiffs' arguments were worth noting.

[10] In fact, a survey of these cases indicates that only five courts have actually allowed a case to proceed against the state entity. None of these courts are in the Fifth Circuit, so none are bound by the dictates of *Chavez*. A more detailed analysis of these cases is found in the Appendix.

realm of performing traditional state functions[11] and enters the commercial marketplace, it should be treated just like any other commercial entity and that the failure to do so leads to results that are less than uniform. Additionally, the Court realizes that even within the smaller subset of colleges which may step into the commercial arena, this principle leads to disparate results as one public college (e.g., San Jose State) may be protected from having to defend an intellectual property lawsuit while another mere minutes away (e.g., Stanford) may be forced to participate in the same litigation for the very same activity.[12] The resolution of this disparity, however, is beyond the province of a district court which is not only bound by the demands of the Constitution, but also by controlling Circuit precedent.

The Court holds that the State (and consequently, the University) retains its Eleventh Amendment sovereign immunity in copyright cases. The Eleventh Amendment confers waivable immunity upon sovereign entities. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997). The purpose of the Eleventh Amendment is to prevent states from being "compelled to litigate" in suits it neither consented to nor initiated. *Id.* The University is an arm of the state. *Eustice v. Tex. A&M Univ.*, 4:15-cv-3180, 2016 WL 87104444, at *3 (Sept. 30, 2016) ("As a state-funded state institution of higher education, TAMU is an arm of the state and, therefore, immune from suit."); *see also* Tex. Educ. Code § 86.02. Plaintiffs do not contend that the State of Texas or the University waived immunity for copyright claims or consented to be sued in Federal court, and Congress has not abrogated the States' immunity for this cause of action. *See Chavez*, 204 F.3d at 603; *Coll. Savings Bank v. Fl. Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666 (1999); *Fl.*

---

[11] This Court will not opine as to whether the establishment and maintenance of a strong football program falls under the umbrella of a traditional state function. Although the Court has an idea what the answer to that question would be in Texas, it suspects that a poll of all fifty states on that topic would also lead to a disparity of results.

[12] This incongruous result could occur in this community just as easily. While Texas Southern University and University of Houston might have Eleventh Amendment protection, Rice University, for the same activity, would not. The University of Texas Medical School would have immunity, while Baylor College of Medicine might not.

17

*Prepaid Postsecondary Ed. Expense Bd. v. Coll. Savings Bank*, 527 U.S. 627 (1999). Therefore, the Court finds that substitution of the University would be improper. Accordingly, Plaintiffs' copyright claims against the A&M Athletic Department are dismissed.

2. *Takings Claim Under Constitution of the State of Texas*

In the alternative, Plaintiffs assert state and federal takings claims against the A&M Athletic Department. (Doc. No. 15 at 30–32). Plaintiffs argue that Defendant A&M Athletic Department took, damaged, or destroyed Plaintiffs' property through its blatant and intentional infringement of Plaintiffs' copyright, to the benefit of A&M Athletic Department, without adequate compensation. (*Id.* at 31). Plaintiffs claim that Bynum owns the exclusive copyrights to the 12th Man book and the Gill Biography, and that this is a property interest protected by section 17 of Article 1 of the Constitution of the State of Texas. (*Id.* at 3–31). They further contend that the Athletic Department's actions constitute a taking in violation of the Fifth and Fourteenth Amendments of the United States Constitution. (*Id.* at 32).

As noted above, the A&M Athletic Department is not an entity with capacity to sue or be sued, and, therefore, the takings claims must be dismissed on that basis. Defendants contend further that the Court may not substitute the proper party in interest, the University, an arm of the State, as a party because it enjoys sovereign immunity.

Nevertheless, even if the Court were to substitute the University as the proper party, the state law claims under the Texas Constitution are barred by the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984) (holding that a claim brought in federal court under state law against a State is barred by the Eleventh Amendment). Therefore, the state law takings claims must be dismissed without prejudice for lack of jurisdiction.

3.  *Takings Claims Under the Constitution of the United States*

The Fifth Circuit has held that takings claims against a state for monetary damages under the Fifth Amendment to the United States Constitution are barred by the Eleventh Amendment. *See John G. and Marie Stella Kenedy Mem'l Found. v. Mauro*, 21 F.3d 667, 674 (5th Cir. 1994) ("[A] Fifth Amendment inverse condemnation claim brought directly against the State . . . is . . . barred by the Eleventh Amendment."); *McMurtray v. Holladay*, 11 F.3d 499, 504 (5th Cir. 1993) ("Even if the Act amounted to a 'taking' under the Fifth Amendment . . . the [] claim would be barred because under the Eleventh Amendment, a citizen may not sue his own state in federal court.").[13]

The Fifth Amendment to the United States Constitution provides that private property shall not "be taken for public use, without just compensation." U.S. CONST. amend. V.  The "Just Compensation Clause" applies to the States through the Fourteenth Amendment. *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 176 & n.1 (1985) (citing cases). Contrary to Plaintiffs' contentions, the United States Supreme Court and the Court of Appeals for the Fifth Circuit have repeatedly held that a takings claim under the Just Compensation Clause is not ripe until a plaintiff seeks compensation through the procedures the state has provided. *See id.* at 194 (noting that "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes the taking of property *without just compensation*") (emphasis added) (citation omitted); *Rolf v. City of San Antonio*, 77 F.3d 823, 826–27 (5th Cir. 1996) ("A just

---

[13] In the context of prospective injunctive relief, however, the Fifth Circuit has held that the Eleventh Amendment did not bar a landowner's federal takings claim. See Severance v. Patterson, 566 F.3d 490, 495 (5th Cir. 2009) (holding that the *Ex Parte Young* exception to Eleventh Amendment immunity applies in the context of a Fifth Amendment takings claim seeking prospective injunctive relief against a state). Plaintiffs seek solely monetary damages, not prospective injunctive relief, for their federal takings claims. (Doc. Nos. 15 at 32–33). Therefore, substituting the University, a party with capacity to be sued, would be futile because the monetary claims against it, as an arm of the State of Texas, are barred by the Eleventh Amendment. In addition, even if Plaintiffs had sought solely prospective injunctive relief against the proper party in interest, their federal takings claim is not ripe.

compensation claim is not ripe, that is, there is no justiciable case or controversy, until the claimant unsuccessfully has sought compensation from the state, unless that state's procedures are inadequate."); *Waltman v. Payne*, 535 F.3d 342, 348 (5th Cir. 2008) (holding that a takings claim is not ripe until (1) the relevant governmental unit has reached a final decision as to what will be done with the property and (2) the plaintiff has sought compensation through whatever adequate procedures the state provides); *Sandy Creek Investors, Ltd. v. City of Jonestown, Tex.*, 325 F.3d 623, 626 (5th Cir. 2003) (same) (citing cases). In order to show that state procedures are not adequate, a plaintiff must show that they "almost certainly" would not be compensated under Texas law. *See John Corp. v. City of Houston*, 214 F.3d 573, 581 (5th Cir. 2000). "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Williamson*, 473 U.S. at 195.

"Texas provides an inverse condemnation action for violation of article I, section 17 of the Texas Constitution." *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 646 (Tex. 2004). Inverse condemnation occurs when a property owner seeks compensation for property taken for public use without process or a proper condemnation proceeding. *City of Abilene v. Burk Royalty Co.*, 470 S.W.2d 643, 646 (Tex. 1971). As Defendants point out, "sovereign immunity does not shield the State of Texas from a claim based on a taking under Article I, section 17 of the Texas Constitution, known as the 'takings clause,'" in state court. *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2009). A claimant seeking damages in Texas state court for a taking under Article I, Section 17 must show that a governmental actor acted intentionally to take or damage property for a public use. *Id.*

20

Although Plaintiffs assert that state procedures are inadequate, they fail to plead facts to show that they "almost certainly" would not be compensated under Texas's inverse condemnation procedure, nor have they alleged that they have utilized the state procedures and have been refused just compensation. Instead, they contend that *Williamson* does not apply because the property taking in this case is "complete" in the sense that the alleged infringement has already occurred. (Doc. No. 93 at 8–9). This contention ignores clear Supreme Court and Fifth Circuit precedent, which requires not only that the taking be complete in the sense that the relevant governmental unit has come to a final decision as to what will be done with the property (the first prong of the ripeness requirement), but also that the plaintiff has pursued his claim in state court (the second prong of the ripeness requirement). *See Williamson*, 473 U.S. at 194-95 (explaining the second prong); *Waltman*, 535 F.3d at 348 (setting forth the two prongs of the ripeness analysis); *Sandy Creek Investors, Ltd.*, 325 F.3d at 626 (same). Since they have not alleged facts to indicate that they have adjudicated their state law takings claims in state court, Plaintiffs' federal takings claims are not ripe for adjudication. Accordingly, even if they had named the proper party in interest, Plaintiffs' federal taking claim is premature and must be dismissed as not being ripe.

### b. Claims against the 12th Man Foundation

Plaintiffs allege that the Foundation is liable for contributory and vicarious copyright infringement for their purported role in the distribution of the allegedly infringing work. (Doc. No 15 at 26–27). As previously mentioned, for a claim for contributory infringement to survive a Motion to Dismiss, Plaintiffs must plead facts indicating that Defendants (1) had knowledge of the infringing activity and (2) induced, caused, or materially contributed to the infringing activity. *DynaStudy*, 325 F. Supp. 3d at 775. For Plaintiffs' claim for vicarious infringement to survive, Plaintiffs must allege facts demonstrating that Defendants (1) had the right and ability to supervise

21

the alleged infringer and (2) had a financial interest in or benefitted financially from the infringement while making no attempt to derail the infringement. *Grokster*, 545 U.S. at 930.

A contributory infringer must have "knowledge of the infringing activity"; in the present case, Plaintiffs failed to plead facts indicating that the Foundation or any employee thereof had knowledge of the infringement. *Alcatel*, 166 F.3d at 790. Moreover, Plaintiffs' allegations to this effect are conclusory: "Defendants at all times had knowledge of these acts and the infringement of the Gill Biography." (Doc. No. 15 at 27). Plaintiffs do no more than "lump" the Foundation together with other Defendants, failing to allege facts about what, specifically, the Foundation did to contributorily infringe. *See Hinojosa v. Livingston*, 807 F.3d 657, 684 (5th Cir. 2015) ("When the plaintiff's complaint uses blanket terms covering all the defendants, by lumping them together or calling them collectively [defendants], these allegations are properly disregarded."). Plaintiffs do not allege plausible facts indicating that the Foundation had any knowledge that Marquardt had his secretary "key in" the Gill Biography and remove the copyright management information, or that he offered the allegedly infringing work for publication on the University's website. *See DynaStudy*, 325 F. Supp. 3d at 777 (dismissing the plaintiff's contributory infringement claim, finding that its mere allegation that defendant "had 'reasonable grounds to believe' that his actions would induce infringement" was insufficient to survive a motion to dismiss). Plaintiffs allege that in 2006, Bynum emailed an early draft of the work to Foundation personnel, but do not allege that this had any implication on the eventual infringing activity, which occurred years later. (Doc. No. 15 at 10). Accordingly, Plaintiffs' claim against the Foundation for contributory infringement is dismissed.

Plaintiffs' claim of vicarious infringement is also dismissed. Plaintiffs have pleaded facts satisfying the second element of vicarious infringement (that being the possibility of a financial

reward), but not the first element. Plaintiffs allege that the Foundation had a financial interest in using the Gill Biography to protect the 12th Man brand because it relies on the tradition to generate donations, its primary source of funding. (Doc. No. 15 at 27). Regardless, Plaintiffs have not pleaded facts indicating that the Foundation had supervisory authority over Marquardt (or any of the other allegedly direct infringers).[14] Thus, Plaintiffs claim for vicarious infringement against the Foundation is dismissed.

### c.  Claims against Marquardt

Plaintiffs allege that Marquardt (in his individual capacity) is liable for direct and contributory infringement as well as violations of the DMCA. As stated above, Marquardt is the Associate Director of Media Relations for the A&M Athletic Department, and is responsible for the "@AggieFootball" Twitter account. Defendants respond that, as an employee of the state, Marquardt is entitled to qualified immunity.[15]

### 1.  Qualified Immunity

Claims against a public official in his or her individual capacity are subject to the defense of qualified immunity. *See, e.g., Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 338 (5th Cir. 2003). In addressing a public official's claim to qualified immunity, courts apply the following test. First, the court must determine whether the plaintiff has made a sufficient showing that the official violated a clearly established constitutional or statutory right. *Id.* at 337. Next, if the answer to this question is in the affirmative, courts ask whether the official's actions were objectively reasonable

---

[14] Plaintiffs have not alleged that any of the individually named defendants are employed by the 12th Man Foundation. (Doc. No. 15 at 4–5).

[15] Plaintiffs disagree that the individually named Defendants are qualifiedly immune because, according to Plaintiffs, "the Athletic Department [which employs these Defendants] is neither the State nor an arm-of-the State." (Doc. No. 62 at 39). As such, Plaintiffs conclude that these Defendants are "not State employees." (*Id.*). The Court has overruled Plaintiffs' underlying argument that the Athletic Department has a separate legal existence. On those same grounds, the Court overrules Plaintiffs' argument on this point.

in light of the clearly established right. *Id.* Thus, "[t]he second prong of this task actually subdivides into two inquiries: (a) whether the allegedly violated rights were clearly established at the time of the incident and (b) whether the violators' conduct was objectively unreasonable in light of those rights." *Khan v. S. Univ. & Agric. & Mech. Coll. Bd. of Supervisors*, No. 03-30169, 2005 WL 1994301, at *3 (5th Cir. Aug. 19, 2005). At the motion to dismiss stage, "it is the defendant's conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness.'" *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).

First, Plaintiffs have pleaded facts demonstrating that Marquardt violated a clearly established right. Courts have found that "copyright protection is [a] clearly established" right. *Campinha-Bacote v. Bleidt*, No. H-10-3481, 2011 WL 4625394, at *3 (S.D. Tex. Oct. 3, 2011). Relatedly, the prohibition against altering copyright management information also protects a "clearly established right" (and a well-known practice in academia). *See* 17 U.S.C. § 1202.

Next, Plaintiffs have pleaded facts which meet the second prong of the qualified immunity analysis. Plaintiffs allege that Marquardt violated Bynum's exclusive rights in his work when Marquardt asked his secretary to "key in" the Gill Biography, removed the copyright management information, and offered the work for distribution via the University's e-Newsletter. Drawing every inference in the light most favorable to Plaintiffs, as the Court must do at this stage, the Court finds that an objectively reasonable individual would have known (or had reason to know) that taking a work authored by another, having one's secretary type it up—omitting all indication of who owned or had edited the work—and distributing the work via an e-Newsletter, was bound to violate U.S. copyright laws. Marquardt allegedly included Whit Canning's name on the infringing work; however, this alone does not tip the scale in his favor at this stage. (Doc. No. 34

at 22). Accordingly, the Court denies Marquardt qualified immunity based on the allegations of infringement and the DMCA violations asserted in Plaintiffs' well-pleaded complaint.

### 2. Direct Infringement

The facts described above that prompted the Court to deny Marquardt's qualified immunity defense also establish a prima facie case of direct copyright infringement. Specifically, Plaintiffs have alleged that Marquardt had access to Bynum's work and that the allegedly infringing work bears probative similarity to the copyrighted work. First, Bynum contends that in June of 2010, he emailed a draft copy to Marquardt and Glen Johnson, a photographer with the Athletic Department. Next, Plaintiffs claim that the Gill Biography that was distributed via the e-Newsletter was a "near verbatim copy" of the draft Bynum had previously sent to Marquardt and Johnson. It is reasonable to infer that this "near verbatim" reproduction encompassed enough of the protectible aspects of Bynum's copyrighted work to constitute appropriation of the same. For purposes of the Motion to Dismiss analysis, Plaintiffs have pleaded facts indicating that Marquardt infringed Bynum's exclusive rights to his work.

### 3. Contributory Infringement

Plaintiffs have also alleged that Marquardt contributorily infringed Bynum's work when he tweeted from the "@AggieFootball Twitter account hyperlinking to the page on the A&M Athletic Department website displaying the infringing article." (Doc. No. 15 at 27). Indeed, this act, as alleged, meets both prongs of the contributory infringement test. Marquardt (1) had knowledge of the infringing activity (Plaintiffs allege that he created the allegedly infringing work in the first place), and (2) materially contributed to the infringing activity (e.g., distribution) by posting a link to the allegedly infringing work on the department's Twitter page, resulting in wider

distribution. Accordingly, Plaintiffs have pleaded facts indicating that Marquart contributorily infringed Bynum's work.

It should be noted that "it is not plausible to hold [an actor] liable secondarily" for the infringement that the actor committed directly. *DynaStudy*, 325 F. Supp. 3d at 776. Nevertheless, since Plaintiffs may plead their claims in the alternative, their direct and indirect infringement claims may survive against Marquardt at this stage (regardless that, as a matter of law, he cannot ultimately be held liable for both).

### 4. DMCA Violations

Plaintiffs also allege that Marquardt violated one of the provisions of the DMCA. 17 U.S.C. §1202. The DMCA prohibits falsifying, removing, or altering "copyright management information." *Id.* at (a)–(b). Plaintiffs have pleaded sufficient facts indicating that Marquardt knew or should have known who the "yellowed" page "story of the 12th Man" belonged to based on the copyright management information that Plaintiffs allege was included in the PDF draft Bynum sent Marquardt in 2010. (Doc. No. 15 at 22). Plaintiffs also emphasize that Bynum was emailing with Marquardt about the 12th Man book in the months leading up to the distribution of the allegedly infringing work. (*Id.* at 14). Plaintiffs claim that this fact makes it more improbable that Marquardt simply forgot who provided him with the Gill Biography; Plaintiffs allege that he should have at least "remembered" that it did not belong to him. Plaintiffs also claim that in the "near verbatim" copy that appeared online, Marquardt removed and omitted all indication of who owned or had edited the work. Drawing all inferences in the light most favorable to the Plaintiffs, as the Court must do at this stage, the Court finds that Plaintiffs have sufficiently pleaded their claim against Marquardt for DMCA violations.

### d.  Claims Against Cannon

Plaintiffs allege that Cannon (in his individual capacity) is liable for direct and contributory infringement. Cannon is the Associate Athletic Director of Media Relations for the A&M Athletic Department. Plaintiffs allege that Cannon is responsible for handling media relations for A&M's sports programs and that he is responsible for the content of the website. (Doc. No. 15 at 5). Defendants respond that Cannon, like Marquardt, is entitled to qualified immunity. The Court will apply the qualified immunity analysis to each claim before determining whether Plaintiffs have pleaded sufficient facts to overcome Defendants' Motion to Dismiss on that point.

#### 1.  Direct Infringement

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Cannon has a qualified immunity defense to Plaintiffs' infringement claims. As mentioned above, Plaintiffs have met the first prong of the qualified immunity analysis because copyright protection is a clearly established right. Regardless, Plaintiffs have failed to plead facts indicating that Cannon's conduct was "objectively unreasonable" under the second prong of the qualified immunity analysis. It was not objectively unreasonable for Cannon to have "approved the distribution and display" of the allegedly infringing work where Plaintiffs have failed to plead facts indicating that Cannon had any knowledge that the work he was approving violated any law or copyright. (Doc. No. 15 at 25); *see Malley*, 475 U.S. 341; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (finding that an officer is entitled to qualified immunity if a reasonable officer could have believed his or her actions were lawful in light of information he or she possessed at the time).

Moreover, even if Cannon's qualified immunity defense failed, in order to survive the Motion to Dismiss on this point, Plaintiffs' pleaded facts would still fall short as to the first element

of a direct infringement claim (actual or constructive copying).[16] Plaintiffs have not alleged that Cannon "actually copied" the Gill Biography. Plaintiffs have also failed to allege that Cannon had access to the copyrighted work. Plaintiffs contend that "Bynum informed . . . Cannon of his research and work to develop the 12th Man book in order to confirm certain facts about Gill's athletic tenure at Texas A&M." (Doc. No. 62 at 44–45). Nevertheless, Cannon's alleged awareness of Bynum's research does not equate to his access to Bynum's copyrighted work. As described above, without access to the original work, constructive copying—that is, probative similarity between the original and the copy—cannot be established. Accordingly, Plaintiffs' claim for direct infringement against Cannon fails.

### 2.  Contributory Infringement

Based on this record, Cannon is also entitled to the protection of qualified immunity for this alleged indirect infringement. The second-prong of the qualified immunity analysis requires the Court to determine whether the defendant acted as a "reasonable official" would under the circumstances. In cases, as here, where the defendant is the secondary actor in the infringement (e.g., is accused of indirect infringement) and has asserted a qualified immunity defense, a plaintiff must demonstrate that the defendant had actual or constructive knowledge of the underlying direct infringement. *See Alcatel*, 166 F.3d at 790.

While copyright protection constitutes a clearly established right, the dispositive question here is "whether an objectively reasonable official would understand that the alleged improper actions were unlawful." *Campinha-Bacote*, 2011 WL 4625394, at *3. Without actual or constructive knowledge of the alleged copying, a reasonable official would not be able to discern whether the act was unlawful. *See Anderson*, 483 U.S. at 641. Here, Plaintiffs have not alleged

---

[16] "A copy is legally actionable if (1) the alleged infringer actually used the copyrighted material to create his own work, and (2) substantial similarity exists between the two works." *Alcatel*, 166 F.3d at 790.

facts indicating that Cannon knew (or had reason to know) about the underlying infringement. Thus, it cannot be said that a reasonable official would have known that publishing the allegedly infringing work online was improper or unlawful in itself. As such, Plaintiffs' claims against Cannon are dismissed.

### e. Claims Against Stephenson

Finally, Plaintiffs allege that Stephenson (in his individual capacity) is liable for direct and contributory copyright infringement. As stated above, Stephenson is the former Director of News and Information Services at the University. Plaintiffs allege that in 2014, when the events at issue occurred, Stephenson was responsible for the content of the University's e-Newsletter, website, and Twitter account, "@TAMU." (Doc. No. 15 at 5). Once again, Defendants assert qualified immunity. As above, the Court will begin with the qualified immunity analysis for each claim.

### *1.  Direct Infringement*

Stephenson has a qualified immunity defense to Plaintiffs' infringement claims. To overcome the qualified immunity defense, Plaintiffs must allege facts showing that a clearly established right was violated, and that Stephenson's actions were "objectively unreasonable" in light of this right. *See Khan,* 2005 WL 1994301, at *3. First, as described above, copyright protection is a clearly established right. Regardless, Plaintiffs have failed to allege facts showing that Stephenson's conduct was "objectively unreasonable" under the second prong of the analysis. A claim of direct infringement requires a showing that the alleged infringer actually or constructively copied the copyrighted work.[17] Thus, acting unreasonably under these circumstances would mean that Stephenson had actually or constructively copied the Gill Biography. Plaintiffs have failed to plead facts indicating that that Stephenson was even aware that

---

[17] As described above, "constructive copying" may be based on circumstantial proof of access to the work plus probative similarity between the original and infringing works. *See Alcatel,* 166 F.3d at 790.

the Gill Biography existed, much less that he actually copied or had access to the original work. The Court finds that Plaintiffs have failed to plead sufficient facts to overcome Stephenson's qualified immunity defense.

Even if Stephenson's qualified immunity defense had been overruled, Plaintiffs' direct infringement claim against him would still fail. Plaintiffs' only allegations against Stephenson on this point state that Stephenson "featured" the hyperlink to the allegedly infringing work in the e-Newsletter and promoted the allegedly infringing work from the "@TAMU" Twitter account. (Doc. No. 15 at 5, 25). Neither of these allegations satisfy the elements of a direct infringement claim which, of course, are (1) actual or constructive copying and (2) improper appropriation. Although Plaintiffs have alleged that the infringing work is a "near verbatim copy" of the original, there are no allegations that Stephenson was responsible for creating this copy (or that he even had access to the original work). It cannot be said that Stephenson's actions, as alleged, meet the elements of a direct infringement claim. The direct infringement claims against Stephenson are dismissed.

### 2. *Contributory Infringement*

Under this same reasoning, it similarly cannot be said that Stephenson acted unreasonably under Plaintiffs' contributory infringement theory. A reasonable individual would not have known that merely circulating a hyperlink to an article, which a coworker flagged for distribution, was improper or unlawful.[18] Accordingly, Stephenson is qualifiedly immune from suit for this claim as well.

Assuming *arguendo* that Stephenson was not entitled to qualified immunity, Plaintiffs' claim would still fail. Plaintiffs allege that Stephenson contributorily infringed Bynum's

---

[18] *See* the Court's analysis for Cannon's qualified immunity defense to contributory infringement, *supra*.

copyrighted work because Stephenson was responsible for a promotional tweet from the "@TAMU" Twitter account. This tweet, similar to that from the "@AggieFootball" account, hyperlinked to the allegedly infringing work. Plaintiffs also contend that Stephenson created the e-Newsletter that featured the link to the allegedly infringing work. Nevertheless, Plaintiffs' claim against Stephenson for contributory infringement fails—Plaintiffs have not alleged any facts indicating that Stephenson knew or should have known about the infringing activity. While a finding of contributory infringement does not require actual knowledge of particular *instances* of infringement, the plaintiff must still plead facts indicating that the defendant knew or should have known about the alleged direct infringement of another prior to the filing of the suit. *DynaStudy*, 325 F. Supp. 3d at 777 (citing *Alcatel*, 166 F.3d at 790). As alleged, Stephenson perhaps contributed to the infringement by compiling the e-Newsletter that ultimately distributed a link to the allegedly infringing work; however, absent particularized facts as to Stephenson's actual or constructive knowledge of the alleged direct infringement, Stephenson cannot be held liable due to qualified immunity. The contributory infringement claims against Stephenson are dismissed.

## IV.    Conclusion

For the foregoing reasons, the Court hereby **GRANTS** Defendant Texas A&M 12th Man Foundation's Motion to Dismiss (Doc. No. 33) and **GRANTS in part** and **DENIES in part** the other Defendants' Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim (Doc. No. 34). Consequently, Plaintiffs' copyright related claims against the A&M Athletic Department, 12th Man Foundation, Cannon, and Stephenson are **DISMISSED**. Additionally, Plaintiffs' takings claims based on federal law are **DISMISSED**. Plaintiffs' takings claims based on state law are

**DISMISSED without prejudice**. Finally, Defendants' Motion to dismiss is **DENIED** as to Defendant Marquardt.

Signed this 29th day of March, 2019.

Andrew S. Hanen
United States District Judge

# APPENDIX

# **APPENDIX**

This Court's review found only five cases that arguably support the Plaintiffs' position here:

In *Berry v. Alabama*, Civ. A. No. 99-C-1053-NE (N.D. Ala. May 25, 1999), there is no discussion as to why the University's motion was denied, nor is there any access to the pleadings to aid in the understanding of the nature of the case and the relief sought.  The motion to dismiss was denied on May 25, 1999, just one month before the United States Supreme Court decided *Florida Prepaid* and a year before the Fifth Circuit decided *Chavez*.  Although the complete absence of available analysis leaves this Court little on which to base a conclusion. It is possible that the district court in Alabama interpreted the Copyright Remedies Clarification Act ("CRCA") as validly abrogating the States' Eleventh Amendment immunity, which is not the law in the Fifth Circuit since *Florida Prepaid* and *Chavez*. Since this opinion, the Eleventh Circuit has issued an opinion overruling this (potential) holding in favor of valid abrogation. *Nat'l Ass'n of Bds. of Pharm. v. Bd. of Regents of the Univ. of Georgia*, 633, F.3d 1297, 1313–1317 (2011) (finding "Congress may not abrogate the State's sovereign immunity pursuant to the Copyright and Patent Clause," and overruling the appellant's alternative argument that "§ 5 of the Fourteenth Amendment supports Congress' abrogation of the State's sovereign immunity under the CRCA.").

In *Cambridge Press et al. v. Becker et al.*, Civ. A. No. 1:08-cv-1425-ODE (N.D. Ga. Sept. 30, 2010), the district court found that the *Ex Parte Young* exception applied to claims for contributory copyright infringement where the plaintiffs sought solely prospective injunctive relief.  After granting summary judgment on all of the claims except the contributory infringement claim, the court cautioned plaintiffs:

> "Under *Ex parte Young*, 209 U.S. 123 (1908), suit against Defendants is allowed to the extent that it seeks "*prospective* equitable relief to end *continuing* violations of federal law." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999).  Plaintiffs must therefore satisfy the "ongoing and continuous" requirement from *Ex Parte Young* in order to receive prospective relief. *Id.* at 1338."

*Cambridge Press*, Civ. A. No. 1:08-cv-1425-ODE, Doc. No. 235 at 30 n. 8.  Notably, Plaintiffs here do not seek "prospective" injunctive relief for an "ongoing and continuous" violation of federal law.  This is a key distinction and renders this case inapplicable to Plaintiffs' claims for monetary damages against an arm of the State of Texas.

*Keeton v. Board of Education*, Civ. A. No. 1:15-cv-1036-LPS-CJB (D. Del. Oct. 12, 2016), is a First Amendment case against officials and a county school board; it has nothing to do with a State's invocation of Eleventh Amendment immunity.  It does not mention the Eleventh Amendment, perhaps because the Defendant is an arm of a municipality rather than a State.  This case is inapposite and does not address a state's Eleventh Amendment immunity or lack thereof for copyright infringement.

In *Oracle v. The Oregon Health Insurance Exchange Corp.*, Civ. A. No. 3:14-cv-1279-BR (D. Or. Nov. 18, 2015), the court found that Oregon waived its immunity in a forum selection clause in a contract with Plaintiff. Here, there is no contract, no forum selection clause, nor any other contractual device that could arguably waive the State of Texas' sovereign immunity for this lawsuit.

In *Allen et al. v. Cooper*, Civ. A. No. 5:15-cv-00627-BO (E.D.N.C. Mar. 23, 2017), plaintiffs, who were in the business of taking photographs and video of shipwrecked vessels and publishing them, sued defendant Governor of the State of North Carolina and other state officials for copyright infringement for publishing some of their works on the internet. Defendants settled with Plaintiffs for $15,000 and signed a settlement agreement. After settling the copyright dispute, North Carolina passed a statute declaring all photographs, video recordings, or other documentary materials of a derelict vessel or shipwreck in the custody of any agency of the State were public record and prohibiting any limitations on the use of those photographs or videos.

Plaintiffs sued the State, asserting a copyright infringement and a takings claim. Defendants moved to dismiss on the basis of Eleventh Amendment immunity. Reasoning that neither the United States Supreme Court nor the Fourth Circuit had directly ruled on the issue, the court found that, contrary to Fifth Circuit law in *Chavez*, Congress had validly abrogated states' sovereign immunity based on section 5 of the Fourteenth Amendment. [Doc. No. 69 at 9]. The district court further challenged Supreme Court precedent in *Hans v. Louisiana*, 134 U.S. 1 (1890), and its progeny, calling the general doctrine of state sovereign immunity "flawed and contrary to the fundamental nature and meaning of the Constitution." [Doc. No. 69 at 10]. The court notes several learned scholars who question the long-standing doctrine of sovereign immunity. [*See id.* at 11 n.5]. The court concluded that the Eleventh Amendment means that a state may not be sued by a citizen of another state in federal court where the basis of jurisdiction lies solely on diversity. [*Id.* at 12]. It then questioned stare decisis and the moorings of the Eleventh Amendment, but later relented, stating that it is "constrained, under the absolute hierarchical system of courts in the federal judiciary, to hold that the defense of sovereign immunity is available to the states in federal court in a case arising under this Court's federal question jurisdiction." [*Id.* at 17]. The court went on to hold, nonetheless, that Congress validly abrogated sovereign immunity and that "such an abrogation was congruent and proportional to a clear pattern of abuse by the states." [*Id.*] The court found that the state law claims were barred by sovereign immunity, however. [*Id.* at 18].

The Fourth Circuit rejected the district court's conclusion that Congress had validly abrogated sovereign immunity and reversed "each of the district court's rulings on immunity and remand with instructions that the district court dismiss without prejudice Allen and Nautilus's claims against North Carolina, the Department, and the public officials acting in their official capacities and to dismiss with prejudice the remaining claims against the officials in their individual capacities." *Allen v. Cooper*, 895 F.3d 337, 358 (4th Cir. 2018). Plaintiffs have filed a petition for a writ of certiorari in the United States Supreme Court.

In sum, each of these cases is distinguishable from the present case or wholly inapplicable. The closest analog is the *Allen* case. At the time the decision was rendered, the Fourth Circuit had not directly addressed whether Congress had validly abrogated sovereign immunity when it

enacted the CRCA.  The Fourth Circuit has now decidedly rejected the district court's conclusion and reversed.  Consequently, even the most favorable cases Plaintiffs refer to, do not really help them.