# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL J. BYNUM and CANADA HOCKEY LLC d/b/a EPIC SPORTS, | § § § § | Civil Action No. 4:17-cv-00181 |
| *Plaintiffs*, | § § | OMAN Amicus Brief |
| vs. | § § | |
| TEXAS A&M UNIVERSITY ATHLETIC DEPARTMENT; TEXAS A&M UNIVERSITY 12TH MAN FOUNDATION; BRAD MARQUARDT, in his individual capacity; ALAN CANNON, in his individual capacity; and LANE STEPHENSON, in his individual capacity, | § § § § § § § § § § § § | |
| *Defendants*. | § | |

---

## *AMICUS CURIAE* RALPH OMAN'S BRIEF IN SUPPORT OF PLAINTIFFS' PENDING MOTION FOR RECONSIDERATION

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………3

STATEMENT OF INTEREST OF AMICUS CURIAE…………………………...4

QUALIFICATIONS………………………………………………………………..6

ARGUMENT………………………………………………………………………9

CONCLUSION……………………………………………………………………16

# TABLE OF AUTHORITIES

## Cases

*Allen v. Cooper* 517 U.S. 44 (2020)

*Atascadero State Hospital v. Scanlon,* 473 U.S. 234 (1985)

*Chavez v. Arte Publico Press,* 204 F3d 601 (5th Cir. 2000)

*United States v. Georgia,* 546 U.S. 151 (2006)

## Constitutional, Statutory, and Regulatory Provisions

U.S. Const. art. I, § 8, cl. 8

Pub. L. No. 101`-553, 104 Stat. 2749

52 Fed. Reg. 42,045 (Nov. 2, 1987)

## Other Authorities

*Copyright Remedy Clarification Act and Copyright Office Report on Copyright Liability of States:  Hearing on H.R. 1131 Before the Subcomn. on Courts, Intellectual Property, and the Administration of Justice of the H. Comm. On the Judiciary,* 101st Cong.  (1989)

Letter from Reps. Robert W. Kastenmeier & Carlos Moorhead, H. Subcomm. On Courts, Civil Liberties, and the Administration of Justice, to Ralph Oman, Register of Copyrights (Aug. 3 1987)

Letter from Ralph Oman, Register of Copyrights, to Reps. Robert W. Kastenmeier & Carlos Moorhead, H. Subcomm. On Courts, Civil Liberties, and the Administration of Justice (June 27, 1988)

U.S. Copyright Office, *Copyright Liability of States and the Eleventh Amendment: A Report of Register of Copyrights* (June 1988)

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

I, Ralph Oman, submit this brief as *amicus curiae* in support of plaintiff's

Motion for Reconsideration.  I submitted an amicus brief in *Allen v. Cooper,* 517

U.S. 44 (2020) and my name was mentioned expressly on several occasions during

oral argument and in Justice Kagan's written opinion.  *See, generally* my amicus

brief attached as Appendix F.  I served as the Register of Copyrights of the United

States from 1985 to 1994, and I am currently the Pravel, Hewitt, Kimball, and

Kreiger Professorial Lecturer in Intellectual Property and Patent Law at the George

Washington University Law School.  Before Congress passed the Copyright

Remedy Clarification Act ("CRCA") Pub. L. No. 101-553, 104 Stat. 2749 (1990),

the U.S. House of Representatives asked me for "assistance with respect to the

interplay between copyright infringement and the Eleventh Amendment," and to

investigate the "practical problems relative to the enforcement of copyright against

state governments."  Letter from Reps. Robert W. Kastenmeier & Carlos

Moorhead, H. Subcomm. on Courts, Civil Liberties & the Admin. of Justice, to

Ralph Oman, Register of Copyrights, at 1 (Aug. 3, 1987) ("1987 Letter to Oman"),

in U.S. Copyright Office, *Copyright Liability of States and the Eleventh*

---

[1] The parties have not consented to the filing of this brief.  No counsel for a party authored this brief in whole or in part; and no such counsel, any party, or any other person or entity---other than amicus curia---made a monetary contribution intended to fund the preparation or submission of this brief.

*Amendment:  A Report of the Register of Copyrights* (June 1988) ("Register's Report"). [2]

In response to that request, I and my staff at the Copyright Office solicited and reviewed dozens of public comments in late 1987 and early 1988.  After completing that review, we reported to Congress on the "dire financial and other repercussions that would flow from State Eleventh Amendment immunity for damages in copyright infringement suits," and noted the recent uptick of cases finding States immune from copyright damages.  Register's Report, at ii-iii.  Congress's decision to enact the CRCA was based, in large part, on that report and on my subsequent testimony about the need for corrective legislation.

I respectfully submit this amicus brief to provide the Court with my first-hand perspective of the evidence that we collected and reviewed.  I have read, and I fully embrace and support, the arguments propounded by plaintiffs in their Motion for Reconsideration.  The invocation of *United States v. Georgia,* 546 U.S. 151 (2006) adds a compelling new dimension to the plaintiffs' motion, as I will discuss below.  Using the jargon of the sports world (appropriate in this case involving a book about Texas A&M football), *United States v. Georgia* is a "game-changer."

---

[2] Available at http://files.eric.ed.gov/fulltext/ED306963.pdf.

But first, with the indulgence of the Court, I will give a brief account of my recollection of the legislative effort that led to enactment of the CRCA.

## QUALIFICATIONS

As the Pravel Professorial Lecturer in Intellectual Property and Patent Law at the George Washington University Law School, I have taught copyright law for more than 27 years.  I have 46 years of experience in domestic and international copyright law and administration.  My qualifications include my education, training, and experience in the area of copyright legislation and U.S. Copyright Office practice and procedure.

As noted above, from 1985 to 1994 I served as the Register of Copyrights of the United States.  As the Register of Copyrights, I was the chief government official responsible for administering the U.S. copyright system.  Among other responsibilities, the Register of Copyrights makes rulings on the copyrightability of works and supervises the work of the Registration Specialists who examine the applications.

As the Register of Copyrights, I acted as principal advisor to Members of Congress on copyright legislation and the state of the Copyright Office.  I continue in that advisory role at the George Washington University Law School.  In September 2008, I testified before the House Judiciary Committee on pending copyright legislation, and in August 2009, I testified before the Senate Judiciary

Committee on a copyright bill that the Chairman, Senator Patrick Leahy of Vermont, had introduced.  I also participated in a hearing in 2014 with Rep. Jerold Nadler, the current Chairman of the House Judiciary Committee.

Internationally, I represented the United States at official meetings and diplomatic conferences, and I served as principal advisor to the U.S. Department of State on copyright matters, including drafting, negotiating and implementing copyright treaties.  During my tenure as Register, I helped move the United States into the Berne Convention for the Protection of Literary and Artistic Works, a goal sought by U.S. Registers for over 100 years.

Before becoming Register, I served in several other government positions, including Chief Counsel of the U.S. Senate Subcommittee on Patents, Copyrights, and Trademarks.  I also served, from 1975 through 1977, as Chief Minority Counsel on the Subcommittee on Patents, Trademarks and Copyrights.  In that capacity, I participated in the final drafting and negotiations that led to passage of the landmark U.S. Copyright Act of 1976, the current statue.

I am a graduate of Hamilton College (A.B., 1962) and Georgetown University Law Center (J.D., 1973), where I served as Executive Editor of the Georgetown Journal of International Law.  I served two tours of duty as a Naval Flight Officer with my squadron in Vietnam before entering law school.  I am also a former Foreign Service Officer in the U.S. diplomatic corps, having served two

years as Third Secretary of Embassy in Saudi Arabia.  I am a Past President of the

Giles S. Rich American Inn of Court (Washington's intellectual property Inn), a

former Trustee of the Copyright Society of the U.S.A., and Past Chair of the

Copyright Division of the ABA's Intellectual Property Law Section.  I now serve

as the Section's Copyright Liaison to the World Intellectual Property Organization

(WIPO) in Geneva.  I have been a frequent delegate at WIPO meetings, including

the series of meetings that led to the 1996 Diplomatic Conference that modernized

the Berne Convention and resulted in passage of the Digital Millennium Copyright

Act of 1998 in the United States.  I also represented the ABA at the diplomatic

conference in Morocco in 2013 that adopted the Marrakech Treaty, which

facilitated access to copyrighted materials by the blind and visually impaired.

At George Washington University Law School, I teach two advanced

copyright seminars.  Additionally, I authored a book entitled "Copyright:  Engine

of Development," published in 1995 in Paris by UNESCO.  In 1993, I received the

International Book Award from the International Publishers Association, and, in

2009, I received the Jefferson Medal in recognition of my lifelong contribution to

intellectual property law.

## ARGUMENT

The U.S. copyright law has a long pedigree.  In 1787, the American people, acting through their representatives in Philadelphia, adopted the copyright clause of the U.S. Constitution.  We were the first country to enshrine author's rights in the organic law of the land – in the Constitution itself.

Under that banner, from the thirteen coastal foot-holds of European civilization that we'd carved out of the wilderness, we would launch the westward drive of a uniquely American civilization.  The United States made copyright a central tenet of our culture.  We recognized that financial incentives would drive creativity and spur innovation.  As we moved from scientific and cultural backwater to economic powerhouse – in the process becoming the world's leading producer and exporter of scientific tracts and popular culture – copyright was with us every step of the journey.  Copyright helped us conquer and people the vast tracts of the interior.  Books, newspapers, maps and charts fired the imagination of the pioneers and gave them courage.  They read the diaries of the pathfinders; they plotted their journey overland on the maps of Lewis and Clark; they navigated around the Horn on the charts of Yankee sea captains.  Once they reached their promised land, "how-to" books on popular mechanics, medicine, agriculture, and animal husbandry taught them how to tame the land, nurse the sick, and educate their children.  The copyright clause helped us build a great nation.

Over the years copyright has increased its reach and importance by accommodating new technologies that have expanded the audience for creative works.  What started out in 1790 as protection for books, maps, and charts has grown to embrace photographs, music, sound recordings, choreography, motion pictures, radio, television, cable, architecture, video games, software, and now the internet.

At each step in that technological evolution, the courts have played a key role in defining the metes and bounds of copyright protection, often without any guidance from Congress.  The challenges to copyright posed by digital technology – including peer-to-peer file sharing of sound recordings and motion pictures, digital reproduction of books and photographs, and uncontrolled online dissemination of all works – are many, and we continue to ask the courts to solve copyright problems as they emerge, while keeping a weather eye on the underlying constitutional purposes of copyright – to promote the Progress of Science.

In 1985 the Supreme Court handed down *Atascadero State Hospital v. Scanlon,* 473 U.S. 234 (1985) the same year that I became Register, and the liability of States for copyright infringement became an open question and an important part of my life.  I have been working on the issue for 35 years.  In the 1976 Copyright Act, Congress thought it had imposed liability on the States despite the constraints of the 11th Amendment, and the States acted accordingly.

They were respectful of copyright, and, mindful of potential liability, they spent time and money educating their employees on the importance of respecting copyrights.  Of course, it was much easier for States in the 1970s to embrace honorable copyright policies, before all of the new technologies changed our world and made unlawful copying fast, easy, and cheap.

The Chairman of the House Subcommittee on Courts, Civil Liberties, and the Administration of Justice, Robert W. Kastenmeier of Wisconsin, had personally shepherded the 1976 Copyright Act through its 20-year extended gestation to final enactment.  He was an astute copyright lawyer, and a widely respected constitutional lawyer as well.  With *Atascadero,* he immediately saw its implications for both copyrights and patents.  Shortly thereafter, his staff began informal consultations with the Copyright Office and with copyright experts in academia.  Finally, in 1987, he and the Subcommittee's ranking Republican, Carlos Moorhead of California, sent me a letter asking the Office to investigate State sovereign immunity and its bearing on copyright infringement, and to prepare a formal report on our findings.  We issued the report, *Copyright Liability of States and the Eleventh Amendment:  A Report of the Register of Copyright,* in June of 1988, and it provided the factual basis for justifying and drafting corrective legislation.  We acknowledged that the report had its limitations.  Without subpoena power, we had to rely on information provided voluntarily by the States

themselves as to their waiver policies and their alternative State remedies, but many of the States chose not to reply. We also recognized that the reports from the private sector did not reflect the full picture of the magnitude of the threat. For one thing, since 1978, the effective date of the Copyright Act of 1976, the States had all assumed that they were fully liable for monetary damages for copyright infringement, and they acted accordingly. I was often told by copyright owners that the State actors usually settled quickly without litigation if infringements were discovered. So the number of actual filed cases stayed low. Also, as mentioned above, many of the digital technologies that would make infringing activity so tempting to State actors were not yet in place, so the digital threat to copyright was still mostly speculative. And, after *Atascadero,* many potential plaintiffs decided to forego expensive litigation if they couldn't win monetary damages and attorneys fees. As a result, the Report's list of copyright infringement suits against States or State actors was relatively short.

Even so, Mr. Kastenmeier recognized that these numbers would jump in the near future, as the digital revolution gathered momentum, as the States became aware of their immunity from monetary liability, as many of them moved their copyright awareness training programs to the back burner, and as the threat of litigation waned and no longer acted as a deterrent to illegal State action. The Chairman acted quickly to introduce legislation that would abrogate State

sovereign immunity for willful infringement, and under his leadership, and the leadership of Senator Leahy, the bill moved through the House and Senate with exceptional speed.  In 1990, Congress enacted the Copyright Remedy Clarification Act (CRCA), and President George H.W. Bush signed it into law.

Mr. Kastenmeier assumed that the courts would respect and rely on the predictive judgment of Congress in enacting the measure, but he was disappointed. Word spread that the CRCA would not pass constitutional muster after the Supreme Court struck down the patent equivalent.  Not unexpectedly, State copyright infringements continued to multiply.  After the Fifth Circuit decision in *Chavez v. Arte Publico Press,* 204 F.3d 601 (5th Cir. 2000) the pace of infringement accelerated.  The use of pirated software by State universities and State agencies rocketed, according to reports from the software industry.  (*See* the brief of The Software & Information Industry Association in Appendix B.) California systematically reproduced tens of thousands of copyright-protected newspaper and magazine articles without authorization or payment.  (*See* the brief of Dow Jones in Appendix C.)  And professional photographers saw their works used repeatedly by State government tourist agencies, without permission and often without even the courtesy of a byline.  (*See generally,* the brief of the American Society of Media Photographers, Inc., and the National Press Photographers Association the North American Nature Photography Association,

the Graphic Artists Guild, the Professional Photographers of America, American Photographic Artists, and the Digital Media Licensing Association in Appendix D.)

I attach in Appendix A of this brief a list of 166 copyright cases filed in federal courts against States or State actors since the *Chavez* decision in 2000. They were filed despite the futility of litigation after *Chavez*. These cases therefore reflect only the tip of the infringement iceberg, but they also offer compelling evidence of the growing magnitude of the problem.

I will not recount the history and holding of the *Allen v. Cooper* case, which the parties have fully briefed. Even so, I note that Justice Kagan, in laying out the roadmap for a congressional effort to enact a revised (and constitutionally sound) version of the CRCA, has also given that roadmap to the U.S. District Courts. If a district court judge, using his or her full measure of discretion, can tailor a remedy that meets the Kagan requirements – that the remedy be "congruent" and "proportional" to the harm done and the nature of the infringement – it will pass constitutional muster. In this case, Texas A&M willfully and brazenly infringed plaintiffs' copyright in their unpublished manuscript. They removed the copyright owners' names. It effectively destroyed the potential market for the book by sending hundreds of thousands of copies to sports-loving Texas A&M alumni. Texas provides no state law remedy. If this Court were to direct a verdict for

plaintiffs that was "congruent" and "proportional" to the infringement, that verdict would satisfy the Supreme Court.  (*See generally* the brief of David Nimmer and Ernest Young in Appendix E.)

Earlier, I mentioned the importance of the Supreme Court's holding in *U.S. v. Georgia.*  As plaintiffs' brief makes clear, that holding allows this Court to reject the Texas assertion of sovereign immunity *in this case* because it results from an unconstitutional taking without just compensation and without due process, in violation of Section 5 of the 14th Amendment.

(Signature on following page)

## CONCLUSION

*Amicus Curiae* Ralph Oman respectfully urges that the Motion for

Reconsideration be granted, and the case proceed on the merits.

Date:  May 20, 2020

Respectfully submitted,

**ARMSTRONG & LEE LLP**

By:     */s/ Joshua D. Lee*
      Joshua D. Lee
      S.D. Tex. Bar No. 2696823
      State Bar No. 24100139
2900 North Loop West, Ste. 830
Houston, Texas 77092
Telephone:   (832) 709-1124
Facsimile:    (832) 709-1125
jlee@armstronglee.com

**Attorney for *Amicus Curiae***
**RALPH OMAN, Pravel, Hewitt,**
**Kimball and Kreiger Professorial**
**Lecturer in Intellectual Property**
**and Patent Law, George**
**Washington University Law School**

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2020 I electronically filed a copy of this Motion, as well as the attached proposed Brief Amicus Curiae by Ralph Oman, using the CM/ECF System for the United States District Court for the Southern District of Texas, which will send notification of that filing to all counsel of record in this litigation.

By:   */s/ Joshua D. Lee*
Joshua D. Lee