**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL J. BYNUM and CANADA HOCKEY LLC d/b/a EPIC SPORTS | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. |
| BRAD MARQUARDT, in his individual capacity, | § | 4:17-CV-00181 |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT BRAD MARQUARDT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

INDEX OF AUTHORITIES..........................................................................................iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS........................... vi

INTRODUCTION ..........................................................................................................1

STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT ....................................2

SUMMARY JUDGMENT STANDARD...........................................................................3

SUMMARY JUDGMENT EVIDENCE ............................................................................3

STATEMENT OF FACTS ..............................................................................................4

    A.   Plaintiffs' claim of copyright ownership rests on a theory of work for hire......................4

    B.   The deposition of Whit Canning produced a single document referencing a work for hire, dated February 5, 2014. ........................................................................................4

    C.   Mr. Canning admits to significant memory problems following a stroke in 2013. ............5

        (1)   Mr. Canning could not provide direct testimony that he actually signed the February 2014 Agreement.........................................................................................................5

        (2)   Mr. Canning could not provide direct testimony that he wrote the article at issue. .....6

        (3)   Mr. Canning did not support the claim of a work for hire...........................................7

        (4)   Mr. Canning testified that after his stroke in 2013, he had agreed with Michael Bynum to accept $5,000 in exchange for the rights to the E. King Gill article......................8

SUMMARY OF ARGUMENT ........................................................................................9

ARGUMENT .................................................................................................................9

     I.    The February 2014 Book Publishing Agreement cannot meet the writing requirement needed to establish a work for hire under the Copyright Act. ...........................................9

     II.   Plaintiffs lack standing to pursue copyright claims because Michael Bynum had no legal interest in the copyright at the time of the alleged infringement. ...........................14

     III.   Plaintiffs' DMCA claims should be dismissed because Plaintiffs cannot show "injury" as a matter of law. ...............................................................................................16

     IV.   The defense of qualified immunity applies here, and should result in dismissal. ..17

CONCLUSION.............................................................................................................20

CERTIFICATE OF SERVICE ......................................................................................22

CERTIFICATE OF CONFERENCE.........................................**Error! Bookmark not defined.**

# INDEX OF AUTHORITIES

Cases

*ABKCO Music, Inc. v. Harrisong Music Ltd.*,
  944 F.2d 971 (2d Cir. 1991) ................................................................... 15

*Allen v. Cooper*,
  895 F.3d 337 (4th Cir. 2018), *aff'd*, 140 S. Ct. 194 (2020) ............................... 19, 20

*Ashcroft v. al-Kidd*,
  563 U.S. 731 (2011) ......................................................................... 20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................... 3

*Davis v. Blige*,
  505 F.3d 90 (2d Cir. 2007) ........................................................... 15, 17, 18

*Davis v. Sherer*,
  468 U.S. 183 (1984) ......................................................................... 20

*Easter Seal Soc'y for Crippled Children & Adults of La., Inc. v. Playboy Enters.*,
  815 F.2d 323 (5th Cir. 1987) ................................................................. 13

*Estate of Kauffmann v. Rochester Inst. of Tech.*,
  932 F.3d 74 (2d Cir. 2019) ....................................................... 12, 13, 14, 18

*Gladwell Gov't Serv., Inc. v. County of Marin*,
  265 F. App'x 624 (9th Cir. 2008) ........................................................ 10, 11

*John Wiley & Sons, Inc. v. DRK Photo*,
  882 F.3d 394 (2d Cir. 2018) ................................................................. 14

*Lane v. First Nat. Bank of Boston*,
  687 F. Supp. 11 (D. Mass. 1988) ........................................................ 18, 19

*Lyrick v. Big Idea Studios*,
  420 F.3d. 388 (5th Cir. 2005) ............................................................... 14

*Morrow v. Meachum*,
  917 F.3d 870 (5th Cir. 2019) ................................................................ 20

*Palmer/Kane LLC v. Rosen Book Works, LLC*,
  204 F.Supp.3d 565 (S.D.N.Y. 2016) ...................................................... 15, 16

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ..................................................................... 18, 20

*Playboy Enters. v. Dumas,*
    53 F.3d 549 (2d Cir. 1995)................................................................................ 11, 12, 13

*Prather v. Neva Paperbacks, Inc.,*
    410 F.2d 698 (5th Cir. 1969) ............................................................................ 15

*QBE Ins. Corp. v. Brown & Mitchell, Inc.,*
    591 F.3d 439 (5th Cir. 2009) ............................................................................ 3

*Roy v. New Hampshire Dep't of Corrections,*
    No. 13-cv-438-PB, 2015 WL 5054652 (D. N.H. July 8, 2015)...................... 19

*Saucier v. Katz,*
    533 U.S. 194 (2001)........................................................................................ 18

*Schiller & Schmidt, Inc. v. Nordisco Corp.,*
    969 F.2d 410 (7th Cir. 1992) ........................................................................ 10, 11

*Silvers v. Sony Pictures Entm't Inc.,*
    402 F.3d 881 (9th Cir. 2005) .......................................................................... 15

*Steele v. Bongiovi,*
    784 F.Supp.2d 94 (D. Mass. 2011) ................................................................ 17

*Uptown Grill, L.L.C. v. Camellia Grill Holdings, Inc.,*
    920 F.3d 243 (5th Cir. 2019) ........................................................................ 3, 4

*Urbont v. Sony Music Entm't,*
    831 F.3d 80 (2d Cir. 2016)............................................................................ 9

## Statutes

17 U.S.C. § 101 ........................................................................................................ 12

17 U.S.C. § 101(2) ................................................................................................ 11, 13

17 U.S.C. § 1201 ...................................................................................................... 24

17 U.S.C. § 1202 ...................................................................................................... 24

17 U.S.C. § 1202(a) .................................................................................................. 24

17 U.S.C. § 1203(a) .................................................................................................. 25

17 U.S.C. § 201 ........................................................................................................ 21

17 U.S.C. § 204 ........................................................................................................ 21

17 U.S.C. § 501 ................................................................................................................... 24

17 U.S.C. § 501(b) ............................................................................................................. 20

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS**

Plaintiffs are Michael Bynum, an individual resident of the State of Alabama, and his publishing company Canada Hockey LLC d/b/a Epic Sports.

The Original Complaint in this case was filed on January 19, 2017.  Doc. No. 1.

The First Amended Complaint was filed on April 17, 2017.  Doc. No. 15.

Brad Marquardt, along with the other named defendants, filed a motion to dismiss on May 17, 2017.  Doc. 34.  That motion was denied as to Brad Marquardt by order dated March 29, 2019.  Doc. 96.

Brad Marquardt answered the First Amended Complaint on April 12, 2019.  Doc. 97.

On May 11, 2020, Plaintiffs filed a Motion for Reconsideration and/or Motion for Leave to File a Second Amended Complaint.  Doc. 131.  That motion remains pending.

On May 29, 2020, this Court entered an agreed Scheduling Order, setting the trial in this case for October 4, 2021.  Doc. 137.

## INTRODUCTION

Michael Bynum did not write the article at the heart of this case.  The article is and always has been attributed to Whit Canning.  These facts are undisputed.

It is also undisputed that in January 2014, which is to say, at all times relevant to the complaint in this case, Michael Bynum had no legal right to the Canning article.  Only in February 2014, after learning that Whit Canning's article had been posted on a Texas A&M University website, did Mr. Bynum attempt to secure the rights to the Canning article by paying Whit Canning, and asking him to sign a Book Publishing Agreement.  This was 17 years after the Canning article was written.

All of Plaintiffs' allegations are based on a claim that they owned a valid, enforceable, exclusive right to publish Whit Canning's article at the time it was posted on the University website.  However, it cannot be disputed that, at that point in time, Plaintiff owned no exclusive right to the Canning article.  That fact is dictated by the black letter law of the Copyright Act.  Plaintiffs' copyright and DMCA claims, therefore, must fail as a matter of law.

Mr. Bynum will disagree, of course, that his February 2014 attempt to *retroactively* secure the rights to the Canning article were ineffective.  But he is effectively asking the Court to treat that agreement as a time machine, forcing the litigants to engage in a fiction that things which were not the case at a particular point in time, will nevertheless now be treated as having happened.   To date, the Second, Seventh and Ninth Circuits have all refused to climb into that time machine.

Moreover, even if this Court were willing to indulge Plaintiffs in some manner of legal fiction regarding what was the case in January 2014, Plaintiffs' claims will still fail under the doctrine of qualified immunity.  That doctrine requires that the right that was allegedly violated

by Brad Marquardt was one that was "clearly established" at the time.   Whatever else may be said of Plaintiffs' efforts to navigate the relevant case law and attempt to establish ownership of this copyright in January 2014, it is certainly clear that this right was far, far away from being clearly established.

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

Defendant Brad Marquardt moves for summary judgment on the following issues:

**1.   Plaintiffs cannot meet the Copyright Act's work-for-hire writing requirements.**

Plaintiffs' copyright infringement claims are based on an article created by Whit Canning in the late 1990s.  As a matter of law, Canning would have owned the copyright to his work upon its creation, *unless* it was created pursuant to a written work for hire agreement.  Because there was no written work for hire agreement in existence at the time of the alleged infringement, Mr. Canning, and not Plaintiffs, owned the copyright to the article.

**2.   Plaintiffs lack standing to pursue a copyright claim based on an infringement that occurred before the copyright was assigned to them.**

Section 501(b) of the Copyright Act provides that "The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular *right committed while he or she was an owner of it*."  17 U.S.C. § 501(b) (emphasis added).  Plaintiffs could not, as a matter of law, have owned the copyright in January 2014 without a writing.

**3. Plaintiffs cannot claim injury under the DMCA based on exclusive rights to the Canning article.**

Plaintiffs' must have suffered "injury" as a result of the alleged DMCA violations in order to sue.  17 U.S.C. § 1203.  Plaintiffs' claims of injury here are based on assertions that Bynum owned the exclusive rights to the Canning article in January 2014, which he clearly did not.

**4. Because Plaintiffs' exclusive publication rights were not clearly established at the time of the alleged infringement, Brad Marquardt is entitled to qualified immunity.**

Qualified immunity applies unless the plaintiff can demonstrate that the defendant violated rights of the plaintiff that were "clearly established" at the time of the alleged violation. Plaintiffs rights in the copyright here, if they exist at all, were not clearly established in January 2014.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate where the competent summary judgment evidence demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009). The district court should "view the evidence in the light most favorable to the non-moving party, and the moving party has the burden of showing [the] court that summary judgment is appropriate." *Id.* "[T]the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

"A court should enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Uptown Grill, L.L.C. v. Camellia Grill Holdings, Inc.*, 920 F.3d 243, 247 (5th Cir. 2019).

## SUMMARY JUDGMENT EVIDENCE

Brad Marquardt relies on all pleadings and briefs currently on file and on the following evidence in moving for summary judgment:

Exhibit A: "Book Publishing Agreement" dated February 5, 2014 [Ex. 6 to Canning deposition]

Exhibit B:  Deposition of Whit Canning, including exhibits

Exhibit C:  Certified copyright registration file produced by the United States Copyright Office

## STATEMENT OF FACTS

### A. __Plaintiffs' claim of copyright ownership rests on a theory of work for hire.__

Plaintiffs' First Amended Complaint states that Michael Bynum and his publishing company own the copyright to an article written by Whit Canning, which Plaintiffs claim was a "work for hire." (hereinafter the Canning article or the E. King Gill article). Plaintiff Michael Bynum made the same claim to the United States Copyright Office, and obtained a copyright registration on that basis. Ex. C at p. 1, 17-18 (certified copy of copyright registration file TXu 2-020-474).

During the registration process, Mr. Bynum was asked by the Copyright Examiner whether Mr. Bynum had a contract with Whit Canning that would support a work for hire assertion. In response, Mr. Bynum stated: "My attorneys have reviewed the agreement with Whit Canning and it specifically states that his portion of the book was created on a 'work for hire' basis." *Id.* at pp. 17-18. This statement pointedly left out the most salient fact about the agreement, which is that it was signed 17 years after the alleged creation of the work.

### B. __The deposition of Whit Canning produced a single document referencing a work for hire, dated February 5, 2014.__

In order to test Plaintiffs' allegations of a work for hire agreement, Defendant took the deposition of Whit Canning at the offices of attorney Warren Norred, pursuant to a subpoena duces tecum. Ex. B, Tr. at p. 7, l. 5 - p. 12, l. 11 (discussion of subpoena duces tecum). The subpoena requested that Mr. Canning bring with him "any documents you have that are related to the agreement dated 2/5/14 . . . including any documents or bank records showing what amount of money you were paid by Michael Bynum and when." *See* Ex. B, Tr. at Ex. 1. Mr. Canning was also asked to provide: "any documents you have that are related to your writing or delivery of the stories referenced in the first paragraph of the agreement." *Id.*

In response to questions directed to Mr. Canning regarding the subpoena, Mr. Norred represented on the record that Mr. Norred had been unable to obtain any responsive documents from Mr. Canning, but that Mr. Norred had obtained certain responsive documents from Mr. Bynum, which he had provided by email to counsel in advance of the deposition.  Ex. B, Tr. at p. 11, l. 8 - p. 12, l. 11.  These documents included a one-page document dated February 5, 2014, entitled "Book Publishing Agreement," and a check dated the same day, for $2,500.00.  Ex. A (copy of February 2014 Agreement) (copy also attached at Ex. B, Tr. at Ex. 1, Ex. 6).

### C.  Mr. Canning admits to significant memory problems following a stroke in 2013.

Mr. Canning was candid in his deposition that he had significant memory problems, and that he had suffered a general decline in his health following a stroke in 2013.   Ex. B, Tr. at p. 10, ll. 20-24 ("I - - told him today when we got here that tomorrow, I'm going to see my doctor to see if I have Alzheimer's.  And I tend to miss things and forget what I'm doing."); p. 131, l. 6 - 134, l. 23 (describing a stroke in March 2013, and a long recovery, and stating that he had not done any professional writing since the stroke).  The deposition transcript as a whole reveals that some of the testimony he gave was conflicting, and sometimes difficult to follow.  Nevertheless, there are a few key points that bear on the issues here.

### (1)  Mr. Canning could not provide direct testimony that he actually signed the February 2014 Agreement.

When counsel provided the February 2014 Agreement to Mr. Canning, and asked if that was his signature on the document, Mr. Canning's initial response was as follows: "Well - - well, I'll call it my signature.  It looks more like my wife's writing, but I'll say it's mine."  Ex. B, Tr. at p. 116, ll. 13-14.  This was in contrast to Mr. Canning's response to questions regarding Exhibit No. 3, to which Mr. Canning had no problem stating that this was his signature.  Ex. B, Tr. at p. 83, ll. 6-13 (referring to the signature on the back of a check marked as Exhibit 3).

Page 5

Later, Mr. Canning came back to the issue of the signature, stating that he was confident that his wife's signature was on the document, but he was not sure about his own. Ex. B., Tr. at 160, ll. 11-14 ("But the thing here is I know that's her signature, my wife's, and she's not even a football fan, so. Well, until I came in here today, I thought that was my signature, but I don't know."). Mr. Canning provided conflicting testimony on the question of whether his wife, who he has been married to for 50 years, would sign checks for him at the bank. Ex. B, Tr. at p. 167, l. 12- 169, l. 14. After Mr. Bynum's attorney attempted to have Mr. Canning compare the signature on the 2014 Book Publishing Agreement with the signature on the back of the check with the same date, and asked Mr. Canning to state that it appeared to be his signature, Mr. Canning's answer was: "Yeah. Okay. I'll put it this way: If it's not mine, it's close enough that nobody could, you know, tell the difference, but –" and then "Huh. Yeah. Okay. Yeah. I'll say it's mine." Tr. at p. 162, l. 23 – p. 163, l. 5.

### (2) Mr. Canning could not provide direct testimony that he wrote the article at issue.

Mr. Canning was also unable to provide testimony that he had written the article at issue in this litigation. Ex. B, Tr. at p. 96, l. 11 - p. 100, l. 3. Although Mr. Canning did remember numerous other articles or parts of books that he wrote in the 1990's, he was not able to state that he remembered writing the article that is the subject of this complaint. Ex. B., Tr. at p. 143, l. 4 – 148, l. 23 (recalling at least 9 separate stories that Mr. Bynum's attorney showed him, from the 1990's onward); Ex. B., Tr. at p. 157, l. 13-16 ("Well - - I don't - - I don't know whether it is or it isn't, but at this - - but at this late date, you know, I'm not going to fight about it.").

Moreover, Mr. Canning stated that he did remember writing articles on E. King Gill as part of his job at the *Fort Worth Star-Telegram,* probably around the time of the 1988 Cotton Bowl. Canning Dep. Tr. at p. 62, ll. 5-10 ("And I - when I was working at the Star-Telegram,

two or three summers — or football seasons, they had me do a piece on the 12th Man.  And I —

I used to have two or — two or three of them laying on the — laying around, but we were

looking around awhile ago and they're not as easy to find as they used to be.").

### (3) **Mr. Canning did not support the claim of a work for hire.**

The February 2014 writing states: "Canning acknowledges that his work on the five

Stories has been done on a 'Work for Hire' basis and that all content in these five stories is

original and was created entirely by Canning."  Canning Dep. Tr. at Ex. 6.  The following

exchange took place with regard to the term "work for hire":

Q.      Did you ever work with Michael Bynum to write a story about E. King Gill?

A.      I think so.

Q.      When was that?

A.      I don't remember.

Q.      What was your understanding of the arrangement that you had with Michael
Bynum when you were working on the E. King Gill story?

A.      I don't recall.

Q.      Have you ever heard the term work for hire?

A.      Yeah.

. . .

Q.  (By Ms. Mather) What does the phrase work for hire mean?

A.      Well, I'm not sure, but I assume it means - - it means the person works for money,
for a salary or some sort of payment.

Q.      (By Ms. Mather) Have you ever had a work for hire agreement with anybody that
you worked for?

A.      Not that I know of.

MR. REDDEN: Objection, form.

Page 7

MR. NORRED: Objection, form.

Ex. B, Tr. at pp. 114, l. 11 - 115, l. 13.

**(4) <u>Mr. Canning testified that after his stroke in 2013, he agreed with Michael Bynum to accept $5,000 in exchange for the rights to the E. King Gill article.</u>**

What Mr. Canning seemed to remember most clearly was that at some point after his stroke in 2013, Michael Bynum had paid him $5,000 for the rights to an article on E. King Gill. Ex. B, Tr. at 136, l. 14 – p. 137, l. 19.   Even when confronted with the $2,500 check, Mr. Canning testified repeatedly that the deal he struck with Mr. Bynum was an exchange of $5,000 for the rights to the article, regardless of whether the money came in one check or two checks. Ex. B, Tr. at 169, l. 15 – p. 172, l. 9.   Mr. Bynum's attorney asked Mr. Canning whether the fact that Mr. Canning remembered a payment of $5,000 and received a check for $2,500 meant that Mr. Canning must have been paid back in 1997.  Ex. B, Tr. at p. 172, l. 16 – 173, l. 23.   Mr. Canning responded to this line of questions by reiterating that Mr. Bynum "bought the rights to the – to the gill thing and I went home with $5,000.  That's about as near as I know how to say it."  Ex. B, Tr. at 173, ll. 6-9 ("You know, my five grand went to him and his five grand went to me, and he bought the rights to the -- to the Gill thing, and I went home with $5000. That's about as near as I know how to say it.").   Mr. Canning also stated that although he did not remember receiving $2,500 back in 1997, that he didn't "think that I would let $2500 pass in front of me without knowing it."   Ex. B, Tr. at p. 173, ll. 10-13.

Mr. Canning also readily acknowledged that Michael Bynum had a reputation for not paying writers, although again, he emphasized that he and Mr. Bynum were "even" since Mr. Bynum had paid him $5,000 for the rights to the Gill article.  Ex. B, Tr. at p. 103, l. 9-24; 173, ll. 18-23.

## SUMMARY OF ARGUMENT

In spite of the questionable circumstances surrounding the execution of the February 5, 2014 writing, Defendant Marquardt is not attempting in this Motion to attack the validity of any prospective copyright assignment from Canning to Bynum.  The grounds for this Motion are based on this single uncontested fact: At the time of the alleged copyright infringement, Plaintiffs owned no copyright to the Canning article.

Plaintiffs did not create the work at issue and the Copyright Act's black letter law requires a written agreement before they may acquire that copyright.  Plaintiffs' after-the-fact attempt to revise history cannot give them standing to pursue a copyright infringement based on the Canning article.

At best, all Plaintiffs had at the time of the alleged infringement was a non-exclusive license to publish the Canning article.  They can make no claim for damages, whether under the Copyright Act or under the DMCA, based on a claimed exclusive right to publish.

## ARGUMENT

### I. <u>The February 2014 Book Publishing Agreement cannot meet the writing requirement needed to establish a work for hire under the Copyright Act.</u>

"A plaintiff in a copyright infringement suit bears the burden of proving ownership of the copyright . . . whether such ownership is challenged by an ostensible employer or by a third party." *Urbont v. Sony Music Entm't*, 831 F.3d 80, 87 (2d Cir. 2016).

Here, Mr. Bynum claims ownership of a copyright in text written by Whit Canning based on an alleged work made for hire agreement.  First Am. Comp. at ¶¶ 24, 31.  A work made for hire is defined in the Copyright Act to include "a work prepared by an employee within the scope of his or her employment," or "a work specifically ordered or commissioned for use as a

contribution to a collective work . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire . . ."  17 U.S.C. § 101(2).

There is no dispute that Mr. Canning was not, at any time, an employee of Mr. Bynum or any of his companies.  First Am. Compl. at ¶¶ 24, 31.  Accordingly, in order to qualify as a work for hire, the work at issue in this case must have been "specifically ordered or commissioned" and "the parties [must] expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  17 U.S.C. § 101(2).

The only written agreement between the parties did not come into existence until February 5, 2014.  Until that date, Michael Bynum had no valid copyright in the Canning article. The alleged copyright infringement occurred from January 19 until January 22, 2014.  Doc. No. 131-1. P. 36-39; Doc. No. 34, p. 1-2.

### A.  Retroactive work-for-hire writings are barred by a bright line rule in the Seventh and Ninth Circuits.

In interpreting and applying the writing requirement of § 101, the Seventh and Ninth Circuits have imposed a bright-line rule that a work for hire agreement must be executed before completion of the work in order to meet the writing requirement.  *See Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412-13 (7th Cir. 1992); *Gladwell Government Services, Inc. v. County of Marin*, 265 F. App'x 624, 626 (9th Cir. 2008).

In *Schiller,* Judge Posner explained that the writing requirement was "not merely a statute of frauds . . . designed to protect people against false claims of oral agreements," but also "has a second purpose – to make the ownership of property rights in intellectual property clear and definite, so that such property will be readily marketable."  *Schiller,* 969 F.2d at 412. Accordingly, "[t]he writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally."  *Id*. at 413.

The Ninth Circuit based its adoption of the bright-line rule on the plain text of "Section 101 of the Copyright Act [which] defines a 'work made for hire' as 'a work specially ordered or commissioned . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire . . .'" *Gladwell*, 265 Fed. Appx. at 626 (quoting 17 U.S.C. § 101(2)). "The plain language of the statute indicates that work-for-hire agreement cannot apply to works that are already in existence." *Id.* "Works 'specially ordered or commissioned' can only be made after the execution of an express agreement between the parties." *Id.*

### B. The Second Circuit's allowance for the possibility of a valid, later-executed agreement was a narrow exception, not applicable in this case.

The Second Circuit, while acknowledging and agreeing with the concerns of the *Schiller* court, nevertheless was willing to entertain the possibility, based on the facts of a particular case, that the writing requirement could be met with a writing executed after completion of the work, if the writing actually memorialized an agreement that was made before the creation of the work. *Playboy Enters. v. Dumas*, 53 F.3d 549, 559 (2d Cir. 1995). ("We agree with the Seventh Circuit that the writing requirement was created, in part, to make the ownership of intellectual property rights clear and definite.  . . . We are not convinced, however, that the actual writing memorializing the agreement must be executed before the creation of the work.")  In applying this test, the Court focused on evidence that demonstrated "pre-creation consent" to a work for hire relationship.  *Id.* at 560.

In that case, an artist had signed and cashed 154 checks over a period of about five years from Playboy Magazine bearing a legend stating that "Payee acknowledges payment in full for the services rendered on a work for hire basis in connection with the Work named on the face of this check."  *Id.*  Even with that endorsement, however, the Court refused to find a valid work for

hire based on the artist having endorsed the first check in the series, because such an endorsement, after the fact of creation, could not demonstrate "pre-creation consent to a work-for-hire relationship."  *Id.*  Nevertheless, the Court did find that the artist's "subsequent pre-creation consent to such a relationship may be inferred from his continued endorsements."  *Id.*

### C.  *Estate of Kauffmann* confirms the limited nature of any allowance for post-creation writings.

The measured nature of this allowance for post-creation writings was further evidenced in the most recent case from the Second Circuit addressing this issue — *Estate of Kauffmann v. Rochester Inst. of Tech.*, 932 F.3d 74 (2d Cir. 2019).  In that case, the Court declined to credit a letter agreement signed five years after the creation of the works at issue, in which the author checked "agreed" to the statement: "We have . . . always understood in doing business with you that, in light of our regular monthly compensation arrangement with you, all articles you have written for The New Republic have been 'works made for hire' as that term is defined under the US Copyright law.."  *Id.* at 76.

Focusing on the wording of the agreement, the district court held that the subsequent writing was sufficient to find a work for hire, because the agreement "unambiguously memorialized in writing a preexisting oral contract, evidently dating back to when Kauffmann started writing for The New Republic in 1958."  *Id.* (cleaned up)  The Court of Appeals, however, described the letter agreement as "signed long after the works were created," and noted that "no special circumstances even arguably warrant applying the written agreement."  *Id.* at 75.

In explaining its decision to overrule the district court, the panel opinion stated: "To give the 2004 Agreement the significance adopted by the District Court would risk endorsing a fiction of 'two separate authors,' specifically rejected in *Playboy*, 53 F.3d at 559, one during the five-year interval before the Agreement was executed and another thereafter."  *Kauffmann*, 932 F.3d

at 78.  The Court further noted that crediting this agreement would "render uncertain several aspects of the copyright in each article, such as its duration, renewal rights, and termination rights."  *Id.*  The fact that the letter agreement "recite[d] a prior oral understanding" between the parties did not serve to eliminate these consequences.  *Id.* at 79.

### D.  Summary judgment on this issue is proper.

The Fifth Circuit has yet to confront the issue of whether to impose a bright-line rule requiring a writing executed before completion of the work, although generally the Fifth Circuit treats the Second Circuit as the "de facto Copyright Court of the United States." *See Easter Seal Soc'y for Crippled Children & Adults of La., Inc. v. Playboy Enters.*, 815 F.2d 323, 325 (5th Cir. 1987).  Whichever standard is applied, however, there is no conceivable basis on which a writing such as the February 2014 Agreement, particularly in light of Mr. Canning's testimony, could qualify.   This alleged writing was executed 17 years after the creation of the work, by an author who has suffered a stroke in the meantime and cannot provide clear, direct testimony that he in fact signed the agreement, or even wrote the work at issue.  Moreover, the author of the work, in his sworn testimony, did not support the claim of a work for hire, but in fact testified that he granted the rights to the article at issue to Mr. Bynum in exchange for $5,000, long after the work was created.  *See Kauffmann*, 932 F.3d at 78 & n.5 (collecting all four district court cases since *Playboy* that credited a later-executed work-for-hire agreement, noting that in each "the creator of the work at issue actually supported the claim of work for hire").

The 17 years at issue here, between the alleged time of creation and the post-creation writing, is over 3 times the number of years found to be too long in *Kauffmann*.  *Id.* at 78 (describing five years as "long after the work was created").  There is simply no scenario in

which crediting this agreement would not "endorse the fiction of two separate authors,"

specifically rejected in *Kauffmann*, 932 F.3d at 78.[1]

## II.   Plaintiffs lack standing under 17 U.S.C. § 501(b) to sue for infringement.

Section 501(b) of the Copyright Act provides in relevant part as follows: "The legal or

beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for

any infringement of that particular right ***committed while he or she was an owner of it***."  17

U.S.C. § 501(b) (emphasis added).  In one recent case from the Second Circuit, the Court

specifically noted this "durational limitation" and found that it reflected "an effort to carefully

circumscribe the right to sue for infringement." *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d

394, 405-406 (2d Cir. 2018).  Mr. Bynum could not be entitled to sue for infringement for acts

occurring in January 2014 when he was not the owner of the copyright at issue at that time. *See*

Doc. 15 (First Am. Compl.) at p. 18 & Ex. N (describing conduct in January 2014).

In one brief, filed in March 2020, Plaintiffs asserted that "[e]ven if Plaintiffs were unable

to prove as a matter of law that the story in question was a 'work for hire,' there is no question

that they will be able to establish that it was validly assigned to Bynum in 2014."  [Doc. 120 at p.

5]  Mr. Marquardt disputes this assertion, but even if it were true, such a finding would not

allow Plaintiffs to sue for conduct occurring before the date of the assignment.  Instead, any

conveyance of a right to sue for past infringement would have to be delineated specifically in the

agreement. *See ABKCO Music, Inc. v. Harrisong Music Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991)

---

[1] The idea of "two separate authors" in this context refers to the fact that the creator of the work is the author and owner of the copyright, but when a work is created pursuant to a valid work-for-hire agreement, the commissioner of the work is considered to be the "Author."  But if a retroactive work-for-hire agreements were allowed, until such time as the agreement was put in writing, either the creator or the commissioner could come forward and claim to be the sole author during that period of time.

(holding that a right to sue for past infringement does not convey automatically with an assignment and must be conveyed separately, if at all); *Silvers v. Sony Pictures*, 402 F.3d 881 (9th Cir. 2005) (same); *Prather v. Neva Paperbacks, Inc.*, 410 F.2d 698, 700 (5th Cir. 1969) (same, addressing the precursor to the 1976 Act).

Moreover, even a writing that purports to recognize a past assignment, which some courts have allowed on particular facts, cannot operate as a time machine, forcing courts or litigants to engage in the fiction that things which were not the case at a particular point in time will nevertheless now be treated as having happened.   See Davis v. Blige, 505 F.3d 90 (2d Cir. 2007) ("declining to credit a retroactive assignment because it would permit the extinguishment of accrued infringement claims "by traveling back in time to 'undo' an unlawful infringement"). Indeed, the Second Circuit's conclusion in Davis with respect to retroactive assignments was categorical: "Accordingly, we hold that a license or an assignment in copyright can only act prospectively."[2]  Id. at 104.

Regardless of what theory Plaintiffs may latch on to, once it is clear that a work for hire is off the table, the fundamental problem that Plaintiffs cannot overcome is the language of the Copyright Act itself.  Under 17 U.S.C. § 501, a person is entitled to "institute an action for . . . infringement of [an exclusive right under a copyright] . . . ***committed while he or she was an owner of it***."  Michael Bynum was not the owner of any exclusive rights to the Canning article in

---

[2] The facts in *Davis* are complicated and involve a plaintiff who was a co-owner of the copyright along with the father of one of the defendants she was suing for infringement.  505 F.3d at 93-95.  While some courts have attempted to limit this holding to its facts, Judge Rakoff's opinion in *Palmer/Kane LLC v. Rosen Book Works, LLC*, 204 F. Supp. 3d 565 (S.D.N.Y. 2016) is persuasive on the point that district courts "cannot disregard *Davis*'s categorical conclusion 'that a license or assignment in copyright can only act prospectively.'"  *Id.* at 579.

January 2014.  As a matter of law, he cannot be a person entitled to sue under the Copyright Act for the alleged infringement.

### III.    Plaintiffs' cannot show "injury" under the DMCA as a matter of law.

Plaintiffs' claims against Brad Marquardt under the DMCA are based on the Act's anti-circumvention provisions.  These provisions prohibit both the unauthorized removal or alteration of "copyright management information" or CMI, and the distribution of "false CMI" in connection with a work.  17 U.S.C. § 1202(a) (false CMI); § 1202(b) (removal or alteration of CMI).   Under § 1203, "[a]ny person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation."  17 U.S.C. § 1203(a).

Here, Plaintiffs' only claims of injury are related to the infringement of an allegedly exclusive right to publish the Canning article.   *See* First Am. Compl. at p. 3, ¶ 5 (complaining that "Defendants destroyed Plaintiffs' prospects for a successful print run"); p. 24, ¶ 66 (general allegation of "substantial injury, loss, and damage to [Bynum's] business"); p. 30, ¶ 107 (claiming "monetary loss" and "recovery of damages").  *See also* Prop. Sec. Am. Compl. [Doc. 131, Ex. A] at p. 36, ¶ 113 (assertion of injury under the Fourth Cause of Action references only "copyright infringement").

As demonstrated above, Mr. Bynum had no exclusive rights with respect to the Canning article in January 2014.  The most that Mr. Bynum could possibly have had in January 2014, with no writing, was a non-exclusive oral license to publish the Canning article, although even that is questionable in light of the fact that Mr. Bynum appears to have not paid Mr. Canning until February 2014.  By definition, a party holding nothing more than a non-exclusive license cannot claim injury based on the fact that its license is not exclusive.  *See Davis v. Blige*, 505

F.3d at 101 (noting that a "non-exclusive license conveys no ownership interest"); *see also Steele v. Bongiovi*, 784 F. Supp. 2d 94, 97-98 (D. Mass. 2011) (dismissing DMCA claim based on the lack of viability of plaintiff's theory of injury).

Because the theory of injury pled here rests entirely on Michael Bynum's alleged ownership of the work, this claim must be dismissed.

### IV. The defense of qualified immunity applies here, and should result in dismissal.

Mr. Marquardt recognizes that this Court declined to dismiss the claims against him at the pleading stage based on qualified immunity, finding that his actions, at least as alleged in the complaint, described conduct that would have violated "clearly established law."  Doc. No. 96 at p. 24.  He asks that the Court look at this issue again, however, in this motion, because now that the author of the article at issue has been deposed, and Plaintiffs have confirmed that the February 2014 agreement is the basis for a work for hire, the weakness of Plaintiffs' arguments that they own the copyright in the first place are now apparent.

Whatever else may be said about whether the Fifth Circuit will adopt a bright-line rule for work for hire agreements, or whether the Second Circuit's decision in *Kauffmann* could ever be distinguished from these facts, or whether the February 2014 writing can act as an effective assignment, prospectively or retrospectively, in light of *Davis v. Blige* and other cases, it must be said, at the very least, that Plaintiffs' rights in this article were not clearly established at the time of the alleged violation, in January 2014.  On these facts, it certainly seems that this would be a case in which the guidance from *Saucier v. Katz*, 533 U.S. 194, 207 (2001) would be particularly relevant: "Our instruction to the district courts and courts of appeals to concentrate at the outset on the definition of the . . .  right [at issue] and to determine whether, on the facts alleged, a . . . violation could be found is important."  *See also Pearson v. Callahan*, 555 U.S. 223, 236 (2009)

("Although we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial.").

While the issue of qualified immunity in copyright cases has not produced a large body of case law, there are courts that have looked at the issue and asked the same question that is at issue here: does the plaintiff have a right to the copyright that is clearly established at the time of the alleged violation?

In one of the first cases in this area, *Lane v. First Nat. Bank of Boston*, a district court in Massachusetts denied a qualified immunity defense to several state employees who had used a databased compiled by the plaintiff, but only after analyzing whether the plaintiff's right to the copyright was "clearly established" in light of some alleged ambiguities around the protection afforded to factual compilations.  687 F. Supp. 11, 16 (D. Mass. 1988).  After analyzing the state of the law governing "the exact interest which is protected in compilations," the Court held that "[a]t the time [plaintiff] alleges the defendants infringed her works, compilations based upon arrangement of preexisting data were clearly established to be copyrightable."  *Id.* at 17.  The case is relevant here not because of the ultimate outcome, that qualified immunity was not applicable, but the reasoning that the Court engaged in, by asking in the first instance whether plaintiff's right in the allegedly copyrighted material was "clearly established."

Similarly, in *Roy v. New Hampshire Dep't of Corrections*, a district court in New Hampshire granted qualified immunity to a prison warden who had used a design created by one of the inmates.  2015 WL 5054652 (D. N.H. 2015).  In that case, the Court began its analysis of qualified immunity by noting that "to establish copyright infringement, the plaintiff must prove two elements: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Id.* at *2.  Accordingly, in order for the warden "to have understood that

he was violating [the inmate's] right under the Copyright Act, it would have been necessary for [the warden] to have understood that *[the plaintiff] owned a valid copyright in [the work]*." *Id.* (emphasis added).

One of the more recent cases on this issue is the Fourth Circuit's decision in *Allen v. Cooper*— the same decision that was recently affirmed by the Supreme Court. *See Allen*, 895 F.3d 337 (4th Cir. 2018), *aff'd*, 140 S. Ct. 994 (2020).  In that case, the district court had denied qualified immunity to the named state officials, based on its finding that "the law of copyright infringement is clearly established." *Id.* at 356.   The Court of Appeals reversed, however, finding that based on the provisions of a previous settlement agreement reached by the parties "and the then applicable public records law, it is far from clear whether the Department was prohibited from displaying Allen's copyrighted materials in the manner alleged in the complaint." *Id.* at 357.  Noting that the Court "need not resolve whether . . . [the officials' conduct] violated the Copyright Act to resolve the question of qualified immunity," the Court held that dismissal of these claims was proper because "reasonable officials in the position of the North Carolina officials would not have understood *beyond debate* that their publication of the material violated *Allen's* rights under the Copyright Act." *Id.* at 357 (second emphasis added).

While it is true that each of these cases involve different facts, including situations in which the defendants may have thought that they had some right to use the material at issue, that fact is not dispositive as to the evaluation of the second prong of the qualified immunity analysis. As the Fifth Circuit summarized in one recent case:  "Qualified immunity includes two inquiries. The first question is whether the [defendant] violated a constitutional right.  The second question is whether the right at issue was clearly established at the time of the alleged misconduct." *See Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (cleaned up, emphasis added) (citing

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  Stated slightly differently, the Supreme Court has put the second prong as follows: "A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue."  *Davis v. Scherer*, 468 U.S. 183, 197 (1984).

Moreover, while this Court was certainly correct in stating in its March 2019 Order that copyright is, at some level of generality, a clearly established right, the Supreme Court has emphasized "repeatedly" that the federal courts should "not define clearly established law at a high level of generality."  *Ashcroft v. al-Kidd,* 563 U.S. 731, 742 (2011).

Here, Plaintiffs are alleging that they have a right to the copyright on the Canning article, and that Brad Marquardt violated that right in January 2014.  At that time, however, Plaintiffs had no clearly established right to the copyright.  Dismissal based on qualified immunity is therefore proper.

**CONCLUSION**

Mr. Marquardt respectfully requests that this Court enter summary judgment in this case and dismiss Plaintiffs' claims.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

JOSHUA R. GODBEY
Division Chief
Financial Litigation and Charitable Trusts Division

 */s/ H. Melissa Mather*_____
H. Melissa Mather
Attorney in Charge
State Bar No. 24010216
Southern District Bar No. 1476779
Assistant Attorney General
Financial Litigation and Charitable Trusts Division
P.O. Box 12548, Austin, TX 78711-2548
Telephone: (512) 475-2540
Facsimile: (512) 477-2348
Email: melissa.mather@oag.texas.gov

Julie Ford
State Bar No. 07240500
Southern District Bar No. 17986
George Brothers Kincaid & Horton, LLP
114 West 7th Street, Suite 1100
Austin, Texas 78701
Telephone: (512) 495-1448
Facsimile: (512) 499-0094
Email: jford@gbkh.com

*Counsel for Brad Marquardt*

**CERTIFICATE OF SERVICE**

       I hereby certify that on June 5, 2020, the foregoing was served upon all counsel of record via the Court's CM/ECF system and/or by certified mail, return receipt requested.

        _/s/ H. Melissa Mather_____

       H. Melissa Mather
       Assistant Attorney General