**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL J. BYNUM and CANADA HOCKEY LLC d/b/a EPIC SPORTS | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CASE NO. |
| BRAD MARQUARDT, in his individual capacity, | § § § | 4:17-CV-00181 |
| Defendant. | § | |

**DEFENDANT BRAD MARQUARDT'S
MOTION FOR SUMMARY JUDGMENT
CASE APPENDIX**

| Item # | Cases |
|---|---|
| 1 | *Gladwell Gov't Serv., Inc. v. County of Marin*, 265 F. Appx 624 (9th. Cir. 2008) |
| 2 | *Rachlin Architects, Inc. v. Los Angeles Unified Sch. Dist*, CV 04-6670 AHM (CWx), 2005 WL 8154587 (C.D. Ca. Oct. 11, 2005) |
| 3 | *Roy v. New Hampshire Dep't of Corrections*, No. 13-cv-438-PB, 2015 WL 5054652 (D. N.H. July 8, 2015) |
| 4 | *Winston v. City of Shreveport*, 390 Fed. Appx (5th Cir. 2010) |

KeyCite Yellow Flag - Negative Treatment
Disagreement Recognized by Estate of Kauffmann v. Rochester Institute of Technology, 2nd Cir.(N.Y.), August 1, 2019

265 Fed.Appx. 624
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Ninth
Circuit Rule 36-3. (Find CTA9 Rule 36-3)
United States Court of Appeals,
Ninth Circuit.

GLADWELL GOVERNMENT
SERVICES, INC., Plaintiff-Appellant,
v.
COUNTY OF MARIN; County of
Tuoluomne, a legal subdivision of the State
of California, Defendants-Appellees.

No. 05-17327.
|
Argued and Submitted Nov. 7, 2007.
|
Filed Jan. 28, 2008.

**Synopsis**

**Background:** Contractor sued county for alleged copyright infringement. The United States District Court for the Northern District of California, Saundra B. Armstrong, J., dismissed action for failure to state claim. Contractor appealed.

**Holdings:** The Court of Appeals held that:

[1] county could not acquire copyright ownership in contractor's pre-existing materials through work-for-hire agreement;

[2] agreement did not, by itself, operate to effect a copyright transfer; and

[3] contractor had standing to sue for copyright infringement.

Reversed and remanded.

West Headnotes (3)

[1] **Copyrights and Intellectual Property** 🔑 Works Made for Hire

Under Copyright Act, county could not acquire copyright ownership in contractor's pre-existing materials through work-for-hire agreement.

17 U.S.C.A. §§ 101(2), 201(b).

8 Cases that cite this headnote

[2] **Copyrights and Intellectual Property** 🔑 Requisites and Validity

Agreement between county and government contractor which provided that all reports, information, data, work product, findings, and conclusions furnished to or collected, prepared, assembled, or made by contractor's agents pursuant to agreement would be county property did not, by itself, operate to effect a copyright transfer. 17 U.S.C.A. § 204(a).

1 Cases that cite this headnote

[3] **Copyrights and Intellectual Property** 🔑 Persons Entitled to Sue

Government contractor, having alleged protectable copyright interest in materials which pre-existed its contract with county and could not be transferred except in conformity with requirements of Copyright Act, had standing to sue for copyright infringement. 17 U.S.C.A. §§ 201(a, b), 204(a).

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*625** Kevin D. Hughes, Los Angeles, CA, for Plaintiff-Appellant.

Cary M. Adams, Esq., Geoffrey Alan Goodman, Murphy Austin Adams Schoenfeld LLP, Sacramento, CA, for Defendants-Appellees.

Appeal from the United States District Court for the Northern District of California, Saundra B. Armstrong, District Judge, Presiding. D.C. No. CV-04-03332-SBA.

Before: HUG, THOMAS, and TALLMAN, Circuit Judges.

MEMORANDUM [*]

**\*\*1** Gladwell Government Services, Inc. ("Gladwell") appeals the district court's dismissal of its copyright infringement action for failure to state a claim under Rule 12(b)(6). We reverse. Because the parties are familiar with the factual and procedural history of this case, we need not recount it here.

I

We review *de novo* a dismissal for failure to state a claim under Rule 12(b)(6). *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir.2005). At this stage, we take as true allegations of material fact in the complaint and construe the pleadings in the light most favorable to the nonmoving party. *Id.* Our review is generally limited to the contents of the complaint, but we "may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir.2006). As the parties concede, we may consider the 1999 contract between Gladwell and Marin under the foregoing exception.

II

**[1]** The central claim raised on appeal is that Gladwell had authored and obtained copyright protection in certain material ("Pre-Existing Materials") that pre-dated the Marin contract that resulted in the creation of the retention schedules ("Marin Schedules"). The Copyright Act provides that copyright ownership "vests initially in the author or authors of the **\*626** work." 17 U.S.C. § 201(a). However, if the work is made "for hire," "the employer or other person for whom the work was prepared is considered the author ... and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b). Section 101 of the Copyright Act defines a "work made for hire" as "a work specially ordered or commissioned ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire...." 17 U.S.C. § 101(2). The plain language of the statute indicates that a work-for-hire agreement cannot apply to works that are already in existence. Works "specially ordered or commissioned" can only be made *after* the execution of an express agreement between the parties. *See* Playboy Enters., Inc. v. Dumas, 53 F.3d 549, 558-59 (2d Cir.1995); Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 412-13 (7th Cir.1992) ("The writing must precede the creation of the property" to qualify as a work-for-hire agreement). Accordingly, Marin could not acquire copyright ownership in Gladwell's Pre-Existing Materials through a work-for-hire agreement.

**[2]** Additionally, the agreement did not transfer Gladwell's copyright interest in the Pre-Existing Materials to Marin. The agreement provides that "[a]ll reports, information, data, work product, findings, and conclusions furnished to or collected, prepared, assembled, and/or made by [Gladwell's agents] under this Agreement ("Work Product") shall be the property of [Marin]." This language by itself cannot operate to effect a copyright transfer as a matter of law. *See* 17 U.S.C. § 204(a) (requiring that a transfer of copyright ownership must be made in a signed writing); Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir.1990). Transfer of a copyright interest must be made expressly. *Id.* ("The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so.").

**\*\*2** **[3]** Because Gladwell has alleged a protectable copyright interest in the Pre-Existing Materials that cannot be transferred except in conformity with the requirements of the Copyright Act, Gladwell has standing to sue for copyright infringement, and has stated a claim for relief sufficient to withstand a motion to dismiss on the pleadings.

2007 Copr.L.Dec. P 29,510

### III

Although Gladwell has stated a claim sufficient to avoid a Rule 12(b)(6) dismissal, it is far from evident that it has a legitimate claim. The record is simply too undeveloped to make that conclusion. It is unclear what, if anything, comprises the Pre-Existing Materials, and whether the Pre-Existing Materials or the Marin Schedules are, in fact, copyrightable-that is, whether they involve the requisite "minimal degree of creativity" necessary for copyright protection. See *Feist Publ'ns, Inc. v. Rural Telephone Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

It is also unclear from the record whether the contract, setting aside the question of the Pre-Existing Materials, actually created a work-for-hire agreement as contemplated by the Copyright Act. The district court's determination was based on a misreading of several parts of the contract. For instance, the district court read the contract to provide that all work product "furnished to [Marin]" shall be the property of Marin, when in fact it states that all work product "furnished to [Gladwell]" shall be the property of Marin. Additionally, the district court reported that Gladwell **\*627** cannot "use or publish" the Marin Schedules without Marin's prior authorization, but the contract only prohibits Gladwell from publishing (or making available) the Marin Schedules without Marin's authorization.

All of these matters are committed to the careful consideration of the district court on remand, and we express no opinion on any of these questions. Our holding simply is that Gladwell has standing to sue and its complaint survives the minimal requirements of Rule 12(b)(6).

### REVERSED AND REMANDED.

### All Citations

265 Fed.Appx. 624, 2008 WL 268268, 2007 Copr.L.Dec. P 29,510

## Footnotes

\*        This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk Pearson v. Callahan, U.S., January 21, 2009

2005 WL 8154587

Only the Westlaw citation is currently available.

United States District Court, C.D. California.

RACHLIN ARCHITECTS, INC., Plaintiff,

v.

LOS ANGELES UNIFIED SCHOOL
DISTRICT and Richard M. Luke, Defendants.

Case No. CV 04–6670 AHM (CWx)

|

Signed 10/11/2005

**Attorneys and Law Firms**

David E. Barker, Collins Collins Muir and Stewart, South Pasadena, CA, for Plaintiff.

David M. Huff, Sarine A. Abrahamian, Colin E. Barr, Orbach Huff and Suarez, Los Angeles, CA, for Defendants.

ORDER GRANTING RICHARD M. LUKE'S
MOTION FOR SUMMARY JUDGMENT

A. Howard Matz, United States District Judge

## INTRODUCTION

*1 This matter is before the Court on Defendant Richard M. Luke's Motion for Summary Judgment. I GRANT the motion on qualified immunity grounds, finding that Luke, as staff architect to the Los Angeles Unified School District, could reasonably have believed his conduct to be lawful with respect to Plaintiff's statutory rights under copyright.

## BACKGROUND

Defendant Los Angeles Unified School District ("LAUSD") retained Plaintiff Rachlin Architects, Inc. ("Rachlin") in November 1998 to design an on-grade parking structure with an eight classroom building on top of the structure. This project was known as the Wonderland Elementary School project (the "Project"). Rachlin designed the structure and obtained the approval of the Department of State Architect ("DSA"). LAUSD retained the right to cancel its contract with Rachlin for any reason upon thirty days' notice.

On January 16, 2002, LAUSD placed the Project on hold because construction required a detailed environmental impact report. LAUSD exercised its right to cancel the contract, properly giving Rachlin thirty days' notice, and paying Rachlin for all services rendered up to the day of cancellation.

At some point thereafter, LAUSD restarted the project. LAUSD's staff architect, Defendant Richard M. Luke, modified the original plans and then stamped, signed, and submitted the plans to the DSA. Construction continued at least through the filing of this motion. The Wonderland Elementary School is scheduled for completion in October 2005.

On August 11, 2004, Rachlin filed suit against LAUSD and Luke, asserting a breach of contract claim against LAUSD and copyright infringement and false designation of origin claims against both LAUSD and Luke. Both Defendants moved to dismiss. On January 21, 2005, I granted that motion with respect to LAUSD, and denied it with respect Rachlin's copyright claim against Luke.

On August 22, Luke filed this motion for summary judgment.

## DISCUSSION

### I. Legal Standard

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A fact is material if it could affect the outcome of the suit under the party to establish, beyond the pleadings, that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the

Case 4:17-cv-00181 Document 143-4 Filed on 06/05/20 in TXSD Page 6 of 25

Rachlin Architects, Inc. v. Los Angeles Unified School District, Not Reported in Fed....

2005 WL 8154587

moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.,* 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." ' *Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 805–06 (1999) (*citing Celotex,* 477 U.S. at 322).

**\*2** When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.; Beyene v. Coleman Sec. Serv., Inc.,* 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.' " *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999) (quoting *Anderson,* 477 U.S. at 255). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson,* 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).

## II. Qualified Immunity

### A. Qualified Immunity as a Defense to Copyright Infringement

Both parties have assumed that qualified immunity principles under 42 U.S.C. § 1983 are applicable here, where a statutory right (copyright), as opposed to a constitutional right, is at issue. [1] They are correct.

The Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), expressly acknowledged that qualified immunity is a potential defense to alleged violations of *statutory* rights: "[Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established *statutory* or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818 (emphasis added). Although most qualified immunity cases involve alleged *constitutional* violations, many nevertheless cite and/or quote *Harlow's* language regarding "statutory" rights. *See, e.g., Spoklie v. Montana,* 411 F.3d 1051, 1060 (9th Cir. 2005); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose,* 402 F.3d 962, 971 (9th Cir. 2005).

Additionally, at least three federal courts have considered the defense of qualified immunity in the context of alleged violations of *statutory* copyright. *See Lane v. First Nat. Bank of Boston,* 687 F.Supp. 11 (D.Mass. 1988); *Pollara v. Seymour,* 150 F.Supp.2d 393 (N.D.N.Y 2001); *Chavez v. Arte Publico Press,* 59 F.3d 539 (5th Cir. 1995). In both *Lane* and *Pollara,* the district courts, although ultimately rejecting the state officials' defense of qualified immunity, proceeded, at least implicitly, on the basis that such a defense was available. *Lane,* 687 F.Supp. at 17–18; *Pollara,* 150 F.Supp.2d at 398. In *Chavez,* the Fifth Circuit considered a qualified immunity defense by a state university employee to plaintiff's allegations of copyright infringement. As here, the court had to look to the parties' contract to determine whether the defendant was entitled to qualified immunity:

> The unlawful act [defendant] is alleged to have committed was authorizing the printing of copies of [plaintiff's] book in violation of the Copyright Act. However, paragraph 14 of plaintiff's Complaint concedes that the contractual provision relating to the duration of the publishing license is ambiguous. The contract itself, appended to the plaintiff's Complaint, confirms this ambiguity. Because the licensing contract was reasonably susceptible to two interpretations, one of which renders [defendant's] alleged

act perfectly legal, he is entitled to qualified immunity.

**\*3** *Chavez,* 59 F.3d at 548 (vacated on other grounds). Thus, in *Chavez,* the Fifth Circuit found that state officials may be qualifiedly immune from suit for claimed violations of copyright.

Given (1) that *Harlow* expressly refers to "statutory" rights, (2) that copyright is itself constitutionally grounded, and (3) that federal courts have acknowledged that government officials may invoke qualified immunity as a defense to allegations of copyright infringement, Luke is entitled to raise qualified immunity as a defense to Rachlin's claims.

**B. Qualified Immunity Standard**

A public official performing a discretionary function enjoys qualified immunity in a civil action for damages, provided his conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow,* 457 U.S. at 818. The immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985).

In *Saucier v. Katz,* 533 U.S. 194 (2001), the Supreme Court stated that in ruling on a summary judgment motion based on qualified immunity, the court must conduct a two-step inquiry. First, the Court must ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional [or statutory] right?" *Id.* at 201. Second, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" when viewed in the context of the case. *Id.*

For a right to be "clearly established," "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202 (citation deleted). For even where plaintiff's factual allegations would, if true, establish an actual violation, immunity will nevertheless be recognized if officials "of reasonable competence could disagree on ... whether a chosen course of action" would be lawful. *Brewster v. Board of Education of the Lynwood Unified School District,* 149 F.3d 971, 977 (9th Cir. 1998) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). "Indeed, [qualified immunity] safeguards 'all but the plainly incompetent or those who

knowingly violate the law....' " *Id.* "If the law did not put the [official] on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier,* 533 U.S. at 202.

Supreme Court and Ninth Circuit decisions make clear that the "clearly established" inquiry must be undertaken in a *context-specific manner. Id.; see also Brewster,* 149 F. 3d at 978. Thus, whether a right is "clearly established" depends substantially on the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987). "[R]eviewing courts must not view ... rights in the abstract but rather 'in a more particularized, and hence more relevant, sense.' " *Brewster,* 149 F.3d at 978 (quoting *Anderson,* 483 U.S. at 640). Thus, here, the right at stake is not merely Rachlin's rights under copyright, but rather Rachlin's rights under copyright *in light of the Rachlin– LA USD contract*—which may or may not have transferred ownership of Rachlin's copyright to LAUSD.

**1. The Rachlin–LAUSD Contract**

**\*4** The parties' dispute whether the November 1998 contract for architectural services between LAUSD and Rachlin transferred copyright ownership in the resulting Project plans. There is only one provision in the contract that pertains to the issue of copyright transfer—Article XI, which states:

> The final preliminary sketches, architectural presentation drawings, final construction documents, structural computations, and other documents prepared by the Architect under this Agreement shall be and shall remain the sole property of the District. The Architect shall not permit reproductions to be made out of the final construction documents without the approval of the District and shall refer all requests by bidders and other persons for construction documents to the District.

SUF ¶ 11.

Rachlin Architects, Inc. v. Los Angeles Unified School District, Not Reported in Fed....

2005 WL 8154587

California Education Code § 17316, however, also governs contracts between school districts and architects. Both parties cite specific language from § 17316 to support their respective arguments. Rachlin argues that § 17316(b) specifies that school districts, in entering contracts for architectural services, obtain no copyright interest in architectural plans for which they contract, absent an express written agreement to the contrary. Luke cites that same California law, albeit subsection (a), in contending that the exact opposite is true —*i.e.,* that, by default, the copyright interest in architectural plans pass to school districts. Section 17316 states:

(a) Any contract entered into... between [a] school district and [an] architect ... shall provide that all plans ... shall be and remain the property of the school district for the purposes of repair, maintenance, renovation, modernization, or other purposes, only as they relate to the project for which the certified architect or structural engineer was retained. Nothing in this subdivision shall preclude the school district from using the plans... for the purposes of additions, alignments, or other development on the site.

(b) The contract set forth in subdivision (a) shall not be construed to transfer the] architect's ... copyrights over these documents, including, but not limited to, all common law, statutory, and other reserved rights, unless the ... architect... expressly transfers... these rights [in writing].

Cal. Educ. Code § 17316 (2001).

Luke contends that subsection (b) preserves Rachlin's copyright only where the contract itself is silent and here it is not silent. He points out that the express language of Article XI labels the plans the "sole property" of the district and prohibits Rachlin from making reproductions of the originals.

### 2. Is Luke Entitled to Qualified Immunity?

Keeping in mind the parties' competing contentions regarding the effect of the Rachlin–LAUSD contract upon Rachlin's copyright interest, I now apply the *Saucier* qualified immunity standard set forth above.

The first inquiry under *Saucier* poses the following question: Taken in the light most favorable to Rachlin, do the facts alleged show that Luke's conduct violated Rachlin's rights under copyright? *Saucier v. Katz,* 533 U.S. at 201. Rachlin alleges that Luke improperly took its plans, made minor

modifications, removed its title block, and signed and stamped the plans as Luke's own. Rachlin contends that these actions constitute infringement of its copyrights under 17 U.S.C. § 102(a)(5) (for pictorial, graphic, and sculptural works) and § 102(a)(8) (for architectural works). The Court assumes for purposes of this Order that Rachlin is correct in this contention.

**\*5** The second *Saucier* inquiry asks whether the right allegedly violated was "clearly established" at the time defendant engaged in the challenged conduct and in light of the circumstances defendant faced. *Saucier v. Katz,* 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*") (emphasis added); *see also Brewster,* 149 F. 3d at 978; *Anderson,* 483 U.S. at 640. Thus, here, I must assess Rachlin's rights, and whether those rights were clearly established, in light of the contract between Rachlin and LAUSD.

Rachlin contends that it alone, as owner of the copyright, had the right to prepare derivative works from its architectural plans and that that right is "clearly established" under 17 U.S.C. § 106(2) (copyright owners hold the "exclusive right[ ] to ... prepare derivative works based upon the copyrighted work."). Rachlin is correct in the abstract, *i.e.,* that the legal contours of the right to prepare derivative works are sufficiently defined to have put people on notice of what is and is not lawful under copyright. Rachlin is incorrect, however, in arguing that its right to prepare derivative works was "clearly established" on the facts of this case, *i.e.,* when one takes into account the circumstances Luke faced.

Luke contends that it was objectively reasonable for him to stamp, sign, and submit the modified Project plans to the DSA, given that the contract can reasonably be interpreted as transferring Rachlin's copyright to LAUSD. Luke argues that Rachlin's and LAUSD's respective rights to the plans under the contract were sufficiently ambiguous such that he cannot be said to have acted unreasonably in treating the plans as his own.

I agree. Although I would likely conclude that Cal. Educ. Code § 17316(b), not § 17316(a), governs the analysis on the merits and, hence, that the contract did *not* transfer Rachlin's copyright to LAUSD, Luke's contention to the contrary is not unreasonable. There is sufficient ambiguity such that Luke could have reasonably believed that his conduct was

Rachlin Architects, Inc. v. Los Angeles Unified School District, Not Reported in Fed....

2005 WL 8154587

lawful. Even if the explicit language of Cal. Educ. Code § 17316(b)(preserving an architect's copyright interest) trumps subsection (a), Article XI's express limitation on Rachlin's reproduction right and the "sole property" language create sufficient doubt as to Rachlin's and LAUSD's respective interests such that Luke's conduct cannot be said to have been unreasonable. Thus, like *Chavez, supra,* because the Rachlin–LAUSD contract was ambiguous with respect to copyright ownership, Rachlin's copyright rights were not clearly established at the time Luke modified, stamped, signed, and submitted the plans. As such, Luke is entitled to qualified immunity.

The Court finds further support for this conclusion in the "decision" of the California Architects Board ("CAB"), the professional peer review and oversight board of both Luke and Rachlin. Rachlin referred Luke to the CAB and alleged that he had improperly taken its plans, made minor modifications, removed its title block, and signed and stamped the plans as Luke's own, in violation of California Business & Professions Code § 5536.1. Violations of § 5536.1 are considered misdemeanors and carry punishments up to $5000 and 1 year in jail. Cal. Bus. & Prof. Code § 536. The CAB considered and "dismissed" Rachlin's allegations of improper oduct by Luke. The CAB made the following determination:

> The Board's enforcement staff and architect consultant reviewed this case and determined that there were no violations of [§ 5536.1] based on the evidence provided, therefore, this case is closed. The Board [finds] that [Luke was] acting in [his] capacity as a staff architect with the LAUSD and that [he] exercised responsible control over the documents for the revised project."

**\*6** Luke Deck, Ex. C ¶ 9. Although the CAB "decision" does not bind the Court in any way, it is relevant to the issue of whether Luke's actions can be considered objectively reasonable. [2] That is, the CAB "decision" helps inform the Court as to what a reasonable LAUSD architect could have done in Luke's situation. That the CAB concluded Luke "exercised responsible control" supports the conclusion that he did in fact act objectively reasonably, and thus is entitled to qualified immunity.

Rachlin's only evidence to the contrary comes from Luke's deposition testimony, in which he allegedly admits to knowing that Rachlin retained the copyright interest in its plans. Rachlin, however, quotes selectively to create such an inference. Luke did indeed testify that he believed Rachlin to be the copyright holder; however, he went on to clarify that belief, stating that he believed Rachlin retained the copyright in the plans *only as to projects other than the Wonderland Project*:

> It was my understanding that as it pertained to *this* project, the Wonderland eight-classroom addition[,] we weren't infringing on any copyright. If we were intending to use it *elsewhere*, that's where[,] it was my understanding[,] we would need to ask permission from Rachlin Architects.

Barr Deck, Ex. A, pp. 10–11 (emphasis added). This statement demonstrates that Luke did not consider his stamping and submitting the modified Wonderland Project plans to have infringed in any way on Rachlin's rights under copyright law.

Given (1) that a colorable argument can be made that the contract transferred Rachlin's copyright to LAUSD, and (2) that the CAB determined that Luke acted as would a responsible architect in submitting the modified plans as his own, the second *Saucier* inquiry compels a finding that Luke is entitled to qualified immunity. Although the right to prepare derivative works under copyright is "clearly established" in the abstract, Rachlin's rights *in this case* were by no means "clearly established" given the ambiguity of the contract.

### C. Remaining Claims

Although qualified immunity is applicable only in civil suits for *damages, see American Fire, Theft & Collision Managers, Inc. v. Gillespie,* 932 F.2d 816, 818 (9th Cir. 1991), the Court nevertheless dismisses any remaining claims for injunctive relief by Rachlin. Rachlin has presented no evidence that Luke's conduct involved projects other than the Wonderland Elementary School, and there is little risk of future infringement.

Rachlin Architects, Inc. v. Los Angeles Unified School District, Not Reported in Fed....

2005 WL 8154587

## CONCLUSION

For the reasons discussed above, the Court GRANTS Luke's motion for summary judgment.[3] Defendants shall lodge a proposed judgment.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2005 WL 8154587

## Footnotes

1    Of course the Constitution itself empowers Congress to enact copyright legislation. U.S. Const. art. I, § 8, cl. 8.

2    Rachlin concedes this. See 9/19/2005 Hearing Transcript, pp. 8:15–9:18.

3    Docket No. 33.

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Roy v. New Hampshire Dept. of Corrections, Not Reported in F.Supp.3d (2015)

2015 WL 5054652

2015 WL 5054652
Only the Westlaw citation is currently available.
United States District Court, D. New Hampshire.

Steven J. ROY
v.
NEW HAMPSHIRE DEPARTMENT
OF CORRECTIONS; William Wrenn,
Commissioner, New Hampshire Department
of Corrections; Richard Gerry, Warden, New
Hampshire State Prison; and Fred Nichols.

No. 13–cv–438–PB.
|
Signed July 8, 2015.

**Attorneys and Law Firms**

Steven J. Roy, Berlin, NH, pro se.

Thomas J. Donovan, Francis Charles Fredericks, Nh
Attorney General's Office, Concord, NH, for New Hampshire
Department of Corrections; William Wrenn, Commissioner,
New Hampshire Department of Corrections; Richard Gerry,
Warden, New Hampshire State Prison; and Fred Nichols.

*REPORT AND RECOMMENDATION*

ANDREA K. JOHNSTONE, United States Magistrate Judge.

 **\*1**  Steven Roy, an inmate in the New Hampshire State
Prison ("NHSP"), has sued in four counts, seeking to recover
for defendants' use of copyrighted software he developed
during the course of his incarceration. Before me for a
report and recommendation is defendants' motion to dismiss.
Plaintiff objects. For the reasons that follow, I recommend that
defendants' motion to dismiss be granted in part and denied
in part.

**I. *The Legal Standard***

Under Rule 12(b)(6), I must accept the factual allegations in
plaintiff's complaint as true, construe reasonable inferences in
his favor, and "determine whether the factual allegations in
the plaintiff's complaint set forth a plausible claim upon which
relief may be granted." *Foley v. Wells Fargo Bank, N.A.,*
772 F.3d 63, 71 (1st Cir.2014) (citation omitted). A claim is

facially plausible "when the plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." *Ashcroft v.
Iqbal,* 556 U.S. 662, 678 (2009). Analyzing plausibility is "a
context-specific task" in which courts rely upon their "judicial
experience and common sense." *Id.* at 679.

**II. *Background***

The facts recited in this section are drawn from plaintiff's
amended complaint, document no. 45.

Before he was sentenced to prison, Roy ran a software
company. So too did Bill Johnson, who, at all times relevant
to this matter, was also an inmate at the NHSP. From 2001
onward, while an inmate at the NHSP, Johnson wrote business
software. He did so at times when he was not engaged in his
prison job because software development was not permitted
during his prison work time.

In mid 2004, the manager of the NHSP furniture shop hired
Roy as a clerk, but quickly reassigned him to work as a tailor.
He was, however, given permission to "play" with furniture-
shop computers on unpaid time. Among other things, Roy
worked on business modules that Johnson had developed,
many of which were then being used by the furniture shop and
one of which was being tested by the business office of New
Hampshire Correctional Industries ("NHCI"), a for-profit
manufacturing division of the New Hampshire Department
of Corrections ("DOC"). Development of Johnson's business
modules—by whom, the complaint does not specify—
continued into 2006. By early 2007, Johnson and Roy had
completed all the basic features of the business software they
were developing and inserted copyright notices into all of the
modules, claiming joint authorship of that software.

In May of 2006, a new manager of the furniture shop made
Roy a clerk. Two months later, after all of the NHCI shops
failed an audit, the furniture-shop manager assigned Roy to
work as the inventory clerk and directed him to solve the
furniture shop's accounting problems.

At some point, the complaint does not say when, Fred Nichols
became the director of NHCI and renamed it "GraniteCor."
After seeing a demonstration of the software Johnson and Roy
had developed, Nichols decided that he wanted it to be used
by all of GraniteCor's shops, from a central network. Johnson

and Roy made the changes necessary to accomplish that goal, and the resulting software package was named "JOINT."

**\*2** In July of 2011, JOINT was put into use by most of the GraniteCor shops. Ultimately, it was deployed to 35 work stations by both staff and inmates. After deployment, Roy's duties included training and assisting users of JOINT and performing maintenance on the software.

In March of 2012, Nichols noticed the copyright notice that Johnson and Roy had placed in the JOINT software. Almost immediately thereafter, Johnson was placed on indefinite leave of absence from his prison job. In response, Johnson and Roy began the process of registering their purported copyright in JOINT. Their registration materials included affidavits that, in their view, established that the JOINT software was not produced as a work for hire, as that term is used in copyright law.[1] The Copyright Office issued a certificate of registration that was effective as of June 11, 2012.

In the late summer of 2012, Roy came to believe that GraniteCor was no longer using JOINT. In May of 2013, he was shown a document dated March 2013 that was generated by JOINT and signed by Nichols. That document demonstrated that GraniteCor was using the JOINT software. Shortly thereafter, Roy sent Nichols an inmate request slip demanding that GraniteCor cease and desist from using or modifying JOINT, and he sent a letter to the office of the Attorney General asking for the same relief. However, GraniteCor continued to use JOINT on at least four computers until mid January of 2014, when it stopped using that software.

Based upon the foregoing, Roy asserts claims for: (1) copyright infringement (claim # 1); (2) conversion (claim # 3); (3) unjust enrichment (claim # 7); and (4) violation of the due-process clause of the Fourteenth Amendment to the United States Constitution (claim # 9).[2] He seeks both monetary damages and injunctive relief.

### III. *Discussion*

Defendants move to dismiss under a variety of legal theories. In this section, I consider each of plaintiff's claims in turn.

A. *Claim # 1*

In claim # 1, plaintiff asserts that the DOC and Nichols are liable to him for copyright infringement.[3] He is suing Nichols in both his individual and official capacities, and he frames his infringement claim this way:

> [D]efendants Fred Nichols and the N.H. Department of Corrections, knowing that JOINT was a copywritten work, (a) engaged in the unauthorized creation of derivative works of JOINT, (b) used DOC funds to pay for the creation of unauthorized derivative works of JOINT, (c) utilized and modified JOINT without the plaintiff's permission after 6/11/2012, (d) copied JOINT from a secure mainframe ... or other network location to user computers and copied it into the CPU's of those computers when they ran it after 6/11/2012; (e) secretly used JOINT after the 8/28/2012 alleged network shutdown, (f) failed to cease using JOINT when notified to do so, and (g) did all of this for commercial gain within the DOC's wholly owned GraniteCor business.

**\*3** Am. Civ. Comp. (doc. no. 45) 11.

In their motion to dismiss, defendants argue that: (1) plaintiff has failed to state a claim for copyright infringement because he did not own the copyright on JOINT, owing to its status as a work for hire; (2) plaintiff is equitably estopped from bringing an infringement claim; (3) plaintiff granted the DOC an irrevocable license to the JOINT software; (4) Nichols is entitled to qualified immunity from claims brought against him in his individual capacity; and (5) the DOC, and Nichols in his official capacity, are entitled to sovereign immunity from an award of damages. Defendants' immunity arguments are meritorious, but do not entitle them to a complete dismissal of plaintiff's copyright-infringement claims.

### 1. Qualified Immunity

"Because the 'qualified immunity defense is, in part, an immunity from trial as well as an immunity from damage awards,' " *Cady v. Walsh,* 753 F.3d 348, 358 (1st Cir.2014) (quoting *Stella v. Kelley,* 63 F.3d 71, 73 (1st Cir.1995)), I begin with that theory. "As the Supreme Court recently reiterated, '[a] government official sued under [ 42 U.S.C. § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.' " *Hunt v. Massi,* 773 F.3d 361, 367 (1st Cir.2014) (quoting *Carroll v. Carman,* 135 S.Ct. 348, 350 (2014)). While typically

employed in the context of claims brought under § 1983, "[c]ourts have considered the doctrine of qualified immunity when a particular area of copyright law was not clearly established." *Ass'n for Info. Media & Equip. v. Regents of Univ. of Cal.,* No. 2:10–cv–09378–CBM (MANx), 2012 WL 7683452, at *6 (C.D .Cal. Nov. 20, 2012) (citing *Molinelli–Freytes v. Univ. of P.R.,* 792 F.Supp.2d 150, 157 (D.P.R.2011); *Campinha–Bacote v. Bleidt,* No. H–10–3481, 2011 WL 4625394, at *3 (S.D.Tex. Oct. 3, 2011)); *see also Chavez v. Arte Publico Press,* 59 F.3d 539, 547–48 (5th Cir.1995), *vacated on other grounds by Univ. of Hous. v. Chavez,* 517 U.S. 1184 (1996).

The doctrine of qualified immunity " 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.' " *Hunt,* 773 F.3d at 367 (quoting *Carroll,* 135 S.Ct. at 350). The court of appeals has described the mechanics of qualified immunity this way:

> The two-step procedure for assessing a plea of qualified immunity at the motion to dismiss stage is well-rehearsed.
> *See, e.g., Feliciano–Hernández v. Pereira–Castillo,* 663 F.3d 527, 532–33 (1st Cir.2011); *Eldredge [v. Town of Falmouth, MA],* 662 F .3d [100,] 104–05 [ (1st Cir.2011) ]. On the basis of the pleadings, we must decide "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado [v. Fontanes],* 568 F.3d [263,] 269 [ (1st Cir.2009) ] (quoting *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)).

**\*4** The "clearly established" inquiry, in turn, has two related aspects. One aspect focuses exclusively on the clarity of the law at the time of the alleged violation. "To overcome qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* (alteration in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The other aspect considers the specific facts of the case at bar. The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (quoting

*Saucier v. Katz,* 533 U.S. 194, 201 (2001)) (internal quotation marks omitted). Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."

*Maldonado,* 568 F.3d at 269 (first alteration in original) (emphasis added) (quoting *Brosseau,* 543 U.S. at 199) (internal quotation marks omitted).

*Rocket Learning, Inc. v. Rivera–Sánchez,* 715 F.3d 1, 8–9 (1st Cir.2013) (parallel citations omitted). "In other words, 'existing precedent must have placed the ... constitutional question beyond debate.' " *Hunt,* 773 F.3d at 368 (quoting *Carroll,* 135 S.Ct. at 350).

Finally, "federal courts have discretion to administer the components of the qualified immunity test in the order that they determine 'will best facilitate the fair and efficient disposition of each case.' " *Rocket Learning,* 715 F.3d at 9 (quoting *Pearson,* 555 U.S. at 242). Thus, "[w]here the court can 'quickly and easily decide that there was no violation of clearly established law,' it need not 'turn[ ] to the more difficult question [of] whether the relevant facts make out a constitutional question at all.' " *Id.* (quoting *Pearson,* 555 U.S. at 239).

Here, the court begins with the "clearly established" inquiry, and the dispositive question is whether a reasonable official in Nichols's shoes, under the circumstances of this case, would have known that he was violating Roy's rights under the Copyright Act by engaging in the conduct alleged in claim # 1. To answer that question, the court must turn to the law of copyright.

"To establish copyright infringement, the plaintiff must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.' " *Latin Am. Music Co. v. Media Power Grp., Inc.,* 705 F.3d 34, 38 (1st Cir.2013) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)). Thus, to have understood that he was violating Roy's right under the Copyright Act, it would have been necessary for Nichols to have understood that Roy owned a valid copyright in JOINT.

Roy has alleged that in March of 2012, Nichols learned that JOINT carried a copyright notice, and the court will

assume, favorably to Roy, that when Roy asked Nichols to cease and desist from using JOINT in the spring of 2013, he informed Nichols that the copyright in JOINT had been registered. When a copyright claim "is registered with the Copyright Office within five years of first publication of the work, the certificate of registration is prima facie evidence of ownership and the validity of the copyright." *Latin Am. Music,* 705 F.3d at 38 (citing 17 U.S.C. § 410(c); *Johnson v. Gordon,* 409 F.3d 12, 17 (1st Cir.2005)). Based upon the foregoing, one might argue that by the spring of 2013, at the latest, a reasonable officer in Nichols's shoes would have understood that at least some of the conduct alleged in claim # 1, such as making derivative works based on JOINT, violated a copyright on JOINT that was owned by Roy.

**\*5** But this is far from an ordinary copyright infringement case, given Roy's status as a prisoner, the circumstances under which JOINT was written, and Nichols's knowledge of those circumstances. In his complaint, Roy alleges that: (1) JOINT was written on DOC computers; (2) the final version was created in response to requests by Nichols for changes necessary for JOINT to be used by all of GraniteCor's shops, *see* Am. Civ. Compl. (doc. no. 45) ¶ 20; and (3) at least some of Roy's work on and with JOINT was accomplished as a part of his prison job, *see id.* ¶ 29. In light of those circumstances, the court cannot say that a reasonable prison official in Nichols's position, even knowing of the copyright registration, would have known that it was possible, in the first instance, for Roy to have owned a copyright in JOINT.

That conclusion is reinforced by Judge Britt's decision in *McKenna v. Lee,* 318 F.Supp.2d 296 (E.D.N.C.2002). In that case, an inmate who created a design for an automobile license plate sued for copyright infringement, asserting that defendants (presumably prison officials) copied and published his design. *See id.* at 298. The court granted summary judgment to the defendants on grounds that the plaintiff was not the author of the license plate design, due to its having been created as a work for hire. *See id.* at 301. So, rather than placing Roy's ownership of a copyright in JOINT beyond debate, precedent tends to support defendants' side of the debate and the proposition that an inmate in Roy's position could not own the copyright on a work he authored while using prison-owned equipment, at the request of prison officials, and intended for use by the prison.

While *McKenna* suggests that works created by prisoners can be subject to the work-for-hire doctrine, plaintiff has not identified any case, and I have found none, in which a court

has ruled that the work-for-hire doctrine was inapplicable to a copyright plaintiff in Roy's position. Thus, there is no basis for determining that a reasonable official in Nichols's shoes would have understood that he was violating Roy's rights under the Copyright Act. Accordingly, Nichols, in his individual capacity is entitled to qualified immunity from Roy's copyright-infringement claim. *See Molinelli–Freytes,* 792 F.Supp.2d at 156–58 (explaining that plaintiff would have difficulty establishing that defendant was not entitled to qualified immunity where application of work-for-hire doctrine in academic context was unsettled area of law); *Ass'n for Info. Media,* 2012 WL 7683452, at \*6 (granting qualified immunity where "it [was] ambiguous whether the [defendant's] use was fair use under copyright law"). Because Nichols is entitled to qualified immunity from plaintiff's copyright-infringement claim, I recommend that defendants' motion to dismiss should be granted as to the individual-capacity copyright-infringement claim that plaintiff asserts against Nichols in claim # 1.

### 2. Sovereign Immunity

**\*6** Defendants next argue that the DOC and Nichols, in his official capacity, are protected by sovereign immunity from liability for civil damages on plaintiff's claim of copyright infringement. Plaintiff contends that Congress has abrogated sovereign immunity for state defendants facing claims of copyright infringement. He is mistaken.

The Eleventh Amendment to the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." Under the Eleventh Amendment, "absent waiver or valid abrogation [by Congress], federal courts may not entertain a private person's suit against a state." *Va. Office for Prot. & Advocacy v. Stewart,* 131 S.Ct. 1632, 1638 (2011). Sovereign immunity also extends to state agencies and to state officials acting in their official capacities. *See Brait Builders Corp. v. Mass. Div. of Capital Asset Mgmt.,* 644 F.3d 5, 11 (1st Cir.2011) (state agencies); *Davidson v. Howe,* 749 F.3d 21, 27 (1st Cir.2014) (state officials acting in their official capacities).

The purported abrogation of sovereign immunity upon which plaintiff relies is expressed in the following statutory provision:

> Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person ... for a violation of any of the exclusive rights of a copyright owner ... or for any other violation under this title.

17 U.S.C. § 511(a); *see also* § 501(a) (defining entities potentially liable for copyright infringement to include "any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity"). Section 511 and the definition in § 501(a) were added to the Copyright Act by a 1990 amendment titled the Copyright Remedy Clarification Act ("CRCA"), Pub.L. No. 101–553, 104 Stat. 104 (1990). The dispositive question here is whether the portion of the CRCA that purports to abrogate state sovereign immunity is legally valid. It is not.

In *National Association of Boards of Pharmacy v. Board of Regents,* 633 F.3d 1297 (11th Cir.2011), the court of appeals was presented with the very same question that faces this court, whether 17 U.S.C. § 511 was a valid abrogation of sovereign immunity. The court began by pointing out that

> Congress may abrogate the States' sovereign immunity when it (1) "unequivocally expresse[s] its intent to abrogate the immunity" through a "clear legislative statement," and (2) acts "pursuant to a valid exercise of [constitutional] power."

*7 *Id.* at 1312 (quoting *Seminole Tribe v. Florida,* 517 U.S. 44, 55 (1996)). Next, the court determined that Congress had unequivocally expressed its intent to abrogate state sovereign immunity from claims for copyright infringement. *See id.* at 1313. Then, the court turned to "the determinative question before [it]: 'Was the Act

in question passed pursuant to a constitutional provision granting Congress the power to abrogate?' " *Id.* (quoting *Seminole Tribe,* 517 U.S. at 59).

In its analysis, the court identified two possible sources of constitutional power: (1) the copyright and patent clause in Article I; and (2) § 5 of the Fourteenth Amendment. With regard to the copyright and patent clause, the court explained that "[t]he legislative history of the CRCA makes clear that Congress intended to abrogate state sovereign immunity under its Article I powers." *NABP,* 633 F.3d at 1313. Then, in reliance upon *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank,* 527 U.S. 627 (1999), the court held that " Congress may not abrogate the States' sovereign immunity pursuant to the Copyright and Patent Clause." 633 F.3d at 1315. Plaintiff does not argue that Article I gives Congress the power to abrogate state sovereign immunity but, rather, argues that

> based on *Seminole Tribe* ..., Congress *must* have used its powers under § 5 of the 14th Amendment in passing the CRCA "clarifying" the Copyright Act to include States and State actors ... because the Court in Seminole held: ONLY § 5 of the Fourteenth Amendment allows Congress to pass legislation abrogating Eleventh Amendment sovereign immunity.

Pl.'s Mem. of Law (doc. no. 48–1) 11 (emphasis in the original). That argument fails because the CRCA was enacted in 1990, six years *before Seminole Tribe* was decided, which means that Congress could not have had *Seminole Tribe* in mind when it passed the CRCA. *See Jacobs v. Memphis Conv. & Visitors Bureau,* 710 F.Supp.2d 663, 671 (W.D.Tenn.2010) ("Congress's reliance on Article I [in passing the CRCA] is unsurprising since passage of the Act preceded the 1996 decision in *Seminole Tribe* precluding abrogation of state immunity under Article I."). Be that as it may, defendants argue correctly, and plaintiff appears to concede, that the copyright and patent clause does not provide Congress with the power to abrogate state sovereign immunity. That leaves § 5 of the Fourteenth Amendment.

Section 1 of the Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." Section 5 provides that "[t]he Congress shall have power to enforce by appropriate legislation, the provisions of this article." Indeed, "[i]t is well established that § 5 grants Congress the authority to abrogate state sovereign immunity for violations of the Fourteenth Amendment." *NABP*, 633 F.3d at 1315 (citing *United States v. Georgia,* 546 U.S. 151, 158 (2006)).

**\*8** Notwithstanding the theoretical availability of § 5 as a constitutional basis for legislation abrogating state sovereign immunity, "[t]he legislative history of the [CRCA] unambiguously reveals that Congress intended to remove the states' sovereign immunity by means of Article I— namely, the Copyright Clause—rather than by means of § 5 [of the Fourteenth Amendment]." *Jacobs,* 710 F.Supp.2d at 671 (citation omitted). Moreover, "because the [CRCA] was undoubtedly passed pursuant to Article I[it] therefore cannot be defended and sustained ... under the Fourteenth Amendment." *Id.; see also Coyle v. Univ. of Ky.,* 2 F.Supp.3d 1014, 1019 (E.D.Ky.2014) (ruling that the CRCA was not a valid abrogation of sovereign immunity because it was enacted under Congress's Article I power, not its power under § 5 the Fourteenth Amendment); *Jehnsen v. N.Y. State Martin Luther King, Jr., Inst. for Nonviolence,* 13 F.Supp.2d 306, 311 (N.D.N.Y.1998) ("due to the fact that the copyright legislation was authorized by Article I and not the Fourteenth Amendment, Congress is without authority to abrogate state sovereign immunity for copyright cases"). In light of the Supreme Court's "disapprov[al] of attempts to justify the legitimacy of legislation abrogating state sovereign immunity on a constitutional basis different from that upon which Congress premised the abrogation at the time of the law's enactment," *Jacobs,* 710 F.Supp.2d at 672 (citing *Chavez v. Arte Publico Press,* 204 F.3d 601, 605 (5th Cir.2000)), and Congress's reliance upon its Article I powers when it enacted the CRCA, the purported abrogation of sovereign immunity in the CRCA is legally invalid.

Because Congress has not validly abrogated state sovereign immunity from claims for damages for copyright infringement, and because plaintiff does not even suggest that the State of New Hampshire has waived its sovereign immunity from such claims, I recommend granting defendants' motion to dismiss as to the claims for copyright-infringement damages that plaintiff asserts in claim # 1 against the DOC and Nichols in his official capacity.

### 3. The Remaining Claims & Defenses

In addition to claiming damages for copyright infringement, plaintiff also seeks various forms of prospective injunctive relief from the DOC and from Nichols in his official capacity. Relief such as that is not barred by sovereign immunity. *See Virginia Office,* 131 S.Ct. at 1638 (describing doctrine established by *Ex parte Young,* 209 U.S. 123 (1908)). Defendants recognize as much, and defend against those claims on three other grounds, which they appear to have drawn from a case with striking factual similarities to this one, *Le v. City of Wilmington,* 736 F.Supp.2d 842 (D.Del.2010).

In *Le,* Judge Stark granted summary judgment to the defendants against a copyright-infringement plaintiff who, as a municipal employee, developed a "software program for use by the City's Department of Licenses and Inspections," 736 F.Supp.2d at 845, and did so "exclusively on his own time in his own home," *id.,* after being forbidden from working on the program while at work, *see id.* At summary judgment, the defendants argued, successfully, that: (1) Le did not own a copyright in the software program because it was a work for hire, *see id.* at 851; (2) Le was estopped from asserting a copyright-infringement claim against the defendants, *see id.* at 852; and (3) "the parties' conduct created in the City an implied and irrevocable license in the Work," *id.* Defendants make all three of those arguments, and any one of them may prove to be meritorious. But, at this stage in the proceedings, all three arguments are premature.

**\*9** To be sure, courts have dismissed copyright-infringement actions when a plaintiff's claim to ownership rests upon the work-for-hire doctrine and the complaint fails to allege adequate facts to support such a claim. *See, e.g., Ward v. Mitchel,* No. 12–cv–3932 NC, 2013 WL 1758840, at \*4 (N.D.Cal. Apr. 24, 2013); *Morris v. Atchity,* No. CV 08– 5321 RSWL, 2009 WL 463971, at \*5–6 (C.D.Cal. Jan. 13, 2009). But here, plaintiff is not claiming ownership under the work-for-hire doctrine; he is claiming ownership as the author of JOINT. Under these circumstances, where work-for-hire is not claimed as the plaintiff's basis for ownership, but is asserted as a defense against a plaintiff's claim of ownership as an author, courts have been reluctant to decide the issue on a motion to dismiss. *See, e.g., Wolf v. Travolta,* No. 2:14– cv–00938–CAS (VBKx), 2014 WL 2472254, at \*4 (C.D. Cal. June 2, 2014). Indeed, in the face of Roy's registration

certificate, which is "prima facie evidence of ownership and the validity of the copyright," *Latin Am. Music,* 705 F.3d at 38, defendants bear the burden of proof on the work-for-hire issue, *see id.,* which suggests that summary judgment is the proper procedural posture for ruling on that issue. Similarly, both defendants' estoppel argument and their argument based upon an implied irrevocable license are affirmative defenses on which they bear a burden of proof. *See* 🔖 *John G. Danielson, Inc. v. Winchester–Conant Props., Inc.,* 322 F.3d 26, 44 (1st Cir.2003) (estoppel); 🔖 *Estate of Hevia v. Portrio Corp.,* 602 F.3d 34, 41 (1st Cir.2010) (implied license). Thus, as with defendants' work-for-hire argument, their other two defenses are better suited for resolution at summary judgment. Finally, I note that in *Le,* all three of the theories that defendants invoke were resolved on summary judgment, not on a motion to dismiss. Accordingly, to the extent that plaintiff seeks relief beyond monetary damages for copyright infringement, I recommend that defendant's motion to dismiss be denied.

B. *Claim # 9*

In claim # 9, plaintiff asserts that all four defendants deprived him a protected property right without due process of law, in violation of the Fourteenth Amendment, by continuing to use the JOINT software after he served them with a cease-and desist notice. As with Nichols in claim # 1, plaintiff is asserting claim # 9 against the individual defendants in both their personal and official capacities. He frames his claim this way:

> Defendants failed to comply with the plaintiff's cease-and-desist notice that asserted his control over his copyright (property). Insofar as the demand was ignored, the defendants infringed on this property right from May of 2013 to mid-January of 2014 (when they actually stopped using JOINT).... Pre-deprivation due process was not feasible as the acts were unpredictable. Post-deprivation due process remedies are not available through state courts.

**\*10**  Am. Civ. Compl. 12. While the complaint does not say as much, I will presume that claim # 9 has been brought under the aegis of 🔖 42 U.S.C. § 1983.

Defendants seek dismissal of claim # 9, but because defendants' memorandum of law is organized on a defense-by-defense basis rather than a claim-by-claim basis, the legal basis for their request for dismissal is not especially clear. As best I can tell, defendants argue that: (1) plaintiff cannot state a due-process claim because he had no property interest in the copyright in JOINT, owing to JOINT's status as a work for hire, and because he granted the DOC an irrevocable license to the JOINT software; (2) plaintiff is equitably estopped from bringing a Fourteenth Amendment claim; (3) Nichols, Wrenn, and Gerry are entitled to qualified immunity from claims brought against them in their individual capacities; (4) the complaint fails to allege any conduct by Gerry or Wrenn that would make them liable for a due-process violation; and (5) the DOC, and Nichols, Wrenn, and Gerry, in their official capacities, are entitled to sovereign immunity from an award of damages.

**1. Qualified Immunity**

Nichols, Wrenn, and Gerry, in their individual capacities, should be granted qualified immunity from plaintiff's due-process claim. I have already recommended granting Nichols qualified immunity from plaintiff's copyright-infringement claim, on grounds that a reasonable official in Nichols's position would not have understood that he was violating the Copyright Act by engaging in the conduct alleged in claim # 1. Because plaintiff's due-process claim rests upon the asserted deprivation of a property right that consisted of the copyright in JOINT, a reasonable official standing in the shoes of Nichols, Wrenn, or Gerry would not have understood that the conduct with which they are charged violated plaintiff's due-process rights. Accordingly, I recommend that all three individual defendants, in their individual capacities, be granted qualified immunity from plaintiff's due-process claim.

**2. Sovereign Immunity**

The DOC, and the individual defendants in their official capacities, should be granted sovereign immunity from plaintiff's claim for damages resulting from their purported due-process violation. In a recent case from the First Circuit, a builder that was debarred from bidding on public projects, and that had a bid rejected, sued the state agency responsible

for the foregoing decisions, claiming a violation of its federal-due process rights. *See Brait Builders,* 644 F.3d at 7–8. The court of appeals dismissed that claim:

DCAM is the only defendant. "The Supreme Court has clearly said that the Eleventh Amendment bars federal suits by citizens against the state or state agencies ... ." *O'Neill v. Baker,* 210 F.3d 41, 47 (1st Cir.2000). Therefore, "[u]nless a State has waived its Eleventh Amendment immunity or Congress has overridden it, ... a State cannot be sued directly in its own name regardless of the relief sought." *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14 (1985) (citing *Alabama v. Pugh,* 438 U.S. 781 (1978)). Pursuant to these principles, it is perfectly clear that Brait's claims in the complaint are barred by the Eleventh Amendment, since Brait sued DCAM in the latter's own name. *See Virginia Office for Protection and Advocacy v. Stewart,* 131 S.Ct. 1632, 1637–38 (2011).

**\*11** *Id.* at 11 (footnotes and parallel citations omitted). The reasoning of *Brait Builders* applies with equal force to plaintiff's due-process claim against the DOC. It also applies to his official-capacity claims against the three individual defendants. *See Davidson,* 749 F.3d at 27. Accordingly, I recommend that the DOC and all three individual defendants, in their official capacities, be granted sovereign immunity from plaintiff's claims for damages resulting from the due-process violations he asserts. However, for the same reasons that apply to plaintiff's copyright-infringement claim, I recommend denying defendants' motion to dismiss plaintiff's claims for relief other than monetary damages for his due-process claim.

### C. *Claim # 6 & Claim # 7*

Claim # 6 is a state-law claim against the DOC and Nichols for conversion, based upon their retention of at least three physical copies of JOINT. Claim # 7 is a state-law claim against the same two defendants for unjust enrichment, based upon "their use of JOINT in running the DOC's for-profit business activities without providing any compensation for either its development, its purchase value, or its ongoing use." Am. Civ. Compl. (doc. no. 45) 12. Again, the organization of defendants' memorandum of law makes it difficult, at best, to discern the legal basis for their motion to dismiss those claims. Defendants may be relying upon the estoppel and implied-license theories from *Le, see* Defs.' Mem. of Law (doc. no. 46–1) 2, but they develop no argument that would allow the court to adapt those theories from the copyright-infringement claims in *Le* to the state-law claims in this case. In any event, as to claim # 6 and claim # 7, I recommend denying defendants' motion to dismiss.

### IV. *Conclusion*

For the reasons detailed above, I recommend that defendants' motion to dismiss, document no. 46, be granted in part and denied in part. Specifically, I recommend that this case should now be limited to: (1) a claim for injunctive relief for copyright infringement against the DOC and Nichols in his official capacity; (2) a claim for injunctive relief for a due-process violation against the DOC and the individual defendants in their official capacities; (3) a claim for conversion against the DOC and Nichols; and (4) a claim for unjust enrichment against the DOC and Nichols.

Any objections to this report and recommendation must be filed within fourteen days of receipt of this notice. *See* Fed.R.Civ.P. 72(b)(2). Failure to file objections within the specified time waives the right to appeal the district court's order. *See United States v. De Jesús–Viera,* 655 F.3d 52, 57 (1st Cir.2011), *cert. denied,* 132 S.Ct. 1045 (2012); *Sch. Union No. 37 v. United Nat'l Ins. Co.,* 617 F.3d 554, 564 (1st Cir.2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

### All Citations

Not Reported in F.Supp.3d, 2015 WL 5054652

### Footnotes

1     The Copyright Act provides that "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have

2015 WL 5054652

expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

2    Claims # 1, # 6, and # 7 were asserted in Roy's original complaint and addressed in the report and recommendation dated December 16, 2013, document no. 11. Claim # 9 was first asserted in Roy's Amended Civil Complaint, document no. 45.

3    In a previous report and recommendation, this court characterized claim # 1 as being asserted against all four defendants, *see* doc. no. 11, at 2–3, but in his amended complaint, Roy makes it clear that he is asserting claim # 1 against only the DOC and Nichols.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

390 Fed.Appx. 379
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals,
Fifth Circuit.

Jasmine M. WINSTON, Plaintiff–Appellant

v.

CITY OF SHREVEPORT; Mike Vansant;
D.R. Sawyer, Corporal; W.J. Willis,
Officer, Defendants–Appellees.

No. 10–30012
|
Summary Calendar.
|
Aug. 12, 2010.

**Synopsis**

**Background:** Arrestee brought § 1983 action against officer and chief of police, alleging false arrest, supervisory liability and other state torts. The United States District Court for the Western District of Louisiana, S. Maurice Hicks, Jr., J., 2009 WL 3584486, granted defendants' motion for summary judgment. Arrestee appealed.

**Holdings:** The Court of Appeals held that:

[1] officer had probable cause to arrest, and

[2] chief was not deliberately indifferent.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (2)

[1]     **Civil Rights** 🔑 Sheriffs, police, and other
        peace officers

Police officer had probable cause to arrest arrestee for failing to disperse, and therefore, officer was entitled to qualified immunity in arrestee's § 1983 action alleging false arrest; officer responded to riot type conditions where up to 40 officers were trying to prevent a volatile situation involving approximately 500 people from escalating, officers were attempting to dispel several disturbances in the crowd, officers were attempting to physically detain those around arrestee, and officer had directed arrestee to move back but she did not do so.

U.S.C.A. Const.Amend. 4; 🔖 42 U.S.C.A. §
1983.

18 Cases that cite this headnote

[2]     **Civil Rights** 🔑 Criminal law enforcement;
        prisons

Police chief was not deliberately indifferent to technique officer used to throw arrestee to the ground after she struck another officer, for purposes of supervisory liability in arrestee's

🔖 § 1983 action, despite arrestee's statement that technique was what was taught to him at police academy, where chief did not personally train officer at academy, chief did not implement or endorse challenged technique, and absent any pattern of violations in using the technique.

U.S.C.A. Const.Amend. 4; 🔖 42 U.S.C.A. §
1983.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*380** Douglas Lee Harville, Harville Law Firm, L.L.C., Shreveport, LA, for Plaintiff–Appellant.

Edwin H. Byrd, III, Joseph Samuel Woodley, Pettiette, Armand, Dunkelman, Woodley, Byrd & Cromwell, L.L.P., Shreveport, LA, for Defendants–Appellees.

Appeal from the United States District Court for the Western District of Louisiana, USDC No. 5:08–cv–00111.

Before BENAVIDES, PRADO, and SOUTHWICK, Circuit Judges.

**Opinion**

PER CURIAM: [*]

 **\*\*1** Jasmine M. Winston appeals the district court's grant of summary judgment in favor of Officer W.J. Willis and former Interim Chief of Police Mike Vansant on her § 1983 claim for false arrest, supervisory liability, and related state torts. The district court found that qualified immunity shielded Officer Willis because he acted reasonably under the circumstances, and that Winston had failed to demonstrate that Chief Vansant had either failed to train or supervise his officers, or had acted with deliberate indifference in allegedly failing to train or supervise them.

On appeal, Winston argues that (1) no reasonable officer could have believed there existed probable cause to arrest her for any of her charged crimes, and thus Officer Willis is not entitled to qualified immunity on her false arrest claim; (2) she has sufficiently demonstrated that Chief Vansant failed to train and supervise his **\*381** subordinates, and this failure amounted to deliberate indifference; and (3) because the district court erred when it granted summary judgment as to her federal claims, it also erred in doing so with regard to her pendent state claims for false imprisonment, excessive force, and vicarious liability. Because we agree with the district court that (1) qualified immunity shields Officer Willis, (2) Winston failed to demonstrate that Chief Vansant was deliberately indifferent, and (3) these conclusions suffice to defeat Winston's state tort claims as a matter of law, we affirm the district court's grant of summary judgment.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In January 2007, Shreveport police officers, including Officer Willis and Corporal D.R. Sawyer, responded to a request to assist with crowd control of a riot type situation at a local downtown nightclub known as "Club Ice." Approximately 1,500 people were inside the club attending a concert, and an additional 500 gathered outside. Based on the large number of people, dispatchers requested that all available officers from all four areas of Shreveport respond. Between twenty and forty uniformed, undercover, and off-duty officers assisted to keep several disturbances in the crowd from erupting into violence.

A Shreveport fire investigator determined that Club Ice's occupancy had exceeded its capacity, and the officers were instructed to prevent anyone from entering the club. In response, the officers issued commands to the crowd to disperse, both verbally and over patrol car PA systems. The commands continued for approximately thirty minutes, and at times, the officers physically pushed people away from the entrance of the building. After some time had passed, part of the crowd had dispersed, but approximately 150–200 people remained outside the club.

After Officer Willis had been present at the club for about a half-hour, Winston, who had previously been drinking at a night club next door, attempted to gain entrance to Club Ice through a side door. Officer Willis watched as Winston tried to maneuver around another, unidentified police officer. Officer Willis then stepped between Winston and the unidentified officer, using his baton to push Winston away from the club.

 **\*\*2** According to Officer Willis and Corporal Sawyer, Winston struck Officer Willis twice: once in the jaw, and again on top of his head. Winston alleges that she simply flailed her arms as she lost her balance and did not mean to strike Officer Willis, but concedes that the officers could have construed this as an attack. Corporal Sawyer responded by grabbing Winston around the shoulder area and forcing her to the ground, where she struck her face on the sidewalk, injuring her lips and teeth. The officers then arrested Winston and removed her from the scene, and she was subsequently charged with refusal to disperse, resisting arrest, and battery on a police officer.

Winston filed suit, alleging false arrest and excessive use of force claims against Officer Willis and Corporal Sawyer; *Monell* claims for unlawful policies and practices, which allegedly caused or contributed to her injuries, against the City of Shreveport, the Shreveport Police Department, and Chief Vansant; and pendent state law claims based on direct and vicarious liability. The defendants collectively moved for summary judgment, asserting that Corporal Sawyer and Officer Willis were shielded by qualified immunity and that Winston produced no evidence to support a *Monell* claim.

 **\*382** Shortly thereafter, Corporal Sawyer and the City of Shreveport made an offer of judgment pursuant to Federal Rule of Civil Procedure 68, [1] which Winston accepted. Based on the offer, the district court entered an order of

partial judgement against the City of Shreveport and Corporal Sawyer. This disposition provided that Winston's only remaining claims were against Officer Willis for false arrest and excessive use of force, and against the Shreveport Police Department and Chief Vansant for supervisory liability.

The district court then granted summary judgment in favor of Officer Willis, the Shreveport Police Department, and Chief Vansant. As to Officer Willis, the district court found that (1) he had probable cause to arrest Winston for failure to disperse, and was thus entitled to qualified immunity on Winston's false arrest claim; [2] and (2) Winston failed to raise a genuine issue of material fact as to whether Officer Willis used excessive force, and he was thus entitled to qualified immunity on that claim as well. [3] As to the Shreveport Police Department and Chief Vansant, the district court found the record entirely devoid of evidence demonstrating failure to train, supervise, or discipline Officer Willis, and that any alleged failure did not amount to deliberate indifference. Finally, the district court found that because Officer Willis acted reasonably under the circumstances, Winston's state law claims for direct and vicarious liability failed. Winston timely appealed. [4]

## II. STANDARD OF REVIEW

"We review the district court's grant of summary judgment *de novo,* applying the same standard as the district court." *Chaney v. Dreyfus Serv. Corp.,* 595 F.3d 219, 228–29 (5th Cir.2010) (citing *Golden Bridge Tech., Inc. v. Motorola, Inc.,* 547 F.3d 266, 270 (5th Cir.2008)). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). "Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists." *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.,* 140 F.3d 622, 625 (5th Cir.1998) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc)).

## III. ANALYSIS

**\*\*3** On appeal Winston advances several arguments. First, she contends that no reasonable law enforcement officer would have, or could have, believed that there **\*383** was probable cause to arrest her, and therefore the district court erred by finding Officer Willis entitled to qualified immunity on her false arrest claim. Next, she argues that she offered sufficient evidence to survive summary judgment on her supervisory liability claim against Chief Vansant. Finally, she alleges that the district court erred when it dismissed her state law claims. We address each argument in turn.

### A. False Arrest Claim against Officer Willis

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In order to determine whether qualified immunity shields an official, the Supreme Court, in *Saucier v. Katz,* mandated a two-step analysis, in which a court must determine whether "the facts alleged show the officer's conduct violated a constitutional right." 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). A court must also ask "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson,* 129 S.Ct. at 816 (citing *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). The Supreme Court has recently held that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818.

The second step involves a determination of whether "the conduct was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred," and that "[t]he touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Glenn v. City of Tyler,* 242 F.3d 307, 312 (5th Cir.2001) (citations omitted) "This means that '[e]ven law enforcement officials who reasonably but mistakenly [commit a constitutional violation] are entitled to immunity.'" *Id.* (quoting *Goodson v. Corpus Christi,* 202 F.3d 730, 736 (5th Cir.2000) (alteration in original)).

Because "[t]he constitutional claim of false arrest requires a showing of no probable cause," *Club Retro L.L.C. v. Hilton,* 568 F.3d 181, 204 (5th Cir.2009) (citation omitted), Officer Willis is entitled to qualified immunity "if officers of reasonable competence could disagree" that Officer Willis had probable cause to arrest Winston for any of the crimes for which she was charged. *See Babb v. Dorman,* 33 F.3d 472, 477 (5th Cir.1994) (citation and internal quotation marks omitted). The Supreme Court has defined probable cause as the "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (citations omitted). Furthermore, this Court has stated that probable cause "does not demand any showing that [the belief that an offense was committed] be correct or more likely true than false," because "the probable cause analysis only requires that we find a basis for an officer to believe to a 'fair probability' that a violation occurred." *Piazza v. Mayne,* 217 F.3d 239, 246 (5th Cir.2000) (citations omitted) (alteration in original).

**\*384  \*\*4  [1]**  The district court correctly found that if Officer Willis had probable cause to arrest Winston for any charge, it did not need to examine whether probable cause existed for the additional charges. *See Wells v. Bonner,* 45 F.3d 90, 95 (5th Cir.1995) ("The claim for false arrest does not cast its primary focus on the validity of each individual charge; instead, we focus on the validity of the arrest. If there was probable cause for any of the charges ... then the arrest was supported by probable cause, and the claim for false arrest fails."). Of the three charges lodged against Winston—refusal to disperse, resisting arrest, and battery on a police officer—the district court only decided that Officer Willis had probable cause to arrest Winston for failure to disperse. With regard to that charge, Louisiana Revised Statute § 14:329.3 provides that:

> Any law enforcement or peace officer or public official responsible for keeping the peace may issue a command to disperse under the authority of R.S. 14:329.1–14:329.8 if he reasonably believes that riot is occurring or about to occur. The command to disperse shall be given in a manner reasonably calculated to be communicated to the assemblage.

Whoever willfully fails to comply with a lawful command to disperse shall be punished in accordance with the provisions of R.S. 14:329.7.

Louisiana Revised Statute § 14:329.1, in turn, defines a "riot" as:

> [A] public disturbance involving an assemblage of three or more persons acting together or in concert which by tumultuous and violent conduct, or the imminent threat of tumultuous and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property.

Winston contends that no reasonable officer could have believed that a riot was occurring or about to occur at the time of the encounter, and that no reasonable officer could believe that Winston had been given a lawful command to disperse. Both the record and her own testimony, however, belie her argument. Officer Willis responded to "riot type" conditions where up to forty officers were trying to prevent a volatile situation involving approximately 500 people from escalating. When he arrived, officers were trying to dispel several disturbances in the crowd and attempting to prevent others from commencing. Even after approximately 300 individuals from the crowd had dispersed, Winston herself testified that at the time of her encounter with Officer Willis, the scene "kind of exploded," and officers were both screaming and in the process of physically detaining those around her. Based on these circumstances, the officers were well within their authority to conclude that a riot, as defined by section 14:329.1, was imminent, and could thus lawfully issue commands to disperse.

Additionally, Winston stated in her deposition that she was aware that Officer Willis directed her to move back, and that she did not do so. Under these circumstances, Officer Willis reasonably believed that he had probable cause to arrest Winston for failure to disperse. As such, he is entitled to qualified immunity on Winston's false arrest claim.[5]

**B. Supervisory Liability Claim against Chief Vansant**

**\*\*5** Supervisory officials may not be held liable under § 1983 for the actions of subordinates **\*385** on theories of vicarious liability or respondeat superior. *Estate of Davis ex rel. McCully v. City of North Richland Hills,* 406 F.3d 375, 381 (5th Cir.2005). Instead, Winston must demonstrate that (1) Chief Vansant failed to supervise or train his subordinate officials; (2) a causal link exists between the failure to train or supervise and the violation of Winston's rights; and (3) the failure to train or supervise amounted to deliberate indifference. *Id.*

We have held, with respect to the third prong, that " 'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action," and that "for an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citations and internal quotation marks omitted). Additionally, "[d]eliberate indifference requires a showing of more than negligence or even gross negligence," and "[t]o satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation." *Id.* (citations and quotations marks omitted).

**[2]** Here, Winston offered the testimony of an expert who opined that the technique employed by Corporal Sawyer to throw Winston to the ground after she struck Officer Willis was unwarranted, and that if the Shreveport Police Department taught and Chief Vansant approved the technique, the system was flawed. Winston also offered the deposition testimony of Corporal Sawyer who asserted that he believed that he used a proper technique because it was in accordance with the technique taught to him at the Shreveport Police Academy. Based on this evidence, Winston contends that Chief Vansant should have properly supervised the officers, withdrawn the policy, and offered proper retraining.

Winston, however, has failed to offer any additional evidence that would tie Corporal Sawyer's activity with any alleged failure by Chief Vansant personally to train, supervise, or discipline his officers. At no point does she assert that Chief Vansant trained Corporal Sawyer at the Academy, or implemented, endorsed, advocated, or was even aware of his officers' use of the challenged technique. Likewise, she does

not advance any evidence that Chief Vansant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed should this technique continue to be used, nor has she demonstrated that Chief Vansant, in fact, "dr[e]w the inference." *Id.* Additionally, Winston fails to demonstrate any "pattern of violations"; rather she offers her own sole incident with Corporal Sawyer. *See id.* Winston's failure to offer any proof of a pattern of violations demonstrates that any alleged wrongdoing on the part of Chief Vansant could be characterized as merely negligence, rather than the requisite deliberate indifference. As such, we hold that the district court correctly found that Winston's § 1983 supervisory liability claim against Chief Vansant fails as a matter of law.

**C. State Law Claims**

**\*\*6** Under Louisiana law, we apply the same "reasonableness" standard to Winston's **\*386** state law claims of false arrest and excessive force that we apply when analyzing whether qualified immunity shields Officer Willis against Winston's federal constitutional claims. *See Reneau v. City of New Orleans,* No. Civ.A. 03–1410, 2004 WL 1497711, at \*3–\*4 (E.D.La. July 2, 2004) (citing *Kyle v. City of New Orleans,* 353 So.2d 969, 973 (La.1977)). As discussed above, Officer Willis acted reasonably throughout his encounter with Winston. We thus hold that Winston's state law claims for direct and vicarious liability fail as a matter of law. [6]

**IV. CONCLUSION**

Because Officer Willis reasonably believed that he had probable cause to arrest Winston for refusal to disperse, he is entitled to qualified immunity on Winston's false arrest claim. Additionally, because Winston has not demonstrated that Chief Vansant failed to adequately train Corporal Sawyer, or that any alleged failure to train rose to the level of deliberate indifference, the district court correctly granted summary judgment in favor of Chief Vansant on Winston's supervisory liability claim. Finally, because Louisiana law adopts the same "reasonableness" standard used in determining whether qualified immunity shields Officer Willis and Chief Vansant on Winston's state law claims for false arrest, excessive force, and vicarious liability. We therefore affirm the district court's grant of summary judgment.

AFFIRMED.

**All Citations**

390 Fed.Appx. 379, 2010 WL 3190709

## Footnotes

\*       Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1       Rule 68 provides that:

        At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. If, within 14 days after being served, the opposing party serves written notice accepting the offer, either party may then file the offer and notice of acceptance, plus proof of service. The clerk must then enter judgment.

2       Finding that Officer Willis had probable cause to arrest Winston for failure to disperse, the district court did not squarely address whether he had probable cause to arrest Winston for the other violations, although it opined, in a footnote, that he probably had probable cause to arrest her for battery on a police officer as well.

3       On appeal, Winston no longer argues that Officer Willis used excessive force.

4       This Court granted the Shreveport Police Department's unopposed motion for dismissal. The only remaining parties to this appeal are Officer Willis and Chief Vansant.

5       Because we hold that Officer Willis reasonably believed that he had probable cause to arrest Winston for failure to disperse and is thus entitled to qualified immunity, we do not address whether he reasonably believed that he had probable cause to arrest Winston for resisting arrest or battery on a police officer.

6       Contrary to Winston's suggestion, the fact that the City of Shreveport and Corporal Sawyer extended an offer of judgment under Rule 68 does not impart liability to Chief Vansant or Officer Willis. *Cf. Meadours v. Ermel,* 483 F.3d 417, 422 (5th Cir.2007) (holding that, in the qualified immunity context, each defendant's actions must be evaluated individually).

---

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.