**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **MICHAEL J. BYNUM AND CANADA** | § | |
| **HOCKEY LLC d/b/a EPIC SPORTS** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CIVIL NO.  4:17-cv-00181** |
| | § | |
| **BRAD MARQUARDT,** | § | |
| **in his individual capacity** | § | |
| *Defendant* | § | |

**FIRST AMENDED ANSWER OF BRAD MARQUARDT TO PLAINTIFFS'
FIRST AMENDED COMPLAINT**

Brad Marquardt, an employee of the State of Texas named as a defendant in this case and sued in his individual capacity, files this First Amended Answer to Plaintiffs' First Amended Complaint [Dkt. No. 15].

1.  Mr. Marquardt denies each and every allegation not specifically admitted.

**RESPONSE TO "NATURE OF ACTION," PARAGRAPHS 1 - 5**.

2.  Whatever complaints Plaintiffs may have against Texas A&M University, Mr. Marquardt individually did nothing wrong.  Mr. Marquardt's job was to facilitate communications between the media and public and the A&M Athletic Department.   He gathered and shared information about topics of interest regarding A&M athletics.  Over the years, he had accumulated a great deal of resource material from a wide variety of sources.

3.  In January 2014, while cleaning his office, Mr. Marquardt found an old paper copy of an article dated 1998 regarding E. King Gill, A&M's original "12th Man."  He asked the department secretary to type the article into a Word document so that he would have it readily available in the event he was asked for information about the 12th Man.  He had no intention of

**EXHIBIT A**

publishing the article; his goal was to have easy access to the factual information contained in that article.

4.      The department secretary keyed in the content of the paper article, but she omitted from her Word document the information on the cover sheet of the article.  The cover sheet included the title, a by-line for Whit Canning, the author of the article, and a 1998 copyright notice for "Epic Sports."

5.      The department secretary emailed the Word document to Mr. Marquardt on January 14, 2014.  Mr. Marquardt had no reason to examine the document at that time, and it sat in his inbox.  He was not aware that the Word document was missing the information from the cover sheet.

6.      Later that week, Mr. Marquardt was asked by Matt Callaway, one of his colleagues in the Athletic Department, for information about the 12th Man.  In response, Mr. Marquardt forwarded the Word document to Mr. Callaway without reading it.  That occurred on Friday afternoon on January 17, 2014.

7.      Someone at A&M decided to post that 1998 article in its entirety on the Athletic Department's website that weekend.  That someone was **not** Brad Marquardt.  At that time, two departments at A&M, the Communications & Marketing Division and the Athletic Department, were working on a social media campaign for the University.  The goal was to reinforce A&M's trademark of the term "12th Man" and educate the public about A&M's 12th Man tradition.  As part of that campaign, the Communications & Marketing Division and the Athletic Department planned to post comments about A&M's 12th Man tradition on Twitter during a Seahawks football game on Sunday, January 19, 2014.  (The Seahawks also used the term, "12th Man," pursuant to a license agreement it had with A&M.)

FIRST AMENDED ANSWER OF BRAD MARQUARDT TO PLAINTIFFS' FIRST AMENDED COMPLAINT – PAGE 2

8.      Several individuals participated in that social media campaign, but Brad Marquardt was not one of them.  Jason Cook, then Senior Associate Athletic Director, headed up the social media plan within the Athletic Department.  (Cook was responsible for the 34+ person media relations department.)  Mr. Cook asked two employees, Matt Callaway and Matt Simon, to implement the Athletic Department's contribution to the social media campaign.  Mr. Callaway worked as an "Information Rep II" and reported to Alan Cannon, Associate Athletics Director/Media Relations.  Alan Cannon in turn reported to Jason Cook.  Matt Simon was the website manager for the Athletic Department, and he reported directly to Jason Cook.

9.      Like Mr. Callaway, Mr. Marquardt's job title was also Information Rep II, and he reported to Alan Cannon.  On the Friday afternoon before the Seahawks game, he simply sent the information he had recently uncovered on the 12th Man to Matt Callaway.  Documents show that Mr. Callaway had planned on editing and then posting the 1998 article on the Athletic Department website that weekend, and that Jason Cook had approved of this plan.  Working up to the last minute, Mr. Callaway sent the edited article to Matt Simon to post on the website on Sunday afternoon, shortly before the Seahawks game was to begin.  Mr. Simon, on his own initiative, changed the headline and added a subhead and the by-line with the phrase "Special to Texas A&M Athletics."

10.     Matt Simon posted the article on the Athletic Department website within minutes of the start of the Seahawks game.  Then Matt Callaway, as set out in his weekend social media plan, sent out messages during the game through the Twitter account @AggieFootball.  One of those tweets contained a link to the 1998 article that had been posted on the Athletics Department website.  Contrary to Plaintiffs' allegations, Mr. Marquardt was not responsible for, or involved in, the tweets that contained a hyperlink to the Canning Article.  Further, Mr. Marquardt had no

supervisory authority over either Matt Simon or Matt Callaway; they were both working directly for Jason Cook on the project.

11.     The following Tuesday, A&M's Communications & Marketing Division decided to feature the 1998 article in the University's online newsletter, the *TAMU Times*.  Again, Brad Marquardt played no role in this decision.   Communications Coordinator Krista Smith wrote a headline with a photo and link to the 1998 article that Matt Callaway and Matt Simon had posted on the Athletic Department website.  (Krista Smith had also been working with Matt Callaway on the social media campaign during the Seahawks game.)  The University's director of News & Information, Lane Stephenson, approved the headline and Smith included the headline and link in the *TAMU Times,* which was posted on Tuesday, January 21, 2014.

12.     That is how a 1998 article written by Whit Canning (the "Canning Article") ended up on the Internet.[1]   Mr. Marquardt's own actions violated no law.  Mr. Marquardt's act of asking a secretary to key in the article for his resource file was clearly protected by the doctrine of fair use.  Fair use also protected Mr. Marquardt's act of sharing a copy of the document to his colleague, Matt Callaway, who was seeking information about the 12th Man tradition.

13.     Mr. Marquardt did not realize the copyright information that had been on the cover sheet of the Canning Article was missing from the Word document typed for his resource file.  Further, he was not consulted on whether permission should be obtained before posting the

---

[1] Plaintiffs' Complaint uses the term "12th Man book" to refer to the book Mr. Bynum had first completed and offered for sale in 2001, and then continued to work on from time to time until 2014.  Plaintiffs' Complaint uses the term "Gill Biography" to refer to the written text in a particular chapter of the 12th Man book.  However, that chapter was not the source of the story that was posted on the A&M Athletic Department website.  The source of that posting was the original 1998 article written by Whit Canning, discovered by Mr. Marquardt in January 2014.  This Amended Answer uses the term, "Canning Article" generally to refer to the 1998 article that was found in paper form and posted on the Athletic Department website, and which is the subject of this copyright action.  The Gill Biography appears to be an edited version of the Canning Article.

Canning Article on the Athletic Department website.  That project was being handled by his colleagues and his boss Jason Cook; Marquardt had no responsibility for, and had no authority over, that social media project, including the posting of the Canning Article on the department website.

14.     In response to the specific allegations in paragraph 1 of the First Amended Complaint, Mr. Marquardt denies that he ignored the Aggie Code of Honor.  He denies that he took a written biography of E. King Gill and copied it as if it was his own.  He denies that any of his actions were in disregard of Plaintiffs' alleged exclusive copyright.  Mr. Marquardt also denies that Plaintiffs owned an exclusive copyright to the 1998 article in January 2014.  Mr. Bynum attempted to acquire that copyright from Whit Canning, the author of the article, on February 5, 2014, *after* the alleged copyright violation.

15.     In response to the specific allegations in paragraph 2, Mr. Marquardt had no insight at the time of any "unyielding desire" of A&M in connection with its efforts to protect its trademark and/or brand.   Mr. Marquardt denies that his conduct constituted willful copyright infringement.

16.     In response to the allegations in paragraph 3, Mr. Marquardt denies that he published an article titled "The Original 12th Man" on the website.  Mr. Marquardt admits that the A&M Athletic Department did not own that article.  Mr. Marquardt denies that Mr. Bynum owned the copyright to the story.  At the time the Canning Article was posted on the Athletic Department website, the copyright belonged to the author of the article, Whit Canning.  Mr. Marquardt denies the remaining allegations in paragraph 3 for lack of knowledge.

17.     In response to the allegations in paragraph 4, Mr. Marquardt denies that the biography of E. King Gill (the Canning Article) was unpublished.   The Canning Article was

included in a biography of E. King Gill which was offered for sale in 2001, and again to potential bulk purchasers in 2006. Further, a large portion of the Canning Article was published as part of a book titled *Bloodfeud,* which was published by Plaintiffs in 2005.

18.    In further response to the allegations in paragraph 4, Mr. Marquardt admits that in 2010, Mr. Bynum sent Mr. Marquardt a PDF copy of pages from a book Mr. Bynum was putting together. Mr. Bynum referred Mr. Marquardt to specific pages, and those pages had nothing to do with E. King Gill. At that time, Mr. Marquardt was preparing for his wedding and honeymoon in Australia, and paid very little attention to Mr. Bynum's project, other than to respond to Mr. Bynum's specific requests, which had nothing to do with E. King Gill.

19.    Bynum indicated he expected to complete the book within 2 or 3 weeks. So in July 2010, as Mr. Marquardt left for his honeymoon, he had no reason to give any further thought to Mr. Bynum's book. For his part, Mr. Bynum lost interest in his 12th Man book for over three years. It appears that there was no further contact between the two men until December 28, 2013, when Mr. Bynum popped up and asked Mr. Marquardt in an email: "Can you tell me what day in 1934 Homer Norton was hired as the A&M football coach?" Nothing in that email exchange referred to E. King Gill or the biography that Mr. Bynum had been working on back in the summer of 2010. As Plaintiffs have pleaded, Mr. Bynum on multiple occasions had contacted Marquardt and others in the Athletic Department to confirm facts for his other sports books about football in Texas. See Amended Complaint, paragraph 25. There was nothing in Mr. Bynum's December 2013 email that would have prompted Mr. Marquardt to recall that Mr. Bynum had been working on a book about E. King Gill three years before.

20.    In further response to paragraph 4, Mr. Marquardt denies that he "retyped his printed copy of the Gill Biography." Mr. Marquardt did not have a printed copy of the PDF of

Mr. Bynum's book, which contained the Gill Biography. The article that Mr. Marquardt asked a secretary to type was the old 1998 paper article by Whit Canning that Mr. Marquardt found while cleaning out his office.

21.     In January 2014, Mr. Marquardt was unaware of any connection between Mr. Bynum and the 1998 Canning Article.  At that time, Mr. Marquardt was not aware that "Epic Sports" was affiliated with Mr. Bynum.  Mr. Marquardt does not deny that the name "Epic Sports" appears on the cover and copyright page of the PDF of Mr. Bynum's book in 2010.  However, Mr. Marquardt denies seeing that information, and has no recollection of even opening the PDF that Mr. Bynum alleges was attached to his June 18, 2018, email.

22.     In further response to paragraph 4, Mr. Marquardt denies that he changed the title to the Canning Article, he denies deleting Bynum's name (which did not appear anywhere in the Canning Article), and he denies making any edits.[2]  Mr. Marquardt further denies that he published any version of Mr. Bynum's work or the Canning Article.  Mr. Marquardt denies that he was involved in any effort to promote the Canning Article to hundreds of thousands of people.

23.     In response to the allegations in paragraph 5, Mr. Marquardt has no information to confirm or deny whether Bynum intended to publish the Canning Article as the opening chapter to his book.  Mr. Marquardt denies that the Canning Article was the heart of Bynum's work as it was configured at the time of the alleged infringement.  Mr. Marquardt denies that he individually did anything that would have destroyed Plaintiffs' prospects for a successful print run.  Mr. Marquardt further denies that the posting of the Canning Article by his colleagues on the Athletic

---

[2] Gill's name was incorrect in the Canning Article that Mr. Marquardt had found.  The fact that this error did not appear in the PDF that Bynum sent to Mr. Marquardt in 2010 confirms that the source of the Canning Article posted on the Athletic Department website was the old 1998 paper copy Mr. Marquardt found in his desk, and not the PDF sent by Mr. Bynum in 2010, as Plaintiffs allege.

Department website had any negative effect whatsoever on Plaintiffs' prospects for a successful print run.

24.     In further response to paragraph 5, Bynum's publishing business model was purely opportunistic.  Bynum would compile articles and photographs into a glossy printed book format when he saw an opportunity to exploit a particular sports topic.  Bynum's goal for his 12th Man/Aggie Football book was to line up a bulk sale of a coffee-table book to Texas A&M or some group affiliated with the University.  But for a period of 13 years, Mr. Bynum was unable to find a bulk buyer for this book.  However, in January 2014, when A&M posted the Canning Article without permission, Bynum decided to pursue a different kind of opportunity - extortion. The bulk purchaser he had initially targeted, Texas A&M University, had made a mistake, and Bynum intended to exploit that situation by forcing it into a bulk purchase.  Bynum said that if A&M did not meet his demands, he would turn the incident into a public relations nightmare for A&M. Although A&M offered to make amends for its mistake, it would not give in to Bynum's demand that the University make a bulk purchase of his book.  At that point, Bynum abandoned all efforts to publish his book and decided to pursue yet another strategy to make money - litigation.

25.     The posting of the Canning Article without permission was an error, but Mr. Marquardt was not responsible for that error.  Moreover, it was an error that caused absolutely no harm to anyone.  Aggie fans had access to an electronic version of the text of the eight-page Canning Article for three days in January 2014.  That fact would not have deterred a reasonable publisher from proceeding with publication of the 200-page printed coffee table book planned by Plaintiffs.  Any financial injury suffered by Plaintiffs was entirely self-inflicted, caused by their refusal to make any effort to sell their book.

**PARTIES.**

26.     In response to paragraph 6, Mr. Marquardt denies for lack of knowledge Mr. Bynum's city of residence.  Mr. Marquardt denies that Mr. Bynum was the copyright owner of the Canning Article at the time of the alleged infringement.  Mr. Marquardt denies the remaining allegations in paragraph 6 for lack of knowledge.

27.     Mr. Marquardt denies the allegations in Paragraph 7 for lack of knowledge.

28.     Paragraph 8 is directed to a defendant that has been dismissed from the case and no response from Mr. Marquardt is required.

29.     Paragraph 9 is directed to a defendant that has been dismissed from the case and no response from Mr. Marquardt is required.

30.     With respect to paragraph 10, Mr. Marquardt has appeared in this action.  Mr. Marquardt denies that he "is responsible for providing content for the A&M Athletic Department's official Twitter account, @AggieFootball."  He admits that he previously served as editor of the "12th Man Sports Hotline."  Mr. Marquardt admits that in January 2014, he functioned as an associate director of media relations for the Texas A&M University Athletic Department and reported to Alan Cannon.

31.     Paragraph 11 is directed to a defendant who has been dismissed from the case, and no response from Mr. Marquardt is required.

32.     Paragraph 12 is directed to a deceased defendant who was dismissed from the case, and no response from Mr. Marquardt is required.

**JURISDICTION AND VENUE.**

33.     Regarding paragraph 13, Mr. Marquardt admits that this Court has jurisdiction over this action.

34.     Regarding paragraph 14, Mr. Marquardt admits that this Court has personal jurisdiction over him.  The remaining allegations in paragraph 14 are directed to defendants who have been dismissed and no response from Mr. Marquardt is required.

35.     Regarding paragraph 15, Mr. Marquardt admits that venue is proper in this District.

## RESPONSE TO "FACTS," PARAGRAPHS 16 – 66.

36.     With respect to paragraph 16, Mr. Marquardt admits that Plaintiff Bynum has edited books concerning sports history and memorabilia in the past.  Mr. Marquardt has no knowledge of the extent of Mr. Bynum's experience and reputation, but denies that he could be considered to be a "widely-published author and editor" given the nature of his particular business.  Rather than acting as a traditional book editor or publisher, Mr. Bynum's business involved scooping up sports related content for little or no money; packaging that content in a printed book format and attempting to make bulk sales of those books to third parties.  The remaining allegations in paragraph 16 are denied for lack of knowledge.

37.     With respect to paragraph 17, Mr. Marquardt admits that Plaintiff Bynum worked on a memorabilia book titled *Bloodfeud. Greatest Moments in the Texas-Texas A&M Football Rivalry,* which was marketed by or through HEB supermarkets; and that he was somehow involved with the production of biographies of Doak Walker, Sammy Baugh, John David Crow, and Darrell Royal, and marketed as a "Dan Jenkins" series in conjunction with the *Fort Worth Star Telegram*. Mr. Marquardt also admits that Mr. Bynum worked on a book titled *King Football,* and published various subsequent publications containing the same content.  The remaining allegations in paragraph 17 are denied for lack of knowledge.

38.     Regarding paragraph 18, Mr. Marquardt denies the allegation that *King Football* sold "extremely well," a statement which was contradicted by Mr. Bynum's own deposition testimony.  Mr. Marquardt denies the sales figures recited in paragraph 18 because Mr. Bynum has been unable or unwilling to produce any business records to support specific claims of book sales, much less "strong sales," of any book described in paragraph 18.  The remaining allegations in paragraph 18 are denied for lack of knowledge.

39.     Regarding paragraph 19, Mr. Marquardt specifically denies that Mr. Bynum regularly employs writers on a work made for hire basis.  Mr. Bynum's practices in obtaining content from writers often involved oral agreements (which as a matter of law are not work for hire agreements), and agreements to write articles suggested by Mr. Bynum "on spec," where payment and a copyright assignment only occurs when and if the articles are accepted and published.  The remaining allegations in paragraph 19 are denied for lack of knowledge.

40.     Regarding paragraph 20, Mr. Marquardt denies that books edited by Bynum has been published by "major publishing houses."  Marquardt admits that plaintiff Canada Hockey LLC, an entity owned and controlled solely by Mr. Bynum, has been listed as publisher for books that Mr. Bynum edited.

41.     Regarding paragraph 21, Mr. Marquardt admits that A&M's famous 12th Man tradition was inspired by the actions of E. King Gill at the 1922 football game known as the "Dixie Classic."  The story of Gill's actions at the Dixie Classic is well known by Aggies and Aggie fans, and was well known in that community long before January 2014.  The remaining allegations in paragraph 21 are denied for lack of knowledge.

42.     Regarding paragraph 22, Mr. Marquardt admits those allegations describing the 12th Man tradition at Texas A&M University. Mr. Marquardt further admits that new signage was

erected at Kyle Field in or around 1988, reading "Home of the 12th Man." The remaining allegations in this sentence regarding who erected the sign are denied for lack of knowledge. Mr. Marquardt further admits that Texas A&M has taken steps to enforce its trademark in the term "12th Man" and that the Aggie Club, an organization founded to raise donations to support Texas A&M athletic programs, was at some point after its founding renamed the "12th Man Foundation." The remaining allegations in this paragraph, regarding the specifics of the University's enforcement efforts, and specific dates related to the University's trademark registration and the founding and renaming of the Aggie Club are denied for lack of knowledge.

43.    With respect to the allegations in paragraph 23, Mr. Marquardt denies for lack of knowledge what Mr. Bynum recognized or understood about the 12th Man tradition at Texas A&M University.

44.    With respect to the allegations in paragraph 24, Mr. Marquardt admits that Whit Canning worked as a sportswriter for the *Fort Worth Star-Telegram*. Mr. Marquardt denies that Mr. Canning was hired by Mr. Bynum on a work made for hire basis. Mr. Bynum and Mr. Canning did not expressly agree in a timely written instrument signed by them that the biography to be written by Whit Canning would be considered a work for hire. Nor was the work requested by Mr. Bynum intended to be a contribution to a collective work; Canning was to write the text for an entire book about E. King Gill.

45.    Mr. Marquardt admits that Mr. Canning wrote a biography about Gill, but denies that the work was titled, "An A&M Legend Comes to Life." The biography Mr. Canning wrote was titled "E. King Gill, The Life & Legend of Texas A&M's 12th Man." The remaining allegations in paragraph 24 are denied for lack of knowledge.

46.     With respect to the allegations in paragraph 25, Mr. Marquardt denies that Mr. Bynum continued to research Gill for his 12th Man book "over the next decade."   After the biography of E. King Gill, by Whit Canning, was created and offered for sale by Mr. Bynum in 2001, Mr. Bynum appears to have abandoned his 12th Man book.  Mr. Bynum did, however, in 2005, publish and sell much of the Canning Article in another book, titled *Bloodfeud.*  Canning's work was published in *Bloodfeud* without attribution, without payment to Canning, and most likely in violation of Canning's copyright to that work.

47.     In further response to paragraph 25, Mr. Marquardt admits that Mr. Bynum met with Texas A&M Athletic Department personnel, but denies that he was involved with Mr. Bynum's visits in 2000 and 2001.  Mr. Bynum did make extensive use of the free services and materials provided to him by personnel in the Athletic Department for many years.  Mr. Marquardt denies that he was informed of Mr. Bynum's research and work in developing the 12th Man book, other than in passing when Mr. Bynum asked Mr. Marquardt to locate photos and details for a book about A&M football.   Mr. Marquardt denies that Mr. Bynum sought to confirm with him "certain details about Gill's athletic tenure at Texas A&M."   Mr. Bynum's requests involved only the second part of his book, which did not concern E. King Gill at all, but instead consisted of 94 pages about Texas A&M's 12 All-Time Greatest Wins.  Mr. Marquardt also denies that Mr. Bynum had licensed photographs to use in his 12th Man book from Glen Johnson or from the Cushing Archives; Mr. Bynum made no effort to obtain licenses until after the alleged copyright violation in January 2014.  Mr. Marquardt admits that on occasion, Mr. Bynum contacted A&M Athletic Department personnel, including Marquardt and Cannon, asking for their time and assistance on other for-profit projects being pursued by Mr. Bynum, and that Mr. Marquardt complied with Mr.

Bynum's multiple requests for information and photos free of charge.  The remaining allegations in paragraph 25 are denied for lack of knowledge.

48.     With respect to paragraph 26, Mr. Marquardt denies that Mr. Bynum was close to completing the draft of the 12th Man book in 2006 because that statement is incomplete and misleading.  Mr. Bynum had completed the 12th Man book in 2001 and it was reviewed in the *Texas Aggie* magazine and offered for sale at a retail price of $17.95.  In 2006, Mr. Bynum once again offered to sell the book and enlisted the services of former *Texas Aggie* editor, Jerry Cooper, to arrange for a bulk purchase.  The remaining allegations in paragraph 26 are denied for lack of knowledge.

49.     Mr. Marquardt denies the allegations in paragraph 27 for lack of knowledge.

50.     With respect to paragraph 28, Mr. Marquardt admits that Mr. Bynum sent an email dated June 18, 2010, to Glen Johnson and Mr. Marquardt which appears to include a request that Mr. Johnson or Mr. Marquardt locate specific photographs. Mr. Marquardt denies that he "reviewed" any PDF except in connection with responding to Mr. Bynum's specific requests, all of which concerned the second part of the book about A&M's "All Time Greatest Wins."  Mr. Marquardt denies that the June 18, 2010, email amounted to a "grant of access" to a draft book for "review" only.  Mr. Bynum shared his works in progress with people he thought might provide him with free assistance and took no precautions to keep his drafts confidential.  In fact, none of the information in the 12th Man was confidential.   Mr. Marquardt has no recollection of opening or reviewing the PDF that Mr. Bynum alleges was sent to him and Glen Johnson on June 18, 2010. The remaining allegations in paragraph 28 are denied for lack of knowledge.

51.     With respect to paragraph 29, the content of the attachment to the June 18, 2010, email which Mr. Bynum alleges was sent to Glen Johnson and Mr. Marquardt speaks for itself, and no further response is required.

52.     With respect to paragraph 30, Mr. Marquardt denies that the image in that paragraph is a true and correct copy of the copyright page of Mr. Bynum's draft book.  That copyright page did not have the boxes or lines highlighting specific information.  Mr. Marquardt further denies that Bynum's publishing imprint, Epic Sports, owned the copyright to all of the content in the draft book, including the material written by Whit Canning.

53.     With respect to paragraph 31, Mr. Marquardt admits that Mr. Bynum's draft book in 2010 included material that had been written by Whit Canning.  Mr. Marquardt denies that Whit Canning wrote that material as a work made for hire for Mr. Bynum.  The remaining allegations in paragraph 31 are denied for lack of knowledge.

54.     Mr. Marquardt denies the allegations in paragraph 32 for lack of knowledge.

55.     With respect to paragraph 33, Mr. Marquardt admits that he and Mr. Bynum engaged in the email exchange attached to the Complaint as Exhibit D.  Mr. Marquardt denies for lack of knowledge what stage of work Plaintiff Bynum was in at the time that this email exchange occurred.

56.     With respect to paragraph 34, Mr. Marquardt denies that A&M's campaign regarding the 12th Man was launched "primarily through the A&M Athletic Department."  As Shane Hinckley, Interim VP, Marketing & Communications, wrote at the time, "Marketing and Communications created a marketing plan to be executed during the buildup to the Super Bowl....Implementation of the plan includes coordination with System Communications, Athletics, and OGC."  Mr. Marquardt admits the remaining allegations in paragraph 34.

57.     With respect to paragraph 35, Mr. Marquardt denies the implication that the social media campaign belonged to the Athletic Department.  As indicated above, that project was created and executed by A&M's Marketing & Communications Division, with the cooperation of other departments.   Mr. Marquardt denies the remaining allegations in paragraph 35 for lack of knowledge.

58.     Mr. Marquardt denies for lack of knowledge the allegations in paragraph 36.

59.     Mr. Marquardt denies for lack of knowledge the allegations in paragraph 37.

60.     With respect to paragraph 38, Mr. Marquardt denies that the A&M Athletic Department created a strategic plan.  Mr. Marquardt further denies that the Athletic Department created a strategic plan that included providing little known information about E. King Gill.

61.     Mr. Marquardt denies the allegations in paragraph 39, and specifically denies that he was instructed "to find background information on Gill that could be used to promote the 12th Man story and solicit more donations." Mr. Marquardt was asked whether he had any information about the 12th Man, not by any supervisor, but by a colleague, Matt Callaway.  Mr. Marquardt casually shared what he had recently found in an effort to be helpful.  Jason Cook had directed Matt Callaway to work with Krista Smith from the Division of Marketing and Communications to create and implement a social media plan for Sunday, January 19, 2014.

62.     With respect to paragraph 40, Mr. Marquardt denies that Defendants had taken "Bynum's copy of the Gill Biography."  Mr. Marquardt admits that his colleagues, Matt Callaway and Matt Simon, with the approval of their supervisor Jason Cook, posted on the Athletic Department website an article dated 1998 with a by-line for Mr. Canning.  Mr. Marquardt denies that the Canning Article had never been published or available to the public before.  That article was included in Mr. Bynum's book, which was offered for sale in 2001 and again in 2006.  Much

of that same article was also published and sold as part of Mr. Bynum's book, *Bloodfeud,* in 2005. Mr. Marquardt denies for lack of knowledge the remaining allegations in paragraph 40.

63.     With respect to paragraph 41, Mr. Marquardt admits that the 1998 article written by Whit Canning was posted on the Athletic Department website on Sunday afternoon, January 19, 2014.  It was taken down three days later, on January 22, 2014.  Mr. Marquardt denies for lack of knowledge the remaining allegations in paragraph 41.

64.     Mr. Marquardt denies for lack of knowledge the allegations in paragraph 42.

65.     With respect to paragraph 43, Mr. Marquardt denies that the material posted on the Athletic Department website varied in any substantial way from the 1998 Canning Article.  The 1998 Canning Article misidentified Gill as Edward King Gill, rather than Earl King Gill.  (That same error appeared in the version of the Canning Article that had been published in *Bloodfeud* in 2005.)  Mr. Marquardt denies for lack of knowledge the remaining allegations in paragraph 43.

66.     With respect to paragraph 44, Mr. Marquardt denies that the "Gill Biography" is the "critical opening" to Bynum's 12th Man book.

67.     With respect to paragraph 45, Mr. Marquardt admits that the Canning Article was posted on the Athletic Department website with a different title and no attribution to Plaintiffs. Mr. Marquardt denies that the term "special to" has any defined meaning in journalism.  Matt Simon added that term to indicate that the source of the article was outside the A&M Athletic Department.

68.     Mr. Marquardt denies the allegations in paragraph 46.

69.     Mr. Marquardt denies the allegations in paragraph 47.  Specifically, and without limitation, Marquardt never had a printed copy of the 12th Man book, and never retained any copy, or any pages from that book. Mr. Marquardt had no reason to know the status of that 12th Man

book, except that in May 2010 Mr. Bynum told him it was close to completion.  Mr. Marquardt denies having his secretary retype anything to be used to refute any claim to the name 12th Man. Mr. Marquardt denies that any of the Defendants claimed a exclusive right to the 12th Man story - the facts surrounding the 12th Man tradition and E. King Gill's role in that tradition are publicly available, and well known by students and alumni of A&M.

70.     Mr. Marquardt denies the allegations in paragraph 48.  Specifically, and without limitation, Mr. Marquardt did not remove or alter Plaintiffs' copyright management information ("CMI") from the 12th Man book.  CMI that appeared on the cover sheet of the 1998 Canning Article was inadvertently omitted by the Athletic Department secretary who was asked to type that article. That CMI did not include Plaintiff Bynum's name.  Mr. Marquardt did not insert or cause to be inserted the phrase, "special to Texas A&M Athletics."  That phrase was added by Matt Simon on his own initiative.  Mr. Marquardt did not alter the title the Canning Article; that was done by Matt Simon on his own initiative.

71.     Mr. Marquardt denies the allegations in paragraph 49.  Specifically, and without limitation, Mr. Marquardt did not admit in an email dated January 22, 2014, that he distributed a plagiarized copy of any article to Lane Stephenson.  Mr. Marquardt sent the Word document typed by a secretary to only two individuals: his colleague Matt Callaway and a student intern named Benjamin Dierker.

72.     Mr. Marquardt denies the allegations in paragraph 50.

73.     With respect to the allegations in paragraph 51, Mr. Marquardt states that the document titled Employee Use & Engagement Guidelines, attached as Exhibit J to the First Amended Complaint, speaks for itself, and no further response regarding the text of this document is required.  The remaining allegations of paragraph 51 are denied.

74.     Mr. Marquardt denies the allegations in paragraph 52.  Specifically, and without limitation, Mr. Marquardt denies any unauthorized copying, distribution or display by him of either the Canning Article or what Plaintiffs call the "Gill Biography."  Mr. Marquardt did not participate in any efforts to drive readers to the Athletic Department website.  Mr. Marquardt did not send out the message on Twitter that is quoted in paragraph 52, but it is his understanding that Matt Callaway sent that message, or a similar message, on January 19, 2014, during the Seahawks game.

75.     The allegations in paragraph 53 are denied for lack of knowledge.

76.     With respect to paragraph 54, Mr. Marquardt states that documents produced by former co-Defendants in this action indicate that the University's Communications and Marketing division communicated about the 12th Man via Twitter during the Seahawks game.  The remaining allegations are denied for lack of knowledge.

77.     With respect to the allegations in paragraph 55, Mr. Marquardt denies that he engaged in any "vociferous efforts" as described in this paragraph, and denies that he participated in the social media activity that took place in connection with the Seahawks game.  The remaining allegations in paragraph 55 are denied for lack of knowledge.

78.     With respect to the allegations in paragraph 56, Mr. Marquardt admits that on January 21, 2014, the *Tamu Times* e-newsletter contained a headline and brief description of the 12th Man, and linked to the Canning Article which was posted on the Athletic Department website.  The remaining allegations in paragraph 56 are denied for lack of knowledge.

79.     With respect to the allegations in paragraph 57, Mr. Marquardt admits that he participated in the email exchange attached as Exhibit N to the First Amended Complaint.  The texts of those emails speak for themselves, and no further response is required.

80.     Mr. Marquardt denies the allegations in paragraph 58.  Specifically, and without limitation, Mr. Marquardt did respond to Mr. Bynum's email and did attempt to explain the origins of the Canning Article that was posted by his colleagues on the Athletic Department website.  Mr. Marquardt did not remove CMI from the Canning Article or from any draft book of Plaintiffs.  At all relevant times, Mr. Marquardt was unaware that the CMI on the cover sheet of the Canning Article had been omitted from the document he shared with his colleague Matt Callaway.  Mr. Marquardt further responds that his email statement that "We remain very interested in utilizing Whit's story" was not an expression of Mr. Marquardt's personal interest or goal; Mr. Marquardt was acting as a messenger for Jason Cook.  It was Mr. Cook who was still interested in using the story.  Upon receiving Mr. Byrum's email to Alan Cannon requesting the immediate removal of the Article, Mr. Marquardt wrote to Jason Cook explaining the situation and asked, "How shall we proceed?"  In an effort to resolve a problem created by his colleagues, Mr. Marquardt suggested to Jason Cook the possibility of making "everyone happy by calling it an excerpt to a future book that will be available in September in conjunction with the 75th anniversary of the 1939 team."  Mr. Cook asked Mr. Marquardt to propose that suggestion to Mr. Bynum.

81.     With respect to the allegations in paragraph 59, Mr. Marquardt admits that he made the statements in the email attached as Exhibit N, but responds that the request to re-post and the statement that "we're keen to have access to Whit's story" were made at the direction of Jason Cook, and were not a reflection of Mr. Marquardt's personal state of mind.  Mr. Marquardt further asserts that the suggestion that the Canning Article be re-posted as an excerpt to Mr. Bynum's book was a reasonable solution, made at Mr. Cook's request, and was a solution that would have

benefitted Mr. Bynum greatly if Mr. Bynum had had any real interest in publishing the book that fall.

82.     With respect to the allegations in paragraph 60, Mr. Marquardt admits that the Canning Article was removed from the website of the Athletic Department on January 22, 2014. Mr. Marquardt denies that he engaged in any promotion of the Article, and denies that the market for Plaintiffs' 12th Man book was harmed in any way by any activity referenced in paragraph 60. The remaining allegations in paragraph are denied for lack of knowledge.

83.     With respect to the allegations in paragraph 61, Mr. Marquardt denies that the market for Plaintiffs' 12th Man book was harmed by any activity referenced in paragraph 61.  The remaining allegations of paragraph 61 are denied for lack of knowledge.

84.     Mr. Marquardt denies the allegations in paragraph 62.  Specifically, and without limitation, Mr. Marquardt denies that his actions directly infringed on anyone's right in the Canning Article.  Mr. Marquardt further denies that Plaintiffs had any exclusive rights to the Canning Article at the time of the alleged infringement.

85.     Mr. Marquardt denies the allegations in paragraph 63.

86.     With regard to paragraph 64, these allegations consist of legal conclusions directed to Mr. Marquardt's now-dismissed co-defendants, and therefore require no response from Mr. Marquardt.  To the extent a response is required, Mr. Marquardt denies these allegations.

87.     Mr. Marquardt denies the allegations in paragraph 65.

88.     Mr. Marquardt denies the allegations in paragraph 66.

**RESPONSE TO FIRST CAUSE OF ACTION, PARAGRAPHS 67 – 80.**

89.     Paragraph 67 re-alleges the previous paragraphs and requires no response.

90.     Mr. Marquardt responds that paragraph 68 is a legal conclusion, and no response is required.

91.     With respect to paragraph 69, Mr. Marquardt denies that Plaintiff Bynum was the copyright owner of the "Gill Biography" or the Canning Article, at any relevant time.

92.     With respect to paragraph 70, Mr. Marquardt denies that the copyright registration for the 2010 draft of the 12th Man book is valid.

93.     With respect to the allegations in paragraph 71, Mr. Marquardt denies that the publishing agreement conveyed an exclusive right to publish the "Gill biography" at issue at any time relevant to this litigation.

94.     With respect to the allegations in paragraph 72, Mr. Marquardt admits that in 2010, he had access to certain pages from the 2010 draft book, but not necessarily the PDF that Plaintiffs allege was sent to Mr. Marquardt and Mr. Johnson in June 2010.

95.     With respect to the allegations in paragraph 73, Mr. Marquardt admits that he asked his department's secretary to make a copy of a work written by Whit Canning with the date of 1998.  Mr. Marquardt denies that the purpose of his request was to create an infringing article.

96.     Mr. Marquardt denies the allegations in paragraph 74.

97.     With respect to the allegations in paragraph 75, Mr. Marquardt admits that an article about E. King Gill by Whit Canning was publicly displayed on the website for the Texas A&M University Athletic Department from January 19, 2014, through January 22, 2014.  The remaining allegations of paragraph 75 are denied.

98.     Mr. Marquardt denies the allegations in paragraph 76.

99.     Mr. Marquardt denies the allegations in paragraph 77.

100.    Mr. Marquardt denies the allegations in paragraph 78.

101.    Mr. Marquardt denies the allegations in paragraph 79.

102.    Mr. Marquardt denies the allegations in paragraph 80.

**RESPONSE TO SECOND CAUSE OF ACTION, PARAGRAPHS 81 – 89.**

103.    Paragraph 81 re-alleges the previous paragraphs and requires no response.

104.    With respect to the allegations in paragraph 82, Mr. Marquardt denies that the posting of the Canning Article constituted direct infringement of any copyright Plaintiffs may have held at the time.  At all relevant times, the copyright to the Canning Article was held by Whit Canning, who is not a party in this lawsuit.

105.    With respect to the allegations in paragraph 83, Mr. Marquardt denies that he induced, caused, or materially contributed to any infringing conduct at issue in this case.  Mr. Marquardt did not encourage, induce, allow or assist others in connection with conduct that may have infringed on any copyright.  Mr. Marquardt denies that he participated in a campaign to use background information on Gill to promote Texas A&M as the true owner of the 12th Man trademark.  Mr. Marquardt denies that anyone "owns" the story about the 12th Man.  Mr. Marquardt denies that he encouraged the unauthorized use of the work Plaintiffs call the "Gill Biography," or the work that referred to herein as the "Canning Article."

106.    Mr. Marquardt denies the allegations in paragraph 84.

107.   Paragraph 85 is directed to Mr. Marquardt's dismissed co-defendants, and no response is required.  To the extent a response is required, the allegations of that paragraph are denied for lack of knowledge.

108.   Paragraph 86 is directed to Mr. Marquardt's dismissed co-defendants, and no response is required.  To the extent a response is required, the allegations of that paragraph are denied for lack of knowledge.

109.   Mr. Marquardt denies the allegations in paragraph 87.

110.   With respect to the allegations in paragraph 88, Mr. Marquardt denies that his acts and conduct constitute contributory copyright infringement.  Mr. Marquardt denies the allegation as it relates to his now-dismissed co-defendants, for lack of knowledge.

111.   Mr. Marquardt denies the allegations in paragraph 89.

**RESPONSE TO THIRD CAUSE OF ACTION, PARAGRAPHS 90 – 97.**

112.   Paragraph 90 re-alleges the previous paragraphs and requires no response.

113.   Paragraph 91 is directed to Mr. Marquardt's now-dismissed co-defendants, and requires no response.  To the extent a response is required, the allegations are denied.

114.   Paragraph 92 is directed to Mr. Marquardt's now-dismissed co-defendants, and requires no response.  To the extent a response is required, the allegations are denied.

115.   Paragraph 93 is directed to Mr. Marquardt's now-dismissed co-defendants, and requires no response.  To the extent a response is required, the allegations are denied.  Mr. Marquardt specifically denies that he committed any infringing act.

116.   With respect to the allegations in paragraph 94, Mr. Marquardt denies that he was the "Director of Media Relations for the A&M Athletic Department." Mr. Marquardt denies that

he committed any infringing acts.  Mr. Marquardt admits that his employer, Texas A&M, had the right and ability to control and supervise his acts. To the extent the remaining allegations in paragraph 94 against now-dismissed defendants require a response, they are denied.

117.   With respect to the allegations in paragraph 95, Mr. Marquardt denies that he or any defendant had a "direct financial interest in the infringement of the Gill Biography."

118.   Paragraph 96 is directed to Mr. Marquardt's now-dismissed co-defendants, and requires no response.  To the extent a response is required, the allegations are denied.

119.   Paragraph 97 is directed to Mr. Marquardt's now-dismissed co-defendants, and requires no response.  To the extent a response is required, the allegations are denied.

### RESPONSE TO FOURTH CAUSE OF ACTION, PARAGRAPHS 98 – 107.

120.   Paragraph 98 re-alleges the previous paragraphs and requires no response.

121.   With respect to paragraph 99, Mr. Marquardt admits that the *12th Man* book contained CMI.

122.   Mr. Marquardt denies the allegations in paragraph 100.  Specifically, and without limitation, Mr. Marquardt did not remove CMI from the 12th Man book.  Mr. Marquardt did not remove CMI from the Canning Article.  Mr. Marquardt admits that CMI was omitted from the copy of the Canning Article when it was typed by a secretary working in the Athletic Department, but denies that he had any knowledge of that fact.  Mr. Marquardt further denies that the Canning Article's CMI included the editor or publisher information.  Mr. Marquardt states that to the extent that the CMI contained in the Canning Article indicated that the copyright holder was "Epic Sports" or anyone other than Whit Canning, it was false information at that time.  Mr. Marquardt further denies that he created an "infringing copy of the Gill Biography."

123.    Mr. Marquardt denies the allegations in paragraph 101.  Specifically, and without limitation, the phrase "special to Texas A&M Athletics" was inserted by Matt Simon on his own initiative.

124.    Mr. Marquardt denies the allegations in paragraph 102.  Specifically, and without limitation, the title to the Canning Article posted on the Athletic Department website was altered by Matt Simon.  The purpose of changing the title was not made in an attempt to establish ownership of the story, and the story was not stolen.

125.    Mr. Marquardt denies the allegations in paragraph 103.  Specifically, and without limitation, Mr. Marquardt forwarded a Word document containing a re-typed copy of the Canning Article to Matt Callaway without knowing that the document was missing CMI.

126.    Mr. Marquardt denies the allegations in paragraph 104.  Specifically, and without limitation, Mr. Marquardt did not distribute an infringing copy of either the Gill Biography or the Canning Article.  Sending a copy of the Canning Article to Matt Callaway was protected under the doctrine of fair use.  Mr. Marquardt did not know CMI had been removed or altered from the document he sent to Matt Callaway.  Mr. Marquardt sent the document without knowing, or having reasonable grounds to know, that his actions would induce, enable, facilitate, or conceal any copyright infringement.

127.    Mr. Marquardt denies the allegations in paragraph 105.

128.    Mr. Marquardt denies the allegations in paragraph 106.

129.    Mr. Marquardt denies the allegations in paragraph 107.

**RESPONSE TO FIFTH AND SIXTH CAUSES OF ACTION, PARAGRAPHS 108 – 120.**

130.    Paragraphs 108 through 120 allege causes of action that have been dismissed, and no response from Mr. Marquardt is required.

**DEFENSES.**

131.    Having answered Plaintiffs' First Amended Complaint, Mr. Marquardt raises the following defenses, including affirmative defenses:

**FAIR USE**

132.    Mr. Marquardt's individual actions are protected under the doctrine of fair use.  Mr. Marquardt's job was to educate the public, usually through the news media, about all things related to A&M football. Mr. Marquardt found the old Canning Article while cleaning out his office, and he asked a secretary to create an electronic copy of the Article so that it would be available to him as a convenient resource.   Mr. Marquardt was asked by a colleague whether he had any information about the 12th Man.  In response, Mr. Marquardt sent him the copy of the re-typed Canning Article sitting in his inbox.

133.    Consideration of the four factors set out in 17 U.S.C § 107 will show Mr. Marquardt's use of the Canning Article was protected under the fair use doctrine.  The purpose and character of Mr. Marquardt's individual use was for nonprofit educational purposes. The Canning Article was factual in nature, and had already been published in whole or in part by Plaintiffs in the past.  Mr. Marquardt's individual use of the Canning Article had no effect whatsoever on the potential market or value of the Canning Article.  In the unlikely event that the *posting* of the Canning Article on the Athletic Department website had an effect on the market or value of the Article or on Plaintiffs' 12th Man book, Mr. Marquardt's own actions - copying the

Article for his research file and then sharing that copy with a colleague - had no effect on the market or the value of the Article.

## QUALIFIED IMMUNITY AS TO ALLEGED COPYRIGHT ACT VIOLATIONS.

134.    Mr. Marquardt is an employee of the State of Texas, entitled to assert the sovereign immunity of the State of Texas, and to qualified immunity under federal law.  Under the principles of sovereign immunity and qualified immunity, the claims against Mr. Marquardt must fail. Specifically, and without limitation, Mr. Marquardt's individual conduct in this case did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

135.    No reasonable person would have known that making a copy of the Canning Article, a 16-year-old article, for his research file, and then sharing that copy with a work colleague, violated a clearly established statutory or constitutional right.

## PLAINTIFFS LACK STANDING TO BRING COPYRIGHT VIOLATION CLAIMS.

136.    The alleged copyright infringement occurred during a three-day period from January 19 to January 22, 2014.  At that time, Mr. Bynum did not own the copyright to Whit Canning's works, the Canning Article (or to the Gill Biography).  But Mr. Bynum was determined to pursue an infringement claim for damages, and he attempted to remedy that fatal flaw.  Mr. Bynum's efforts to manufacture standing, efforts that grew increasingly desperate over time, were tainted by fraud and must fail.  As a result, Plaintiffs lack standing to pursue this action.

***At the time of the alleged infringement, there was no written agreement and Whit Canning had not been paid.***

137. Mr. Bynum created books consisting of text and photos that did not belong to him. He often operated without regard to copyright formalities. He also had a reputation for not paying writers. It was only after it appeared that publication would occur in the near future, that Mr. Bynum would attempt to secure releases from third parties. In this case, his actions were consistent with that practice.

138. Before 1997, Mr. Bynum had worked with Whit Canning on two biographies of Texas football heros, Doak Walker and Sammy Baugh. In 1997, Mr. Bynum asked Mr. Canning to write a third biography, a book about E. King Gill. There was no written agreement that covered the Gill book, and Mr. Bynum did not pay Mr. Canning at that time, which was consistent with his business practice.

139. Mr. Canning apparently delivered the text for this third biography at some point in 1997 or 1998. That text consisted of an account about how E. King Gill became the original 12th Man, together with descriptions of the two football games that were part of Gill's story, the 1922 Dixie Classic and the 1922 A&M/UT game. There is no credible evidence that Mr. Canning was paid for the rights to these works upon delivery. There is no credible evidence that Mr. Bynum obtained a signed written agreement of any kind from Mr. Canning at that time, much less a work made for hire agreement. There is no evidence of a meeting of the minds on the essential terms of any such agreement, whether oral or written. No one (and certainly not Mr. Canning) remembers the terms of any understanding between Mr. Bynum and Mr. Canning that was reached in 1997 or 1998.

140. In 2014, when Mr. Bynum learned that the Canning Article had been posted by A&M without permission, he decided to exploit the situation with a claim of copyright violation.

But first he needed to overcome two obstacles.  Whit Canning was telling people that he had not been paid for the Canning Article.  More importantly, Mr. Canning had never signed a written agreement giving Mr. Bynum an exclusive right to publish his work.  These steps - payment and copyright assignment or other release - were exactly the sorts of things that Mr. Bynum failed to do as a matter of course unless and until he needed to.

***The February 5, 2014, writing contained numerous misrepresentations.***

141.    To remedy this problem, Mr. Bynum set out to secure a "release" from Mr. Canning for the writings in the 12ᵗʰ Man book.  He sent Mr. Canning a document titled "Book Publishing Agreement" along with a check for $2,500.  Mr. Canning apparently signed the document on or about February 5, 2014.

142.    Mr. Canning is unable to confirm that he even signed that document.  Mr. Canning had suffered a stroke around that time, and when he was asked to testify on this matter, his memory was substantially impaired.  All that Mr. Canning could say was that he had been paid for the rights to use his work on February 5, 2014, and since that payment had been made, the stories he had delivered in 1997 or 1998 belonged to Mr. Bynum.

143.    The February 5, 2014, writing, drafted entirely by Mr. Bynum, was flawed in several respects.  The document recites that Mr. Bynum had retained Whit Canning to "write a feature story on E. King Gill and a sidebar story on the January 2, 1922, Dixie Classic [as well as three other stories about SMU football]."  This recitation was false.  Mr. Canning was asked to write a *book* on E. King Gill.  The book was to be a biography about E. King Gill, and Mr. Canning was the author of that book, just as he was on the previous two biographies.  That book had already been offered for sale in 2001.

144.    The February 5, 2014, document also stated that Mr. Canning was paid an initial payment of $2,500 for five stories about Texas A&M and SMU football, including the Canning Article.  There is no record that any such payment was made.  In fact, the first thing Mr. Canning said when contacted in January 2014 after the alleged infringement was that he had *not* been paid for the stories.

145.    The document states that Canning "acknowledges" that the copyrights to the five stories "were assigned to Bynum when the five Stories were originally delivered in 1997 to Bynum, and that such assignment is final."  That recitation was false.  Mr. Canning had no understanding of the status of the copyright to his works at the time he signed this document in February 2014.  In fact, there was no assignment of copyright at the time Mr. Canning delivered the stories in 1997.  Mr. Bynum admitted as much in an email to a friend dated February 23, 2014, where he wrote: "Whit Canning has been in full for all of his stories on the SMU and 12th Man books.  I have his signed release now."

146.    The document also states, "Canning acknowledges that his work on the five Stories has been done on a "Work for Hire" basis..."  That statement was false.  In fact, Mr. Canning's work was not done on a work for hire basis and Mr. Canning would not have understood what that term even meant when he signed this particular document.  All that Mr. Canning understood was that he was finally getting paid for his work and, at that point, Mr. Bynum had the right to publish his work.

147.    The document then states "Bynum now intends to publish the five Stories in a pair of books on Texas A&M and SMU football and has issued a second payment of $2,500 to Canning, which he acknowledges receiving."  That statement was false.  Mr. Bynum did not "now intend"

to publish either book.  The only reason Mr. Bynum paid Mr. Canning at all was so that Mr. Bynum could make a copyright violation claim in this case based on Mr. Canning's work.

148.    Due to these flaws and misrepresentations, it is entirely unclear whether the February 5, 2014, document was sufficient to transfer Mr. Canning's copyright to Mr. Bynum. What *is* clear is that, as a matter of law, this document could not meet the requirements for a work made for hire agreement.  This means that the copyright belonged to Whit Canning at the time of the alleged copyright infringement in January 2014.

**Mr. Bynum misrepresented the facts to the U.S. Copyright Office.**

149.    After obtaining Mr. Canning's signature on February 5, 2014, Plaintiffs apparently realized that a copyright assignment (or a "release," to use Mr. Bynum's term) in February 2014 would be of no help in attempting to recover damages for alleged infringements in January 2014. At that point, Plaintiffs took their deception to a whole new level.  First, Mr. Bynum intentionally misled the U.S. Copyright Office by asserting that the portion of his 12th Man book that had been written by Whit Canning was done so pursuant to a valid work for hire agreement.  *See* paragraphs 162 - 168, *infra*.

**Mr. Bynum caused Mr. Canning, who was impaired, to sign a false affidavit.**

150.    In 2020 Mr. Marquardt moved for summary judgment based in part on the fact that a writing signed 17 years after the work was created would not meet the statutory requirement for a work made for hire.  Recognizing that his house of cards was about to fall, Mr. Bynum caused Mr. Canning to sign a false affidavit that claimed for the first time that there had been a written agreement signed back in 1997, but Mr. Canning had lost it.  (Mr. Bynum made the same misrepresentation in his own affidavit.) While this Court declined to strike Mr. Canning's affidavit,

the Order noted that "the fact that Bynum cannot locate the actual written contract may prove fatal in front of a jury."  Doc. 179, p. 3-4.

***Mr. Bynum caused Mr. Canning to sign a second fraudulent agreement.***

151.    With his recently invented story about a "lost" 1997 written contract cast into doubt, Mr. Bynum made another fraudulent attempt to create standing.  In December 2020, Mr. Bynum asked Mr. Canning to sign another sham agreement.  In that document, Mr. Bynum first had Mr. Canning sign off on detailed recitations that Mr. Canning clearly had no ability to recall as of 2020. For example, the December 2020 document recites that in the alleged lost 1997 written agreement, "Bynum and Canning agreed in the 1997 Agreement that the Stories would be considered a 'work for hire' as defined in the Copyright Act of 1976, and that Bynum would be deemed to be the sole and exclusive owner of all right, title, and interest in and to the Stories, including all copyright and proprietary rights relating thereto." Only six months before, Mr. Canning stated in his affidavit that as to the alleged written agreement in 1997, "I cannot find a copy of this written agreement though, and *do not recall the exact language that was in it*."

152.    The December 2020 document goes on to "confirm" other detailed terms of their alleged 1997 agreement, even after Mr. Canning had testified that he had absolutely no recollection of the terms of their agreement.  He knew only that after Mr. Bynum paid him in February 2014, they were "square," and Mr. Bynum could use his work.

153.    The December 2020 document then set up another deception.  Mr. Canning was to "dictate" two new 500-word introductions for the 12th Man book and an SMU football book.  For that service, Bynum was to pay Mr. Canning a fee of $2,000 upon the signing of the agreement. This was a complete sham designed to pay off Mr. Canning for his continued cooperation as a

witness for Mr. Bynum in this case.  In 2020, it is highly unlikely that Mr. Canning was capable of dictating two 500-word introductions at all, much less one that would justify a payment of $2,000.  Further, as Mr. Bynum has testified, he never pays for stories upon entering an agreement with an author, and he does not pay for people to write introductions.

154.    The December 2020 document also states "if the Stories are not considered work for hire, Canning assigns to Bynum all of Canning's rights and interest in and to the copyright to the Stories and in and to all other proprietary rights associated with the Stories." This assignment, besides being duplicative of the February 5, 2014, writing, would not achieve what Mr. Bynum needed.  Mr. Bynum would not be entitled to damages that pre-dated any such assignment.

155.    Mr. Bynum's only possible way to stay in court in this case was to have Mr. Canning assign, not just his copyright, but also his cause of action for the alleged copyright infringement in January 2014.  The December 2020 document attempted to accomplish that goal through fraud.

156.    Instead of making it clear to Mr. Canning that Mr. Bynum wanted to acquire Mr. Canning's potential cause of action, the December 2020 agreement is intentionally deceptive on that point. The body of the agreement, although detailed in many respects, makes no mention of such an assignment.  But Exhibit A to the agreement was a document titled "Assignment of Copyright."   Buried in the assignment language in Exhibit A is the first and only mention of an assignment of "all causes of action, whether now accrued or hereafter existing in connection therewith."   Mr. Canning, who was impaired by a stroke, could not have noticed this buried assignment.

157.    Further, when Mr. Bynum got Mr. Canning to sign this document, he deliberately failed to disclose the fact that Bynum believed - based on assertions of damages claimed in this case - that cause of action was worth from $2 million up to over $700 million. That omission alone makes the attempted assignment void for fraud.[3]

158.    Mr. Bynum also deceived Mr. Canning in connection with the consideration to be paid in exchange for the assignment of that cause of action.  Mr. Bynum says that consideration for the assignment of Mr. Canning's potential cause of action was the royalties described in section 13 of the December 2020 document.  That consideration is illusory on its face.  The royalties were to be based on the sale of published copies of the 12th Man book and the SMU Football book.  But the document expressly gives Plaintiffs the right to not publish either of those books.  In fact, Mr. Bynum had absolutely no intention of publishing the 12th Man book.

159.    Mr. Canning may have thought in 2014 that payment of $2,500 was sufficient compensation for the exclusive right to publish the Canning Article, but it is highly unlikely that in 2020 he thought that a promise to pay royalties on books that might never be published was sufficient compensation for an assignment of a cause of action in which Plaintiffs are claiming over $700 million in damages and penalties.

160.    Plaintiffs' attempt to acquire through assignment a cause of action based on the alleged infringement in January 2014 is void due to fraud.

---

[3] Mr. Marquardt believes the cause of action against him individually has no value.  He did nothing wrong, and nobody got hurt.  However, Mr. Bynum apparently thinks it is worth millions and failed to disclose his opinion to Mr. Canning when inducing Canning to execute the December 2020 agreement.

161.    In sum, even if the February 5, 2014, writing was sufficient to assign the Canning Article copyright to Mr. Bynum, Plaintiffs still lack standing to sue for claims based on an alleged infringement in January 2014.   Further, Plaintiffs cannot prove Mr. Bynum was the original copyright owner of the Canning Article under a work made for hire agreement because no such writing existed at that time.   Last, Plaintiffs' attempt to acquire Mr. Canning's potential cause of action is void for fraud.   Therefore, the claims in this action must fail for lack of standing.

## PLAINTIFFS' COPYRIGHT REGISTRATION IS INVALID.

162.    Pursuant to 17 U.S.C § 411, Mr. Marquardt pleads that Plaintiffs' certificate of copyright registration alleged to cover the Canning Article is invalid.   Inaccurate information was included in the application for copyright registration with the knowledge that it was inaccurate; and the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

163.    Mr. Bynum told the Copyright Office that he was the author of the Canning Article because that text was created pursuant to a work made for hire agreement.   That statement was inaccurate.   Mr. Bynum knew that information was inaccurate at the time.

164.    Mr. Bynum was asked by the copyright examiner: "While you hired Whit Canning to create a portion of the work, it is not clear whether or not the work is a work made for hire. What kind of contract do you have with Mr. Canning?   Does the contract specifically state his portion was created as a work made for hire?"   In response, Mr. Bynum stated, "My attorneys have reviewed the agreement with Whit Canning and it specifically states that his portion of the book was created on a 'work for hire' basis."   Presumably, the agreement reviewed by Bynum's counsel was the February 5, 2014, agreement.   While the February 5, 2014, document does contain those

words, it is highly unlikely that Mr. Bynum's attorneys told him that the agreement was a work made for hire agreement. Those attorneys would have known that a work made for hire agreement must be signed at or near the time the work was created. Here, on its face, the February 5, 2014, document referred to works created in 1997. Mr. Bynum's answer to the question was deliberately misleading. Mr. Bynum knew that he had obtained the right to Mr. Cannings work with a "release" in February 2014, and not under a work made for hire agreement contemporaneous with the preparation of the work in 1997.

165.    Further, if Mr. Bynum had, in fact, obtained a signed contract in 1997 that specifically stated Mr. Canning's work was being created as a work for hire, he misrepresented the facts to the copyright examiner. Mr. Bynum stated that his attorneys reviewed the work for hire agreement, which was impossible because Mr. Bynum claims he lost that (alleged) 1997 agreement.

166.    On information and belief, Mr. Bynum also knew that Mr. Canning's work was not created as a work made for hire because it did not fall within any of the nine categories in the statutory definition of work made for hire. Mr. Canning was asked to create a biography which would be published as a book authored entirely by Mr. Canning. As such it does not fall within the definition of a work for hire. Mr. Bynum was consulting with counsel at that time, and would have been advised of this fact.

167.    Mr. Bynum also misrepresented information about whether the work to be registered was published or unpublished. Mr. Bynum had already published the 12th Man book, including the Canning Article, in 2001 and again in 2006 by offering to distribute copies to a group of persons for purposes of further distribution. Additionally, a substantial portion of the work at

issue here, the Canning Article, was published and sold by Plaintiffs in 2005 as part of a book titled, *Bloodfeud.*

168.    Mr. Marquardt requests, pursuant to 17 U.S.C. § 411 (b)(2), that this Court request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.

## FAILURE TO MITIGATE ACTUAL DAMAGES.

169.    An injured party is required to use reasonable diligence to minimize losses. Plaintiffs are precluded from recovering damages caused by their own unreasonable conduct after an alleged injury.  After the alleged infringement, Plaintiffs engaged in a course of conduct that was not only unreasonable, but became irrational over time.  Any losses suffered by Plaintiffs was caused by that unreasonable conduct and not by an act of Mr. Marquardt or A&M.

170.    After the alleged copyright infringement in January 2014, Plaintiffs took no steps to minimize the losses they claim occurred as a result of the infringement.  Plaintiffs allege that they intended to publish the 12th Man book in the fall of 2014.  Plaintiffs failed to publish the book and, from January 2014 until the present, they have made no effort to do so.  Plaintiffs' claim that such an effort would be futile because of the alleged infringement[4] is completely without merit.

171.    The fact that the Canning Article was posted several months before Plaintiffs claim they were going to publish would not have affected the market for Plaintiffs 12th Man book.  In

---

[4] It may have been futile for Plaintiffs to pursue publication, but that would not be because of anything A&M or Mr. Marquardt did.  Mr. Bynum's business model was to sell to bulk purchasers.  In spite of sporadic attempts, from 2001 until January 2014, Mr. Bynum had been completely unsuccessful in selling the book.  Nobody wanted it.  It may be that after January 2014, there was still no one who wanted to buy it.  But that was not caused by an alleged infringement.

fact, if Plaintiffs had accepted A&M's offer to repost the story as part of a promotion for the 12th Man book, the posting would have helped, not hurt, Plaintiffs' prospects for selling the book.  The practice of disclosing select chapters of a book ahead of publication is a widely used marketing tool which obviously does not hurt the market for the book but typically enhances it.  It was unreasonable for Plaintiffs to reject that option.

172.    Plaintiffs' 12th Man book was a glossy coffee table book containing numerous photos.  It was over 200 pages, with 94 pages dedicated to football games that had nothing to do with E. King Gill.  A&M's posting of the Canning Article, which was simply eight pages of text, briefly posted on an internet website, would have had no effect on the ability of Plaintiffs to market the glossy coffee table book they had created.

173.    Further, republication of sports content is very common.   In fact, Plaintiffs republished the same content in different publications as part of their business model.  Prior publication of that content did not prevent them from using it again.  In fact, although a substantial portion of the Canning Article was published by Plaintiffs in 2005, Mr. Bynum intended to publish it again as early as 2006.

174.    Additionally, in the unlikely event that the posting of the Canning Article could have adversely affected the market for Plaintiffs 12th Man book, that effect would not have lasted long.  Yet, inexplicitly, eight years have passed and Plaintiffs still have no plans to publish the book.  They made this choice even though an ideal occasion to do so would have been last year, on the 100th Anniversary of the 12th Man.

175.    To completely abandon the publication of the 12th Man book because a small portion of the book's text had been posted on the internet for a 3-day period was inherently unreasonable.

176.    Plaintiffs chose to abandon all efforts to market the 12th Man book and decided to pursue extortion, then litigation and revenge, instead of just selling the book.  Bynum's goal for his 12th Man/Aggie Football book was to line up a bulk sale of a coffee-table book to Texas A&M or some group affiliated with the University.  But for a period of 13 years, Mr. Bynum was unable to find a bulk buyer for this book.  In January 2014, when A&M posted the Canning Article without permission, Bynum changed course.  The bulk purchaser he had initially targeted, Texas A&M University, had made a mistake, and Bynum intended to exploit that situation and force them into a bulk purchase of the book.  Bynum made it clear that if A&M did not meet his demands, which included a bulk purchase, he would turn the incident into a public relations nightmare for A&M.

177.    Although A&M made a reasonable offer to remedy the situation, it declined to buy the book.  Mr. Bynum then embarked on an unhinged campaign to try to ruin reputations of A&M and the individual Defendants.  First, he went to the police claiming that his book (which he falsely said was worth $5 million) had been stolen.  Then in 2016, he sent letters to 18 influential individuals - including former Senator Jeff Sessions, Senator Ted Cruz, Senator John Cornyn, Governor Greg Abbott, Attorney General Ken Paxton and then Secretary of Homeland Security Jeh Johnson - claiming that A&M employees had committed criminal felony theft.  Still clinging to his attempt at extortion, he hinted darkly of leaks to the media that "would bring an avalanche of bad press to Texas A&M."  When he filed this lawsuit in 2017, he sent a press release to the media saying that A&M stole a book valued at $7 million.  Mr. Bynum's smear campaign

continues to the present.  In June 2022, Mr. Bynum sent letters to various law enforcement officials about the alleged theft.  One letter, which states that "Marquardt, Cook and the other Texas A&M employees should be arrested," was sent to five news outlets.  Mr. Bynum's conduct even veered into an attempt at witness intimidation when he sent a letter to Jason Cook threatening to have him arrested.

178.    Plaintiffs' conduct of pursuing extortion and revenge instead of just selling the book constitutes a course of unreasonable conduct, and it was that unreasonable conduct, rather than any act by A&M or Mr. Marquardt, that caused the alleged injury of lost sales.

179.    Any damages suffered by Plaintiffs were self-inflicted, and Plaintiffs must not benefit from their own unreasonable conduct.

## DMCA CLAIMS.

### *Lack of intent.*

180.    Liability for violations of the DMCA requires a showing that Mr. Marquardt intentionally removed or altered "copyright management information" (CMI), and that Mr. Marquardt knew or had reasonable grounds to know that such removal or alteration would "induce, enable, facilitate, or conceal an infringement of copyright."  Plaintiffs cannot meet that burden. The CMI on the Canning Article was on the cover sheet of the Canning Article.  Mr. Marquardt was unaware that this information had been omitted from the Word document a secretary had typed for his research file.  He did not intentionally remove or alter anything.  Because he was not even aware the CMI was missing, he could not have had reasonable grounds to know the omission would induce or conceal a copyright infringement.

181.    Similarly, when Mr. Marquardt emailed the Canning Article to his colleague, he did not know the CMI had been removed or altered.  He could not have known such distribution would "induce, enable, facilitate, or conceal an infringement of a copyright."

182.    The "alteration" of CMI alleged by Plaintiffs is the phrase "Special to Texas A&M Athletics."  That phrase was added by Matt Simon at the last minute on a Sunday afternoon.  Mr. Marquardt was not aware that this was done.  Further, no one would have had reasonable grounds to think the addition of that phrase would lead to copyright infringement.

*Lack of injury*

183.    A claim for civil remedies for an alleged violation of 17 U.S.C §1201 or §1202 may be brought by a "person injured by a violation."  Because Plaintiffs cannot show they were injured by any omission or alteration of CMI from the Canning Article, they are not authorized to bring a civil action.  At the time the Canning Article was posted, Plaintiffs did not own an exclusive right to publish the Canning Article, and the omission of their CMI caused no injury.

184.    Additionally, and alternatively, even if Plaintiffs had an exclusive right to publish the Canning Article, they cannot show the alleged violation caused them any injury.

185.    Additionally, the omission of the copyright notice of Epic Sports from the Canning Article when it was posted was not a violation of the DMCA because, in fact, Epic Sports did not hold the copyright at that time.  The copyright holder was Whit Canning.  Mr. Canning's name was not omitted from the posted Article.

*Innocent violation.*

186.    Alternatively, Mr. Marquardt had no reason to believe that any of his acts constituted violations of the DMCA and his acts should be considered an innocent violation of the

DMCA.  Any damage award should be reduced or remitted by the Court pursuant to 17 U.S.C §

1203(b)(5).

***Qualified immunity against DMCA claims.***

187.    Under the principles of sovereign immunity and qualified immunity, the DMCA

claims against Mr. Marquardt must fail.  Specifically, and without limitation, Mr. Marquardt's

individual conduct in this case did not violate clearly established statutory or constitutional rights

of which a reasonable person would have known.  Qualified immunity protects Mr. Marquardt

because he did not omit or alter any CMI, as described above in paragraphs 180 - 182.  His own

conduct violated no statute or constitutional right.

188.    Additionally, at all relevant times, the statutory right that Plaintiffs allege was

violated was far from clear.  The only person whose rights were clear at the time was the author,

Whit Canning.  The posting may have violated Mr. Canning's copyright, but any omission of CMI

did not violate any of Mr. Canning's rights. Mr. Canning's name was not omitted or altered from

the posted version of the Canning Article.  Although the posted Article omitted the copyright notice

for Epic Sports, that omission was not a violation of a clearly established statutory or constitutional

right because it was far from clear that Epic Sports, in fact, owned the copyright.

189.    Additionally, the omission of CMI under the circumstances in this case did not

involve a "clearly established statutory right" because at that time, it was far from clear the alleged

acts violated the DMCA at all.  In early cases construing the DMCA's definition of CMI, district

courts reached different conclusions on whether the removed information must function as a

component of an automated copyright protection or management system.  In recent years courts

have rejected that argument, finding that, although the argument is supported by the legislative

history, it is contrary to the text in the statute.  However, that consensus was far from clear in 2014, and lawyers were still pursuing this argument as late as 2017.  In 2014, a reasonable person could not have known the omission under these circumstances constituted a violation of the DMCA when lawyers and courts were still grappling with that issue.

***Request for Attorneys' Fees***

190.    Mr. Marquardt requests that, as the prevailing party in the claims brought pursuant to the DMCA, he be awarded his reasonable attorneys' fees as part of the costs, pursuant to 17 U.S.C. § 505.

## PRAYER

Brad Marquardt, an employee of the State of Texas, sued here in his individual capacity, prays that all relief requested by Plaintiffs be denied, that Plaintiffs take nothing on their claims and that Defendant Brad Marquardt recover any relief to which he is entitled, including attorneys' fees, under law or in equity.

Dated:  August 9, 2022.                    Respectfully submitted,


_____*/s/ Julie A. Ford*_____ _____
Julie A. Ford
SBN: 07240500
Jford@gbkh.com
GEORGE BROTHERS KINCAID & HORTON, LLP
114 W. 7th Street, Suite 1100
Austin, Texas 78701
Tel: 512-495-1448
Fax: 512-499-0094
***Attorneys for Defendant Brad Marquardt***

FIRST AMENDED ANSWER OF BRAD MARQUARDT TO PLAINTIFFS' FIRST AMENDED COMPLAINT – PAGE 44

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 9, 2022, the foregoing document was electronically submitted with the Clerk of Court for the United District Court, Southern District of Texas, using the electronic case filing system of the Court, and served on the attorneys of record via same.

Warren V. Norred
Norred Law, PLLC
515 E. Border Street
Arlington, Texas 76010

Stephen M. Doniger
Doniger/Burroughs
603 Rose Avenue
Venice, California 90291

*Attorneys for Plaintiffs Michael J. Bynum and Canada Hockey, LLC d/b/a Epic Sports*

*/s/ Julie A. Ford*
Julie A. Ford