**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL J. BYNUM AND CANADA HOCKEY LLC d/b/a EPIC SPORTS, | § § § | |
| PLAINTIFFS, | § § | |
| v. | § § | CIVIL ACTION NO. 4:17-CV-00181 |
| BRAD MARQUARDT, in his individual capacity, | § § § | |
| DEFENDANT. | § § § | |

## DEFENDANT BRAD MARQUARDT'S MOTION FOR SUMMARY JUDGMENT

Ray Chester (attorney-in-charge)
State Bar No. 04189065
S.D. Tex. Bar No. 36495
Ian Davis
State Bar No. 24120793
S.D. Tex. Bar No. 3644072
MCGINNIS LOCHRIDGE LLP
1111 W. 6th Street
Bldg. B, Suite 400
Austin, TX  78703
512-495-6000
512-495-6093 (Fax)
rchester@mcginnislaw.com
idavis@mcginnislaw.com

***Attorneys for Defendant Brad Marquardt***

<u>**TABLE OF CONTENTS**</u>

TABLE OF CONTENTS .................................................................................................... ii

INDEX OF AUTHORITIES ............................................................................................. iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS ............................. v

I.   INTRODUCTION ............................................................................................... 1

II.  STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT .................................. 1

III. SUMMARY JUDGMENT STANDARD ...................................................................... 2

IV. QUALIFIED IMMUNITY STANDARD ..................................................................... 3

V.  SUMMARY JUDGMENT EVIDENCE ....................................................................... 5

VI. STATEMENT OF FACTS .................................................................................... 5

     i.   How a 1998 article about the 12th Man got posted on an A&M website .................. 6

     ii.  How the Canning Article ended up in the TAMU Times ............................. 7

     iii. How Brad Marquardt got sued for something he didn't do ........................... 7

VII. SUMMARY OF THE ARGUMENT ......................................................................... 9

VIII. ARGUMENT & AUTHORITIES ........................................................................... 10

    A.   The Doctrine of Fair Use Protects Marquardt from Claims of Copyright
        Infringement ........................................................................................ 10

    i.   Fair use is a flexible doctrine determined on a case-by-case basis ........................... 11

    ii.  An analysis of the statutory factors shows Marquardt's specific use of the
       Canning Article is protected by fair use ...................................................... 12

    B.   Marquardt Is Not Liable for Contributory Copyright Infringement ........................... 14

    C.   The Undisputed Summary Judgment Record Shows that Marquardt Did
        Not Violate the DMCA ........................................................................... 15

    i.   Marquardt did not remove or alter copyright infringement information ................... 16

    ii.  Marquardt did not distribute copies of the Canning Article knowing that
       CMI had been removed or altered .............................................................. 17

    iii. Marquardt did not alter the Canning Article's title ....................................... 18

    D.   Marquardt Is Entitled to Qualified Immunity ............................................... 18

    i.   No statutory violation of Plaintiffs' rights .................................................. 18

    ii.  No pre-January 2014 clearly established law .............................................. 18

IX.  PRAYER ...................................................................................................... 20

CERTIFICATE OF SERVICE ........................................................................................ 21

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. Creighton*, 483 U.S. 635 (1987) ...............................................................5

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................2

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ......11

*Antoine v. First Student, Inc.*, 713 F.3d 824 (5th Cir. 2013) ......................................2

*Ass'n. for Info. Media & Equip. v. Regents of the Univ. of California*, 2012 U.S. Dist. LEXIS 187811 (C.D. Cal. 2012) ....................................................................4, 5, 19

*Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313 (5th Cir. 2022) .......11, 12, 13, 14

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...............................12, 13, 14

*Campinha-Bacote v. Bleidt*, No. H-10-3481, 2011 U.S. Dist. LEXIS 113430 (S.D. Tex. 2011) .............................................................................................................4, 20

*Chavez v. Arte Publico Press*, 59 F.3d 539 (5th Cir. 1995) .........................................4

*Chavez v. Arte Publico Press*, 204 F.3d 601 (5th Cir. 2000) .......................................4

*Dow Jones & Co. v. Harris*, 2024 U.S. Dist. LEXIS 167626 (W.D. Tex. Sep. 17, 2024).......16, 17

*Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, LP*, 948 F.3d 261 (5th Cir. 2020) ......................................................................................................15

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt, Inc.*, 443 F.2d 1159 (2d Cir. 1971) ..............15

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 ..............................................................11, 12

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .............................................................3, 19

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .........................11, 13, 14

*Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007) ...................................................3

*Issaenko v. Univ. of Minn.*, 57 F. Supp. 3d 985 (D. Minn. 2014) .................................4

*Malley v. Briggs*, 475 U.S. 335 (1986) ...................................................................3, 20

*Mango v. Buzzfeed, Inc.*, 970 F.3d 167 (2d Cir. 2020) ..............................................17

*Matsushita Elect. Indust. Co. v. Zenith Radio*, 475 U.S. 574 (1986) ............................2

*MGM Studios, Inc. v. Grokster*, 545 U.S. 913 (2005) ............................................2, 14

*Mitchell v. Forsyth*, 472 U.S. 511 (1985)..................................................................3

*Morrow v. Meachem*, 917 F.3d 870 (5th Cir. 2019) ............................................2, 4, 19

*Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam) ....................................................3-4

*Pearson v. Callahan*, 555 U.S. 223 (2009) ...............................................................3

*Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ..............................14-15

*Reiner v. Canale*, 301 F. Supp. 3d 727 (E.D. Mich. 2018) ........................................4

*Romero v. City of Grapevine*, 888 F.3d 170 (5th Cir. 2018) ...........................................3

*Saucier v. Katz*, 533 U.S. 194 (2001) .................................................................3

*Scott v. Harris*, 550 U.S. 372 (2007) .................................................................2

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) ...........................................4

*Univ. of Houston v. Chavez*, 517 U.S. 1184 (1996) ....................................................4

*Victor Elias Photography, LLC v. Ice Portal, Inc.*, 43 F.4th 1313 (11th Cir. 2022) .....................17

**Statutes**

17 U.S.C. § 107 ..................................................................................1, 11, 13

17 U.S.C. § 1202 .............................................................................2, 15, 16, 17

17 U.S.C. § 1203 ...................................................................................20

42 U.S.C. § 1983 ...................................................................................4

**Rules**

Federal Rule of Civil Procedure 56(c) .............................................................3

**Other**

MELVILLE B. NIMMER & DAVID NIMMER, 4 NIMMER ON COPYRIGHT § 13.05(A)(4)(2021) ...................... 12-13

## <u>STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS</u>

This is a copyright infringement case filed in 2017. Doc. No. 15 (First Amended Complaint). The lawsuit is based on the publication of an allegedly copyrighted article on the website of Texas A&M's Athletics Department on January 19, 2014, for a period of three days.

Plaintiffs are Michael Bynum and his business entity, Canada Hockey LLC. All defendants except Brad Marquardt were dismissed on the pleadings in 2019. Doc. No. 96.

Defendant Marquardt filed a motion for summary judgment in September 2023. Doc. No. 265. Plaintiffs filed two responses, each of which urged that summary judgment was inappropriate given the lack of discovery conducted (despite the fact that the case had been on file for six years at that point). In April 2024, the Court entered a one-page order denying Defendant's motion without prejudice. Doc. No. 275. It then set several deadlines, including that discovery must be completed by December 31, 2024. *Id.* Finally, the Court's order provided that the: "Defendant may, if he so chooses, refile his Motion for Summary Judgment anytime after September 1, 2024." *Id.*

Since the Court entered its April 2024 order, Plaintiffs have had the opportunity to take essentially unlimited additional discovery and have taken seven fact witness depositions. Both sides' experts have been deposed as well. These additional depositions have fleshed out some details, but the basic facts of the case remain unchanged. Therefore, Defendant Brad Marquardt now re-urges summary judgment, requesting dismissal of all claims against him.

## I.    INTRODUCTION

1.    Whatever complaints Plaintiffs may have against Texas A&M University, Defendant Brad Marquardt did nothing wrong. In January 2014, Marquardt found an old paper article about A&M's 12th Man tradition in his office. Believing the factual information in the article could be useful, Marquardt had a word-searchable copy made for his own research file. He then shared his copy with a co-worker and an intern in A&M's Athletics Department. For that, Plaintiffs seek hundreds of millions of dollars from Marquardt.

2.    This suit was filed because Marquardt's colleagues independently decided to post the entire article on a university website as part of a social media campaign. Then, other A&M employees decided to link to the article in an electronic newsletter, the *TAMU Times*. Marquardt had no involvement with these decisions. It never occurred to Marquardt that his colleagues might end up inadvertently violating copyright law. Ultimately, Plaintiffs' lawsuit rests on the erroneous conflation of Marquardt with his colleagues in Texas A&M University's Athletics Department. But none of Marquardt's colleagues are parties to this lawsuit, and Plaintiffs have not shown a genuine issue of material fact establishing that Marquardt did anything wrong.

3.    But even if the Court finds a fact issue, the doctrine of qualified immunity nonetheless compels summary judgment. Plaintiffs fail step two of the doctrine, as they cannot point to case law or other authority from before January 2014 that clearly establishes the violative nature of Marquardt's conduct.

## II.    STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

4.    Marquardt moves for summary judgment on the following issues:

   a.    **No copyright infringement based on Marquardt's individual actions**. Marquardt's individual actions in making a copy of the article for his own research use and then sharing his copy with two colleagues are protected under the doctrine of fair use. *See* 17 U.S.C. § 107.

b. **No contributory copyright infringement**. The undisputed evidence shows that Marquardt did not intentionally induce or encourage direct infringement. *See, e.g., MGM Studios, Inc. v. Grokster,* 545 U.S. 913, 930 (2005).

c. **No violation of the DMCA**. The uncontested evidence shows that Marquardt did not violate the Digital Millenium Copyright Act (DMCA), 17 U.S.C. § 1202. Marquardt did not remove copyright management information (CMI) from the article; he did not distribute the article knowing that CMI had been removed; and he did not alter any CMI with the required scienter.

d. **Qualified immunity requires dismissal**. A reasonable government official in Marquardt's shoes would not have understood that (i) making a copy of an old article to use as a resource, and then sharing his copy with two colleagues without any knowledge of or control over those colleagues' eventual use of it, was a violation of anyone's clearly established statutory rights. If there is any question as to whether Marquardt's own conduct violated copyright law, that question is not "beyond debate" and Marquardt is therefore entitled to qualified immunity. *Morrow v. Meachem,* 917 F.3d 870, 874 (5th Cir. 2019).

## III.    SUMMARY JUDGMENT STANDARD

5.     Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment must be granted when there is no genuine issue of material fact, and the moving party demonstrates it is entitled to judgment as a matter of law. A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue is not "genuine" when there is nothing more than "some metaphysical doubt as to the material facts." *Matsushita Elect. Indust. Co. v. Zenith Radio,* 475 U.S. 574, 586 (1986).

6.     In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris,* 550 U.S. 372, 378 (2007). Factual controversies are resolved in favor of the nonmoving party, "but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Antoine v. First Student, Inc.,* 713 F.3d 824, 830 (5th Cir. 2013). "[T]he

nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007).

### IV.    QUALIFIED IMMUNITY STANDARD

7.      Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[1] The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). And because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . ***it is effectively lost if a case is erroneously permitted to go to trial***." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis added).

8.      To determine whether qualified immunity applies, courts conduct the two-part analysis set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), as modified by *Pearson*, 555 U.S. at 236. That is, to defeat summary judgment, a plaintiff must offer sufficient evidence to raise a genuine dispute of material fact regarding (1) whether a public official violated the plaintiff's rights; and (2) whether such actions were objectively unreasonable in the light of clearly established law at the time of the conduct. *See Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018). Courts may address these prongs in either order. *See Pearson*, 555 U.S. at 236.

9.      Under the second step of qualified immunity, the "dispositive question is whether the violative nature of particular conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12

---

[1] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

(2015) (per curiam) (internal quotation omitted). The Fifth Circuit has described the second question as "a doozy" for which the plaintiff bears a "heavy" burden to prove that the "question is beyond debate." *Morrow v. Meachem,* 917 F.3d 870*,* 874 (5th Cir. 2019).

10.    Although qualified immunity is typically applied in the context of suits under 42 U.S.C. § 1983, courts (including this one) also apply it to suits alleging copyright violations by public employees. *See, e.g., Campinha-Bacote v. Bleidt,* No. H-10-3481, 2011 U.S. Dist. LEXIS 113430, at *7-9 (S.D. Tex. 2011).[2] Indeed, the Fifth Circuit has applied qualified immunity in a copyright infringement case involving a public official.[3]

11.    Relevant here, public employees are protected by qualified immunity when "a particular area of copyright law was not clearly established." *Ass'n. for Info. Media & Equip. v. Regents of the Univ. of California*, 2012 U.S. Dist. LEXIS 187811, at *14 (C.D. Cal. 2012). Courts have also granted a public employee qualified immunity in the copyright context when their conduct was "objectively reasonable." *See Campinha-Bacote*, 2011 U.S. Dist. LEXIS 113430, at *7-9 ("Because it was objectively reasonable for Demps to believe that she would not be violating copyright law in administering the survey in 2007-09, she is entitled to summary judgment.").

---

[2] *See also Issaenko v. Univ. of Minn.,* 57 F. Supp. 3d 985, 1013 (D. Minn. 2014) (citing decisions that applied qualified immunity to copyright infringement disputes); *Reiner v. Canale,* 301 F. Supp. 3d 727, 740 (E.D. Mich. 2018) (same).

[3] *See Chavez v. Arte Publico Press,* 59 F.3d 539, 547 (5th Cir. 1995) (university employee who allegedly authorized printing of a book in violation of copyright was entitled to qualified immunity), *vacated sub nom. Univ. of Houston v. Chavez*, 517 U.S. 1184 (1996), *overturned on other grounds after remand*, 204 F.3d 601 (5th Cir. 2000). In *Chavez,* the plaintiff was a "nationally renowned playwright" who contracted with the University of Houston to publish her books. *Id.* at 540. The University printed more copies than the plaintiff allowed, and she sued under copyright law and the Lanham Act naming the University and an employee, Kanellos, as defendants. *Id.* at 541. The Court engaged in an extensive analysis on whether Congress could abrogate state sovereign immunity for lawsuits of copyright infringement through its Article I powers. *See id.* at 541-47. The Court concluded that it could. *Id.* at 547. The Court then applied qualified immunity to Kanellos. *See id.* The Supreme Court granted certiorari and vacated the holding in light of *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), which severely limited Congress' ability to abrogate sovereign immunity. Neither the Supreme Court, nor any subsequent decisions by the Fifth Circuit after remand, revisited the initial application of qualified immunity to protect Kanellos. Thus, it can be rightfully said that this case was reversed and remanded on other grounds and that its application of qualified immunity to copyright infringement remains undisturbed.

12. To determine whether a right is "clearly established," the Court "must determine not whether copyright law is clearly established in a broad sense, but whether a ***specific right*** is clearly established under copyright law." *Ass'n. for Info. Media & Equip.*, 2012 U.S. Dist. LEXIS 187811, at \*13 (emphasis added). Ultimately, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Thus, the issue is whether there was clearly established pre-2014 precedent that Marquardt's specific conduct in this case violated Plaintiffs' rights, not—as Plaintiffs assert—whether Marquardt is generally aware of copyright law.

## V.     SUMMARY JUDGMENT EVIDENCE

13. In support of this Motion, Marquardt attaches the following summary judgment evidence:

> **Exhibit A**:     Declaration of Brad Marquardt
> > **Exhibit A-1**: Copy of the Canning Article found in Marquardt's office
> > **Exhibit A-2**: Email with Word copy of the Canning Article attached
> > **Exhibit A-3**: Email correspondence between Plaintiff and Marquardt in 2014
> > **Exhibit A-4**: Copy of Exhibit C to Plaintiffs' First Amended Complaint
> > **Exhibit A-5**: Copy of Exhibit D to Plaintiffs' First Amended Complaint
> **Exhibit B**:     Declaration of Alan Cannon
> **Exhibit C**:     Declaration of Shane Hinckley
> **Exhibit D**:     Declaration of Krista Berend
> **Exhibit E**:     Declaration of Matt Simon
> **Exhibit E-1**:   Email correspondence between Matt Callaway and Matt Simon, dated January 19, 2014

## VI.     STATEMENT OF FACTS

14. On a Sunday afternoon in January 2014, an article by sportswriter Whit Canning was posted on Texas A&M's Athletics Department website. Two A&M employees, Matt Callaway and Matt Simon, posted the article while working under the general direction of their boss, Jason Cook. Ex. C; Ex. E. Whit Canning's 1998 article (the "Canning Article") recounts the original

story of A&M's 12th Man tradition. The tradition began in 1922 when an Aggie named E. King

Gill was called down from the bleachers and asked to suit up for the "Dixie Classic" football game.

### i.      *How a 1998 article about the 12th Man got posted on an A&M website*

15.     In January 2014, the term "12th Man" was also being used by the Seattle Seahawks

as that team was headed for the Superbowl. During the NFL playoffs, A&M wanted to remind the

public that the 12th Man tradition originated at A&M. Ex. C, ¶ 3. To achieve that goal, Shane

Hinckley, then interim VP of Marketing & Communications at A&M, worked with Jason Cook,

Senior Associate Athletics Director, to create a 12th Man public relations campaign. Ex. C, ¶ 3.

One of their first tasks was to use social media to get the word out during the Seahawks' January

19 playoff game. Hinckley tapped Krista Smith to handle the project for A&M's Marketing &

Communications Division. Ex. C, ¶ 4; Ex. D, ¶ 3. Cook instructed Athletics Department employee

Matt Callaway to work with Smith on that social media project. Ex. C, ¶ 4; Ex. D, ¶ 3.

16.     Three days before the game, Smith sent Callaway a tentative social media plan with

her suggested tweets. Ex. D, ¶ 4. Callaway proposed adding a tweet that would link to a 12th Man

story to be posted on the Athletics Department website. Ex. D, ¶ 4. That Friday, Smith sent the

social media plan to Shane Hinckley and Jason Cook, both of whom approved it. Ex. C, ¶ 5. The

person tasked with actually posting the 12th Man story over the weekend was Matt Simon, the

Athletics Department's website manager. Ex. E, ¶ 3. On Sunday, Callaway sent Matt Simon the

story to be posted, with a note saying: "Written by Whit Canning in 1998." Ex. E, ¶ 3; Ex. E-1.

17.     The title of the story was "*E. King Gill: The Life and Legend of Texas A&M's 12th*

*Man.*" On his own initiative, Simon changed the title to "*The Original 12th Man.*" Simon believes

he likely changed the title to fit the display on the website. Ex. E, ¶ 5. Simon also added an

introduction to the story: "*In this retrospective, originally written in 1998, we bring you the story*

*of E. King Gill – the life and legend of Texas A&M's 12th Man[,] by Whit Canning[,] Special to*

*Texas A&M Athletics*." Ex. E, ¶ 5. Simon added the words "special to Texas A&M Athletics" because he often used that phrase to indicate a particular article came from outside the Athletics Department. No one told Simon to make any of these changes. Ex. E, ¶ 5. The Canning Article was posted to the website and a tweet linking the Article was sent out during the Seahawks' game.

### ii. How the Canning Article ended up in the TAMU Times

18.     Within A&M's Marketing & Communications Division,[4] there were more plans for the Canning Article. On Tuesday January 21, Krista Smith included the Canning Article in a list of proposed stories to be linked to in the University's electronic newsletter, the *TAMU Times*. Smith drafted a headline and introduction to the story for the *TAMU Times* that read:

> *The Original 12th Man*
> *E. King Gill never led Texas A&M to a national championship, but because of one simple act in Dallas in 1922, he became the most revered Aggie of them all: the 12th Man.*

19.     That headline linked readers to the Athletics Department website where the Canning Article had been posted two days before. Ex. D, ¶ 7. The *TAMU Times* newsletter with this link was published on Tuesday January 21, 2014. The next day, Plaintiff Michael Bynum contacted the Athletics Department and demanded that the Canning Article be taken down. Shortly after receiving Bynum's complaint, the Canning Article was removed from both the Athletics Department website and the *TAMU Times*. Ex. D; Ex. A, ¶ 15.

### iii. How Brad Marquardt got sued for something he didn't do

20.     As described above, there were five individuals involved in A&M's decision to publish the Canning Article: Shane Hinckley, Krista Smith, Jason Cook, Matt Callaway, and Matt Simon. None of those individuals were named as defendants in this lawsuit. After more than 7

---

[4] Marquardt was and is employed in the Athletics Department, which is entirely separate from the Marketing & Communications Division.

years of litigation, Marquardt is the only remaining Defendant. Marquardt was not involved in the decision to post the Canning Article on the Athletics Department website. Ex. A, ¶ 11; Ex C, ¶ 5; Ex. D, ¶ 5; Ex. E, ¶ 6. He did not post the Article on the website or post any tweets linking to the Article, nor did he post a link to the Article on the *TAMU Times.* And Marquardt did not remove or alter copyright information from the Article. Ex. A, ¶ 13.

21.     ***The uncontested evidence about Marquardt's individual actions establishes the following***: While cleaning his office in January 2014, Marquardt discovered an old paper copy of the Canning Article. *Id.*, ¶ 3. He did not recall seeing the Article before, nor did he know how it landed in his office. *Id.*, ¶ 4. But he thought the historical facts contained in the Article would be useful. *Id.*, ¶ 5.[5] He asked the Department's secretary to type the Article into a Word document so he could have a resource handy in a word searchable format when answering questions about the 12th Man. *Id.*, ¶ 6. He had no intention of publishing the Canning Article. *Id*.

22.     The Department secretary emailed the Word document she created to Marquardt on January 14, 2014. *Id.*, ¶ 8. The email sat in Marquardt's inbox until he learned that his colleague Matt Callaway was looking for information about the 12th Man. *Id.*, ¶ 7. Marquardt forwarded the secretary's email to Callaway with the Word document attached. *Id.*; Ex. A-2.[6] Marquardt did not review the document before forwarding it to Callaway. Ex. A, ¶ 8. As it turned out, in creating the Word document, the Department secretary did not include the information on the Article's cover sheet. The cover sheet had said:

---

[5] Marquardt worked in the Athletics Department media relations office. His job was to facilitate communications between the media and the Athletics Department. As a part of his job, Marquardt gathered and shared information on topics of interest regarding A&M athletics. Ex. A, ¶ 5.

[6] The email indicates that Marquardt also sent the Article to an intern working in the Athletics Department named Benjamin Dierker. There is no indication to Dierker did anything in connection with posting the Article on the Athletics Department website.

*E. King Gill:*
*The Life & Legen of Texas A&M's 12th Man*
*By Whit Canning*
*Copyright © 1998 Epic Sports*
*All rights reserved*

Marquardt did not realize that the cover sheet information had been omitted from the Word document. *Id.*, ¶ 12. Nor did he intend for the Department secretary to remove it. *Id.*

23.    Marquardt was not a part of the team working on the 12th Man public relations campaign. No one asked Marquardt whether the Article should be posted on the Athletics Department website. No one asked Marquardt whether they needed permission to do so. Marquardt never encouraged anyone to post, publish or link the Canning Article.  *Id.*, ¶ 12; Ex C, ¶ 5; Ex. D, ¶ 5; Ex. E, ¶ 6. And when Marquardt forwarded the Article to Matt Callaway, it did not occur to him that his colleagues might use the Article in a way that violated copyright law. Ex. A, ¶ 12.

24.    After Plaintiff Bynum complained to the Athletics Department about the posting, Marquardt, who knew Bynum, apologized and explained to Bynum how he had found the old paper article in his office and gave a copy to a colleague who was looking for information about the 12th Man. *Id.*, ¶ 15; Ex. A-3. Bynum apparently ignored Marquardt's explanation.[7]

## VII.    <u>SUMMARY OF THE ARGUMENT</u>

25.    Plaintiffs allege that Marquardt directly infringed copyrighted material. This claim fails as a matter of law, as Marquardt's own act of "copying" was protected under the doctrine of fair use. Marquardt played no role in the decision to post the entire Canning Article, which resulted in the actual infringement alleged in this case. Further, the uncontested evidence shows Marquardt did not induce or encourage direct infringement by others.

---

[7] Bynum's theory—that Marquardt had copied the E. King Gill story from his draft book—is demonstrably false. A comparison of the old Canning Article to the story in Bynum's coffee table book clearly demonstrates that the copy posted to the Athletics Department website was the old paper copy dated 1998. *Compare* Ex. A-1 *to* Doc. 15-1, pp. 15-27 (Pls' First Amended Complaint).

26.     Plaintiffs also allege that Marquardt violated the Digital Millenium Copyright Act (DMCA) because copyright information had been omitted from the Canning Article when it was posted on the Athletics Department website. The DMCA only prohibits intentional conduct, and the undisputed evidence shows the omission was completely unintentional.

27.     Overarching these issues is the doctrine of qualified immunity. A reasonable government official in Marquardt's position, under the specific circumstances of this case, was not on notice that his own use of the Canning Article clearly violated any right. Qualified immunity therefore requires that the claims against Marquardt be dismissed.

## VIII.    ARGUMENT & AUTHORITIES

### A.  The Doctrine of Fair Use Protects Marquardt from Claims of Copyright Infringement

28.     Plaintiffs' copyright infringement claim against Marquardt cannot survive summary judgment. Critically, when Marquardt asked the Department secretary to copy the Canning Article for his research file, his goal was to use only the factual information contained in the Article as a resource when educating the media about A&M's 12th Man tradition. Ex. A, ¶¶ 5-6. Marquardt shared his copy with co-worker Matt Callaway, who was looking for information about the 12th Man. Ex. A, ¶ 8. Making a copy for this limited purpose was purely noncommercial and Marquardt's individual actions had no effect on the market value of that 1998 article. Accordingly, Marquardt's individual act of copying should be protected under the fair use doctrine as a matter of law. And even if the Court decides that fair use cannot be conclusively established at summary judgment, dismissal is nonetheless appropriate under step two of qualified immunity because Plaintiffs cannot point to caselaw clearly establishing the inapplicability of fair use under a similar set of facts.

### *i.*    *Fair use is a flexible doctrine determined on a case-by-case basis*

29.    "[C]ourts have long recognized a limited privilege in those other than the owner of

a copyright to use the copyrighted material in a reasonable manner without the owner's consent."

*Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.,* 27 F.4th 313, 321 (5th Cir. 2022) (internal

citations omitted). That privilege, known as the fair use doctrine, is codified in the Copyright Act:

> In determining whether the use made of a work in any particular case is a fair use
> the factors to be considered shall include—
>> (1) the purpose and character of the use, including whether such use is of
>> a commercial nature or is for nonprofit educational purposes;
>> (2) the nature of the copyrighted work;
>> (3) the amount and substantiality of the portion used in relation to the
>> copyrighted work as a whole; and
>> (4) the effect of the use upon the potential market for or value of the
>> copyrighted work.

17 U.S.C. § 107. As the Supreme Court recently stated, the Copyright Act's fair use provision:

> [S]et[s] forth general principles, the application of which requires judicial
> balancing, depending upon relevant circumstances. Because those principles apply
> across a wide range of copyrightable material, from books to photographs to
> software, fair use is a flexible concept, and its application may well vary depending
> on the context. . . . The fair use provision, and the first factor in particular, requires
> an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an
> infringement.' The same copying may be fair when used for one purpose but not
> for another.[8]

30.    In other words, fair use analysis is not to be simplified with bright-line rules.

Instead, the statute (like the doctrine it recognizes) calls for case-by-case analysis. *Harper & Row*

*Publishers, Inc. v. Nation Enters.,* 471 U.S. 539 560 (1985). "Courts typically give attention to

factors one and four (the purpose and market effect of the use)." *Bell,* 27 F.4th at 321. "But

ultimately, courts have 'almost complete discretion in determining whether any given factor is

---

[8] *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,* 598 U.S. 508, 527, 532 (2023) (quoting *Google, LLC v. Oracle America, Inc.,* 593 U.S. 1, 19 (2021)).

present in any particular case' and whether the totality favors fair use." *Id.* (citing MELVILLE B. NIMMER & DAVID NIMMER, 4 NIMMER ON COPYRIGHT § 13.05(A)(4)(2021)).

> ### ii.    An analysis of the statutory factors shows Marquardt's specific use of the Canning Article is protected by fair use

31.    **_The first factor favors fair use_**. Under the first fair use factor, courts look to (1) whether the work is used for commercial or noncommercial purposes, (2) whether the work is transformative, and (3) whether the user acted in good faith. *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579, 584 (1994); *Google*, 593 U.S. at 31.

32.    Here, the record establishes that Marquardt's use of the Article was noncommercial and had a distinct purpose from the original. The undisputed evidence shows that Marquardt asked his secretary to copy the Article so that he could have an internal resource if he or colleagues needed to answer media questions about the 12th Man's origin. Ex. A, ¶ 6. This specific use is noncommercial, as Marquardt did not seek to monetize the copied Article. It is also transformative because Marquardt's use is entirely distinct from that of the original Article.

33.    Plaintiffs allege that the Article's original purpose was purely commercial. Doc. 273, p. 20. Specifically, Bynum claims that he intended to publish the Canning Article as a chapter in a coffee table book about A&M athletics. *Id.* at p. 9.  But that is a far cry from the use of and purpose behind Marquardt's copy. In other words, Marquardt's use of the work was not to "appropriate it for its expressive elements," but instead to "disseminate the underlying facts" of the 12th Man tradition. *Bell,* 27 F.4th at 323. Finally, the evidence establishes that Marquardt acted in good faith. Marquardt neither intended nor was involved in the decision to publish the Article on the Athletics Department website. And, when Bynum demanded that the Article be taken down, Marquardt personally contacted him to apologize. Taken together, the noncommercial and

transformative character (*i.e.* different purpose) of Marquardt's specific use, along with his good faith, militates in favor of fair use.

34.    ***The second factor slightly favors fair use.*** The second factor is deemed the "least significant fair-use factor." *Bell,* 27 F.4th at 323. It considers the nature of the copyrighted work, and "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. A court is more likely to find fair use when the copied work is factual as opposed to fictional and creative. *Harper & Row*, 471 U.S. at 563.

35.    The Canning Article is characterized by numerous references to dates, sports history, the results of football games, and people relevant to the 12th Man. Although these dense facts are linked together by Whit Canning's literary contribution, the comparatively meager expressive elements do not dominate over the factual content. And importantly, it is undisputed that Marquardt's use of the Article related only to its underling facts—*i.e.* as a research resource regarding the 12th Man's origins. Because the defining feature of the Canning Article is its factual content, not its expressive flourish, the second factor weighs slightly in favor of fair use.

36.    ***The third factor weighs against fair use.*** The third factor examines "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." *Bell,* 27 F.4th at 323-24. This factor weighs against fair use because the Canning Article was copied in its entirety.

37.    ***The fourth factor favors fair use.*** Finally, courts consider "the effect of the use upon the potential market for or value of the copyrighted work." *Campbell*, 510 U.S. at 590 (quoting 17 U.S.C. § 107(4)). Analysis of this factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer," but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a

13

substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (cleaned up). Put differently, the inquiry "must take account not only of harm to the original but also of harm to the market for derivative works." *Harper & Row*, 471 U.S. at 567.

38.     Here, Marquardt gained no commercial advantage from copying the Canning Article for his own research file. Nor did he gain a commercial advantage from forwarding that copy to colleagues. He was simply performing his employment duties. Additionally, the market impact on Plaintiffs resulting from ***Marquardt's use*** (as opposed to the use by his colleagues) is nonexistent. Having a copy made for Marquardt's research file, and then sharing that copy with two colleagues, had absolutely no adverse impact on the value of the Canning Article.[9]

39.     Taken together, the first and fourth factors—considered to be the most important— clearly favor fair use. Marquardt's particular use of the copyrighted work was noncommercial and for the transformative purpose of research, and had absolutely no effect on the market value of the work. Therefore, Marquardt's own conduct should be protected under the fair use doctrine.

## B. Marquardt Is Not Liable for Contributory Copyright Infringement

40.     Plaintiffs allege that Marquardt's conduct (along with other non-parties) constitutes contributory copyright infringement. Doc. 15, p. 27. Liability for contributory copyright infringement requires "intentionally inducing or encouraging direct infringement." *MGM Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930 (2005). The general rule is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a contributory infringer." *Perfect 10, Inc. v. Amazon, Inc.,* 508 F.3d

---

[9] Even if the Court were to consider the effect of actions taken by other A&M employees, there is no evidence that such use had a negative impact on the market for or value of the Canning Article. A copy of the Canning Article, nine pages of plain text, was available online for a period of just 3 days. Plaintiffs offer no evidence that this short-lived online activity had any effect on the ability to market a glossy 143-page coffee table book that Bynum was supposedly planning to publish. *See, e.g., Bell,* 27 F.4th at 324 ("We do not see a plausible economic rationale to support Bell's assertion that widespread tweeting of the WIN passage would undermine the value of his copyright.").

1146, 1170–71 (9th Cir. 2007) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt, Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971)).

41.    Here, the summary judgment record establishes that Marquardt did not cause or encourage Callaway, or anyone else, to publish the entire Article or to violate anyone's copyright. When others decided to post the Canning Article on the Athletics Department website, Marquardt was not involved in that decision, nor was he consulted as to whether permission was needed. Ex. A, ¶ 12; Ex C, ¶ 5; Ex. D, ¶ 5; Ex. E, ¶ 6. Marquardt's individual actions were not substantially certain to result in direct infringement. Marquardt reasonably expected that his colleagues would use the Canning Article in a lawful way. Ex. A, ¶ 11; Ex. B, ¶¶ 5-7. The uncontested facts therefore show that Marquardt did not intentionally encourage any infringing conduct of his colleagues. Yet even if the Court finds a fact issue, summary judgment should be granted under the doctrine of qualified immunity because Plaintiffs cannot identify pre-2014 caselaw clearly establishing liability for contributory infringement sufficient to have put Marquardt on notice.

**C.    The Undisputed Summary Judgment Record Shows that Marquardt Did Not Violate the DMCA**

42.    Bynum claims that Marquardt violated the Digital Millenium Copyright Act (DMCA), 17 U.S.C. § 1202. Doc. 15, pp. 29-30. The DMCA "protects the integrity of copyright information by prohibiting any person from intentionally removing or altering CMI if he or she knows or has reasonable ground to know it would induce, enable, facilitate, or conceal copyright infringement." *Id.* (citing 17 U.S.C. § 1202)[10]. Because Bynum cannot show a fact issue as to the essential elements of the DMCA claims, those claims should be dismissed on summary judgment.

---

[10] The DMCA was enacted in 1988 primarily to address concerns about technological circumvention of copyright protection. *See Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, LP,* 948 F.3d 261, 276 (5th Cir. 2020).

###### i.   *Marquardt did not remove or alter copyright infringement information*

43.    The DMCA provides:

No person shall intentionally remove or alter any copyright management information (CMI) knowing or having reasonable grounds to know, that it [the alteration or removal] will induce, enable, facilitate, or conceal an infringement of a copyright.

17 U.S.C. § 1202(b)(1). CMI includes, in part, the title, the author and the copyright owner of a work. *See id.* at § 1202(c)(1)–(3).

44.    The Canning Article had a cover sheet with the following CMI: the author's name, copyright notice, and date. It is uncontested that Marquardt gave the Department secretary a paper copy of the Article, together with the cover sheeting containing that CMI. It is also uncontested that the secretary retyped the Article into a word-searchable document. And it is uncontested that she failed to type into the Word document the CMI on the cover sheet.

45.    But Section 1202 prohibits only the ***intentional*** removal of CMI. The undisputed evidence shows that Marquardt did not intend for the secretary to remove any CMI from the Canning Article. And without reviewing that document, Marquardt simply forwarded it to Callaway. Ex. A, ¶¶ 5-6, 8, 13. Thus, there is no evidence of the required scienter.

46.    *Dow Jones & Co. v. Harris* is instructive. *See* 2024 U.S. Dist. LEXIS 167626 (W.D. Tex. Sep. 17, 2024). There, the plaintiff alleged a violation of the DMCA when the defendant distributed copyrighted news articles after removing CMI. *See id.* at *20. The defendant moved for summary judgment, arguing that the plaintiff had no evidence of actual knowledge that CMI had been removed, nor actual or constructive knowledge that such removal would induce or conceal infringement. *See id.* at *21. The court agreed and granted summary judgment. It found that the plaintiff "provide[d] no evidence that [the defendant] ever intentionally or knowingly altered the CMI associated with the" copyrighted news articles, and that the defendant "on the

other hand, provided declarations stating that those involved in creating the [emails in which the articles were distributed] never knowingly or intentionally made any deletions or alterations to any articles[.]" *Id.* It held: "In sum, [the plaintiff] has not provided evidence that [the defendant] knowingly removed or altered CMI in any way and [the plaintiff] failed to establish a genuine issue of material fact on scienter." *Id.* at *22.

47.    The same is true here. Plaintiffs have not offered evidence to suggest that Marquardt intended to omit CMI from the Word document, nor that he knew or had reasonable grounds to know that his secretary's inadvertent removal of CMI would induce or conceal an infringement.

### ii.    *Marquardt did not distribute copies of the Canning Article knowing that CMI had been removed or altered*

48.    The DMCA further provides:

> No person shall distribute copies of works knowing that [CMI] has been removed or altered knowing or having reasonable grounds for knowing that [the distribution] will induce, enable, facilitate, or conceal an infringement.

17 U.S.C. § 1202(b)(3). Section 1202(b)(3) also contains a double scienter requirement. "[T]he defendant who distributed improperly attributed copyright material must have actual knowledge that CMI 'has been removed or altered without authority of the copyright owner or the law,' as well as actual or constructive knowledge that such distribution will 'induce, enable, facilitate, or conceal an infringement.'" *Mango v. Buzzfeed, Inc.,* 970 F.3d 167, 171 (2d Cir. 2020); *Victor Elias Photography, LLC v. Ice Portal, Inc.,* 43 F.4th 1313, 1319–21 (11th Cir. 2022). It is undisputed that Marquardt did not know that CMI had been removed when he emailed the document to Callaway. Ex. A, ¶ 12. Further, he had no reasonable grounds to know that his email would "induce, enable, facilitate, or conceal an infringement." It was reasonable for Marquardt to assume that whatever his colleagues did with the Canning Article would not violate copyright law. Ex. B.

17

### *iii. Marquardt did not alter the Canning Article's title*

49.     Bynum also alleges a DMCA violation because the title to the Canning Article was changed and the phrase "Special to Texas A&M Athletics" was added. But it is undisputed that Matt Simon, acting alone, changed the Article's title and added that phrase. Ex. E, ¶¶ 5-6.

50.     In sum, CMI was unintentionally omitted when the Athletics Department secretary typed the Canning Article into a Word format. Then another employee, Matt Simon, wrote a new title and subhead. Marquardt did not intend to remove CMI, nor did he have actual knowledge that anything had been omitted from the Canning Article when he sent his email copy to colleagues. Further, Marquardt had no reason to believe that his actions would "induce, enable, facilitate, or conceal an infringement." Ex. A, ¶ 13. Plaintiffs have offered no evidence to show a fact issue on these elements of the DMCA claim and, as explained below, Plaintiffs' DMCA claims cannot survive step two of qualified immunity. Summary judgment should be granted accordingly.

### D.  Marquardt Is Entitled to Qualified Immunity

### *i. No statutory violation of Plaintiffs' rights*

51.     As explained above, the summary judgment record establishes that Marquardt did not violate Plaintiffs' statutory rights for direct copyright infringement, contributory infringement or a violation of the DMCA. Although others at A&M *may* have infringed Plaintiffs' copyrights— or contributed to that infringement—Marquardt did not. Therefore, Plaintiffs cannot overcome the first step of qualified immunity and summary judgment should be granted.

### *ii. No pre-January 2014 clearly established law*

52.     Even if the Court finds that Plaintiffs have shown a fact issue on the various copyright claims, summary judgment is nonetheless warranted. Under the second step of qualified immunity, Plaintiffs cannot point to pre-January 2014 precedent that clearly establishes the rights allegedly violated. In fact, the opposite is true. In similar circumstances, courts have dismissed

copyright claims under the second step of qualified immunity. *Ass'n. for Info. Media & Equip. v. Regents of the Univ. of California* is instructive. *See* 2012 U.S. Dist. LEXIS 187811, at *14 (C.D. Cal. 2012). There, the plaintiffs alleged that UCLA and several of its employees used their copyrighted DVDs. *See id.* at *3. The individual defendants asserted fair use, as well as qualified immunity. The court framed the central question as "not whether [the individual defendants'] actions as alleged violate a law, but ***whether a reasonable Defendant would have known that the alleged actions violated clearly established copyright law***." *Id.* at *15 (emphasis added).

53.     To answer this question, the court embarked on an analysis of the four fair use factors. After doing so, it concluded that there was, "at a minimum, ambiguity as to whether Defendants' streaming constitutes fair use and that it would not have been clear to a reasonable person in Defendants' position that its streaming did not constitute fair use." *Id.* at *17; *see also id.* at *15 (citing *Harlow*, 457 U.S. at 818) ("a reasonable person would not have known that the alleged conduct violated any clearly established rights pursuant to copyright law because it is ambiguous whether the use was fair use under copyright law."). Accordingly, it found that qualified immunity protected the defendants from copyright liability and dismissed the claims. *Id.* at *17.

54.     Here, a reasonable person in Marquardt's shoes would ***not*** have known that clearly established copyright law was violated by collecting information of interest about A&M's athletics programs and their traditions. It was common practice in the Athletics Department to copy factual material like the Canning Article and to share it with colleagues in the office. Ex. B, ¶¶ 5-6.

55.     As the court in *Ass'n. for Info. Media & Equip.* recognized, there is inherent ambiguity in fair use determinations, which are necessarily decided on a case-by-case basis. Absent precedent that "squarely governs the specific facts at issue", Plaintiffs cannot show that—in this case—the inapplicability of fair use "is beyond debate." *Morrow,* 917 F.3d at 874, 876–77. The

19

same is true of Plaintiffs' other claims. No law says that Marquardt's individual acts could have been a clear violation of the DMCA. Nor can Plaintiffs point to clearly established law that would have put Marquardt on notice that his individual actions amounted to contributory infringement.

56.     Taken together, Marquardt's actions were "objectively reasonable." *Campinha-Bacote v. Bleidt,* No. H-10-3481, 2011 U.S. Dist. LEXIS 113430, at *7-9 (S.D. Tex. 2011) ("Because it was objectively reasonable for Demps to believe that she would not be violating copyright law in administering the survey in 2007-09, she is entitled to summary judgment."). This is not a case involving a government official who is "plainly incompetent" or "knowingly violate[d] the law." *Malley*, 475 U.S. at 341. As a result, Plaintiffs cannot overcome the second step of qualified immunity analysis and summary judgment should be granted.

## IX.    <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Defendant Brad Marquardt respectfully requests that the Court grant this Motion, enter summary judgment in this case, dismiss Plaintiffs' claims, and enter an order awarding Defendant attorneys' fees pursuant to 17 U.S.C. § 1203(b)(5), with the amount to be determined at a later date.

Respectfully submitted,

*/s/Ray Chester*
Ray Chester (attorney-in-charge)
State Bar No. 04189065
S.D. Tex. Bar No. 36495
Ian Davis
State Bar No. 24120793
S.D. Tex. Bar No. 3644072
MCGINNIS LOCHRIDGE LLP
1111 W. 6th Street
Bldg. B, Suite 400
Austin, TX  78703
512-495-6000
512-495-6093 (Fax)
rchester@mcginnislaw.com
idavis@mcginnislaw.com

**Attorneys for Defendant**
**Brad Marquardt, in his individual capacity**

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of January, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.

/s/*Ray Chester*
Ray Chester