## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **MICHAEL J. BYNUM AND CANADA** | § | |
| **HOCKEY LLC d/b/a EPIC SPORTS** | § | |
| *Plaintiffs* | § | |
| | § | |
| **v.** | § | **C.A. NO. 4:17-cv-00181** |
| | § | |
| **BRAD MARQUARDT,** | § | |
| **in his individual capacity** | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## SECOND MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

STATEMENT OF THE NATURE AND STAGE
   OF THE PROCEEDINGS ................................................................... ix

INTRODUCTION................................................................................... 1

SUMMARY OF THE ARGUMENT....................................................... 1

STATEMENT OF THE ISSUES TO BE RULED ON BY THE COURT ......................... 2

FACTUAL BACKGROUND ................................................................. 2

STANDARD OF REVIEW .................................................................... 6

ARGUMENT ......................................................................................... 6

    I.    All of Marquardt's Arguments Fail Because His Self-Serving Declaration Cannot Support Summary Judgment............................................................. 6

        A.  Marquardt's declaration is a "sham" that contracts his prior statements. ........................................................................ 7

        B.  Marquardt's declaration, at most, raises credibility issues inappropriate for resolution via summary judgment. ............................. 8

    II.   Marquardt's Actions Are Not Fair Use ........................................ 9

        A.  Marquardt's copying was <u>not</u> for research purposes................................ 9

        B.  *Factor 1* – The purpose and character of the Marquardt's claimed use weight against finding fair use. ............................................................ 10

        C.  *Factor 2* – Marquardt's copying of the expressive elements of the unpublished article weigh against finding fair use................................ 12

        D.  *Factor 3* – Marquardt concedes the third factor weight in Plaintiff's favor ......................................................................... 14

        E.  *Factor 4* – Marquardt's copying harmed the market for the article. ...... 14

PD.48432135.1

III.    Marquardt is Liable for Contributory Copyright Infringement...................... 15

IV.    Marquardt is Liable for DMCA Violations.................................................... 16

V.    Marquardt is Not Entitled to Qualified Immunity......................................... 17

    A.  Qualified immunity should not be applied to this dispute ...................... 17

    B.  Marquardt's actions violated clearly established law ............................ 18

CONCLUSION ...................................................................................................... 20

**TABLE OF EXHIBITS**

| DESCRIPTION | Exhibit No. |
|---|---|
| Excerpts from the Deposition of Brad Marquardt ...................................................... | 1 |
| Excerpts from the Deposition of Matt Callaway ..................................................... | 2 |
| Declaration of Michael Bynum (with Exhibits) ....................................................... | 3 |
| Defendant's Objections and Responses to Plaintiffs' Requests for Admission .................... | 4 |
| First Amended Answer ............................................................................ | 5 |
| E. King Gill Biography [BM 0001 – 9]............................................................. | 6 |
| Email forwarding Draft of Book Including Gill Biography [BYNUM 00569-713] ............. | 7 |
| Email forwarding Draft of Book Including Gill Biography  [BYNUM 00714-859] ............ | 8 |
| CMI [BM 0001]................................................................................... | 9 |
| CMI [BYNUM 000721] ........................................................................... | 10 |
| Brad Marquardt's Discovery Responses August 23, 2021 ..................................... | 11 |
| January 17, 2014 Correspondence from Brad Marquardt to Matt Callaway........................ | 12 |
| First Amended Complaint........................................................................ | 13 |
| Marquardt July 24, 2020 Declaration ........................................................... | 14 |
| Thornton Marquardt Email Re Gill Bio [BM000010 – 19]........................................ | 15 |
| Excerpts from the Deposition of Jackie Thornton .............................................. | 16 |
| January 17, 2024 Email Chain [TAMU 000675 – 677] ......................................... | 17 |
| The Original 12th Man Article by Whit Canning [BYNUM 942-955]................................. | 18 |
| Hinckley Email January 23, 2014 [TAMU 000001 – 3] ......................................... | 19 |
| TAMU Times Email January 21, 2014 [TAMU 001580] .......................................... | 20 |
| TAMU Times Newsletter [TAMU Prod 000001-3]................................................. | 21 |
| TAMU Times [BYNUM 941]........................................................................ | 22 |
| January 21, 2014 Email Chain [TAMU 518-521] ................................................ | 23 |

TAMU Message Board ................................................................................................ 24

Press Release [BYNUM 32-40] .............................................................................. 25

Email Re Strategic Plan [BYNUM 257-259] ......................................................... 26

Email Re Statue January 19, 2014 [TAMU 000670] ............................................. 27

TAMU Guidelines ..................................................................................................... 28

January 21, 2014 Email Chain [BM 20-21] ........................................................... 29

Bynum Email January 22, 2014 [BM 22-23] ......................................................... 30

Deposition Excerpts from Deposition of Matt Simon ........................................... 31

Jan. 22, 2014 Email from Marquardt to Cook ....................................................... 32

Gary Huestis Expert Report ..................................................................................... 33

PD.48432135.1

# **TABLE OF AUTHORITIES**

## **Cases**

*After II Movie, LLC v. Grande Commc'ns Networks, LLC*, No. 1:21-CV-709-RP, 2023 WL 1422808 (W.D. Tex. Jan. 31, 2023). ........................................................ 15

*Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1993) ........................................... 11

*Am. Inst. of Physics v. Winstead PC*, Case No. 3:12-cv-1230-M, 2013 U.S. Dist. LEXIS 169929 (N.D. Tex. Dec. 3, 2013) ................................................ 12

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). .................................................. 6

*Bell v. Eagle Mt. Saginaw Indep. Sch. Dist.*, 27 F.4th 313 (5th Cir. 2022 .............................. 11-14

*Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998) .................................................. 18

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) .................................... 9

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994). ...................................... 9-12, 14

*Campinha-Bacote v. Bleidt*, No. H-10-3481, 2011 LEXIS 113430 (S.D. Tex. Oct. 3, 2011) .................................................. 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................. 6

*Chavez v. Arte Publico Press*, 59 F.3d 539 (5th Cir. 1995) .......................................... 18

*Club Retro L.L.C. v. Hilton,* 568 F.3d 181 (5th Cir. 2009). ........................................ 18

*Compaq Computer Corp. v. Ergonome, Inc.*, 387 F.3d 403, 409-10 (5th Cir. 2004) .................................................. 11

*DCA Design v. Bellavida Custom Homes LLC*, No. H-17-3314, 2018 U.S. Dist. LEXIS 232921 (S.D. Tex. Dec. 5, 2018) ........................................ 15

*DISH Network L.L.C. v. Khalid*, No. CV H-19-4563, 2021 LEXIS 39044 (S.D. Tex. Feb. 23, 2021) .................................................. 2

*Emmerich Newspapers, Inc. v. Particle Media, Inc.*, No. 3:21-cv-32, 2022 U.S. Dist. LEXIS 141283 (S.D. Miss. Aug. 9, 2022) ................................ 13, 15

*Estate of Barre v. Carter*, 272 F. Supp. 3d 906 (E.D. La. 2017) ............................... 11, 13

*Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169 (2d Cir. 2018) .......................... 13

*Gordon v. Nextel Communs.*, 345 F.3d 922 (6th Cir. 2003) ........................................ 16

*Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160, 2023 U.S. Dist. LEXIS 50749 (S.D.N.Y. Mar. 24, 2023) ................................ 11, 12, 13

*Harper & Row Publrs. v. Nation Enters.*, 471 U.S. 539 (1985). ............................... 11, 13, 14, 19

*Kipp Flores Architects, LLC v. Pradera SFR, LLC*, No. SA-21-CV-673-XR,
2023 U.S. Dist. LEXIS 92 (W.D. Tex. Jan. 2, 2023) ...................................................... 2, 9

*Kisela v. Hughes*, 584 U.S. 100 (2018) ............................................................................... 18

*Lattimore Materials Corp. v. Asquip, Inc.*, No. 4:20-CV-03153, 2021 LEXIS
439 (S.D. Tex. Sept. 23, 2021) ...................................................................................... 8

*Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019) ........................................................ 20

*Peteski Prods. v. Rothman*, 264 F. Supp. 3d 731 (E.D. Tex. 2017) ........................... 9, 20

*Pierson v. DoStuff Media, LLC,* Case No. A-19-cv-435, 2019 U.S. Dist.
LEXIS 188020 (W.D. Tex. Oct. 29, 2019) ......................................................... 9

*Recif Res., LLC v. Juniper Capital Advisors, L.P.*, No. H-19-2953, 2020 U.S.
Dist. LEXIS 175431(S.D. Tex. Sept. 24, 2020) ............................................. 16

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) ................................... 9, 10

*Religious Tech Ctr. v. Netcom On-line Commun. Servs.*, 923 F. Supp. 1231
(N.D. Cal. 1995) ........................................................................... 11

*S. WS. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489 (5th Cir. 1996) ................................ 2, 7

*Samuel v. Holmes*, 138 F.3d 173 (5th Cir. 1998) ........................................................... 18

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29
(1st Cir. 2012) ............................................................................ 20

*Sony Corp. of Am. V. Universal City Studios, Inc.*, 464 U.S. 417 (1994) ...................... 11

*Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d
680 (N.D. Tex. 2008). ...................................................................... 12

*Tower v. Glover*, 467 U.S. 914 (1984) ............................................................................. 18

*Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253 (5th Cir. 2007)..................................... 6

*UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y 2000) ........................... 13

*UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d
743 (W.D. Tex. 2019) ...................................................................... 15

*United States v. Kozeny*, 541 F.3d 166 (2d Cir. 2008).................................................... 19

*Vais Arms, Inc. v. Vais*, 383 F.3d 287 (5th Cir. 2004) .................................................... 9

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) ................................................. 11

PD.48432135.1

*White v. Pauly*, 580 U.S. 73 (2017) ........................................................................ 18

*Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) ...................................................................................................... 11

*Zadeh v. Robinson*, 928 F.3d 457, 478-81 (5th Cir. 2017) ...................................... 2

## Statutes

17 U.S.C. § 107 .................................................................................... 2, 9, 11, 14

17 U.S.C. § 108 ...................................................................................................... 19

17 U.S.C. § 1202 ...................................................................................................... 2

## Other Authorities

Daniel J. Meltzer, *Overcoming Immunity*, 53 Stan. L. Rev. 1331 (2001) ..................................... 18

## Rules

Fed. R. Civ. P. 56(a). .............................................................................................. 6

## Regulations

138 Cong. Rec. S17358-01 (1992) ........................................................................ 20

PD.48432135.1

## **STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS**

On January 19, 2017, Plaintiffs filed this lawsuit. DE 1. On March 29, 2019, this Court granted Texas A&M University Athletic Department and The Texas A&M 12th Man Foundation's Motions to Dismiss. DE 96. In the same Order, the Court denied Marquardt's Motion to Dismiss finding he was not entitled to qualified immunity. DE 96. Since then, the case was severed, with the case against Texas A&M et al. separated from the case against Marquardt. DE 180. Both severed pieces of the case went up on appeal on separate tracks — No. 20-20530 (Marquardt) and No. 20-20503 (Texas A&M et al.). The Fifth Circuit issued decisions in both appeals on September 8, 2021; a decision on rehearing was issued on January 26, 2022, in the Marquardt appeal. DE 226.

In the interim, on September 18, 2019, the Court stayed the case, pending the outcome of the Supreme Court's decision in *Allen v. Cooper*. DE 111. On January 3, 2020, the Court lifted the stay for the sole purpose of taking the deposition of Whit Canning. DE 117. On August 22, 2022, the Court entered an Amended Scheduling Order. DE 246. On February 16, 2023, the Court stayed discovery in this matter pending the Court's decision on the Motion to Amend. DE 263.

Marquardt then filed a motion for summary judgment. DE 265. The Court denied that motion without prejudice. DE 275. In its order denying the motion for summary judgment, the Court gave the parties until December 31, 2024 to complete discovery DE 275.

Following the close of discovery, Marquardt filed the instant motion. DE 282. Plaintiffs Michael Bynum and Canada Hockey LLC d/b/a Epic Sports now submit this opposition to Marquardt's Second Motion for Summary Judgment, stating as follows:

## INTRODUCTION

When Brad Marquardt finds writing that he likes, he steals it. During his deposition, he was asked about the information in his Texas A&M University ("TAMU") biography.

> A: Well, there was a guy, Alan Jones, and he was – his bio wrote [-] one of the most versatile members of the department, and then he retired. And I loved the way that sounded. And so I thought, I'm going to steal that phrase.

> Q: Is there anything else that you stole to put together this bio for yourself?

> A: I don't have the bio in front of me, but I don't – I don't recall.

Ex. 1 at 25:3-18. What Marquardt stole from Plaintiffs was much more than a phrase. Marquardt stole the chapter that is the heart of Plaintiffs' unpublished book on the 12th Man tradition.

In January 2014, TAMU started a campaign to promote itself as the original home of the 12th Man. As Matt Callaway, who was responsible for the campaign, testified, he "definitely talked to [Marquardt] about [the 12th Man social media campaign]" during the period the campaign was happening. Ex. 2 at 38:11-39:6. In response, Marquardt told Callaway "I have this article" (*i.e.* the Canning Article). Ex. 2 at 38:11-39:6. After that conversation, Marquardt had his assistant re-type a paper copy of Plaintiffs' article and remove the Copyright Management Information ("CMI"). He then forwarded the article to Callaway and assisted with the posting of the article to TAMU's website. That is copyright infringement.

Marquardt moves for summary judgment based on a self-selected and incomplete set of facts that are overly favorable to him. Those facts are not correct. This Court should deny Marquardt's motion for summary judgment.

## SUMMARY OF THE ARGUMENT

*First*, all Marquardt's arguments fail because they are based on a sham, self-serving declaration that is contrary to Marquardt's deposition testimony and other evidence in the record. *Second*, Marquardt's fair use argument fails because all four fair use factors support a finding of

1

infringement. *Third*, Marquardt's contributory copyright infringement and DMCA arguments fail because there is a material fact dispute regarding whether Marquardt intentionally caused, facilitated or encouraged his colleague's use of the Canning Article. *Fourth*, Marquardt's qualified immunity arguments fail because: (a) qualified immunity is not applicable under these facts; and (b) Marquardt's actions violated clearly established law.

## STATEMENT OF THE ISSUES TO BE RULED ON BY THE COURT

1. Is Marquardt's declaration, which conflicts with his own deposition, a sham declaration? *S. WS. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).

2. Are Marquardt's arguments regarding his intent appropriately decided on summary judgment? *Kipp Flores Architects, LLC v. Pradera SFR, LLC*, 2023 U.S. Dist. LEXIS 92, at *54-55 (W.D. Tex. Jan. 2, 2023).

3. Do the fair use factors support a finding of infringement? 17 U.S.C. § 107.

4. Is Marquardt entitled to summary judgment on the contributory copyright infringement and DMCA claims where: (a) there is evidence that Marquardt intentionally caused, facilitated and encouraged the widespread copyright infringement at issue; and (b) granting Marquardt's motion would require the Court to accept Marquardt's credibility, and resolve factual disputes against Plaintiffs, on summary judgment? 17 U.S.C.A. § 1202; *DISH Network L.L.C. v. Khalid*, No. H-19-4563, 2021 U.S. Dist. LEXIS 3690474, at *3 (S.D. Tex. Feb. 23, 2021).

5. Is Marquardt entitled to invoke qualified immunity and, if so, did Marquardt's conduct violate clearly established law? *See Zadeh v. Robinson*, 928 F.3d 457, 478-81 (5th Cir. 2017).

## FACTUAL BACKGROUND

Michael Bynum, through Canada Hockey, LLC d/b/a Epic Sports, has written, edited, and published more than 100 sports books. Ex. 3 ⁋ 2. In 1997, Bynum hired Whit Canning, on a work-for-hire basis, to write a biography of E. King Gill, titled "An A&M Legend Comes to Life," (the "Canning Article"), for inclusion as the centerpiece of a book Bynum planned to publish on TAMU's "12th Man" tradition. *Id.* ⁋⁋ 3-6.

The Canning Article was emailed to Marquardt, an Associate Director of Media Relations in TAMU's Athletic Department, in 1998 for limited fact checking purposes prior to its anticipated publication as the lead chapter of Plaintiff's book. *Id.* ⁋ 7. And Bynum emailed Marquardt near

2

final versions of the book, which included the Canning Article, in May and June 2010. Exs. 7 &

8. The Canning Article in Marquardt's possession included the following CMI on its cover page:

**E. King Gill: The Life & Legend of Texas A&M's 12th Man**
**By Whit Canning**
**Copyright © 1998 Epic Sports**

Ex. 4 at No. 2; *see also* Ex. 6; Ex. 3 ⁋ 8; DE 251.

The Seattle Seahawks also use the "12th Man" trademark under a licensing agreement with

TAMU. Ex. 5 ¶ 7. In January 2014, when the Seahawks were competing in the NFL's postseason,

certain TAMU employees, including Marquardt's co-worker Matt Callaway, were working on a

social media marketing campaign for the university. Ex. 5 ¶¶ 7, 56; Ex. 13 ¶ 34; Ex. 2 at 17:22-

25. The primary goal of this campaign was to reinforce the university's trademark over the term

"12th Man" and TAMU's long-standing tradition associated with the phrase. Ex. 5 ¶ 7.

By January 11, 2014, Callaway was working on the 12th Man campaign. Ex. 5 ¶ 56. As

part of the campaign, following a January 11 Seahawks playoff victory, the Athletic Department's

Twitter account posted an image of a E. King Gill statue with the caption, "Imitation is the sincerest

form of flattery, Texas A&M is The Home of the #12thMan." Ex. 13 ¶ 34, Ex. E; Ex. 5 ¶ 56.

Marquardt worked in the same six-person department as Callaway. Ex. 11 at No. 16.

Marquardt's office was located near Callaway's, and they talked to each other "multiple times a

day." Ex. 2 at 16:21-23. Callaway told Marquardt about the 12th Man campaign while it was

ongoing. *Id*. at 38:11-39:6. Marquardt responded by telling Callaway "I have this article" (*Id*. at

54:5-13) and agreed to send the article to Callaway for the purposes of posting it online as part of

the campaign.[1] Callaway believes his conversation with Marquardt in that regard "would have

been before the 14th [of January]." Ex. 2 at 54:20-55:3.

---

[1] Ex. 2 at 37:21-25 ("Q. Okay. Do you remember why it was sent to you? A. To be posted on the Web site. Okay. How do you know that it was sent to you to be posted to the Web site? A. I remember that."); Ex. 1 at 95:17-20 ("Q. And when you sent the article to Matt Callaway, did you have an understanding that he was going to use it for the

On January 13 or 14, 2014, Marquardt provided a hard copy[2] of the Canning Article to his assistant, Jackie Thornton. Ex. 5 ¶¶ 3-4; Ex. 4 at No. 1; Ex. 11 at No. 5.[3] Although Marquardt had access to a digital scanner (Ex. 1 at 35:11-36:3, 39:14-19 & 41:4-14), Marquardt instructed Thornton to re-type the Canning Article into a new Microsoft Word file. Ex. 5 ¶¶ 3-4; Ex. 4 at No. 1; Ex. 11 at No. 5. Thornton then manually re-typed the Canning Article. Ex. 5 ¶¶ 3-4.

Marquardt testified that the one and only other time he could remember asking his assistant to re-type a document, rather than scanning it, was in preparation for publishing that document in a digital format. Ex. 1 at 74:6-75:20. Neither a pdf nor a physical copy can be readily used to post content on a website because the text of the document must be copied and pasted or manually re-typed. Ex. 2 at 30:20-25. Thus, when TAMU personnel sent content to be posted on the website, they never sent a PDF and instead typically sent a Microsoft Word file so that the person uploading the content to the website could easily copy and paste the text. Ex. 2 at 30:14-19.

On January 14, 2014, Thornton emailed the keyed-in version of the Canning Article, with CMI removed,[4] to Marquardt. Ex. 4 ¶ 5; Ex. 15. On January 17, 2014, at 11:40 a.m., Callaway emailed Krista Smith with the subject line "Re: Tentative #12thMan plan," outlining TAMU's media strategy around the Seattle Seahawks' January 19th playoff game. Ex. 17. Callaway's email to Smith referenced plans to post a tweet from the TAMU Athletic Department's Twitter account, linking to a story to be posted on the TAMU Athletics Department website. *Id.* Callaway

---

12th Man campaign? A. Yes."); *id.* at 108:18-109:7 ("Q. So, you may not have known exactly how he was going to use it on the website, but you knew that he was going to use it in some form or fashion on the website? A. Yes.").

[2] The copies of the article in Marquardt's possession were in either hard copy or in digital PDF. Exs. 7, 8, 15.

[3] The exact date Marquardt gave the Canning Article to Thornton must be deduced from two other facts in the record: (1) Marquardt must have provided it to Thornton prior to her making the copy on January 14, 2014; and (2) Marquardt's contemporaneous emails state that he first "found" the document in his office the week of January 13, 2014. Ex. 32 (January 22, 2014, email from B. Marquardt to J. Cook stating that Marquardt found the Gill biography in his office "last week"); *see also* Ex. 1 at 105:22-25. If both of those things are true, then Marquardt *must* have provided the document to Thornton on either January 13 (Monday) or 14 (Tuesday), 2014.

[4] Marquardt blames the omission on Thornton, claiming he did not tell her to remove the CMI. Thornton testified that, when typing documents, "I typed it the way they gave it to me," "whatever Mr. Marquardt gave me and asked me to type . . . that's what I'd type. Nothing more, nothing less." Ex. 16 at 25:2-13; *id.* at 30:19-31:4 & 38:4-11.

mentioned that the content for the website was being finalized that morning. *Id*. Later that same day, Marquardt sent an email to Callaway attaching the keyed-in copy of the Canning Article created by Thornton. Ex. 5 ¶¶ 6, 71; Ex. 11 at No. 5; Ex. 15.

On January 19, 2014, Callaway sent the typed copy of the Canning Article to the Athletic Department's webmaster, Matt Simon, to post. Ex. 5 ¶ 9. Marquardt assisted with the posting by "discuss[ing] matters involving how the posting should look." Ex. 11 at No. 6. Additionally, shortly before the article was posted, Simon and Callaway realized that the version of the Canning Article provided was missing the author and date (because that information was, alongside the now missing CMI). Ex. 27. At that point, the only source for that information was Marquardt, who had the only available complete version of the document in his possession. Ex. 6. Callaway was able to provide that missing information to Simon shortly before the Canning Article was posted to the website. Ex. 27. When asked where he got that information, Callaway testified that he "would have asked Brad [Marquardt]." Ex. 2 at 40:17-21, 59:5-12. Marquardt acknowledged that the missing author and date information was "obviously communicated to the individuals involved in posting the [Canning Article] on the website." Ex. 11 at No. 20. A new byline was added when Simon posted the Canning Article: "Special to Texas A&M Athletics." Ex. 5 ¶¶ 9-10; Ex. 18.

At the start of the Seahawks' January 19 game, Simon published the Canning Article on the Athletics Department's website. Ex. 5 ¶¶ 9-10. TAMU personnel, including Callaway and Smith, then executed the remainder of the 12th Man social media plan by taking several key steps to promote and disseminate the story on the website, including: (a) tweets from two TAMU Twitter accounts (with approximately 150,000 followers) linking to the story; (b) a nine-page press release that copied the story verbatim (Ex. 25); and (c) publishing an excerpt of the story, with a link to the website, in a weekly e-newsletter called the TAMU Times (which had between 70,000 and 75,000 followers) (Exs. 20, 21, 22). *See generally* Ex. 33; *see also* Ex. 23.

On January 22, 2014, Bynum contacted Alan Cannon demanding the Canning Article be removed from the website. Ex. 30; Ex. 11 at No. 6.[5] When Bynum complained to Cannon (who was Marquardt's *and* Callaway's supervisor), Cannon instructed Marquardt to remove the article from the website. It was Marquardt (not Callaway) who called Simon and requested the removal.[6] Ex. 11 at No. 6. After the article was taken down, Marquardt sent Bynum an email stating: "We remain very interested in using [the Gill biography], however. With the Seattle Seahawks and their 12th Man getting a lot of attention in the NFL, the story was an important part of **our strategic plan** to show Texas A&M is the true owner of the '12th Man.'" Ex. 26 (emphasis added).

## STANDARD OF REVIEW

Summary judgment is warranted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of demonstrat[ing] the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). A dispute of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id*. at 255.

## ARGUMENT

### I.    All Of Marquardt's Arguments Fail Because His Self-Serving Declaration Cannot Support Summary Judgment.

As an initial matter, all of Marquardt's arguments are based on a self-serving declaration that is contrary to both his prior sworn statements and other evidence in the record. *See generally* DE 282-1. Based on this narrative, Marquardt argues that his personal use was fair, that he did not

---

[5] The previous day, Jerry Cooper, a retired editor and friend of Bynum's, had e-mailed Marquardt regarding the posting. Ex. 29.
[6] It was also Marquardt who informed Alan Cannon's boss of the issue. Ex. 30.

6

know he was facilitating copyright infringement, and that he did not know the CMI was missing. But there are two reasons why his declaration cannot support summary judgment.

### A.  Marquardt's declaration is a "sham" that contradicts his prior statements.

As an initial matter, "[i]t is well-settled that the courts in this Circuit will not allow a party to defeat [or obtain] summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *Bynum v. Marquardt*, No. 4:17-cv-181, 2020 U.S. Dist. LEXIS 162521, at *2 (S.D. Tex. Sept. 4, 2020) (citing *S. WS. Erectors, Inc.*, 72 F.3d at 495). "This Court has utilized that doctrine in multiple cases where a party attempted to use a sham declaration to counter his or her prior testimony." *Id.*

Here, Marquardt's declaration is directly contrary to his deposition testimony on the central issue of *why* he sent the document to Callaway. Marquardt's declaration states that "I was not aware at the time of how Matt Callaway intended to use the [Canning Article]," and "[a]t the time I sent the article to Matt Callaway, I was unaware of the plans being put together by that team to post the Canning [A]rticle on the Athletics Department website." DE 282-1 at ¶¶ 11-12. But at his deposition he testified to exactly the opposite. Ex. 1 at 95:17-20 ("Q. And when you sent the article to Matt Callaway, did you have an understanding that he was going to use it for the 12th Man campaign? A. Yes."); *id.* at 108:18-109:7 ("Q. So, you may not have known exactly how he was going to use it on the website, but you knew that he was going to use it in some form or fashion on the website? A. Yes."). Indeed, in other prior sworn statements Marquardt testified that he participated in formatting the posting. Ex. 11 at No. 6.

### B.  Marquardt's declaration, at most, raises credibility issues inappropriate for resolution via summary judgment.

Applying the summary judgment standard, "[t]he court cannot make a credibility determination in light of conflicting evidence or competing inferences." *Landmark Am. Ins. Co. v. Plaza Cent.*, No. 4:17-cv-718, 2018 U.S. Dist. LEXIS 235326 at *3 (N.D. Tex. Apr. 30, 2018).

7

(citing *Anderson*, 477 U.S. at 255). "[C]onflicts of credibility . . . require jury resolution." *Lattimore Materials Corp. v. Asquip, Inc.*, No. 4:20-CV-03153, 2021 U.S. Dist. LEXIS 183000 at *2 (S.D. Tex. Sept. 23, 2021).

Marquardt claims he did not know about the 12th Man social media campaign, coincidentally found the article in his office around the same time period, asked Thornton to copy the article for his own personal use, failed to notice that Thornton omitted the CMI, and forwarded the article to Callaway without knowledge of why Callaway wanted it. DE 282-1. The jury must test the credibility of that story in light of all of the evidence.

The evidence is: Callaway was tasked with creating an online marketing plan that highlighted the university's connection to the 12th Man trademark and tradition. Marquardt worked in the same small group as Callaway and interacted with him daily. Ex. 11 at No. 16; Ex. 2 at 16:21-23. Callaway contemporaneously told Marquardt about the 12th Man campaign. Ex. 2 at 38:11-39:6, 54:20-55:3. Marquardt "found" a copy of the Canning Article in his office within days of that conversation. *See* n.3, *supra*. Although he had a digital scanner under his desk, (Ex. 1 at 35:11-36:3, 39:14-19 & 41:4-14), Marquardt asked his assistant to re-type the article, a method Marquardt had only used before when he intended to prepare a document for digital publication. Ex. 1 at 74:6-75:20. The CMI disappeared from the Canning Article during that re-typing—a fact that: (a) if Thornton's testimony is credited (Ex. 16 at 25:2-13; *id.* at 30:19-31:4 & 38:4-11), could only happen if Marquardt removed it himself or instructed her not to copy it; and (b) is consistent with the actions of someone preparing a copyrighted document for publication without the owner's permission. Callaway testified Marquardt sent him the keyed-in copy of the Canning Article for the purpose of posting it on the website. Ex. 2 at 37:21-25. Marquardt himself testified that he knew, at the time he sent the story to Callaway, that it would be posted as part of the campaign. Ex. 1 at 95:17-20, 108:18-109:7. Marquardt was then consulted on how the posting should look

(Ex. 11 at No. 6) and provided Callaway with information (the author and date of the story) necessary to finalize the posting since the CMI had been removed. Ex. 27; Ex. 2 at 40:17-21, 59:5-12; Ex. 11 at No. 20. When Bynum complained, Marquardt and Callaway's supervisor instructed Marquardt (not Callaway) to remove the article. Marquardt then sent Bynum an email stating posting the article was part of "our strategic plan" (*i.e.*, a plan that Marquardt participated in). Ex. 26. None of those actions are consistent with the claims in Marquardt's declaration.

## II.    Marquardt's Actions Are Not Fair Use.

"Fair use is an affirmative defense 'that can excuse what would otherwise be an infringing use of copyrighted material.'" *Pierson v. DoStuff Media, LLC,* No. A-19-cv-435, 2019 U.S. Dist. LEXIS 188020, at *6 (W.D. Tex. Oct. 29, 2019) (quoting *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1238 (11th Cir. 2014)). The party claiming fair use has the burden of proof. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). Fair use may be resolved on summary judgment only if a reasonable trier of fact could reach only one conclusion. *Peteski Prods. v. Rothman*, 264 F. Supp. 3d 731, 734 (E.D. Tex. 2017). A fair use analysis requires the consideration of: (1) the purpose and character of the use; (2) the nature of the work; (3) the amount and substantiality of the portion used in relation to the work as a whole; and, (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

### A.  Marquardt's copying was <u>not</u> for research purposes.

Marquardt's defense rests on his own self-serving declaration which claims he copied the article for research purposes. DE 282 at 10. As described above, the question of *why* Marquardt copied the document is a question of intent that cannot be resolved on summary judgment via a self-serving declaration. *Kipp Flores Architects, LLC v. Pradera SFR, LLC*, 2023 U.S. Dist. LEXIS 92, at *54-55 (W.D. Tex. Jan. 2, 2023); *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004); *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147-148 (2000). Defendants, like

Marquardt, have a reason to offer self-serving testimony, and that testimony can be rejected by the trier of fact. *Sanderson Plumbing Prods.*, 530 U.S. at 147-48.

Marquardt's own testimony undermines his "research purposes" rationale. Marquardt first advanced a version of the "research purposes" argument in his interrogatory answers, in which he stated that he copied the story "as part of his ongoing collection and preservation of information of interest about A&M and the 12th Man." Ex. 11 at No. 5. He admitted at his deposition that he was *not* engaged in such a research effort at the time. Ex. 1 at 79:1-9 ("Q. Had you been collecting and preserving information about the "12th Man" tradition? A. Not specifically.").

Marquardt's "research purposes" argument is also inconsistent with his actions. Marquardt did not solely make a single copy for research purposes. Rather, he sent the re-typed document to Callaway, an act that both Callaway and Marquardt testified was done *for the purposes of putting it on the website*. Marquardt thereafter participated in discussions regarding how the posting should look and provided Callaway with other information necessary to complete the posting.

Even the *method* Marquardt used to copy the document belies his "research purposes" argument. Marquardt had a digital scanner capable of scanning documents under his desk. He did not use it and instead instructed Thornton to laboriously re-type the article into a new Word document—a method that Marquardt had only ever used to prepare a document for digital publication. There can thus be no question about *why* Marquardt instructed Thornton to re-type the entire document into a Word file—he did it to prepare the document for digital publication, not for research purposes.

## B. *Factor 1* - **The purpose and character of the Marquardt's claimed use weighs against finding fair use.**

 When analyzing the first factor, courts start with the question of whether the infringing use is "transformative." *Campbell*, 510 U.S. at 579. "Under this analysis, a use is transformative where it does not merely supersede the object of the original creation but instead adds something

new, with a further purpose or different character, altering the first with new expression, meaning or message." *Id*. Transformative works "lie at the heart of the fair use doctrine." *Id*.   Here, Marquardt makes no transformative use argument because there was no transformation—he copied and distributed the work, verbatim, in its entirety.

Without a transformative use, courts must consider whether a use is "commercial" or is for a nonprofit educational purpose. *Estate of Barre v. Carter*, 272 F. Supp. 3d 906, 934 (E.D. La. 2017).[7] Without a transformative use, when there is a commercial use, the first factor weighs against the finding of fair use. *Compaq*, 387 F.3d at 409-10. A use is commercial when a benefit, monetary or otherwise, comes from an exploitation of the copyrighted material. *Harper & Row Publrs. v. Nation Enters.*, 471 U.S. 539, 562 (1985). Commercial profit includes any "advantage or benefit from [the] distribution and use of the copyrighted works." *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160, 2023 U.S. Dist. LEXIS 50749, at *27 (S.D.N.Y. Mar. 24, 2023). Especially in academia, commercial use exists where an individual benefits through an increase in status or recognition despite a lack of monetary gain. *Religious Tech Ctr. v. Netcom On-line Commun. Servs.*, 923 F. Supp. 1231, 1244 (N.D. Cal. 1995) (citing *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)). In short, where there is no transformative use and there is a benefit to the user, the first factor weighs against fair use.

In *Texaco*, the Second Circuit held that, even in research settings, making copies so that multiple individuals could access the information (instead of relying on a single copy) is *not* fair use. *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 930 (2d Cir. 1993).[8] Thus, creating copies and sharing them with colleagues is not the kind of use that the first factor tolerates. In fact,

---

[7] This principle is well established with the decision citing, 17 U.S.C. § 107; *Campbell*, 510 U.S. at 584; *Sony Corp. of Am. V. Universal City Studios, Inc.*, 464 U.S. 417, 450 n.32 (1994) and *Compaq Computer Corp. v. Ergonome, Inc.*, 387 F.3d 403, 409-10 (5th Cir. 2004).

[8] The Fifth Circuit favorably cited *Texaco* in the lone decision cited by Marquardt in his analysis of the first factor, *Bell v. Eagle Mt. Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 325 (5th Cir. 2022).

courts have distinguished *Texaco* when the copies of journal articles were *not* shared with colleagues. *Am. Inst. of Physics v. Winstead PC*, Case No. 3:12-cv-1230-M, 2013 U.S. Dist. LEXIS 169929, at *23-24 (N.D. Tex. Dec. 3, 2013). Accordingly, infringers seeking to rely on fair use defenses routinely claim they do not share the copies made. *See Hachette Book Grp.*, 2023 U.S. Dist. LEXIS 50749, at *31-32.

Here, Marquardt distributed copies to his colleagues. By his own admission, Marquardt knew at the time he made those distributions that his colleagues would use the work as part of a marketing campaign and post some or all of the Canning Article on the internet. It is that sharing that started this dispute, and which ultimately makes Marquardt liable for copyright infringement.

TAMU derived a commercial benefit from Marquardt's actions by bolstering its 12th Man marketing campaign. DE 265 at 1. This campaign promoted TAMU in advance of the Super Bowl, and strengthened TAMU's ability to protect, license and monetize the 12th Man trademark (as it was, at the time, doing with the Seattle Seahawks). DE 251 at ¶ 7; Ex. 5 ¶ 7. TAMU was paid for advertisements associated with this campaign. Ex. 31 at 55:14-25 And Marquardt, in turn, increased his esteem or value as a TAMU employee,[9] which is an independently sufficient basis to find commerciality. *See Hachette Book Grp.*, 2023 U.S. Dist. LEXIS 50749, at *27.

### C. *Factor 2* - Marquardt's copying of the expressive elements of the unpublished article weigh against finding fair use.

The second factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. Courts are more likely to find fair use when the copied work is factual, not creative. *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680, 699 (N.D. Tex. 2008). In *Bell*, the Fifth Circuit found that "[t]o

---

[9] We know providing the article improved Marquardt's esteem because not only did Marquardt and his bosses specifically state that this was an important campaign for TAMU, but TAMU's President was the recipient of a memo regarding the campaign in which the first two bullet points were both about the "archived article." Ex. 19 & 26.

determine the nature of the work, we consider whether the work has been appropriated for its 'expressive elements,' rather than to disseminate 'the underlying facts." *Bell*, 27 F.4th at 323. Marquardt's Motion concedes, where a work is not purely factual but includes expressive elements, this factor counsels against finding fair use. DE 265 at 16 (citing *Bell*, 27 F.4th at 323).

Non-fiction works which include "subjective descriptions and portraits . . . whose power lies in the author's individualized expression," are "far removed from the . . . factual or descriptive work more amenable to fair use." *Hachette Book Grp.*, 2023 U.S. Dist. LEXIS 50749, at *35 (quoting *Harper & Row*, 471 U.S. at 563; *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y 2000)). The fact that a work is creative means copying that work is less likely to be fair use. *Estate of Barre*, 272 F. Supp. 3d at 935. Other courts in this Circuit have found that "[w]hile news articles are factual in nature, wholesale copying and redistribution is not a fair use." *Emmerich Newspapers, Inc. v. Particle Media, Inc.*, No. 3:21-cv-32, 2022 U.S. Dist. LEXIS 141283, at *10 (S.D. Miss. Aug. 9, 2022) (citing *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 (2d Cir. 2018)).

Here, the Canning Article is far from a news report; it is a creative work that communicates a story filled with expressive elements. The Canning Article captures events that occurred almost a century ago. It is the expressive elements that provide value in presenting facts that have been well known for decades. Further, there is no dispute that Marquardt copied the entire article, not just the facts, distributed the entire article, and the article was full of creative elements. DE 265 at 16; DE 282 at ¶ 36. Marquardt argues he was only interested in the facts. From that premise, Marquardt argues his copying was purely factual. But there are no cases that support Marquardt's theory that his intention is at issue under this factor. Instead, the question is: what did Marquardt copy? He copied not just the facts, but the creative and expressive portions of the article. Even *Bell*, the case Marquardt cites, found the second factor weighed against finding fair use.

Marquardt's analogizing his case to *Bell* shows that, under Fifth Circuit precedent, the second factor weighs against a finding of fair use here.

Most clearly, Marquardt's use could not have been a fair use because the Canning Article was unpublished. Bynum repeatedly communicated that fact to Marquardt. Ex. 3 ¶¶ 11-12. "The fact that a work is unpublished is a critical element of its 'nature.'" *Harper & Row*, 471 U.S. at 564. Even where a work is newsworthy and of historical significance, there will generally not be a finding of fair use if the work has not been published. *Id.* Especially in cases where a book is planned, any use that infringes the copyright holder's interests in confidentiality and creative control is "difficult to characterize as 'fair.'" *Id*.

**D.  *Factor 3* - Marquardt concedes the third factor weighs in Plaintiff's favor.**

The third factor – the substantiality of the portion used in relation to the work as a whole – counsels against finding fair use where the "portion used by the alleged infringer is a significant percentage of the copyrighted work, or where the portion used is 'essentially the heart of" the copyrighted work. *Harper & Row*, 471 U.S. at 565. This factor weighs so clearly in Plaintiffs' favor that Marquardt makes no contrary argument.

**E.  *Factor 4* - Marquardt's copying harmed the market for the article.**

"Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row*, 471 U.S. at 566-67. Thus, "[t]he fourth factor looks to the 'effect of the use upon the potential market for or value of the copyrighted work.'" *Pierson*, 2019 U.S. Dist. LEXIS 188020, at *13 (quoting 17 U.S.C. § 107(4)). The fourth factor requires courts to consider not only the extent of market harm caused by the actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590.

Any "commercial use is presumed to harm the potential market for or value of the copyrighted work." *DCA Design v. Bellavida Custom Homes LLC*, No. H-17-3314, 2018 U.S. Dist. LEXIS 232921, at *18 (S.D. Tex. Dec. 5, 2018) (citing *Sony Corp.*, 464 U.S. at 451). Verbatim copying interferes with article viewership in other forms and creates market harm. *Emmerich Newspapers*, 2022 U.S. Dist. LEXIS 141283, at *12. As discussed above, Marquardt's use was a commercial use, and he copied the article verbatim, therefore market harm is presumed.

Putting the inference of market harm aside, the Canning Article was made available—via the university's website, multiple social media posts, an e-newsletter, and a press-release—to hundreds of thousands of individuals.[10] Those recipients—TAMU faithful that read the Athletics Department website, followed TAMU football social media, and subscribed to the TAMU e-newsletter—were the heart of the market for Plaintiff's book. Distributing an entire unpublished article to the exact group of individuals who may have purchased it is not fair use.

## III.    Marquardt is Liable for Contributory Copyright Infringement.

Marquardt argues he is not liable for contributory copyright infringement because he lacked knowledge of the infringement and did not induce, cause or materially contribute to it. DE 282 at 14. This knowledge requirement "has been interpreted to include 'both those with actual knowledge and those who have reason to know of direct infringement.'" *After II Movie, LLC v. Grande Commc'ns Networks, LLC*, No. 1:21-CV-709-RP, 2023 U.S. Dist. LEXIS 15772, at *6 (W.D. Tex. Jan. 31, 2023). And any "material contribution" is contributory infringement. *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 384 F. Supp. 3d 743, 767 (W.D. Tex. 2019).

The evidence shows Callaway told Marquardt about the 12th Man marketing campaign while it was ongoing, and Marquardt responded by telling Callaway about the 12th Man article.

---

[10] While Marquardt claims this harm is alleviated because TAMU removed the article from its website after only a few days, Marquardt's actions led to the article living forever online. For instance, one TAMU fan copied and pasted the Canning Article onto a TAMU sports message Board. Aggie Message Board, Exhibit 24. Marquardt let the cat out of the bag and into the wild.

15

Marquardt instructed his assistant to re-type the article in a format used to prepare a document for digital publication. Marquardt sent the document to Callaway. Callaway testified that Marquardt sent him the document for the purpose of publishing it on the website. Marquardt similarly testified that, at the time he sent the document, he knew Callaway: (a) intended to use it as part of the 12th Man campaign; and (b) would publish some or all of it on the website. Marquardt thereafter participated in discussions regarding how the posting should look, and provided last minute information (*i.e.*, the author and date) needed to finalize the post. When he got caught: (a) his supervisor instructed him (and not Callaway) to remove the article from the website; and (b) Marquardt sent an email to Bynum stating that posting the article was part of a strategic plan he was involved in. A reasonable jury could find that Marquardt had knowledge of the infringing activity and induced, caused or materially contributed to it.

### IV.    Marquardt Is Liable for DMCA Violations.

Marquardt argues that he is not liable for DMCA violations because: (a) he did not intentionally remove the CMI; and (b) "had no reasonable grounds to know that [emailing Callaway the re-typed article] would 'induce, enable, facilitate, or conceal an infringement." DE 282 at 16-17. The DMCA intent requirement applies to both knowing conduct and conduct where a defendant has reasonable grounds to know. *Recif Res., LLC v. Juniper Capital Advisors, L.P.*, No. H-19-2953, 2020 U.S. Dist. LEXIS 175431, at *24-25 (S.D. Tex. Sept. 24, 2020) (citing *Gordon v. Nextel Communs.*, 345 F.3d 922, 927 (6th Cir. 2003)).

Marquardt blames the omission of CMI on his assistant, Thornton. DE 282-1 ¶ 13. But Thornton testified that, when typing things provided by Marquardt and others in the Athletic Department, "I typed it the way they gave it to me," and "whatever Mr. Marquardt gave me and asked me to type … that's what I'd type. Nothing more, nothing less." Ex. 16 at 25:2-13; *id.* at 30:19-31:4 & 38:4-11. If Thornton's testimony is credited, it means one of the following two things

is true: (1) Marquardt removed the cover page, including the CMI, prior to giving the document to Thornton; or (2) Marquardt provided the entire document to Thornton but expressly instructed her not to include the content on the cover page, including the CMI. Each of those actions is consistent with an individual preparing a copyrighted document for online publication without the owner's permission, and both are far more plausible than Thornton forgetting to type the first page.

Thornton emailed the keyed-in version of the Canning Article, with CMI removed, to Marquardt. Ex. 5 ¶ 5; Ex. 15. Marquardt's declaration denies that he opened the file after receiving it from Thornton. DE 282-1 ¶ 8. But Marquardt testified at his deposition that he in fact does not recall whether he opened the document. Ex. 1 at 71:14-72:16 ("I don't think I did, but I don't recall"). And there is, of course, a natural inference—that must be drawn in Plaintiff's favor—that someone who asked his assistant to re-type a nine-page document for use on TAMU's website would at least open the document for review prior to forwarding it to his colleagues for publication.

Moreover, there is evidence that, shortly before the article was published on the website Callaway contacted Marquardt to get the author and date. Ex. 27; Ex. 2 at 40:17-21 & 59:5-12; Ex. 11 at No. 20. That information was on the first page of the article, along with the CMI. The evidence shows Marquardt provided that information to Callaway. Ex. 27; Ex. 2 at 40:17-21, 59:5-12; Ex. 11 at No. 20. At that moment, *regardless* of what he knew before then, Marquardt was put on notice that the version of the article he sent to Callaway for publication was missing the first page (and thus the CMI). Marquardt responded by providing *some* of the information on the first page, but not the CMI. Ex. 1 at 117:2-7.

## V.    Marquardt is Not Entitled to Qualified Immunity.

### A.    Qualified immunity should not be applied to this dispute.

Courts primarily recognize qualified immunity as a defense to claims under 42 U.S.C. § 1983, typically to shield law enforcement officers who must make split-second decisions to protect

public safety. Qualified immunity is not automatic; any extension of immunity to a new sort of official for a different sort of claim must establish that the official was of the sort "accorded immunity from tort actions at common law when the Civil Rights Act was enacted in 1871" and that accordingly immunity now would be consistent with "§ 1983's history or purposes." *Tower v. Glover*, 467 U.S. 914, 920 (1984); *see also Samuel v. Holmes*, 138 F.3d 173, 178 (5th Cir. 1998) (rejecting qualified immunity in whistleblower cases under the False Claims Act). Marquardt has made no such showing. The Fifth Circuit has applied qualified immunity in a copyright case only once, without discussing *Tower* and in a case ultimately decided on other grounds. *See Chavez v. Arte Publico Press*, 59 F.3d 539 (5th Cir. 1995), *vacated* 517 U.S. 1184 (1996). At least one leading scholar has suggested that qualified immunity is *not* available in copyright cases. Daniel J. Meltzer, *Overcoming Immunity*, 53 Stan. L. Rev. 1331, 1357-58 n.96 (2001). At a minimum, this court should read the statutory fair use defense as defining Congress's view of reasonable behavior in copyright cases; allowing qualified immunity on top of fair use would be double counting. *Cf. Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998) (holding that a more specific statutory defense under the wiretap statute superseded qualified immunity).

### B. Marquardt's actions violated clearly established law.

Even if qualified immunity were a viable defense to copyright infringement, under these circumstances, Marquardt's violation of clearly established law voids such defense in the present case. To be "clearly established" the right must be sufficiently clear so that a reasonable official would understand that his actions violate the law. *Club Retro L.L.C. v. Hilton,* 568 F.3d 181, 195 (5th Cir. 2009). The qualified immunity doctrine "does not require a case directly on point for a right to be clearly established." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 73 (2017)).

This Court has previously ruled that "'copyright protection is [a] clearly established' right." DE 96 at 24 (quoting *Campinha-Bacote v. Bleidt*, No. H-10-3481, 2011 U.S. Dist. LEXIS 113430 at *3 (S.D. Tex. Oct. 3, 2011). In fact, the law is so well established that TAMU has published copyright guidelines that Marquardt violated. TAMU Guidelines. Ex. 28.

Not only is copyright protection a clearly established right, the limits of the reproduction and distribution of full works are clearly established by the Copyright Act itself. Congress exempted libraries and archives from liability under the Copyright Act for the reproduction of certain works. 17 U.S.C. § 108. The reproduction and distribution must be made without any direct or indirect commercial advantage; the reproducer must be acting on behalf of the public and not solely for its own benefit; and the reproduction must include a notice of copyright. 17 U.S.C. § 108(a). Section 108 speaks only to preservation, not distribution, and is narrowly crafted to avoid any distribution of replacement copies outside of a library. Most importantly, only one copy is allowable. *Id*. That § 108 limits the reproduction and distribution of physical works in digital formats for educational purposes shows Congress considered digitization and distribution of physical works separate from, and not subject to, fair use. *See United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) (statutory canons require courts to read statutory sections in conjunction with "the provisions of the whole law, and to its object and policy"). An interpretation of fair use broader than § 108 would make § 108 superfluous and would eviscerate an author's exclusive rights. No reasonable person could believe an athletic department would have broader fair use rights than a research library.

As discussed in Section II(b) above, there is binding Supreme Court precedent that distributing portions of an unpublished book is not a fair use. *See Harper & Row*, 471 U.S. 539. In that case, the Court found that "the public's interest in [a President's memoir]" was not sufficient to allow even excerpts to be distributed when that distribution robbed the copyright holder of the

right of first publication. *Id*. at 569. Courts in this Circuit have long held that the copying of an unpublished work strongly suggests its copying is not a fair use. *See Peteski Prods.*, 264 F. Supp. 3d at 741 (citing 138 Cong. Rec. S17358-01 (1992)). Counsel has not located a single case in the Fifth Circuit where the copying and distribution of an unpublished work was a fair use.

The qualified immunity doctrine requires a reasonable government official to be aware of binding circuit precedent. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). The Supreme Court has held that distributing unpublished copyrighted works is almost never a fair use. Fifth Circuit precedent does not limit that binding principle. Likewise, relying on *Harper & Row*, the First Circuit has held, fair use is simply not applicable where one party commandeers control over an unpublished copyrighted work and robs the copyright holder of the distribution of the work. *Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 62 (1st Cir. 2012). Here, not only did Marquardt infringe an unpublished work, but Marquardt admits one of the other four factors supports a finding that his use was not a fair use. Marquardt's Motion offers very little analysis of the other two factors, apparently conceding his use was not transformative. A reasonable government official would have known that he could not copy and distribute an unpublished creative work. Even based on the overly generous facts that Marquardt puts forward, his Motion for Summary Judgment must be denied.

## CONCLUSION

The Court must deny Marquardt's Motion for Summary Judgment.

Respectfully submitted,

/s/ *David L. Patrón*
David L. Patrón (Attorney-In-Charge)
Texas Bar No. 24101336
Lindsay Calhoun
Texas Bar No. 24134740
PHELPS DUNBAR LLP
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone: (504) 566-1311
Facsimile: (504) 568-9130
Email: patrond@phelps.com
      lindsay.calhoun@phelps.com

and

Charles W. Prueter
(admitted *Pro Hac Vice)*
FORTIF LAW PARTNERS, LLC
2021 Morris Avenue, Suite 300
Birmingham, Alabama 35203
Telephone: 205-792-2639
Email: charles@fortif.com

Andrew W. Coffman
Mississippi Bar No. 106207
Texas Bar No. 3860598
PHELPS DUNBAR LLP
105 East Main Street, Suite 201
Post Office Box 1220
Tupelo, MS 38802-1220
Telephone: (662) 842-7907
Facsimile: (662) 842-3873
Email: andrew.coffman@phelps.com

and

Warren V. Norred
Texas Bar No. 24045094
NORRED LAW, PLLC
515 E. Border Street
Arlington, Texas 76010
Telephone: (817) 704-3984
Facsimile: (817) 524-6686
E-mail: warren@norredlaw.com

**ATTORNEYS FOR PLAINTIFFS**

PD.48432135.1

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on 14th day of February, 2025, this document was filed electronically and will be served on all counsel of record in accordance with the Federal Court of Civil Procedure via the Court's ECF system.

                                        /s/ *David L. Patrón*
                                        David L. Patrón