# EXHIBIT A

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4        _____

5    MICHAEL J. BYNUM AND CANADA

6    HOCKEY LLC d/b/a EPIC SPORTS,

7            Plaintiffs,

8        v.                              C.A. No.

9    BRAD MARQUARDT, in his              4:17-cv-00181

10   individual capacity,

11           Defendant.

12   _____

13            VIDEOTAPED DEPOSITION OF

14                 BRAD MARQUARDT

15   DATE:         Thursday, December 19, 2024

16   TIME:         9:12 a.m.

17   LOCATION:     Texas A&M University

18                 Moore/Connally Building

19                 301 Tarrow Street, Room 124

20                 College Station, TX 77840

21   OFFICIATED BY: John Shavers

22   JOB NO.:      7060382

23

24

25

                                          Page 1

| | |
|---|---|
| 1 A P P E A R A N C E S | 1 A P P E A R A N C E S (Cont'd) |
| 2 ON BEHALF OF PLAINTIFFS MICHAEL J. BYNUM AND CANADA | 2 ON BEHALF OF TEXAS A&M UNIVERSITY SYSTEM: |
| 3 HOCKEY LLC D/B/A EPIC SPORTS: | 3    TOM SILVER, ESQUIRE |
| 4    DAVID L. PATRON, ESQUIRE | 4    WARREN DELUCA, ESQUIRE |
| 5    Phelps Dunbar | 5    Texas A&M University System |
| 6    365 Canal Street | 6    301 Tarrow Street |
| 7    New Orleans, LA 70130 | 7    College Station, TX 77840 |
| 8    david.patron@phelps.com | 8    tsilver@tamus.edu |
| 9    (504) 584-9295 | 9    wjdeluca@tamus.edu |
| 10 | 10    (979) 458-6159 |
| 11    ANDREW COFFMAN, ESQUIRE (by videoconference) | 11    (979) 458-6150 |
| 12    Phelps Dunbar | 12 |
| 13    201 South Spring Street, #70 | 13 ALSO PRESENT: |
| 14    Tupelo, MS 38802 | 14    Rob Curfnoc, Videographer |
| 15    andrew.coffman@phelps.com | 15 |
| 16    (662) 842-7907 | 16 |
| 17 | 17 |
| 18    NICOHLAS F. WASDIN, ESQUIRE (by videoconference) | 18 |
| 19    Dwoskin | Wasdin | 19 |
| 20    110 North Wacker, Suite 2500 | 20 |
| 21    Chicago, IL 60606 | 21 |
| 22    nwasdin@dwowas.com | 22 |
| 23    (312) 434-5361 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 2 | Page 4 |

| | |
|---|---|
| 1 A P P E A R A N C E S (Cont'd) | 1 I N D E X |
| 2 ON BEHALF OF DEFENDANT BRAD MARQUARDT, IN HIS | 2 EXAMINATION:                    PAGE |
| 3 INDIVIDUAL CAPACITY: | 3    By Mr. Patron              8 |
| 4    RAY CHESTER, ESQUIRE | 4 |
| 5    McGinnis Lochridge | 5       E X H I B I T S |
| 6    1111 West 6th Street | 6 NO.        DESCRIPTION          PAGE |
| 7    Austin, TX 78703 | 7 Exhibit 1    Email Exchange w/ Mr. Bynum, |
| 8    rchester@mcginnislaw.com | 8       05/05/10              46 |
| 9    (512) 495-6000 | 9 Exhibit 2    Email Response to Mr. Bynum, |
| 10 | 10       05/05/10              51 |
| 11    JULIE A. FORD, ESQUIRE (by videoconference) | 11 Exhibit 3    Email, Mr. Bynum, 06/18/10      56 |
| 12    George Brothers Kincaid & Horton LLP | 12 Exhibit 4    Email Response to Mr. Bynum, |
| 13    114 West 7th Street | 13       06/10/10              62 |
| 14    Austin, TX 78701 | 14 Exhibit 5    Email, Mr. Callaway and Ms. Smith, |
| 15    jford@gbkh.com | 15       01/16/14              66 |
| 16    (512) 495-1600 | 16 Exhibit 6    Email, Mr. Dierker, 01/17/14      68 |
| 17 | 17 Exhibit 7    Interrogatory Responses      77 |
| 18 | 18 Exhibit 8    Declaration              90 |
| 19 | 19 Exhibit 9    Screenshot, TAMU Times        96 |
| 20 | 20 Exhibit 10    Whit Canning Article        97 |
| 21 | 21 Exhibit 11    Email, Mr. Bynum and Mr. Cannon, |
| 22 | 22       January 2022              103 |
| 23 | 23 Exhibit 12    Email, Mr. Hinckley, 01/23/14    112 |
| 24 | 24 Exhibit 13    Mr. Canning Press Release      114 |
| 25 | 25 |
| Page 3 | Page 5 |

PROCEEDINGS

1   THE VIDEOGRAPHER:  We're now on the
2   record.  The time is 9:12 a.m., December 19, 2024.
3   This is the deposition of Brad Marquardt.  Okay.
4   THE OFFICER:  Good morning.  My name
5   is John Shavers.  I'm the reporter assigned by
6   Veritext to take the record of this proceeding.
7   This is the deposition of Brad
8   Marquardt taken in the -- taken in the matter of
9   Michael J. Bynum, et. al., vs. Brad Marquardt.  It's
10  being taken on December the 19th, 2024.  We are
11  located in in College Station, Texas.
12  I am a notary authorized to take
13  acknowledgments and administer oaths in Texas.
14  Absent an objection on the record
15  before the witness is sworn, all parties and the
16  witness understand and agree that any certified
17  transcript produced from the recording of this
18  proceeding:
19  - is intended for all uses permitted
20     under applicable procedural and
21     evidentiary rules and laws in the
22     same manner as a deposition recorded
23     by stenographic means; and
24  - shall constitute written stipulation

Page 6

1   of such.
2   This proceeding will be recorded via
3   video technology by Rob Curfnoc.
4   At this time will everyone in
5   attendance in person here, beginning with the
6   gentlemen on the end here next to Mr. Patron and
7   proceed back around the table, please identify
8   yourselves for the record.
9   MR. SILVER:  Tom Silver, I'm an
10  attorney with Texas A&M University System.
11  MR. PATRON:  David Patron of the law
12  firm Phelps Dunbar representing the plaintiffs,
13  Michael Bynum and Canada Hockey doing business as Epic
14  Sports.
15  MR. CHESTER:  Ray Chester representing
16  Brad Marquardt.
17  MR. DELUCA:  Warren DeLuca with Texas
18  A&M University System.
19  THE OFFICER:  And now will those who
20  are attending by Zoom please identify yourselves?
21  MR. COFFMAN:  Andrew Coffman on behalf
22  of the plaintiffs, and I have with me in my office one
23  of the plaintiffs, Mike Bynum.
24  THE OFFICER:  Thank you.  Hearing no
25  objection, I will now swear in the witness.

Page 7

1   Mr. Marquardt, would you please raise
2   your right hand.
3   WHEREUPON,
4   BRAD MARQUARDT,
5   called as a witness and having been first duly sworn
6   to tell the truth, the whole truth, and nothing but
7   the truth, was examined and testified as follows:
8   THE OFFICER:  Thank you.
9   Mr. Patron, you may proceed, sir.
10  MR. PATRON:  Thank you.
11  EXAMINATION
12  BY MR. PATRON:
13  Q   Good morning, Mr. Marquardt.  As I said, I'm
14  David Patron.  I represent the plaintiffs in this
15  matter.  I'm going to be taking your deposition today.
16  Have you ever had your deposition taken before?
17  A   No.
18  Q   Okay.  So I just want to go over some ground
19  rules just so you're familiar with it.  All I can do
20  today is ask you questions.  I can't answer any
21  questions from you.  And all that you're required to
22  do is answer my questions truthfully and fully to the
23  best of your ability.  Can you do that?
24  A   Yes.
25  Q   Is there anything that would prevent you

Page 8

1   from answering my questions truthfully and completely
2   today?
3   A   No.
4   Q   Okay.  Now there's a court reporter here
5   that's going to be taking down everything that we say.
6   So it's important that we not talk over each other.
7   And so if you could allow me to finish my questions
8   before your answers, we'll get a good record of this
9   proceeding.  Can you do that?
10  A   Yes.
11  Q   And I'm going to do my best to not talk over
12  you and allow you to finish your answer.  Sometimes
13  I'm not good at that and if I do, I'm sure Mr. Chester
14  here is going to remind me that I need to let you
15  finish and I'm going to do that.
16  There may be some times where Mr. Chester
17  will make an objection to a question that I'm asking
18  you.  And if he does, that unless he instructs you not
19  to answer, you can go ahead and answer my question.
20  Do you understand that?
21  A   Yes.
22  Q   Okay.  I think that's basically it.  The
23  other thing is they can only take down what you say.
24  So if you give a nod of your head or you say "uh-huh"
25  or something like that, it won't be a clear record.

Page 9

1  So just give, you know, full verbal answers if you
2  could.
3      A   I will.
4      Q   Okay.  The first thing I'd like to do is
5  just go over some general background of your work and
6  educational history.  Can you tell me your educational
7  history?
8      A   Yes.  I'm class of '88 with a journalism
9  degree at Texas A&M.
10     Q   All right.  And were you there for four
11  years?
12     A   No.  I -- I went to Blinn Junior College for
13  two years.
14     Q   And then you went to Texas A&M for two
15  years?
16     A   Correct.
17     Q   And you got a degree in journalism?
18     A   I did.
19     Q   Did you study journalism also at your junior
20  college?
21     A   No.
22     Q   Okay.  And when you were getting your
23  journalism degree, did you have any training or
24  education in journalism ethics?
25     A   I'd have to look at my -- my transcript, I

Page 10

1  suppose, but I don't recall my classes.
2      Q   It's not necessarily your classes.  It could
3  have been in one of your classes.  Do you recall
4  receiving any education or training during the course
5  of your getting a degree in journalism at Texas A&M?
6      A   I don't recall it.
7      Q   Okay.  What about any education or training
8  about copyright law?
9      A   I don't recall.  It's been 35 years since my
10  undergrad days.
11     Q   Okay.  While you were at Texas A&M, were you
12  in the Society of Professionalism Journalists?
13     A   Yes.
14     Q   What is that?
15     A   It is an organization that supports
16  journalism students, and I thought it would look good
17  on my resume.
18     Q   Is it just for students?
19     A   I don't know.
20     Q   Are you currently in the Society of
21  Professional Journalism?
22     A   No.
23     Q   When did you stop being in that society?
24     A   I don't recall.  Probably when I graduated.
25     Q   Okay.  Are you in any professional

Page 11

1  organizations currently?
2      A   Yes.
3      Q   What are those organizations?
4      A   The College Sports Communicators.  It was
5  formerly the College Sports Information Directors of
6  America.  Probably in the Football Writers Association
7  and the U.S. Basketball Writers Association.
8      Q   And how long have you been in those four
9  different organizations?
10     A   I have been in CSC, College Sports
11  Communicators, since 1990.  Football Writers, I'm not
12  sure.  For a long time.  And the Basketball Writers
13  for the last two or three years.
14     Q   And the College of Sports Information
15  Directors is a predecessor of CSC?
16     A   They just rebranded.
17     Q   Okay.  So it's really just three
18  organizations?
19     A   Yes.
20     Q   Okay.  What do you do with the College of
21  Sports Communicators?  What is your involvement in
22  that organization?
23     A   They have an annual convention where you
24  have workshops that you attend.  And through the year,
25  they provide, you know, all academic -- all-American

Page 12

1  teams, things that we would use in the Athletic
2  Communications Office.
3      Q   And the workshops, are those educational
4  training workshops?
5      A   Yes.
6      Q   Have you ever had any training or education
7  regarding journalism ethics in association with the
8  College of Sports Communicators?
9      A   I do not recall that.
10     Q   What about any education or training
11  regarding copyright laws?
12     A   I don't recall that.
13     Q   Do you have -- what is your involvement in
14  the Football Writers Association?
15     A   I'm a member.  It gives me a directory of
16  all the media covering football and all the other --
17  my peers at the other schools across the nation.
18  Other than that, it doesn't -- I vote on some awards,
19  et cetera, as the entire group does.
20     Q   Are you in that organization because you are
21  a football writer?
22     A   I'm not -- no.
23     Q   So why are you in that organization?
24     A   Because it -- it -- I'm being supportive of
25  the writers, which I think is important.  And also it

Page 13

4 (Pages 10 - 13)

1  gives me access to resources that all football
2  reporters would have.
3      Q    And what about the Basketball Writers
4  Association?  What is your involvement in that?
5      A    Very similar to Football Writers.  I have a
6  membership and, honestly, I don't recall a single
7  interaction I've had with the Basketball Writers,
8  except they -- they sent me a directory.
9      Q    Okay.  Other than those three professional
10  organizations, are you involved in any other
11  professional organizations?
12      A    No.
13      Q    Can you recall ever receiving training or
14  education in any capacity regarding journalism ethics?
15      A    No.
16      Q    Do you have any understanding of journalism
17  ethics?
18      A    I would say a loose understanding.
19      Q    And how did you come about that
20  understanding?
21      A    Well, I'm -- I was a journalism graduate,
22  and I've worked in the industry for 35 years.
23      Q    Okay.  But I believe you testify you don't
24  recall receiving any education or training when you
25  were a student; is that right?

Page 14

1      Q    So you're a published author.  Is that
2  correct?
3      A    Not in my view.  There --
4      Q    Why not in your view?
5      A    Well, I mean, there are things with my
6  bylines, but your question makes it sound like I'm
7  a -- book author or something.  I -- I wrote for an
8  alumni magazine and there was my byline on it, but
9  I --
10      Q    Mr. Marquardt, I didn't say anything about
11  books.  I just said you're a published author; is that
12  correct?
13      A    [No audible response.]
14      Q    Do you disagree with that statement?
15      A    I -- I don't agree.
16      Q    Okay.  And why is that?  Because you haven't
17  published books?
18      A    Correct.
19      Q    Okay.  How many articles have you written
20  that have been published?
21      A    Fifty with my byline.
22      Q    And how many of those were at the Georgia
23  Bulldog magazine?
24      A    I don't recall.
25      Q    Was it just a small fraction?

Page 16

1      A    I don't recall it.
2      Q    Right.  And I asked you if you recall
3  receiving in any capacity, and you don't recall that.
4  So you say you have a loose understanding.  I'm trying
5  to understand where does that come from, if you've had
6  no training or education that you can recall.
7      A    I guess it -- it would be from the working
8  in the working in the industry for -- but working in
9  the industry for 35 years.
10      Q    Okay.  So what happened after you graduated
11  from Texas A&M with a degree in journalism?  Where did
12  you go after that?
13      A    I went to the University of Georgia.
14      Q    And what did you do at the University of
15  Georgia?
16      A    I was the editorial -- editorial assistant
17  for the Georgia Bulldog magazine.
18      Q    And what did you do as the editorial
19  assistant?
20      A    I wrote stories about the University of
21  Georgia student-athletes, and I believe I handled
22  subscriptions.
23      Q    Okay.  So you actually wrote articles for
24  the magazine?
25      A    Yes.

Page 15

1      A    Yeah, there were 12 magazines.  I probably
2  wrote three things in there, so what's that, 36.  And
3  over the past 35 years, there I guess occasionally
4  have been times where -- my name's on a lot of things.
5  But hard to say if, you know -- 50 is probably a good
6  number.
7      Q    Have you ever copyrighted any articles that
8  you've written?
9      A    Not to my recollection.
10      Q    Have you ever designated on an article that
11  you've written that you're the copyright owner?
12      A    I don't recall doing that.
13      Q    Is it possible that you have, but you just
14  don't recall?
15      A    Well, nothing I've ever done has been
16  copywritten.  And I -- I don't know if there was a
17  tagline that says that it was.  But I know that I've
18  never copywritten any -- anything.
19      Q    What do you mean when you say that it's
20  never been copywritten?  What does that mean to you?
21      A    I -- I assume that there is an official
22  process that you go through, and I know I've never
23  gone through an official process.
24      Q    Are you talking about filing with the U.S.
25  Copyright Office?

Page 17

1  A  Yes.
2  Q  That's what you're talking about?
3  A  Yes.
4  Q  Okay. Putting aside filings with the U.S.
5  Copyright Office, have any of your articles that
6  you've authored designated you as the copyright owner?
7  A  No.
8  Q  And you're sure about that?
9  A  Yes.
10  Q  Okay. Who's the copyright owner of the
11  articles that you have authored?
12  A  The University of Georgia Athletic
13  Association and Texas A&M.
14  Q  So they are the copyright owners of your
15  articles?
16  A  The intellectual property that I produce is
17  owned by Texas A&M currently. Before that, it would
18  have been the University of Georgia.
19  Q  And why is that?
20  A  I don't know.
21  Q  Okay. Would you have the right to reproduce
22  an article that is owned by, for instance, Texas A&M?
23  A  I -- I don't understand your question.
24  Q  I think you just testified that the people
25  that you work for own the articles, that they own the

Page 18

1  copyright for the articles that you've written; is
2  that correct?
3         MR. CHESTER: No, he did not testify
4  they own the copyright.
5         MR. PATRON: All right.
6  BY MR. PATRON:
7  Q  Well, then, can you clarify? That's what I
8  understood you to say.
9  A  Can you repeat your question?
10  Q  Okay. My question is: If you are not the
11  copyright owner of the articles you've written, and
12  your understanding is that the people that you work
13  for are the owners, would you have the right to
14  reproduce those articles?
15  A  I don't know.
16  Q  You don't know?
17  A  No.
18  Q  So you think you can reproduce the
19  articles --
20  A  No, I -- I -- I'm sorry.
21  Q  Do you think you can reproduce the articles
22  that other people have copyrights to?
23         MR. CHESTER: Objection. Form. You're
24  twisting his words around.
25         MR. PATRON: I'm asking a question.

Page 19

1         MR. CHESTER: I don't know why --
2         MR. PATRON: I'm not twisting words.
3  He can either answer or not.
4  BY MR. PATRON:
5  Q  You understand my question?
6  A  One more time, please.
7  Q  I said, do you think you have the right to
8  reproduce articles which are owned by other people
9  that own the copyrights to those articles?
10  A  No.
11  Q  And why do you have that understanding?
12  A  I would say that -- I'm sorry. Repeat your
13  question one more time.
14  Q  You just testified that you do not have the
15  right to reproduce articles that are owned by other
16  people that own the copyrights to those articles.
17         MR. CHESTER: Okay. Which is it? That
18  they own it or they own the copyright? Because that's
19  two different things. You keep -- I object. It's a
20  compound question.
21         MR. PATRON: You can object. Let's
22  just keep it to an objection.
23  BY MR. PATRON:
24  Q  The question is: You just testified that
25  you do not have the right to reproduce an article that

Page 20

1  someone else owns the copyright to; is that correct?
2  You said yes to that.
3  A  You're -- you're speaking in a hypothetical,
4  and I don't know the answer to copyright rules. I
5  feel very confident that things that -- that I would
6  produce for Texas A&M are Texas A&M's property, and I
7  wouldn't -- I -- I wouldn't go and put them out
8  somewhere else, nor would I have an avenue to do that.
9         MR. PATRON: Okay. I'm going to object
10  as nonresponsive.
11  BY MR. PATRON:
12  Q  Do you want to take back your answer that
13  you do not have the right to reproduce articles that
14  other people own the copyrights to? Because I have a
15  follow-up to that question.
16  A  No.
17  Q  Okay. How is it that you've come to the
18  understanding that you do not have the right to
19  reproduce articles that other people have the
20  copyright ownership of?
21  A  I don't know.
22  Q  Is it because, if someone owns the copyright
23  to it, you don't have the right to reproduce it?
24  That's the law? Do you understand that?
25  A  I don't know the law. My loose

Page 21

6 (Pages 18 - 21)

1  understanding would say -- would agree with that
2  statement.
3      Q   Okay.  How long were you at the University
4  of Georgia's Athletic Association?
5      A   One year.
6      Q   And why did you leave?
7      A   Texas A&M had a job, and they offered it to
8  me.
9      Q   And what year was that?
10     A   1990.
11     Q   And what position did you accept?
12     A   Assistant director.
13     Q   Assistant director of what?
14     A   Sports Information.
15     Q   Wasn't it assistant director of Media
16  Relations?
17     A   At the time, it was sports information.  We
18  rebranded to Media Relations, and now we have
19  rebranded to Athletic Communications.
20     Q   But was it the same job, even after the
21  rebranding?
22     A   Yes.  Times have changed.  But it, you know,
23  we've gone from phones to fax machines to Zoom calls
24  to the internet all of my career.
25     Q   And what were your duties and

1      A   I have.
2      Q   Has it all been for media guides?
3      A   I'd have to go look through the
4  certificates, but I think it was all for media guides.
5      Q   And how are those awards decided?
6      A   There are voters -- voters from within the
7  organization.  They -- everybody sends their media
8  guide, and then they're judged on a checklist of -- of
9  items that need to be in that media guide and its
10  appearance.
11     Q   And what organizations are those?
12     A   It would be the College Sports of -- or
13  College Sports Communicators, formerly CoSIDA, or
14  College Sports Information Directors of America.
15     Q   So all of your publication awards have come
16  from the College of Sports Communicators or its
17  predecessor before the rebranding?
18     A   That's -- that is correct.  I -- I have also
19  been a part of the -- the group that was honored for
20  Johnny Manziel's Heisman campaign.  So I don't even
21  know if my name is on that award, but it's not
22  inconceivable.
23     Q   The staff directory of the Texas A&M
24  Athletics website says that you're one of the most
25  versatile members of the Texas A&M Athletics

1  responsibilities as the assistant director of Media
2  Relations?
3      A   I publicized -- I publicized the -- whatever
4  my assigned sports and kept statistics, built
5  publications, media guides to assist the media with
6  their coverage of Texas A&M athletics.
7      Q   Did you write articles for Texas A&M?
8      A   I am sure -- yes.
9      Q   Are you an award-winning journalist?
10     A   Yes.
11     Q   What awards have you won?
12     A   A variety of publication awards.
13     Q   And what were the awards for?
14     A   Our media guides.  So I -- I won awards for
15  the football media guide, for track and field media
16  guides, cross-country media guides, for how they
17  looked, how useful they were, that sort of thing.
18     Q   Have you ever won an award for an article
19  that you've written?
20     A   I do not recall that.
21     Q   So the awards you've won have been for
22  publication of media guides; is that accurate?
23     A   Yes.
24     Q   And have you won more than 25 publication
25  awards?

1  Department.  Do you agree with that statement?
2      A   Yes, I wrote it.
3      Q   Why are you one of the most versatile
4  members of the Texas A&M Athletics Department?
5      A   So I guess you want the truth here.
6      Q   I think that's what you're required to give
7  me.
8      A   Well, there was a guy, Alan Jones, and he
9  was -- his bio wrote one of the most versatile members
10  of the department, and then he retired.  And I loved
11  the way that sounded.  And so I thought, I'm going to
12  steal that phrase.
13     Q   Is there anything else that you stole to put
14  together this bio for yourself?
15     A   I don't have the bio in front of me, but I
16  don't -- I don't recall.
17     Q   So you like what he wrote, and so you
18  decided to use it; is that right?
19     A   Yes.
20     Q   Did you talk -- who was that person?
21     A   Alan Jones.
22     Q   Alan Jones.  Did you talk to Alan Jones
23  about that?
24     A   I don't recall.
25     Q   You don't recall?

1    A   I mean, he retired and went back to
2  Mississippi.
3    Q   So probably not?
4    A   Probably not.
5    Q   Okay.  The bio -- did you write this whole
6  bio about yourself?  Is this something that you
7  drafted?
8    A   Yes.
9    Q   Okay.  It says that you handled the
10  publicity efforts of virtually every varsity sport at
11  some point during your 30-plus tenure in Aggieland; is
12  that true?
13    A   Yes.
14    Q   So every sport at Texas A&M you've handled
15  the publicity efforts for?
16    A   Not all of them, but close.
17    Q   Okay.  Is that something that was on someone
18  else's bio that you used?
19    A   No.
20    Q   And you wrote that yourself?
21    A   I did.
22    Q   Okay.  Is that something you'll do sometimes
23  is, when you're producing something as a journalist?
24  You'll use something that someone else has written?
25    A   Can you -- that's a very broad question.

Page 26

1  Can you reword?
2    Q   Okay.  This is an example where you're
3  writing something about yourself or you use something
4  that someone else has written.  You use it for
5  yourself.  I'm asking, are there other examples of
6  that, that you've done that?
7    A   I would say that I read other people's -- I
8  look at other people's game notes and see if there's
9  any ideas or themes that I can apply to what I'm doing
10  now.
11    Q   Have you ever used, like, specific words
12  that people use and put it in your own article?
13    A   No.  I -- I don't plagiarize.
14    Q   Well, what is plagiarism?
15    A   Where you're copying someone else's words
16  into something that are -- that is yours.
17    Q   So you understand that you can't do that?
18    A   Yes.
19    Q   And where did you come to that
20  understanding?
21    A   I went to school, to the university for four
22  and a half years, and I understand that -- what
23  plagiarizing is because you can't do it.
24    Q   That's something you learned in your
25  journalism degree?

Page 27

1    A   I would say every college student knows what
2  plagiarism is to be able to do research papers or
3  essays, et cetera.
4    Q   Do you understand what the term
5  "attribution" means?
6    A   Yes.
7    Q   What does that mean to you?
8    A   That you attribute the -- you attribute
9  where you got the information from the source of the
10  information.
11    Q   And what does that term "attribution" mean
12  in the context of journalism?
13    A   It's a pretty broad -- broad question, but
14  your sources are important, and you can't just write
15  broad sweeping statements just without attribution to
16  a source that would know something.
17    Q   And what about if you're actually publishing
18  the words of someone else?  What is the significance
19  of attribution in that context?
20    A   I don't know.
21    Q   Is there any requirement that you attribute
22  the source of that work in journalism?
23    A   I'm going to say yes, but I mean, I -- yes,
24  that's my belief.
25    Q   Okay.  You're no longer the assistant

Page 28

1  director of Media Relations; is that correct?
2    A   Yes.
3    Q   How long did you have that title?
4    A   From 1990 until 2018.
5    Q   And what changed in 2018?
6    A   I was promoted to the director of Athletics
7  Communications.
8    Q   Do you know why you were promoted?
9    A   I would hope because of my quality work.
10    Q   But you don't know that for a fact?
11    A   No.
12    Q   Okay.  How did your duties and
13  responsibilities change once you became the director
14  of Athletic Communications?
15    A   I began supervising the -- the staff.  I
16  stepped away from some of the day-to-day coverage of
17  sports so I could be more of a manager.
18    Q   And how long did you hold that position?
19    A   I'm still in that position.
20    Q   Have you taken on any other duties or
21  responsibilities or titles?
22    A   No.
23    Q   Are you not the --
24    A   I mean, duties is a -- I'm sorry.  You can
25  answer -- or ask your question.

Page 29

1    Q   Are you not currently the assistant AD for
2    Athletics Communications?
3        A   I am, yes -- yes, you're correct.  I was the
4    director of Athletic Communications and then that
5    title was changed to the Assistant AD, yes.
6        Q   So what is the significance of the change in
7    that title?
8        A   It's just a higher level -- higher
9    classification of job that I -- that I would be would
10   be so I could supervise people properly, chain of
11   command --
12       Q   So, how did your duties and responsibilities
13   change when you became the assistant AD for Athletics
14   Communications?
15       A   I would say that the move from Director to
16   Assistant Athletics Director, I was performing the
17   same duties.
18       Q   Are you familiar with a "12th Man" campaign
19   that was initiated by Texas A&M in the 2013, 2014
20   timeframe?
21       A   Yes.
22       Q   What was your involvement in that campaign?
23       A   I was not involved.
24       Q   You were not involved at all in that
25   campaign?

Page 30

1        A   No.
2        Q   What is your understanding of that campaign?
3        A   In 2013, there was a NFL team that -- NFL
4    team that uses 12 in some of their trademark, and
5    there's an agreement with the university that -- that
6    they can -- they can use our trademark.
7        Q   And that's the Seattle Seahawks; right?
8        A   Yes.  So, yes.  As I understand everything,
9    it is a -- you have to protect the trademark, use the
10   trademark to keep the trademark.  But that's -- that's
11   something that I've just picked up over years.  It
12   didn't necessarily stick to 2013.  That's an ongoing
13   process, the protection of the "12th Man" trademark.
14       Q   So in 2013, 2014, you were the Assistant
15   Director of Media Relations; right?
16       A   Correct.  Correct.
17       Q   What department within the university did
18   you work?
19       A   Athletics.
20       Q   Okay.  Was the Athletics Media Relations
21   Department responsible for the 12th Man campaign?
22       A   No.
23       Q   Who was responsible for that?
24       A   I wasn't involved in it, so I don't really
25   know.  Since then, I've learned that it is -- was a

Page 31

1    collaboration of a portion of the department that
2    wasn't me and the university.
3        Q   So you had colleagues within your department
4    working on the 12th Man campaign, but you're saying
5    that you did not work on it?
6        A   Correct.
7        Q   Did you have discussions with your
8    colleagues about the 12th Man campaign?
9        A   I don't recall.
10       Q   You don't recall any discussions with any of
11   your colleagues about the 12th Man campaign?
12       A   I don't recall.  I don't recall the
13   discussions.
14       Q   Okay.  And when you say you don't recall,
15   does that mean that it's possible that you had those
16   discussions and you just don't recall them, or you
17   think you didn't have any?
18       A   I'm saying it was ten years ago, and it
19   wasn't my project.  I had my own things to -- to do,
20   and I don't recall what was discussed.
21       Q   Do you have any memory of when you first
22   learned of the 12th Man campaign?
23       A   I don't recall.
24       Q   Well, you recall that the Seattle Seahawks
25   were having a successful year in 2013, and they made

Page 32

1    it to the playoffs that year; is that right?
2        A   Yes.
3        Q   Okay.  Do you recall that there was a
4    campaign centered around the Seahawks' playoff run?
5        A   There are many things I've -- I've learned
6    since January of 2014.  But I don't -- as I said, I
7    wasn't point -- or part of any sort of a -- before,
8    with the campaign, I wasn't a part of it, so I don't
9    really know about it.
10       Q   How do you know Mike Bynum?
11       A   Mike was an author that came to our campus,
12   I don't recall the years, and he would be going
13   through our photo archives seeking photos for projects
14   he was working on.
15       Q   Do you remember first meeting him?
16       A   I do not, but it was a long time ago, like
17   in the '90s.
18       Q   In the 1990s.  Do you recall any of the
19   interactions you had with Mr. Bynum in the 1990s?
20       A   Just that I knew him, liked him, wanted to
21   be helpful.
22       Q   Well, why did you like him?
23       A   I think I just like people.
24       Q   Why did you want to help him?
25       A   I like to be helpful as well, especially for

Page 33

Alpha Reporting
A Veritext Company

1  things that are putting Texas A&M into -- into a good
2  light.
3      Q    And do you think Mr. Bynum was doing that,
4  putting Texas A&M in a good light?
5      A    I mean, I -- I guess at the time I -- I
6  didn't know, but I mean, I was hopeful.
7      Q    Okay.  Have you helped other authors the way
8  you've helped Mr. Bynum?
9      A    Yes.
10     Q    Which authors?
11     A    Homer Jacobs.
12     Q    Who's Mr. Jacobs?
13     A    He's deceased, and he wrote Texas
14  A&M-centric books.  Rusty Burson, not deceased, would
15  be another person in the -- in the -- that did things
16  like that.  I, you know -- yeah.  There -- there's
17  been -- I would -- I would say that, you know, I
18  specifically remember Mike coming in looking for
19  photos.  The other guys less so, but I -- I still help
20  them with whatever I can.
21     Q    And would you help get photos for Mike?
22     A    Yes.
23     Q    Do you keep a collection of photos?
24     A    There's a photo archive, yes.
25     Q    Are those electronically kept, the archive?

Page 34

1      A    There's digital and there are the actual
2  photographs.
3      Q    Are some of the actual photographs not
4  digitized?
5      A    Yes, many.
6      Q    Many are not?  How do you send someone a
7  copy of a photo that has not been digitized?
8      A    At this time, I -- I mean, I don't think
9  that scenario ever happens.  Back in the day, you
10  would mail photos, but --
11     Q    Let's say like in 2014, if you needed to
12  send someone a copy of a photo that you didn't have an
13  electronic copy of, what would you do?
14     A    You would scan it.
15     Q    Is that something you would do?
16     A    Yes.
17     Q    So you had access to a scanner in 2014?
18     A    A photo scanner, yes.
19     Q    Well, could it scan other things besides
20  photos?
21     A    Yes, but it would still just be a photo.
22     Q    Right.  But the scanner you have had the
23  capacity and ability to scan things other than photos;
24  is that right?
25     A    Yes.

Page 35

1      Q    It could scan a piece of paper with text on
2  it; isn't that right?
3      A    It could scan anything.
4      Q    Okay.  And you had that in 2013?
5      A    I don't recall when I -- I had it exactly,
6  but --
7      Q    Well, you just specified you had it in 2014.
8  Now I'm asking about 2013.  Did you have it in 2013?
9      A    I don't recall, but I think I've had the
10  scanner for a long time.
11     Q    Okay.  Who did you work with in your
12  department in 2013 and 2014?  Who were members of your
13  department?  And let me ask you, what was the name of
14  your department that you worked in?  Is it Media
15  Relations?
16     A    Yes.
17     Q    Okay.  So how many people were in Media
18  Relations in 2013 and 2014?
19     A    I don't have an exact number because I
20  wasn't supervising then.  But I would say that there's
21  about eight of us.
22     Q    Okay.  And that included Matt Simon?
23     A    No.  I -- I worked with Matt Simon, but he
24  was not in our office.
25     Q    What office was he in?

Page 36

1      A    It's now Digital Strategy.  I'm -- I'm not
2  sure what department.  It probably would have been in
3  the Internet Department.  The Web Department.
4      Q    Okay.  But he wasn't in Media Relations?
5      A    Actually, he -- at some point, he built and
6  maintained our website.  And then he had a career
7  change, and he came over and worked in SID in
8  sports -- in Media Relations.  And now he's gone back,
9  and and he's the webmaster again.
10     Q    You said SID.  What --
11     A    Sports information director.
12     Q    Okay.  Would you have daily interactions
13  with Matt Simon back in 2013 and 2014, even if he
14  wasn't in your department?
15     A    I wouldn't say daily, but as needed.
16     Q    Regular?
17     A    Regular, yeah.
18     Q    Did you work in close proximity to him?
19     A    I honestly don't recall where -- I know
20  where I was and we worked in -- not next door, but
21  close.
22     Q    Okay.  You said that it was about eight
23  people that were in your department.  Who were those
24  eight people, the best you can recall, back in 2013
25  and 2014?

Page 37

Alpha Reporting                    800-556-8974
A Veritext Company                 www.veritext.com

| | |
|---|---|
| 1   A   Allen Cannon was the director. | 1   A   Yes. |
| 2   Q   He was your supervisor? | 2   Q   And others asked you to scan things for |
| 3   A   Correct. Jackie Thornton was our | 3   them; is that correct? |
| 4   administrative assistant. Adam Quisenberry, Matt | 4   A   If they had something that needed to be |
| 5   Callaway, Thomas Dick, maybe Meredith Collier. | 5   scanned. And I don't recall this scenario that you're |
| 6   Q   Meredith Collier? | 6   putting out there, but I mean, I -- I would have |
| 7   A   Yes. What -- what -- how -- what number am | 7   helped them out. |
| 8   I up to now? | 8   Q   So do you have any recollection of ever |
| 9   Q   You've got Allen Cannon, Jackie Thornton, | 9   doing that for somebody? |
| 10  Adam -- | 10  A   No. |
| 11  A   Quisenberry. | 11  Q   Were the people in your office generally |
| 12  Q   Quisenberry. Meredith Collier, Thomas Dick, | 12  aware that you had a scanner that was available? |
| 13  and Meredith. | 13  A   I don't know. |
| 14  A   Yeah, so I -- I -- | 14  Q   Did Jackie Thornton -- is that your |
| 15  Q   Matt Callaway? | 15  administrative assistant? |
| 16  A   I said Matt Callaway; right? | 16  A   Correct. |
| 17  Q   Yeah. Was Krista Smith in your group? | 17  Q   At the time, in 2014? |
| 18  A   No. | 18  A   Yes. |
| 19  Q   What about Jason Cook? | 19  Q   Was she aware that you had a scanner? |
| 20  A   He was not in our office. He was Allen | 20  A   I don't know. |
| 21  Cannon's direct supervisor. | 21  Q   Do you recall her ever using your scanner? |
| 22  Q   Okay. In your office, who would you sort of | 22  A   No. |
| 23  interact on a daily basis? Would it be your | 23  Q   What did you use your scanner for? |
| 24  administrative assistant? | 24  A   Scanning photos. |
| 25  A   Yeah. Yes. | 25  Q   Did you ever use it to scan anything else |
| Page 38 | Page 40 |

| | |
|---|---|
| 1   Q   Matt Callaway? | 1   besides photos? |
| 2   A   I would say that I interacted with all | 2   A   Not to my recollection, because it's a |
| 3   the -- all my -- all the other Media Relations | 3   photo -- photo scanner. |
| 4   staffers. | 4   Q   When you say "it's a photo scanner," what do |
| 5   Q   And would you talk about what you were | 5   you mean by that? |
| 6   working on with each other? | 6   A   That it's just taking a photo of something. |
| 7   A   As applicable. | 7   Q   So when you say "it takes a photo of |
| 8   Q   Who is Krista Smith? | 8   something," it copies an image and reduces it to a |
| 9   A   She works for the university in their | 9   digital file? |
| 10  marketing communications. | 10  A   Correct. |
| 11  Q   Did you ever have any dealings with her? | 11  Q   Okay. But I think you testified you can use |
| 12  A   I knew who she was, and I don't recall any | 12  it to scan other things, including pages of paper; |
| 13  actual dealings with her. | 13  right? |
| 14  Q   Where was the scanner located that you were | 14  A   You could. |
| 15  referring to earlier, back in 2014? | 15  Q   Do you remember the model of the scanner you |
| 16  A   Under my desk. | 16  had? |
| 17  Q   So you had a scanner under your desk back in | 17  A   No. It was a dinosaur, meaning it's old. |
| 18  2014? | 18  Q   Was it old back in 2014? |
| 19  A   Yes. | 19  A   I -- I don't recall when I got my first -- |
| 20  Q   Did anyone use this scanner besides you? | 20  first scanner. I don't recall -- I don't -- I don't |
| 21  A   I don't recall. If they -- if they did, | 21  recall the iteration of scanners, when it all |
| 22  they would have just asked me to scan whatever they | 22  happened. |
| 23  needed. | 23  Q   Do you remember when you first learned of |
| 24  Q   But this was a scanner that could be used by | 24  The 12th Man book by Michael Bynum and Epic Sports? |
| 25  anybody in the office; is that correct? | 25  A   The 12th Man book. Maybe in 2017, whenever |
| Page 39 | Page 41 |

11 (Pages 38 - 41)

1  the lawsuit came out.
2    Q   You think that's the first time you ever --
3    A   Well, you said a book.
4    Q   Okay.  So when you say "book," you mean like
5  a physical copy of a book?
6    A   Well, you said "book."
7    Q   Well, there could be books in electronic
8  format; correct?
9    A   Yes.
10   Q   Okay.  And when you said "book," you using
11  just in the physical sense of when you first learned
12  about the existence of a book?  I'm just trying to
13  clarify.
14   A   Yeah, yeah, I mean, whenever I learned that
15  Mike was doing a 12th Man book would have been 2017.
16   Q   Okay.  You didn't have any notice before
17  that that he was working on a 12th Man book?
18   A   He works on books.  I -- it's not my job
19  to -- he worked on a variety of books for a long time.
20  I never saw any of them.
21   Q   Okay.  You never saw any of the books --
22   A   Not at --
23   Q   -- is that right?
24   A   -- Texas A&M.
25      MR. PATRON:  Okay.  One thing I forgot

Page 42

1  to say at the beginning of this is that this isn't an
2  endurance competition, and if you need to take a break
3  at any point, you know, just please let me know, let
4  Mr. Chester know.
5      MR. CHESTER:  You think we could take a
6  short break now?
7      MR. PATRON:  Yeah, that's fine.
8      THE WITNESS:  Great.  Yeah.
9      MR. CHESTER:  Like five minutes?
10     MR. PATRON:  That's fine.
11     THE VIDEOGRAPHER:  The time is 10:11.
12  We're now off the record.
13     (Off the record.)
14     THE VIDEOGRAPHER:  We're back on
15  record.  The time is 10:22.
16  BY MR. PATRON:
17   Q   Mr. Marquardt, I want to ask you about
18  something we were talking about before, where you have
19  some photos that you keep that might have been
20  electronically stored and some that were just physical
21  copies in boxes.  Did you have your own archival
22  system that you kept when you were the assistant
23  director of Media Relations?
24   A   There's a filing cabinet in my office for
25  particularly important things that I like to keep that

Page 43

1  I don't want to get lost in the flotsam of the photo
2  archive.
3    Q   I want to talk about that photo archive, but
4  let's talk about your -- what would you call that?
5  I'm using the right words.  This is your filing
6  system, a cabinet in your office, where you would keep
7  things that you wanted to retain?
8    A   I have a filing cabinet in my office.
9    Q   And that's where you would keep some of the
10  things that you wanted to save for yourself?
11   A   Yes.
12   Q   Okay.  And is that separate from an archival
13  system that the department had?  Does the department
14  have a separate archival system?
15   A   Yes.
16   Q   Okay.  How is that archival system
17  maintained, the department archival system?
18   A   We have rooms filled with filing cabinets
19  and manila envelopes with still photos and articles
20  that may have been written about a person.
21   Q   And back in 2013 and 2014, was there a
22  digital archival system where you would keep things
23  electronically stored?
24   A   I wish we were better at this, at -- at the
25  whole organization system, but we're -- we had a

Page 44

1  server -- a server that collected a lot of digital
2  images, digital photos, yes.
3    Q   Were there things besides photos, such as
4  stories or articles, that you would keep
5  electronically back in 2013 and 2014?
6    A   I -- I don't believe so.
7    Q   So you would keep physical copies of those?
8  The things that you wanted to keep, you would not have
9  electronic copies of them back in 2013 and 2014?
10   A   What are we talking about here?
11   Q   I was asking you if there was an electronic
12  archival system, and I think you said, back in 2014,
13  you wouldn't have that.  You would just have the
14  physical copies that you would maintain; is that
15  correct?
16   A   I would say all -- all the -- all the media
17  relations people probably archive their stuff in
18  different ways.  Some of them in three-ring binders.
19  Sometimes you would just, you know, there are photos
20  that you had, then you would archive them on the
21  server.  Season stats, the -- I never really worked
22  it, but I know there's -- there's like an archive of
23  statistical -- whatever statistical things that are
24  produced by stat crew was the -- the program, and that
25  information is exported and then it goes -- allows you

Page 45

1  to create HTML on the website and --
2      Q   Well, you talked about photos, and you said
3  that's something that would be archived
4  electronically; is that right?
5      A   Yes.
6      Q   And then I was asking you about things that
7  weren't photos, such as articles and stories.  I just
8  want to get your testimony correct here.  It's my
9  understanding you said that that's something that
10  wouldn't be electronically stored, that that was
11  something that would just be maintained by the people
12  in your department; is that correct?
13     A   I -- I think that's correct.
14     Q   Okay.  All right.  I want to show you a
15  document that I'm marking as Exhibit 1 for your
16  deposition.
17         (Exhibit 1 was marked for
18         identification.)
19         MR. PATRON:  I only have three copies.
20  This is a copy for you.  I don't have copies for you
21  guys.  Sorry.
22         MR. CHESTER:  Thank you.
23  BY MR. PATRON:
24     Q   So this is an email exchange that you had
25  with Mr. Bynum back in 2010.  I want to give you an

1      Q   He attached a draft of the book; didn't he?
2      A   I don't -- I don't know.
3      Q   Well, do you --
4      A   Is that what the email indicates?
5      Q   Well, he's asking you about specific pages,
6  like "Look at page 87," or "I'm looking for one to two
7  photos from the 1976 game to go with this game story
8  on pages 102 to 105."
9         Does this not refresh your recollection that
10  you were given a draft, advanced copy of a book that
11  he was working on that was still a work in progress?
12     A   No.
13     Q   Is that because you don't remember receiving
14  this email?
15     A   Well, I surely don't recall getting this
16  email.
17     Q   Well, you responded to it.
18     A   Yeah.
19     Q   Do you deny that you responded to it?
20     A   It's right there, sir.
21     Q   Okay.  So I'm just asking you, you're
22  claiming no memory of this.  Are you denying that this
23  didn't occur?
24     A   The question of me in this email is "I need
25  a head shot of John David Crow, and I'm looking for

1  opportunity to look at it.  The email is entitled "E.
2  King Gill, 12th Man Book."  At the bottom of the page,
3  there's an email from James Wilkins to Mike Bynum, May
4  5, 2010.  It says, "See if this is better, thanks."
5  Do you know who James Wilkins is?
6      A   I do not.
7      Q   You can turn the page.  He writes -- well, I
8  think this is Mike Bynum to James.  "Please look at
9  the new 12th Man Book pages you sent."  But you don't
10  know who James Wilkins is?
11     A   No.
12     Q   Okay.  But then in the middle of the first
13  page is the email to you that says, "Hi, Brad."  It's
14  from May 6, 2010, at 9:30 a.m.  And it says, "Attached
15  is a set of low-resolution PDFs for the 12th Man book.
16  I'm still two to three weeks away from finishing this.
17  At this point, everything is still a work in
18  progress."
19         Does this refresh your memory as to when you
20  first may have become aware of the 12th Man Book that
21  Mike Bynum was preparing?
22     A   No.
23     Q   And why is that?
24     A   He's asking me for -- I mean, I answered
25  with some photos for the '76 Texas game.

1  one to two photos of this game."  I'm sure I sent
2  him -- I -- I don't know what I sent him, but I
3  clearly am -- am looking at the '76 Texas game, which
4  I wouldn't know how that has to do with the -- The
5  12th Man book.  I mean, the subject of this does not
6  have anything to do with --
7      Q   The subject is "12th Man Book."  How does it
8  have nothing to do with 12th Man book?  The subject of
9  the email is "E. King Gill, 12th Man Book."  And so
10  are you saying this didn't make you aware that he was
11  working on a 12th Man book?
12     A   I'm saying that I answered his question, and
13  I did not pay attention to -- I -- I clearly -- I read
14  his email, and I -- I provided whatever I could for
15  his request, and didn't have any, I mean, I -- I can
16  see the words "12th Man book," but at the time I just
17  answered his questions.
18     Q   Did you open the attachment that was
19  attached to the email?
20     A   I have zero recollection of that.
21     Q   So you just don't remember?  It could have
22  happened, but you don't remember?
23     A   Yes.
24     Q   Okay.  Do you know if you had any
25  discussions with Mr. Bynum before this email about his

| | |
|---|---|
| 1 12th Man book? | 1 served as our athletic director for an amount of time. |
| 2    A No. | 2 I'd have to look up. |
| 3    Q You don't recall? And again when you say | 3    Q And do you recall Mr. Crow personally |
| 4 you don't recall, you don't know whether it happened | 4 bringing you that photo for you to scan? |
| 5 or not? | 5    A I do recall John David bringing a photo. |
| 6    A Mike has -- has sent many emails over the | 6 I -- I assume this is -- that's the one I'm referring |
| 7 years, and I did not catalog them. | 7 to here. |
| 8    Q I'm not asking you whether you cataloged | 8    Q Did he bring it to you that morning in |
| 9 them. I'm asking whether you have any recollection if | 9 response to the request? |
| 10 you had any discussions with Mike Bynum before May 6, | 10    A I don't recall, but I wouldn't think so. |
| 11 2010, about his 12th Man book. | 11    Q This might have been something that he |
| 12    He's sending you this email out of the blue | 12 brought to you personally on some other occasion? |
| 13 that says, "Attached is the low-resolution PDFs for | 13    A Yes. |
| 14 the 12th Man book." Did you have any discussions with | 14    Q Okay. You say that he personally brought in |
| 15 him before this email was sent to you? | 15 for you to scan. What was the occasion that he wanted |
| 16    MR. CHESTER: Objection. Asked and | 16 you to scan something? |
| 17 answered. | 17    A I don't recall. |
| 18 BY MR. PATRON: | 18    Q Okay. Do you recall whether he brought the |
| 19    Q You can answer the question. | 19 photo in for you to scan so that you could give it to |
| 20    A I do not recall. | 20 Mike Bynum because that was the request? |
| 21    Q Okay. Reading your email when you respond, | 21    A I don't recall, but I'm certain that's not |
| 22 you say you have a box of unsorted black and white | 22 the scenario. I would -- I believe that John David |
| 23 shots from that era, is that what you were referring | 23 has had a preferred photo from his 1957 that he liked |
| 24 to before how you had loose copies of photos in your | 24 to see. |
| 25 office? | 25    Q And so this, you think that it was brought |
| Page 50 | Page 52 |

| | |
|---|---|
| 1    A Are you asking specifically about my -- my | 1 to you before May 6, 2010; is that right? |
| 2 response to Mike in 2010? | 2    A Yes. |
| 3    Q Yeah. You refer to the fact that you have a | 3    Q Okay. And you're referring to a scan back |
| 4 box of photos. | 4 in May 6, 2010. Did you have a scanner back in 2010? |
| 5    A Yes. I remember finding a -- a box of | 5    A Yes. |
| 6 unsorted black and white photos from that era in our | 6    Q Okay. And it may have been even earlier |
| 7 photo archive. | 7 than that because Mr. Crow brought you in his photo |
| 8    Q Okay. I'm going to show you a document I'm | 8 before that to scan; is that accurate? |
| 9 going to mark as Exhibit 2 now. | 9    A Yes. |
| 10    (Exhibit 2 was marked for | 10    Q Okay. And did you personally scan that |
| 11    identification.) | 11 photo? |
| 12    MR. PATRON: This is for you -- | 12    A I don't recall, but I believe I did. |
| 13    MR. CHESTER: Thank you. | 13    Q Was Ms. Thornton working with you back in |
| 14 BY MR. PATRON: | 14 2010? |
| 15    Q This is a different email response that you | 15    A Yes. |
| 16 make to the same email. And you see in the middle of | 16    Q Could she have scanned it for you? |
| 17 the page it's the same email as we saw on the first | 17    A I know that Jackie got a scanner at some |
| 18 exhibit where he's sending you the 12th Man book. | 18 point, but I'm not sure when. |
| 19    And this time you respond, and it appears to | 19    Q So Jackie also had a scanner at some point? |
| 20 be on the same day. It says May 6, 2010, at 10:26 | 20    A Yes. |
| 21 a.m. You say, "Here is a JDC headshot that JDC | 21    Q Do you know if she had one back in 2010? |
| 22 personally brought in for me to scan." Who is JDC? | 22    A I don't -- I don't recall. |
| 23    A John David Crow. | 23    Q Do you know if she had one in 2013? |
| 24    Q Who is Mr. Crow? | 24    A I don't -- I don't know. Probably. |
| 25    A He's the 1957 Heisman Trophy winner, and he | 25    Q Okay. So sitting here today, you can't |
| Page 51 | Page 53 |

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

1  recall actually how that JDC photo was scanned back in
2  2010 or whenever it was scanned?
3      A.  No.
4      Q.  But you sent it to Mr. Bynum in response to
5  his email sending you his 12th Man book; is that
6  right?
7      A.  I sent it to Mr. Bynum because he requested
8  it.
9      Q.  And he requested it because he needed it for
10  page 87 of his 12th Man book; isn't that right?
11      A.  That is what the email says.
12      Q.  And that's why you sent it to him, because
13  he requested it; isn't that correct?
14      A.  Yes.
15      Q.  So you were helping Mr. Bynum back in 2010
16  with his 12th Man book; isn't that correct?
17      A.  I'm going to have to disagree and just say
18  that I'm -- I'm -- he made a request, and I tried to
19  accommodate him.
20      Q.  But that request was specifically for his
21  12th Man book; isn't that true?
22      A.  I don't know.  I mean, according to this
23  email.  I mean --
24      Q.  I mean, do you deny receiving this email?
25      A.  No.

Page 54

1      MR. CHESTER:  Oh, come on.
2  BY MR. PATRON:
3      Q.  Okay.  Well, it says, "I need to get a head
4  shot of John David Crow to put in a similar info box
5  for page 87."
6      A.  I've got to say, I don't want to, like, I
7  mean, you're -- you're talking about something for
8  John David Crow and Paul Bryant.  None of these have
9  anything to do with the E. King Gill or 12th Man.
10      So nothing in what he's requesting from me
11  has any correlation to the 12th Man.  So none of these
12  words here made me go, "Oh, he is working on a 12th
13  Man book."
14      Q.  None of the words here in this email
15  suggest -- to you that he's working on a 12th Man
16  book?
17      A.  In the questions where he had an action item
18  for me, there was nothing -- nothing that correlates
19  to the 12th Man.
20      Q.  I just want to understand your testimony.
21  Are you saying that you did not have an understanding
22  that Mr. Bynum was working on a 12th Man book back in
23  2010 when you responded to this email?
24      A.  I'm saying that I didn't note his book
25  because that -- it was not what -- it wasn't what he

Page 55

1  was requesting of me, and it wasn't my project.  He
2  needed two photos, or a couple photos.  And I tried to
3  accommodate him.
4      Q.  Okay.  I'll give you an exhibit I've marked
5  as Exhibit 3.
6          (Exhibit 3 was marked for
7          identification.)
8      MR. PATRON:  Oops, sorry.
9      MR. CHESTER:  I got it.
10      MR. PATRON:  Thank you.
11  BY MR. PATRON:
12      Q.  This is an email that Mr. Bynum sent to you
13  on June 18, 2010.  The first sentence is, "Hi, Brad
14  and Glen."  It's also sent to Glen Johnson.  Who is
15  Glen Johnson?
16      A.  He was our photographer for many years.
17      Q.  I see that he doesn't have an
18  athletics.tamu.edu email address.  Was he a like a
19  freelance photographer, or was he an employee of the
20  university?
21      A.  I don't actually know what -- what his
22  contractual obligation to the university was.  I know
23  what I think, but I don't know.
24      Q.  All right.  Well, putting aside whether he
25  was an independent contractor or an actual employee,

Page 56

1  how did you interface with Mr. Johnson in your
2  capacity as Assistant Director of Media Relations?
3      A.  He was our photographer.  He provided us
4  with still photos until he went digital in 2000.
5      Q.  Okay.  So he would go to the sporting events
6  and take the photos?  Okay.
7      A.  Yes.
8      Q.  So do you recall receiving this email from
9  Mr. Bynum back in June 18, 2010?
10      A.  No.
11      Q.  And do you deny receiving this email, or you
12  just don't remember it?
13      A.  I am not denying it.
14      Q.  Okay.  Do you see in the first sentence
15  where it says, "I have attached for your review a
16  draft version of the 12th Man book on E. King Gill and
17  Texas A&M football"?  Do you recall looking at that
18  attachment?
19      A.  Is there an attachment?
20      Q.  There is not.  He's saying that he attached
21  this, and I'm asking if you recall --
22      A.  Okay.
23      Q.  -- looking at the attachment?
24      A.  No, I do not.
25      Q.  But this is the second email in 2010 where

Page 57

1  he's sending you a draft version of his 12th Man book;
2  isn't that correct?
3      A   According to these emails, yes.
4      Q   Okay.  Do you know if this is the version of
5  the 12th Man book that you asked your assistant,
6  Jacqueline Thornton, to retype?
7      A   Come again?
8      Q   I said, do you know if this version of the
9  12th Man book is what you asked your secretary or
10  administrative assistant, Jacqueline Thornton, to
11  retype?
12      A   No.
13      Q   How do you know that?
14      A   Because I asked her to type a stapled 8-1/2
15  by 11 version of -- of an article.
16      Q   And where did you get that article?
17      A   It was in my desk.  I don't --
18      Q   And where did it come from?
19      A   -- I -- I don't know.
20      Q   So sitting here today, you don't know
21  whether or not it came from the attachment to this
22  email; is that correct?
23      A   I -- I am certain it did not come from the
24  attachment of this email.
25      Q   How are you certain of that?  Because you

Page 58

1  instruct him not to answer, instruct him not to
2  answer.  But if you don't do that, it's just an
3  objection, and he's going to answer.
4          MR. CHESTER:  I understand that.  But
5  he's my client, and I'll be the one to let him know
6  the difference.
7          MR. PATRON:  Well, do you want to tell
8  him after every time you make an objection that he can
9  answer?  Because he's not going to know.  I mean,
10  that's normally how it works is that you object --
11          MR. CHESTER:  If I don't say anything,
12  then he can answer.
13          THE WITNESS:  Okay.
14          MR. CHESTER:  But we're not taking
15  instructions from opposing counsel on when to assert
16  the attorney-client privilege or any other privilege.
17          MR. PATRON:  I'm not trying to do that,
18  Ray.  You know that.  I just want, if he -- okay, I
19  think it's clear.
20          If he tells you not to answer, don't
21  answer.  If he objects, I think you can answer unless
22  he tells you not to.  So I think you can answer the
23  question.
24          THE WITNESS:  Can you repeat the
25  question?

Page 60

1  don't know where it came from.  That's what you just
2  testified.
3      A   I'm judging off the -- the fact that it was
4  a stapled 8-1/2 by 11, you know, compilation of -- of
5  an article.
6      Q   And you don't know where it came from;
7  right?
8      A   I do not.
9      Q   Okay.  So you don't know that it didn't come
10  from this; is that correct?  That was my question.
11      A   And I think my answer was that I'm sure it
12  didn't come from this.  Because, I -- I mean, then
13  you're asking me, did I, you know, so I printed it and
14  made a copy of it and shoved it in my desk and then
15  forgot about it.  And that's not logical to me.
16      Q   Well, you don't know where it came from that
17  was in your cabinet.  So you can't say how it got
18  there; isn't that right?
19          MR. CHESTER:  Objection.  Form,
20  argumentative.
21          MR. PATRON:  You can answer.
22          MR. CHESTER:  Listen, I'll tell him
23  when he can answer and not answer, if you don't mind.
24          You can answer.
25          MR. PATRON:  Well, Ray, if you want to

Page 59

1          MR. PATRON:  Can you read the question
2  back, please?
3          THE OFFICER:  Just one moment, sir.
4  I'm stopping and need a moment.
5          MR. PATRON:  Yeah, sure.
6          (The officer repeated the record as
7          requested.)
8          THE WITNESS:  Because we've been doing
9  this for a long time, I'm pretty sure that the
10  attachment that was connected to this was a -- a PDF
11  of a -- a page spread of some sort.  Not the form
12  that -- that I instructed Jackie to type in.
13  BY MR. PATRON:
14      Q   So you do have a recollection of what's
15  attached to this, to this email that we've been
16  looking at, Exhibit Number 3?
17      A   I mean, yes.  This lawsuit's been going on
18  for a decade.
19      Q   Okay.  And you think it's different from
20  what you gave your secretary to type?
21      A   Yes.
22      Q   Okay.  Let's go back to that article that
23  you did give your secretary to type, and you say you
24  don't think it was what was attached to this email.
25  Do you have any idea how you came into possession of

Page 61

16 (Pages 58 - 61)

Alpha Reporting          800-556-8974
A Veritext Company        www.veritext.com

1  that article?
2    A  No.
3    Q  Do you think there's any possible way you
4  would have gotten that article other than through Mike
5  Bynum?
6    A  I don't know.
7    Q  Can you think of any way that that would
8  have happened?
9    A  There are no facts in my brain about how --
10  other -- other ways it could have got in my desk.
11    Q  Do you think it's likely that you did get it
12  from Mike Bynum?
13    A  I don't know.
14      MR. PATRON:  All right.  We're on
15  Exhibit 4 now.
16      (Exhibit 4 was marked for
17      identification.)
18      MR. PATRON:  Here you go, Ray.
19      MR. CHESTER:  Thank you.
20  BY MR. PATRON:
21    Q  Okay.  This is you now responding to the
22  email that we just went over.  Do you remember sending
23  this email to Mike Bynum on June 25, 2010, responding
24  to his email where he sent you a draft version of the
25  12th Man book?

Page 62

1    Q  And the PDF was a draft version of the 12th
2  Man book; isn't that correct?
3    A  If you say so.
4    Q  I'm not saying it.  I want to know what your
5  answer is.
6    A  Well, I don't know -- I opened a PDF.  And
7  it's, you know, again, not having anything to do with
8  the "12th Man" -- "12thMan" tradition.
9    Q  Why do you say that, that it has nothing to
10  do with the "12th Man" tradition?
11    A  Well, the "12th Man" started in 1922.  So,
12  that would be A. King Gill, and then really the 12th
13  Man tradition came back in, say, '83 when Jackie
14  Sorrell started the kickoff team.  So Lindsay Nelson
15  talking to Bear Bryant has nothing to do with the
16  "12th Man" tradition.
17      So, I mean, I see his, you know, his subject
18  line.  I see that he refers to it as -- as this.  But
19  everything that he's asking me about, the '84 Texas
20  game doesn't, you know, they're just A&M history
21  stuff.  And I'm just trying to help out the man.
22      MR. PATRON:  I'm going to object as
23  nonresponsive.
24  BY MR. PATRON:
25    Q  Is it your testimony that this email

Page 64

1    A  No, I do not.
2    Q  But you don't deny that you actually sent
3  it; you just don't remember it?
4    A  Correct.
5    Q  If you look down in the email he sent you on
6  June 18th, in the middle of that email he says, "I
7  need help in locating images for the following."  And
8  the first one, he said, "See page 91.  Do you have a
9  better version of this photo?"  Do you see that?
10    A  I do.
11    Q  And in your response, you say, "I've used
12  that Lindsay Nelson shot from page 91 previously, but
13  I can't find a copy of it currently."  Do you see
14  that?
15    A  Yes.
16    Q  So in order to respond to Mr. Bynum asking
17  about page 91 of his attachment, you had to actually
18  open the attachment and look at it in order to say, "I
19  have used that shot from page 91 previously, but I
20  can't find a copy of it"; isn't that true?
21    A  That is correct.
22    Q  So it is actually opened up the draft version
23  of the 12th Man book in order to respond to this email
24  from Mr. Bynum; isn't that correct?
25    A  I opened a PDF.

Page 63

1  exchange had nothing to do with the 12th Man book of
2  Mr. Bynum?
3    A  My take on it was trying to answer or -- or
4  accommodate his photo requests.  It didn't have
5  anything to do with the "12th Man" tradition.
6    Q  Okay.
7    A  It's just Aggie football.
8    Q  I understand that, sir.  That wasn't my
9  question.  My question to you was, it is your
10  understanding that this email exchange that you had
11  with Mr. Bynum had nothing to do with Mr. Bynum's 12th
12  Man book; is that correct?
13    A  The email's title calls it the 12th Man
14  book.  But that's not what I read from the email.
15    Q  And the attachment is a draft version of the
16  12th Man book; isn't that correct?
17    A  Looks to me as if it's just a Texas A&M
18  football book.
19    Q  Why do you say that?
20    A  Because everything that he's asking me
21  about, that win, '84 Texas, Lindsay Nelson, '76 game,
22  they don't deal with the "12th Man."
23    Q  Let me show you a document I'm going to mark
24  as Exhibit 5.
25  //

Page 65

17 (Pages 62 - 65)

1          (Exhibit 5 was marked for
2     identification.)
3          MR. PATRON:  This one's your copy.
4          MR. CHESTER:  Thank you.
5     BY MR. PATRON:
6     Q    You're not on this email chain.  I'm just
7  going to represent that to you.  This is an email
8  exchange between Matthew Callaway and Krista Smith on
9  January 16, 2014, about the "12th Man" campaign.  Have
10  you ever seen this document before?
11     A    Yes.
12     Q    When did you see this document?
13     A    I don't recall.
14     Q    Were you aware on January 16 that your
15  department was very active on this "12th Man"
16  campaign?
17     A    I don't recall.
18     Q    You don't recall having discussions with
19  Matt Callaway and others that you work with about the
20  "12th Man" campaign?
21     A    No.
22     Q    This would have been in the middle of the
23  playoff season with the Seattle Seahawks in January of
24  2014?
25     A    Okay.

Page 66

1     Q    That doesn't refresh your memory of whether
2  you would have been aware of this campaign?
3     A    I don't recall this -- I don't recall the
4  campaign.
5     Q    Okay.  And so you don't recall having
6  discussions with Matt Callaway about the campaign?
7     A    I wasn't a part of the campaign.  I was
8  doing my own job.
9     Q    Mr. Marquardt, I'm not asking you whether
10  you were involved in the campaign.  I'm asking you
11  whether you were aware of the campaign.  That's a
12  different question.
13     A    And I still don't recall.
14     Q    Okay.  You sat in on the deposition of Matt
15  Callaway.  You were present when he was testifying
16  under oath; weren't you?
17     A    Yes.
18     Q    Do you recall that he said he discussed it
19  with you?  Do you remember that testimony of
20  Mr. Callaway?
21     A    I listened to five depositions, so I -- I
22  don't recall exactly what he said.
23     Q    Well, if he said that he did have
24  discussions with you about it, would you say that he
25  was wrong?

Page 67

1     A    I don't know.
2     Q    You don't know if he was wrong?
3     A    I mean, I don't have any recollections of
4  conversations about -- about the "12th Man" campaign.
5     Q    Right.  If he did have recollections of
6  discussing it with you, and you don't have those
7  recollections, would you say that he's wrong?
8     A    I don't know.
9     Q    Do you have any reason to believe that
10  Mr. Callaway was being untruthful when he said that?
11     A    No.
12          MR. PATRON:  I'm going to mark Exhibit
13  Number 6.
14          (Exhibit 6 was marked for
15     identification.)
16          THE WITNESS:  Thank you.
17          MR. PATRON:  This one's yours, Ray.
18          MR. CHESTER:  Thank you.
19     BY MR. PATRON:
20     Q    This is a email that you sent to Benjamin
21  Dierker.  Am I pronouncing that correctly?
22     A    Yes.
23     Q    And Matthew Callaway on January 17, 2014.
24  Who's Mr. Dierker?
25     A    He was a student assistant.

Page 68

1     Q    Okay.  Why did you send him this email?
2     A    I have zero recollection of that.
3     Q    Now, the email you sent is forwarding an
4  email of Ms. Thornton; isn't that correct?
5     A    Yes.
6     Q    And does Ms. Thornton's email have an
7  attachment to it?
8     A    [No audible response.]
9     Q    If you turn the page, do you see that where
10  it says, "E. King Gill, The Life and Legend of Texas
11  A&M's 12th Man"?  Is that what was attached to Ms.
12  Thornton's email?
13     A    Yes.
14     Q    And do you remember receiving this email
15  from Ms. Thornton?
16     A    Yes.
17     Q    Okay.  Why was Ms. Thornton sending you this
18  email on January 14, 2014?
19     A    Because she had completed a task and sent me
20  a Word doc.
21     Q    And what was the task that she completed?
22     A    I asked her to type in the article about the
23  "12th Man" tradition, E. King Gill.
24     Q    And when did you ask her to do that?
25     A    I don't recall.  But somewhere in the

Page 69

18 (Pages 66 - 69)

1  transition of moving from the west side of Kyle Field
2  to the east side of Kyle Field.  So sometime
3  between -- between the end of 2013 and the beginning
4  of 2014.
5      Q   Can you describe to me what you're referring
6  about moving?  Were you moving offices?
7      A   Yes.
8      Q   Okay.  And so you think that you asked her
9  sometime, maybe a week or two before she actually sent
10  it to you?
11     A   I don't recall when.  I mean, it isn't --
12  it's not a -- a high -- it was not a high-priority
13  request.
14     Q   Okay.  Well, what did you ask her
15  specifically to do?
16     A   To type it in.
17     Q   And you gave her the article that you got
18  out of your file cabinet?
19     A   Yes.
20     Q   Did you give her the complete copy of that?
21     A   Yes.
22     Q   And what were your instructions to her?
23     A   "Please type this in."
24     Q   And do you have a recollection today of
25  giving her those instructions?

Page 70

1  different than "I don't recall," which is what your
2  question was.
3  BY MR. PATRON:
4      Q   Okay.  You said "Not that I recall".  So,
5  are you saying, "No, I didn't do that," or "I don't
6  have a memory one way or the other"?  That's what I'm
7  trying to clarify.
8          When you say you don't recall or not that I
9  recall, I'm just trying to understand what you mean by
10  that.  The question was, just so I can back it up,
11  was: Do you recall looking at the attachment?
12         And you said, I think Mr. Chester said, "Not
13  that I recall."  And I just want to clarify what you
14  mean when you say that.  Is that, you don't have a
15  memory one way or the other, or "I don't think I did"?
16     A   I don't think I did, but I don't recall.
17     Q   Okay.  And why do you think you didn't?
18     A   Because the information I asked her to type
19  in wasn't a pressing thing for me.  I mean, I wouldn't
20  have been really interested in the information until
21  the next football season.
22     Q   Why did you ask her to do it?
23     A   The -- the "12th Man" story is a very
24  common, well-known story, but the details of it are
25  less well-known.  And we were new to the SEC, and

Page 72

1      A   I know I asked her to do it, but I don't
2  recall the -- I don't recall the date or the
3  specific -- specific scenario.
4      Q   Do you remember where you were when you
5  asked her to do that?
6      A   No.
7      Q   Were you in your office and she was in your
8  office?  Do you have a recollection of that?
9      A   No.
10     Q   So do you have any recollection of the
11  specific words that you used when you told her -- to
12  give her this task?
13     A   No.
14     Q   And did you look at the attachment that she
15  sent to you?
16     A   Not that I -- I recall.
17     Q   And when you say you don't recall, again,
18  just for clarification, you could have looked at it,
19  you could have not looked at it, but you just don't
20  recall?
21         MR. CHESTER:  Actually, what he said
22  was "Not that I recall."
23         MR. PATRON:  I'm trying to clarify that
24  statement.
25         MR. CHESTER:  Right.  But it's a little

Page 71

1  the -- the people that were covering us really had no
2  idea about the "12th Man" tradition.
3         So I was interested in some of the -- the
4  deep facts that were in -- in the article that I could
5  use in the -- to help the media understand the "12th
6  Man" tradition better.
7      Q   So you intended to use this to help the
8  media?  Is that what your testimony is?
9      A   The -- parts of the information, yes.
10     Q   Right.  Why did it have to be retyped?  Or
11  typed, I should say.
12     A   Well, because then I can just save it on my
13  computer, and then text is searchable.
14     Q   Do you recall doing that with other articles
15  that you received?
16     A   Yes.
17     Q   Okay.  Can you tell me what articles you've
18  done that for?
19     A   We have, in Athletics, Communications,
20  Sports Information, Media Relations, whatever, you
21  often keep a clip file that the TV crew, when they're
22  talking about your team, they want to read stories
23  that are about your team.  So that would be one
24  instance.
25     Q   But you could just send them a copy of the

Page 73

1  article.  Why would you have to type that in?
2      A    Back in the day, we were like clipping out
3  of newspapers.  And then at some point it went
4  digital, and it was just a changing in -- in the way
5  that you did things.
6      Q    Prior to January of 2014, can you give me
7  any example of an article that you had Ms. Thornton
8  type in to her computer to give you a Word document?
9      A    Yes.  There was a story on the origins of
10  Kyle Field that we put in our football media guide.
11      Q    So that's an example where you had it typed
12  in because you wanted to use it in a publication that
13  you were going to push out?
14      A    Yes.
15      Q    Any other examples of that, that you can
16  think of, prior to 2014?
17      A    As I stated, there were often times where I
18  compiled the clip books digitally, and then I would
19  put them into my game notes, which would also give the
20  media to help them cover the game.  And sometimes I
21  would pull quotes that they had put in their stories
22  into my game notes, as they would be able to tell the
23  story better.  And so, yes.  I mean, I --
24      Q    That's an example of where you had an
25  article that you had Ms. Thornton type the article in

Page 74

1  as a Word document?
2      A    No, she wouldn't have to type that in.  That
3  would just be from -- from the internet.  But no, not
4  typing --
5      Q    Right.  So I'm asking examples of where you
6  had Ms. Thornton type in an article for you in January
7  of 2014, and I've asked you for any other times you
8  had done that prior to 2014.
9      A    Right.
10      Q    You've given me one example.
11      A    It was -- it was --
12      Q    Kyle Field.
13      A    -- Kyle Field, our football stadium.
14      Q    Right.  And it was an article that you had
15  her type up because you wanted to put that into a
16  publication that you were going to do; right?
17      A    Yes, into a media guide.
18      Q    Yeah.  Any other examples that you can give
19  prior to 2014?
20      A    No.
21      Q    So the only other time before 2014 is when
22  you had Ms. Thornton do this, was when you wanted to
23  use it to push out in a publication for Texas A&M's
24  media publication?
25          MR. CHESTER:  Objection.  You're

Page 75

1  mischaracterizing his testimony and --
2          MR. PATRON:  It's a question.
3          MR. CHESTER:  Yeah.  He said earlier
4  that he had done it several times before, and --
5          MR. PATRON:  Please -- no talking
6  objections, Ray --
7          MR. CHESTER:  -- just because he can't
8  remember a specific time over ten years ago, now
9  you've changed it into he's never done it before
10  except the Kyle Field thing.  So I object.
11          MR. PATRON:  All right.  Well, I'm
12  going to object to the talking objection.  You can
13  object and he can answer, or you can instruct him not
14  to answer.  But you're not to give these standing,
15  talking objections, Ray.
16          MR. CHESTER:  If you're going to twist
17  his words and try and trick him, then I'm going --
18          MR. PATRON:  I'm not tricking him.
19          MR. CHESTER:  -- to do whatever I need
20  to do to protect my client.
21          MR. PATRON:  Yeah, well, you know
22  that's not proper.  All right.
23          MR. CHESTER:  Let me let you finish
24  this line of questions if you're not finished, and
25  then maybe we can take a short break.

Page 76

1          MR. PATRON:  That's fine, Ray.  Let's
2  do that.
3          MR. CHESTER:  Now's okay?
4          MR. PATRON:  Yeah.
5          THE VIDEOGRAPHER:  The time is 11:15.
6  We are now off the record.
7          (Off the record.)
8          THE VIDEOGRAPHER:  We're back on the
9  record.  The time is 11:25.
10  BY MR. PATRON:
11      Q    I'm going to give you a document now I'm
12  marking as Exhibit 7.
13          (Exhibit 7 was marked for
14          identification.)
15          MR. CHESTER:  Thank you.
16  BY MR. PATRON:
17      Q    These are interrogatory responses that you
18  gave in this case.  This was back in 2021.  Do you
19  remember working with your attorneys to respond to
20  these questions in the case?
21      A    Yes.
22      Q    And I don't know if you verified these
23  interrogatory responses.  Do you remember whether you
24  signed a verification for these interrogatories?
25      A    I assume I did.

Page 77

20 (Pages 74 - 77)

Alpha Reporting              800-556-8974
A Veritext Company          www.veritext.com

1    Q   Okay.  Well, let me just ask you, is it your
2  understanding that the answers that you gave in these
3  interrogatories were truthful?
4    A   Yes.
5    Q   Okay.  I'm going to ask you about some of
6  the questions.  If you could turn to page 6.  This is
7  an answer that you gave in response to an
8  interrogatory that appears on the previous page.
9        It asks you about individuals and entities
10  that you gave a copy of any version of the Gill
11  biography.  And I'm going to go over some of your
12  responses here.
13        In the top of page 6, in the middle of that
14  first paragraph, you say, "In answering these
15  interrogatories, Marquardt will refer to the articles
16  by Whit Canning, which he found in paper form in his
17  files as the Canning article."  Do you see that?
18    A   Yes.
19    Q   Okay.  I'm going to ask you about this next
20  sentence.  "Marquardt gave the Canning article to his
21  secretary, Jacqueline Thornton, in early 2014."  I
22  think earlier, you weren't sure if it was late 2013 or
23  early 2014.  You think it's in early 2014; is that
24  correct?
25    A   Yes.

Page 78

1    A   Yes.
2    Q   Okay.  What do you recall about that request
3  from Matt Callaway for information relating to the
4  "12th Man"?
5    A   Not much beyond he asked me for -- if I had
6  any information on the "12th Man."
7    Q   Do you know why he was asking you for
8  information about the "12th Man"?
9    A   Well, I -- I know now that it was for their
10  "12th Man" campaign.
11    Q   You didn't know at the time?
12    A   I'm not sure what I knew at the time.
13    Q   So you could have known.  You just might not
14  recall now; is that accurate?
15    A   He's asking me, I mean, he's asking me for
16  information about the "12th Man."  I don't recall what
17  he was asking me -- what it was in relation to.
18    Q   Do you recall having any discussions with
19  him after you sent him the article, the Canning
20  article, about what he was going to do with it?
21    A   I have no specific recollection, but I knew
22  I would be a resource for, you know, questions that he
23  might have.
24    Q   Well, isn't it true that you knew that he
25  was going to post the article?

Page 80

1    Q   Okay.  And then it says, "his purpose was to
2  have the information contained and the Canning article
3  preserved as part of his ongoing collection and
4  preservation of information of interest about A&M and
5  the '12th Man.'"  Do you see that?
6    A   Yes.
7    Q   Had you been collecting and preserving
8  information about the "12th Man" tradition?
9    A   Not specifically.
10    Q   Okay.  Was this maybe the first thing that
11  you were collecting for that, the "12th Man," that you
12  can recall?
13    A   I would have collected every image of
14  DX Vital [ph] and E. King Gill.  So it's a -- it's a
15  process over many years.
16    Q   Okay.  But that sentence is true to the best
17  of your knowledge; right?  That last sentence of the
18  paragraph?
19    A   Yes.
20    Q   Okay.  Go down two paragraphs.  And the last
21  sentence of that paragraph says, "The purpose of
22  forwarding Ms. Thornton's email and attachment was to
23  respond to a request from Matt Callaway for
24  information relating to the '12th Man.'"  Is that a
25  true statement?

Page 79

1    A   No.
2    Q   That's not true?  Isn't it true that you
3  actually helped Mr. Callaway determine how the posting
4  should look like?
5    A   No, Matt Callaway and Matt Simon, they would
6  know how to post the article better than me.  They're
7  younger and more tech savvy than me.
8    Q   Okay.  Again, I'm not asking you whether
9  they might have known better.  I'm asking you whether
10  you had any involvement in that.
11    A   I -- I don't recall.  I know I was -- I was
12  there.  If they needed something, then I would have
13  been there as a resource.
14    Q   Well, let's go down the page under page 6,
15  the last paragraph.  Do you see that where it said,
16  second sentence of the last paragraph?  "Marquardt was
17  aware that, Matt Callaway, a colleague in the media
18  relations department, was interested in using the
19  Canning article as part of an effort to highlight and
20  celebrate A&M's '12th Man' tradition."  Do you see
21  that?
22    A   I do.
23    Q   Okay.  Now, you testified that you think
24  these answers are truthful; is that true?
25    A   Yes.

Page 81

21 (Pages 78 - 81)

1    Q   Okay.  Then it says after that, "Marquardt
2   believes he discussed matters involving how the
3   posting should look."  Do you see that?
4    A   I do.
5    Q   Is that true?
6    A   I think that I -- I was there as a -- if
7   there was a resource -- I was as a resource.  I mean,
8   those guys know how to post it and make it look good.
9    Q   But do you recall -- this is your
10  interrogatory response.  Do you recall discussing
11  matters involving how the posting should look?
12   A   No, I don't.  But I -- I would have been
13  there to assist them.
14   Q   You were present during Matt Callaway's
15  deposition, I think we established that; right?
16   A   Yes.
17   Q   Do you recall in his deposition when he
18  testified that you knew that he was going to post it?
19      MR. CHESTER:  Wait a minute.  I don't
20  believe he said that.
21      MR. PATRON:  I'm asking if you recall
22  that.  I --
23      THE WITNESS:  I don't recall.
24      MR. PATRON:  Okay.
25      THE WITNESS:  I took notes, but I have

Page 82

1   not reviewed them.
2   BY MR. PATRON:
3    Q   So, sitting here today, do you deny what's
4   contained in your interrogatory response that you
5   believe you discussed matters involving how the
6   posting should look like?
7    A   Yes, how they should look, I -- I don't
8   think I was involved in that.  If -- if they needed --
9   had other questions, I would have known who the author
10  is and what year it was written.
11   Q   Did you give them that information?
12   A   I don't recall, but I know that I was there
13  as a resource.
14   Q   Do you recall any discussions -- this
15  doesn't say in your interrogatory response who you had
16  these discussions with.  Do you recall who you may
17  have had these discussions with?
18   A   I know that -- I've learned that Matt and --
19  Matt Callaway and Matt Simon were collaborating on the
20  posting of this article.
21   Q   How were you aware that Matt Callaway, your
22  colleague, was interested in using the Canning article
23  as part of an effort to highlight and celebrate A&M's
24  "12th Man" tradition?
25   A   Because he asked me for -- if I had any

Page 83

1   information on the "12th Man."
2    Q   Right.  That would explain it, that he was
3   interested in the "12th Man" tradition, but this says
4   -- your interrogatory response says that you were
5   aware that he was interested in specifically using
6   that Canning article as part of an effort to celebrate
7   the "12th Man" tradition.  How were you aware of that,
8   that he was interested in using the Canning article?
9    A   Yeah, I -- I would say that we filled in
10  some blanks after, you know, through the litigation
11  over the years.  Then the, you know, the facts became
12  apparent.
13   Q   So in January of 2014, you were aware that
14  Matt Callaway was interested in using that Canning
15  article as part of an effort to celebrate and
16  highlight A&M's "12th Man" tradition; is that correct?
17   A   Yes.
18   Q   When you turn the page, at the top of page
19  7, there's a statement, "Marquardt believes that Jason
20  Cook oversaw the decision to post the Canning article
21  on the website."  What is the basis for that belief?
22   A   Jason Cook was our director of external, so
23  he would have -- his purview would have included Media
24  Relations, the website, all of our external-facing
25  departments.

Page 84

1    Q   So the belief is based just upon the fact
2   that he was the head of the department, is the reason
3   why you believe that he oversaw that decision?
4    A   Yes.
5    Q   Okay.  Any other reason?
6    A   I think Jason, before he came to Athletics,
7   was on the university side and was very involved in
8   protecting the "12th Man" trademark.
9    Q   Did you sit in on Jason Cook's deposition?
10   A   No.
11   Q   If he denied that he had any involvement in
12  the decision to post the Canning article, would you be
13  in a position to disagree with him?
14   A   No.
15   Q   Dropping down two paragraphs to the third
16  paragraph, the first sentence says, "Marquardt's
17  immediate supervisor, Allen Cannon, instructed
18  Marquardt to have the Canning article removed from the
19  website on January 22, 2014."  Why were you instructed
20  to have the Canning article removed?
21   A   Allen Cannon's office is directly across
22  from mine.  And so whenever he got the call from Mike,
23  then I'd say that Allen doesn't handle digital -- he
24  doesn't handle the website.  So -- and I don't either,
25  but I have a very -- working relationship with Matt.

Page 85

22 (Pages 82 - 85)

1   Q   I'm just trying to understand.  I believe
2  your testimony is that you weren't involved in the
3  "12th Man" campaign and you weren't involved in the
4  decision to post this article on the website.  So why
5  are you the one that's being instructed to have it
6  removed?
7   A   I don't have a good answer to that, except
8  I -- I mean, I have a long relationship with Mike
9  Bynum, and then I have a close relationship with Matt
10 Simon, who is our webmaster.
11  Q   The last sentence of that paragraph says,
12 "Marquardt on that same day requested guidance from
13 Jason Cook on how to proceed"; do you recall that?
14  A   Yes.
15  Q   Well, what do you recall about that
16 discussion?
17  A   I believe he emailed -- I emailed him and
18 asked for guidance, and he responded.
19  Q   You didn't have a verbal discussion with him
20 about what happened?
21  A   I don't recall.
22  Q   What did Jason Cook tell you on how to
23 proceed?
24  A   As I recall it, he still very much wanted
25 to, you know, have this story on our website and would

Page 86

1  there be a way to sort something out with Mike and get
2  permission to keep it on our website?
3   Q   Did you also want to keep it on the website?
4   A   It -- it didn't matter to me.  I -- I was
5  just doing what I was told.
6   Q   Do you know why Jason Cook wanted to keep it
7  on the website?
8   A   No.
9   Q   You didn't have a discussion about that with
10 him?
11  A   No.  I mean, I think that we can, you know,
12 you hate taking things down from a -- form a website
13 and it was his preference to keep it up there.
14  Q   And was it a positive article for the
15 university?
16  A   I suppose.  It was an article about a
17 tradition that is near and dear to Texas A&M fans.
18  Q   Do you know why it was decided to put the
19 article up in the first place?
20  A   Part of the campaign.
21  Q   Okay.  Can you go back to, I believe it's
22 Exhibit 6?  It's the email that Jackie Thornton sent
23 to you with the exhibit.  The attachment that she
24 typed up, it doesn't have anything in there about who
25 wrote this article; right?

Page 87

1   A   No.
2   Q   It doesn't have, like, who owns the
3  copyright either; isn't that right?
4   A   Correct.
5   Q   And it doesn't have the time when this
6  article was written; isn't that correct?
7   A   Correct.
8   Q   Do you know why it doesn't have that
9  information on this document?
10  A   I do not.
11  Q   But there was information on the document
12 that you gave her to type that had that information;
13 isn't that correct?
14  A   Yes.
15  Q   Did you sit in on the deposition of
16 Ms. Thornton?
17  A   Yes.
18  Q   Do you recall her testimony that she would
19 have typed everything that was given to her to type?
20      MR. CHESTER:  Do you have a page cite
21 on that?  Because that's not exactly the verbiage I
22 recall.
23      MR. PATRON:  I'm not asking what you
24 recall.  I'm asking if he recalls.  He was there.
25      Do you recall that?

Page 88

1      MR. CHESTER:  Well, you're stating it
2  as a fact that's what she testified to, and I'm
3  challenging you on that, so --
4      MR. PATRON:  It's a question.  I'm not
5  stating facts.
6      THE WITNESS:  I mean, I was there, and
7  I took notes.  I don't have those notes in front of
8  me.  I mean, do you have what she said?
9      MR. PATRON:  I do not.  I'm asking
10 you --
11     MR. CHESTER:  I have the depo, if we
12 need it.
13 BY MR. PATRON:
14  Q   You don't have any recollection of her
15 testimony about what she would have done if given
16 something to type, that she would have typed it all?
17 Do you have any recollection of that?
18  A   I -- I believe that's correct.
19  Q   Okay.  What was actually published in the
20 posting of this article, it did have information about
21 the author and the year that it was written; isn't
22 that correct?
23  A   Yes.
24  Q   How did that information get into the
25 article that was published if it wasn't what was sent

Page 89

23 (Pages 86 - 89)

1 to Matt Callaway?
2     A   I don't recall exactly, but as I said, I --
3 I would have been a resource. I know who the author
4 was. I know what year it was written. They -- they
5 could have called or texted me, but I didn't have no
6 specific memory of that.
7     Q   Okay. They wouldn't have that information,
8 though; would they? You would have it; is that
9 correct?
10     A   I would -- I would say that, I mean, you
11 know, that -- that stapled version of the "12th Man"
12 story was on my desk, and it was on Jackie's desk for
13 a long time. Anybody could have read it while it was
14 sitting on her desk, so --
15     Q   Okay. Was that speculation on your part?
16     A   You asked me if there was any other way and,
17 yeah, probably.
18         MR. PATRON:  Okay. I'm going to mark
19 Exhibit 8.
20         (Exhibit 8 was marked for
21 identification.)
22         MR. CHESTER:  Thank you.
23         MR. PATRON:  Ooh, my bad.
24 BY MR. PATRON:
25     Q   This is a declaration that you submitted in

Page 90

1 and forward the information to others? Is that
2 correct?
3     A   In -- in my view, it would have been
4 specifically in my game notes, which are forwarded to
5 other people.
6     Q   When you say game notes, what are these game
7 notes? What does that mean?
8     A   I put together a -- a package of information
9 that describes all the good points of the football
10 team or basketball team or whatever sport I'm working
11 with. It contains stats and other facts.
12     Q   So you keep notes on each game, is that what
13 I understand your testimony is?
14     A   Yes.
15     Q   Okay. Do you send these game notes out to
16 people?
17     A   Yes.
18     Q   Who do you send them to?
19     A   I mean, it's posted on our website for
20 everyone, fans and everybody to see. I specifically
21 forward it to our beat media people.
22     Q   So you wanted the ability, by having this
23 keyed in, the ability to use it in your game notes; is
24 that your testimony?
25     A   Parts of it, yes, the pertinent information.

Page 92

1 this litigation. Do you recognize it?
2     A   Yes.
3     Q   And you signed this under penalty of
4 perjury; is that correct?
5     A   Yes.
6     Q   On the first page, paragraph 5, you swore in
7 this declaration that you "asked my secretary to key
8 in Exhibit A from my file so that I could easily
9 locate the information contained in the article"; is
10 that correct?
11     A   Correct.
12     Q   If this is true, why didn't you just have
13 the article copied or scanned?
14     A   I wanted it to be word-searchable.
15     Q   Why did you want to have it word-searchable?
16     A   Well, it was very long and just easier to
17 get to navigate through it and find pertinent
18 information.
19     Q   Did you want the ability to cut and paste
20 from it?
21     A   Yes.
22     Q   And why would you want that ability?
23     A   To provide context on the tradition of the
24 "12th Man" to media members.
25     Q   So, you wanted to be able to cut and paste

Page 91

1     Q   Did you ever use any of the information from
2 that article in any of your game notes?
3     A   No.
4     Q   Okay. How did you save the Word document
5 once you received it from Ms. Thornton?
6     A   That specific instance, I don't think I ever
7 saved it. I just -- it sat in my email box.
8     Q   If you look at Exhibit A to your
9 declaration, this is the document that you say you
10 gave to Ms. Thornton to type in; is that correct?
11     A   Yes.
12         MR. CHESTER:  I'm sorry, I spaced out.
13 What is ---
14         MR. PATRON:  It's Exhibit A to the
15 declaration. It's --
16         MR. CHESTER:  Okay.
17         MR. PATRON:  Yeah.
18         MR. CHESTER:  Got you. Thank you.
19 BY MR. PATRON:
20     Q   But what she sent back to you after keying
21 it in did not include the first page; is that right?
22     A   Yes. That is what I've learned, yes.
23     Q   And you don't have any understanding of why
24 that's the case; is that correct?
25     A   Correct.

Page 93

24 (Pages 90 - 93)

1    Q   Is it possible that you gave her the
2  document without the first page to type in?
3    A   No.
4    Q   Is it possible that you told her, "Don't
5  worry about typing up the first page"?
6    A   No.
7    Q   And you did not notice when she sent it back
8  to you that it did not include the first page; is that
9  correct?
10   A   I don't believe I opened it.
11   Q   And when you say you don't believe you
12 opened it, is it that you don't have any memory of
13 opening it, or you think you did not open it?
14   A   I think I did not open it.
15   Q   Okay.  If you look at Exhibit B that's
16 attached to your declaration, this is an email that
17 you sent to Mike Bynum on January 22nd.  You say, "Let
18 me know about the excerpt.  We're keen to have access
19 to Whit's story.  And I'm thinking it might be good
20 pub for your book."  Why did you say that "We're keen
21 to have access to Whit's story"?
22   A   That was after discussions with Jason Cook,
23 and he had -- and he had said that he wanted to have
24 it still on the website.
25   Q   Did you understand this article to be

Page 94

1  helpful to the "12th Man" campaign that was going on
2  at the time?
3    A   Yes.
4    Q   Did you understand the posting of this
5  article to be part of that campaign?
6    A   Yes.
7    Q   Did you have discussions with your
8  supervisor, Allen Cannon, about using this article as
9  part of the campaign?
10   A   No.
11   Q   Did your request for your secretary to key
12 in the Canning article have anything to do with the
13 "12th Man" campaign that was going on at the time?
14   A   No.
15   Q   It was just a coincidence?
16   A   Yes.
17   Q   And when you sent the article to Matt
18 Callaway, did you have an understanding that he was
19 going to use it for the "12th Man" campaign?
20   A   Yes.
21   Q   Did you know that he was going to post it to
22 the website?
23   A   No.  No, I would say that he was going to
24 use parts of it.
25   Q   Do you know which parts?

Page 95

1    A   No.
2    Q   What is the TAMU Times?
3    A   Something I'm not involved with, but it's a
4  university side email that goes out with links to
5  stories.
6        MR. PATRON:  I'll mark this up as
7  Exhibit 9.
8        (Exhibit 9 was marked for
9        identification.)
10       MR. CHESTER:  Thank you.
11 BY MR. PATRON:
12   Q   Do you recognize this as a screenshot of the
13 TAMU Times where it has the original "12th Man"
14 subject up there?
15   A   Yes.
16   Q   Do you recall that the Canning article was
17 promoted with a link on this website in January of
18 2014?
19   A   I mean, I am after the fact.
20   Q   And it contained a link to the athletic
21 department's server; is that your understanding?
22   A   That is my understanding after the fact.
23   Q   Okay.  Did you have any involvement with the
24 TAMU Times in 2014?
25   A   No.

Page 96

1    Q   You never enlisted to work with them to
2  promote athletics through your department?
3    A   No.
4    Q   Okay.  And do you know how the Canning
5  article got posted on the TAMU Times?
6    A   No.
7    Q   Do you know how many people received the
8  TAMU Times in 2014?
9    A   No.
10   Q   Is it more than 50,000?
11   A   I wouldn't know.  I don't even know how many
12 our athletic department email goes to.
13       MR. PATRON:  I'm going to show you a
14 document I'm going to mark as Exhibit 10.
15       (Exhibit 10 was marked for
16       identification.)
17       MR. CHESTER:  Thank you.
18 BY MR. PATRON:
19   Q   Do you recognize this as the document that
20 was ultimately posted on the website?
21   A   Yes.
22   Q   And we discussed this previously, but it
23 differs from what you sent to Matt Callaway in that
24 underneath the original "12th Man" here it has some
25 language that did not appear in the Word document that

Page 97

1   you sent him; isn't that correct?
2      A   Yes.
3      Q   Do you know who added this language?
4      A   Either Matt Callaway or Matt Simon.
5      Q   Did you talk to them about that?
6      A   I don't recall talking to them about it.
7      Q   And it has the author now where it didn't
8   before, "By Whit Canning"; do you see that?
9      A   Yes.
10     Q   And do you know who put that in?
11     A   Same guys.
12     Q   Okay.  And do you recall having any
13  discussions with how they came to that information?
14     A   No, I don't.
15     Q   And the next thing underneath "By Whit
16  Canning," it has some language that says, "Special to
17  Texas A&M and Athletics."  What do you understand that
18  to mean?
19     A   On a rare occasion that we have content, I
20  guess special content, that -- that just denotes it.
21  That's my understanding of it.
22     Q   When does the Media Department use that
23  language?
24     A   The Media Department wouldn't use that
25  language.  The website would use that.

1      Q   Okay.  When would that language be used on
2   the website by media that is put up there, by the
3   Media Department?
4      A   Media Department or Media Relations, we
5   wouldn't be putting that up in that -- in that manner.
6   But you asked about another situation --
7      Q   Can I clarify that?  I thought you said that
8   Matt Callaway posted this to the website.  Isn't that
9   what you testified?
10         MR. CHESTER:  I think he said it was
11  Matt Simon.
12         THE WITNESS:  One of the Matts.  Matt
13  Simon or Matt Calloway.  Both of whom are -- Matt
14  Calloway would be in media relations or athletic
15  communications.  Matt Simon is not.
16  BY MR. PATRON:
17     Q   He's in the web department?
18     A   Yes.
19     Q   Okay.  So, you don't know who put this
20  language in there?
21     A   No, I don't know.  I would assume Matt
22  Simon, but I don't know.
23     Q   And what does it mean to add that language?
24  What does it say about this article when you use the
25  language "Special to Texas A&M Athletics"?  What do

1   you understand that to mean?
2      A   Not written by Texas A&M Athletics.
3      Q   Okay.  Have you ever used that language on
4   anything that you've published?
5      A   No.
6      Q   Have you published articles that weren't
7   written by Texas A&M Athletics?
8      A   No.
9      Q   You've never worked with outside authors to
10  publish their works?
11     A   No.
12     Q   Okay.  And what involvement did you have
13  with Texas A&M Social Media in January 2014?
14     A   I would say I was a part of it.  Just --
15  yeah, I -- I would be part of it.
16     Q   What would you do typically?
17     A   As I recall it at the time, it would have
18  been adding fun facts about what happened during a
19  game.  We were pretty elementary at the time, I'd say
20  and the guy -- yeah --
21     Q   Can you give an example?
22     A   Just like, "So-and-so has rushed for 100
23  yards today, and that's his eighth straight 100-yard
24  game."  I don't know.  I guess it's really kind of
25  esoteric information.  At, you know, at the time, that

1   is what we were putting up there.  Now it's better
2   content.
3      Q   Is this something that you would tweet or
4   push out on the website?
5      A   It would be on -- on Twitter.
6      Q   Okay.  Would you actually do the tweet?
7      A   On a rare occasion.
8      Q   On the occasions when you didn't do that,
9   would you come up with the content and give it to
10  someone to tweet; is that how it would work?
11     A   No.
12     Q   So in the example that you gave where you
13  said someone ran for a certain number of yards, that
14  would be one of the occasions where you did the tweet?
15     A   Yes.
16     Q   Okay.  So how else were you involved in
17  social media besides that?
18     A   I would say we didn't have as many
19  parameters as we -- we do now.  So, for me, at that
20  time, it was just a -- a vehicle to get out
21  information that I thought was -- painted A&M in a
22  positive light in regard to student-athlete
23  accomplishments.  So I -- I wasn't involved in the
24  strategy of social media.
25     Q   Were you aware of any university policies

1  that governed social media in 2014?
2      A  No.
3      Q  Were you aware of any requirement that you
4  comply with copyright laws as part of your social
5  media activities?
6      A  No. No.
7      Q  Have you ever seen any university guidelines
8  for the Texas A&M that govern social media activities?
9      A  Yes. Since this lawsuit has come out, I
10 don't even know when it originated on TAMU.edu, our
11 official university website.
12     Q  Were those guidelines promulgated as a
13 result of this lawsuit?
14     A  I don't know.
15     Q  Do you know if any guidelines existed prior
16 to this lawsuit?
17     A  No.
18     Q  You don't know, or there were none?
19     A  I don't know.
20     Q  So you don't know when Texas A&M first came
21 up with guidelines for social media activities?
22     A  No.
23     Q  Sitting here today, can you say whether or
24 not there were any policies in effect in January of
25 2014?

Page 102

1      A  I'm unaware.
2      Q  But you do know they exist now; right?  And
3  you don't know when those came online; is that right?
4      A  Correct.
5      Q  Okay.  Do you know how the university
6  tracked its social media efforts back in 2014?
7      A  No.
8          MR. PATRON:  I'm going to show you --
9          Let me make sure it's not one of mine.
10 Darn it.  This has been marked as Exhibit Number 11.
11         (Exhibit 11 was marked for
12         identification.)
13         One for you, Ray.
14         MR. CHESTER:  Thank you.
15 BY MR. PATRON:
16     Q  This is a couple of emails.  At the bottom
17 of the page, do you see an email from Mike Bynum to
18 Allen Cannon copying you on January 22nd, where he
19 says, "We have a problem"?  Do you remember receiving
20 this email?
21     A  I -- I -- yes.
22     Q  And this is the email where he says it's a
23 problem that the Canning article was posted on the
24 website; right?
25     A  Yes.

Page 103

1      Q  Okay.  And on the top of the page, this
2  looks like an email from you to Jason Cook, same day.
3  It's like 15 minutes later where you're forwarding
4  that email to Jason.  Do you remember doing that?
5      A  Yes.
6      Q  Did Jason ever respond to this email?
7      A  I remember getting an answer.  I don't
8  recall if it came via email or phone call.
9      Q  That's going to be my next question.  If you
10 didn't receive an email, do you remember having a
11 conversation with him either in person or on the
12 phone?
13     A  I don't recall, but I know I don't -- I
14 don't act without my supervisor, not direct
15 supervisor, but I don't act without him directing me
16 on -- on subjects like this.
17     Q  Jason Cook wasn't your direct supervisor,
18 though; right?
19     A  Correct.
20     Q  Allen Cannon was; right?
21     A  That is correct.
22     Q  The email was from Mike to Allen, but then
23 you forwarded the email to Jason.  Did you have any
24 discussions with Allen before you forwarded this email
25 to Jason Cook?

Page 104

1      A  I don't recall, but that would be the line
2  of up, you know, up the chain type things.
3      Q  Do you know why Allen Cannon had you forward
4  the email to Jason Cook, if that's what he did?
5      A  I -- I think it would be because I'm more
6  savvy in things on the website than he is.
7      Q  Okay.  Why are you more savvy than your
8  supervisor, Allen Cannon, on things dealing with the
9  website?
10     A  Well, I -- I don't want to disparage Allen
11 Cannon at all.  I -- I just -- I'm more interested --
12         MR. CHESTER:  He's about my age.
13         THE WITNESS:  Well, Allen Cannon is not
14 much older than me, but I, you know, I -- I'm able to
15 do things, desktop publishing or whatever, and, you
16 know, he has a -- a desktop computer.  I've taken a
17 laptop home with me for, I don't know how many years.
18 BY MR. PATRON:
19     Q  You're more tech savvy than Mr. Cannon; is
20 that fair to say?
21     A  Yes.
22     Q  Okay.  No shame in that.  In your email to
23 Jason Cook -- would you be truthful when you send an
24 email to Mr. Cook?
25     A  Yes.

Page 105

27 (Pages 102 - 105)

1    Q   Okay.  You say, "Hey, Jason, needing some
2  guidance here.  Last week, I decided to suddenly come
3  to my office.  In doing so, I uncovered an old copy of
4  a story on 'E. King Gill, The Life and Legend of Texas
5  A&M's 12th Man.'"  So you're saying on January 22nd
6  that you found this article the previous week; right?
7    A   Yes.
8    Q   So that would put this no sooner than
9  January 15th?
10    A   Yes.
11    Q   Okay.  You say that you have no recollection
12  of this story about Whit Canning, who I recall from
13  the Fort Worth Star Telegram back in the day.  How do
14  you know Witt Canning?
15    A   Because he was a sports reporter that
16  covered Texas A&M, and I don't know if that would have
17  been the Big 12 or the Southwest Conference, but it
18  would be a reporter that covered the Aggies on
19  occasion, and he has a distinctive name.
20    Q   When you found this article in your office,
21  did you do anything to discover who owned the story?
22    A   No.
23    Q   Did you call Whit Canning?
24    A   No.
25    Q   Did you call the Fort Worth Star Telegram?

Page 106

1  letter --
2    Q   Are you saying it was on the front page of
3  the document you gave to Ms. Thornton to type up?
4    A   Yes.
5    Q   Okay.  But it also had Epic Sports on that
6  page, as well; right?
7    A   Yes.
8    Q   Did you ever try to figure out who Epic
9  Sports was?
10    A   I did after the lawsuit came out.
11    Q   I'm talking about at the time when you
12  realized that this had been published without
13  permission.
14    A   After Mike Bynum contacted us, then yeah, I
15  looked into all that stuff.
16    Q   But not beforehand?
17    A   No.
18    Q   Okay.  Is it true that you never asked
19  anyone about permission to use that article?
20    A   Correct.
21    Q   But when you sent it to Matt Callaway, you
22  knew he was going to post it on the website; isn't
23  that correct?
24    A   I didn't know what his final -- what it was
25  going to look like.  It was, you know, it was excerpts

Page 108

1    A   No.
2    Q   In the last paragraph you say, "Retired
3  Texas Aggie editor Jerry Cooper was nice enough to
4  point this out to both Whit Canning and Mike Bynum.
5  Now it seems that Mike is not happy."  What are you
6  referring to there?
7    A   That he pointed it out and alerted them that
8  there was something up on the web.
9    Q   And when you say "He was nice enough to
10  point that out," are you being sarcastic there?
11    A   Yes.
12    Q   Because you didn't think that was nice; did
13  you?
14    A   At the time, probably not.
15    Q   Was this a problem for you at the time, that
16  you had an article that ended up posted to a website
17  that there was no permission to post?
18    A   I don't know if it was a problem, but it was
19  a circumstance that had to be remedied.  And I -- I
20  don't want Mike Bynum to be unhappy.  I want things to
21  be right.
22    Q   How did you know that the story was written
23  by Whit Canning?
24    A   It was on -- it was on the page -- the --
25  the front of that -- the Bynum -- or the Canning

Page 107

1  or something.  I, you know, again, I didn't know what
2  he was doing with it.
3    Q   So, you may not have known exactly how he
4  was going to use it on the website, but you knew that
5  he was going to use it in some form or fashion on the
6  website?
7    A   Yes.
8    Q   And isn't it also true that you knew that,
9  at the time, Texas A&M was involved in a specific
10  campaign to promote the "12th Man" while the Seahawks
11  were still alive in the playoffs?  Isn't that true?
12    A   I don't recall what I knew before Mike Bynum
13  called, but I know Mike -- or Matt Callaway asked me
14  for an article to be used.
15    Q   And in fairness, you've testified that you
16  weren't involved in the "12th Man" campaign --
17    A   Correct.
18    Q   -- did you say, I believe you testified that
19  you were aware that the campaign was going on; is that
20  true?
21    A   After the fact, I learned about the
22  campaign.
23    Q   Well, hadn't the campaign been going on for
24  a while at this point?  I mean, there was --
25    A   I don't know.

Page 109

28 (Pages 106 - 109)

1  Q   Do you remember when you first learned of
2  the campaign?
3  A   I mean, I learned about the entire campaign
4  after all this happened with -- with Mike Bynum.
5  Q   Just so I'm clear, is it your testimony that
6  you weren't aware of the "12th Man" campaign until
7  after Mike Bynum sent you an email that his article
8  had been posted on the website without his permission?
9  A   I was aware that Mike -- that Matt Callaway
10 needed some information on the "12th Man," and so
11 there's a vague knowledge of something is happening.
12 After everything came out, then I, you know, I saw all
13 the stuff that -- that Matt and Krista were working
14 on, but I was not privy to any of that.
15 Q   Did the Media Department institute any type
16 of training or guidelines as a result of the posting
17 of this article without permission?
18 A   No.
19 Q   Were you given any feedback from your
20 supervisor, Allen Cannon, or Jason Cook, about how
21 this should have been handled?
22 A   No.
23 Q   Did anyone give you feedback about how this
24 should have been handled?
25 A   No.

Page 110

1  Q   Was there any internal discipline of anyone
2  in the Media Department, to your knowledge, about this
3  incident of the article being posted without
4  permission?
5  A   I have no knowledge of -- of that.
6  Q   To your knowledge, have you produced all
7  your correspondence with Lane Stevenson [ph], Allen
8  Cannon, and Jason Cook regarding the Whit Canning
9  story?
10 A   Yes.
11 Q   What did you do to look for that
12 correspondence?
13 A   Searched all my emails.  I believe that we
14 enlisted the IT department.
15 Q   Do you recall, after the article was taken
16 down from the website, whether there was a meeting to
17 discuss what happened?
18 A   No, only when the lawsuit was filed, and
19 then there was many meetings.
20 Q   But to your knowledge and recollection,
21 there was no sort of, post-incident discussion of how
22 this happened?
23 A   Not that I was involved in.
24     MR. PATRON:  I'm going to show you a
25 document I'm going to mark as Exhibit 12.

Page 111

1     (Exhibit 12 was marked for
2     identification.)
3     MR. PATRON:  Here you go, Ray.
4     MR. CHESTER:  Thank you.
5  BY MR. PATRON:
6  Q   This is an email from Shane Hinckley,
7  January 23, 2014.  Who is Shane Hinckley?
8  A   He is on the university side in marketing
9  and communications.
10 Q   And this email is sent to Steve Moore.  Who
11 is Steve Moore?
12 A   He -- he was also on the university side.
13 I'm not -- I'm not sure what his title was.
14 Q   When you say he's on "the university side,"
15 does that mean he's not in the Athletics Department?
16 I'm trying to understand that nomenclature.  Do you
17 have the Athletics Department and the university?  Is
18 that how you're distinguishing these people?
19 A   Yeah.  Like if you were at a TV station,
20 there would be the news side and the sports side.
21 Q   Okay.  Got it.  Both of those people are on
22 the university side.  Shane and Steve; right?
23 A   Yes.  Steve, not anymore, but yes.
24 Q   At the time.  And then Katherine Knight.
25 A   I don't recognize that name.

Page 112

1  Q   It doesn't appear that she has an
2  athletics.tamu -- am I saying that right, "tamu"?  Do
3  you know who she is?
4  A   No.
5  Q   And then there's Scott Kelly.  Do you know
6  who that is?
7  A   I believe he's with the Office of General
8  Counsel.
9  Q   Then there's you -- no, there's Jason Cook.
10 "Not me."  Were you ever privy to any of this
11 information?
12 A   No.
13 Q   Turn the page.  This is the memorandum to
14 the president.  Have you ever seen this document
15 before?
16 A   I mean, once the lawsuit came out.
17 Q   So, you're now aware that the posting of the
18 Whit Canning story was part of this "12th Man"
19 marketing campaign?
20 A   Yes.
21 Q   But your testimony is that you weren't aware
22 of that at the time?
23 A   Correct.
24 Q   Did you ever have discussions with
25 colleagues in your media department about the "12th

Page 113

1 Man" marketing campaign that you can recall?
2     A   Before or after the lawsuit?
3     Q   In 2014, while it was going on.
4     A   No, I was not a part of the campaign.  I
5 don't recall discussions of it.
6         MR. PATRON:  I'm going to mark a
7 document as Exhibit 13.
8         (Exhibit 13 was marked for
9         identification.)
10        Here you go, Ray.
11        MR. CHESTER:  Thank you.
12 BY MR. PATRON:
13    Q   Have you seen this document before?
14    A   After the lawsuit, yes.
15    Q   Do you know what this document is?
16    A   No.
17    Q   Okay.  It's dated January 20, 2014, and it
18 appears to be a press release of the Whit Canning
19 article; do you see that?
20    A   Yes.
21    Q   What is Plus Media Solutions?
22    A   I don't have any idea.
23    Q   Do you see the first line where it says
24 Texas A&M University, the state of Texas, has issued
25 the following news release?  Were you aware of any

Page 114

1     Q   Other than your divorce?
2     A   Then we had a dispute about child support.
3     Q   Not talking about child support --
4     A   Okay.  Then no.
5     Q   Okay.
6     A   I just want to be truthful.
7     Q   Have you ever filed for bankruptcy?
8     A   No.
9     Q   Have you ever been convicted of a crime?
10    A   No.
11        MR. PATRON:  All right.  Want to take a
12 break?
13        THE WITNESS:  Sure.
14        MR. PATRON:  All right.
15        THE VIDEOGRAPHER:  The time is 12:40,
16 and we are now off the record.
17        (Off the record.)
18        THE VIDEOGRAPHER:  Back on the record,
19 the time is 12:51.
20 BY MR. PATRON:
21    Q   Mr. Marquardt, you remember attached to your
22 declaration is the article that you found in your
23 cabinet that you gave to Ms. Thornton to type and it
24 had on the first page "Copyright 1998 Epic Sports, all
25 rights reserved."  Do you remember that?

Page 116

1 news release on January 20, 2014, as your capacity as
2 a member of the Media Department?
3     A   No.
4     Q   It says Austin.  Does Texas A&M have offices
5 in Austin?
6     A   Not that I'm aware of.
7         MR. CHESTER:  We don't allow that.
8         MR. PATRON:  What?
9         MR. CHESTER:  We don't allow that --
10 BY MR. PATRON:
11    Q   In January 2014, what was AG Times?  Do you
12 know what AG Times is?
13    A   AG Times, I believe, was a fan website.
14    Q   Did you have an AG Times account back in
15 January 2014?
16    A   I doubt that I've made an account.  I mean,
17 I -- I recall looking at it at some point.
18    Q   Did you ever post on AG Times?
19    A   Not that I recall.
20    Q   Were you aware that the Whit Canning story
21 was published on the AG Times in January 2014?
22    A   No.
23    Q   Have you ever been a party to a lawsuit
24 other than the current one?
25    A   I got divorced.  That count?

Page 115

1     A   Yes.
2     Q   In 2014 when you sent this to Matt Callaway
3 and everything that happened after that, did you tell
4 anyone that the article that you sent to Matt Calloway
5 that ultimately ended up being posted on the website
6 was protected by a copyright of Epic Sports?
7     A   No.
8         MR. PATRON:  I have no further
9 questions and pass the witness.
10        MR. CHESTER:  We'll reserve ours until
11 time of trial.
12        MR. PATRON:  All right.  Thank you,
13 Mr. Marquardt.  You're about done, but I know we have
14 to finish up here.
15        THE WITNESS:  So ready to go.
16        THE OFFICER:  So, Mr. Chester, are you
17 wanting a copy of the transcript --
18        MR. CHESTER:  Yes, please.  I'll take
19 the original or the read and sign.
20        THE OFFICER:  Okay.
21        MR. CHESTER:  And a copy of the video
22 as well, and I'll need it synced.
23        MR. PATRON:  You want it synced?  You
24 got it, John?
25        MR. PATRON:  Yeah, I want a copy of the

Page 117

1  transcript, obviously, --
2       MR. CHESTER:  Yeah.
3       MR. PATRON:  -- and synced video.
4       MR. CHESTER:  Synced video.
5       THE OFFICER:  Synced.
6       THE VIDEOGRAPHER:  Synced.
7       That concludes the deposition.  The
8  time is 12:53, and we are now off the record.
9       (Signature reserved.)
10       (Whereupon, at 12:53 p.m., the
11       proceeding was concluded.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                      Page 118

1            CERTIFICATE OF DEPOSITION OFFICER
2       I, JOHN SHAVERS, the officer before whom the
3  foregoing proceedings were taken, do hereby certify
4  that any witness(es) in the foregoing proceedings,
5  prior to testifying, were duly sworn; that the
6  proceedings were recorded by me and thereafter reduced
7  to typewriting by a qualified transcriptionist; that
8  said digital audio recording of said proceedings are a
9  true and accurate record to the best of my knowledge,
10  skills, and ability; that I am neither counsel for,
11  related to, nor employed by any of the parties to the
12  action in which this was taken; and, further, that I
13  am not a relative or employee of any counsel or
14  attorney employed by the parties hereto, nor
15  financially or otherwise interested in the outcome of
16  this action. January 6
17            JOHN SHAVERS
18       Notary Public in and for the
19            State of Texas
20
21  [X] Review of the transcript was requested.
22
23
24
25
                                      Page 119

1            CERTIFICATE OF TRANSCRIBER
2       I, SARAH COSTA, do hereby certify that this
3  transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in the outcome of this action.
13  January 6, 2025
14
15            SARAH COSTA
16
17
18
19
20
21
22
23
24
25
                                      Page 120

1  Ray Chester
2  rchester@mcginnislaw.com
3            January 6, 2025
4  RE:  Bynum, Michael J. Et Al.  v. Marquardt, Brad
5  12/19/2024, Brad Marquardt (#7060382)
6       The above-referenced transcript is available for
7  review.
8       Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  errata-tx@veritext.com.
16   Return completed errata within 30 days from
17  receipt of testimony.
18       If the witness fails to do so within the time
19  allotted, the transcript may be used as if signed.
20
21
22       Yours,
23       Veritext Legal Solutions
24
25
                                      Page 121

31 (Pages 118 - 121)

1 Bynum, Michael J. Et Al.  v. Marquardt, Brad
2 Brad Marquardt (#7060382)
3          E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Brad Marquardt            Date
25
                                      Page 122

1 Bynum, Michael J. Et Al.  v. Marquardt, Brad
2 Brad Marquardt (#7060382)
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, Brad Marquardt, do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____  _____
12 Brad Marquardt            Date
13 *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15          _____ DAY OF _____, 20___.
16
17
18          _____
19          NOTARY PUBLIC
20
21
22
23
24
25
                                      Page 123

[& - 2021]

| & | | |
|---|---|---|
| **&** 3:12 | | |

**0**

**00181** 1:9
**01/16/14** 5:15
**01/17/14** 5:16
**01/23/14** 5:23
**05/05/10** 5:8,10
**06/10/10** 5:13
**06/18/10** 5:11

**1**

**1** 5:7 46:15,17
**10** 5:20 97:14
97:15
**100** 100:22,23
**102** 48:8
**103** 5:22
**105** 48:8
**10:11** 43:11
**10:22** 43:15
**11** 5:21 58:15
59:4 103:10,11
**110** 2:20
**1111** 3:6
**112** 5:23
**114** 3:13 5:24
**11:15** 77:5
**11:25** 77:9
**12** 5:23 17:1
31:4 106:17
111:25 112:1

**12/19/2024**
121:5
**124** 1:19
**12:40** 116:15
**12:51** 116:19
**12:53** 118:8,10
**12th** 30:18
31:13,21 32:4
32:8,11,22
41:24,25 42:15
42:17 47:2,9
47:15,20 49:5
49:7,8,9,11,16
50:1,11,14
51:18 54:5,10
54:16,21 55:9
55:11,12,15,19
55:22 57:16
58:1,5,9 62:25
63:23 64:1,8
64:10,11,12,16
65:1,5,11,13,16
65:22 66:9,15
66:20 68:4
69:11,23 72:23
73:2,5 79:5,8
79:11,24 80:4
80:6,8,10,16
81:20 83:24
84:1,3,7,16
85:8 86:3
90:11 91:24
95:1,13,19
96:13 97:24

106:5 109:10
109:16 110:6
110:10 113:18
113:25
**12thman** 64:8
**13** 5:24 114:7,8
**14** 69:18
**15** 104:3
**15th** 106:9
**16** 66:9,14
**17** 68:23
**18** 56:13 57:9
**18th** 63:6
**19** 1:15 6:3
**1922** 64:11
**1957** 51:25
52:23
**1976** 48:7
**1990** 12:11
22:10 29:4
**1990s** 33:18,19
**1998** 116:24
**19th** 6:11

**2**

**2** 5:9 51:9,10
**20** 114:17
115:1 123:15
**2000** 57:4
**201** 2:13
**2010** 46:25
47:4,14 50:11
51:2,20 53:1,4
53:4,14,21

54:2,15 55:23
56:13 57:9,25
62:23
**2013** 30:19
31:3,12,14
32:25 36:4,8,8
36:12,18 37:13
37:24 44:21
45:5,9 53:23
70:3 78:22
**2014** 30:19
31:14 33:6
35:11,17 36:7
36:12,18 37:13
37:25 39:15,18
40:17 41:18
44:21 45:5,9
45:12 66:9,24
68:23 69:18
70:4 74:6,16
75:7,8,19,21
78:21,23,23
84:13 85:19
96:18,24 97:8
100:13 102:1
102:25 103:6
112:7 114:3,17
115:1,11,15,21
117:2
**2017** 41:25
42:15
**2018** 29:4,5
**2021** 77:18

**[2022 - able]**

**2022**   5:22
**2024**   1:15 6:3
   6:11
**2025**   119:16
   120:13 121:3
**22**   85:19
**22nd**   94:17
   103:18 106:5
**23**   112:7
**25**   23:24 62:23
**2500**   2:20
**25776**   119:16
**28760**   120:14

**3**

**3**   5:11 56:5,6
   61:16
**30**   26:11
   121:16
**301**   1:19 4:6
**312**   2:23
**35**   11:9 14:22
   15:9 17:3
**36**   17:2
**365**   2:6
**38802**   2:14

**4**

**4**   5:12 62:15,16
**434-5361**   2:23
**458-6150**   4:11
**458-6159**   4:10
**46**   5:8
**495-1600**   3:16

**495-6000**   3:9
**4:17**   1:9

**5**

**5**   5:14 47:4
   65:24 66:1
   91:6
**50**   17:5
**50,000**   97:10
**504**   2:9
**51**   5:10
**512**   3:9,16
**56**   5:11
**584-9295**   2:9

**6**

**6**   5:16 47:14
   50:10 51:20
   53:1,4 68:13
   68:14 78:6,13
   81:14 87:22
   119:16 120:13
   121:3
**60606**   2:21
**62**   5:13
**66**   5:15
**662**   2:16
**68**   5:16
**6th**   3:6

**7**

**7**   5:17 77:12,13
   84:19
**70**   2:13

**70130**   2:7
**7060382**   1:22
   121:5 122:2
   123:2
**76**   47:25 49:3
   65:21
**77**   5:17
**77840**   1:20 4:7
**78701**   3:14
**78703**   3:7
**7th**   3:13

**8**

**8**   5:3,18 90:19
   90:20
**8-1/2**   58:14
   59:4
**83**   64:13
**84**   64:19 65:21
**842-7907**   2:16
**87**   48:6 54:10
   55:5
**88**   10:8

**9**

**9**   5:19 96:7,8
**90**   5:18
**90s**   33:17
**91**   63:8,12,17
   63:19
**96**   5:19
**97**   5:20
**979**   4:10,11
**9:12**   1:16 6:3

**9:30**   47:14

**a**

**a&m**   1:17 4:2,5
   7:10,18 10:9
   10:14 11:5,11
   15:11 18:13,17
   18:22 21:6
   22:7 23:6,7
   24:23,25 25:4
   26:14 30:19
   34:1,4,14
   42:24 57:17
   64:20 65:17
   79:4 87:17
   98:17 99:25
   100:2,7,13
   101:21 102:8
   102:20 106:16
   109:9 114:24
   115:4
**a&m's**   21:6
   69:11 75:23
   81:20 83:23
   84:16 106:5
**a.m.**   1:16 6:3
   47:14 51:21
**ability**   8:23
   35:23 91:19,22
   92:22,23
   119:10 120:7
**able**   28:2 74:22
   91:25 105:14

**[above - archive]**

| | | | |
|---|---|---|---|
| **above** 121:6 123:7 | **actually** 15:23 28:17 37:5 | **agreement** 31:5 **ahead** 9:19 | 60:9,12,20,21 60:21,22 64:5 |
| **absent** 6:15 | 54:1 56:21 | **al** 6:10 121:4 | 65:3 76:13,14 |
| **academic** 12:25 | 63:2,17,22 | 122:1 123:1 | 78:7 86:7 |
| **accept** 22:11 | 70:9 71:21 | **alan** 25:8,21,22 | 104:7 |
| **access** 14:1 | 81:3 89:19 | 25:22 | **answered** |
| 35:17 94:18,21 | 101:6 | **alerted** 107:7 | 47:24 49:12,17 |
| **accommodate** | **ad** 30:1,5,13 | **alive** 109:11 | 50:17 |
| 54:19 56:3 | **adam** 38:4,10 | **allen** 38:1,9,20 | **answering** 9:1 |
| 65:4 | **add** 99:23 | 85:17,21,23 | 78:14 |
| **accomplishm...** | **added** 98:3 | 95:8 103:18 | **answers** 9:8 |
| 101:23 | **adding** 100:18 | 104:20,22,24 | 10:1 78:2 |
| **account** 115:14 | **additions** 123:6 | 105:3,8,10,13 | 81:24 |
| 115:16 | **address** 56:18 | 110:20 111:7 | **anybody** 39:25 |
| **accuracy** 121:9 | **administer** | **allotted** 121:19 | 90:13 |
| **accurate** 23:22 | 6:14 | **allow** 9:7,12 | **anymore** |
| 53:8 80:14 | **administrative** | 115:7,9 | 112:23 |
| 119:9 120:5 | 38:4,24 40:15 | **allows** 45:25 | **apparent** 84:12 |
| **acknowledge...** | 58:10 | **alumni** 16:8 | **appear** 97:25 |
| 123:3 | **advanced** | **america** 12:6 | 113:1 |
| **acknowledg...** | 48:10 | 24:14 | **appearance** |
| 121:12 | **ag** 115:11,12,13 | **american** 12:25 | 24:10 |
| **acknowledg...** | 115:14,18,21 | **amount** 52:1 | **appears** 51:19 |
| 6:14 | **age** 105:12 | **andrew** 2:11 | 78:8 114:18 |
| **act** 104:14,15 | **aggie** 65:7 | 7:21 | **appended** |
| **action** 55:17 | 107:3 | **andrew.coff...** | 123:7 |
| 119:12,16 | **aggieland** | 2:15 | **applicable** 6:21 |
| 120:8,12 | 26:11 | **annual** 12:23 | 39:7 121:8 |
| **active** 66:15 | **aggies** 106:18 | **answer** 8:20,22 | **apply** 27:9 |
| **activities** 102:5 | **ago** 32:18 | 9:12,19,19 | **archival** 43:21 |
| 102:8,21 | 33:16 76:8 | 20:3 21:4,12 | 44:12,14,16,17 |
| **actual** 35:1,3 | **agree** 6:17 | 29:25 50:19 | 44:22 45:12 |
| 39:13 56:25 | 16:15 22:1 | 59:11,21,23,23 | **archive** 34:24 |
| | 25:1 | 59:24 60:1,2,3 | 34:25 44:2,3 |

**[archive - audible]**

| | | | |
|---|---|---|---|
| 45:17,20,22 51:7 | **articles** 15:23 16:19 17:7 | **asks** 78:9 | 99:25 100:2,7 112:15,17 |
| **archived** 46:3 | 18:5,11,15,25 | **assert** 60:15 | **athletics.tamu** |
| **archives** 33:13 | 19:1,11,14,19 | **assigned** 6:6 | 113:2 |
| **argumentative** | 19:21 20:8,9 | 23:4 | **athletics.tam...** |
| 59:20 | 20:15,16 21:13 | **assist** 23:5 | 56:18 |
| **article** 5:20 | 21:19 23:7 | 82:13 | **attached** 47:14 |
| 17:10 18:22 | 44:19 45:4 | **assistant** 15:16 | 48:1 49:19 |
| 20:25 23:18 | 46:7 73:14,17 | 15:19 22:12,13 | 50:13 57:15,20 |
| 27:12 58:15,16 | 78:15 100:6 | 22:15 23:1 | 61:15,24 69:11 |
| 59:5 61:22 | **aside** 18:4 | 28:25 30:1,5 | 94:16 116:21 |
| 62:1,4 69:22 | 56:24 | 30:13,16 31:14 | 121:11 |
| 70:17 73:4 | **asked** 15:2 | 38:4,24 40:15 | **attachment** |
| 74:1,7,25,25 | 39:22 40:2 | 43:22 57:2 | 49:18 57:18,19 |
| 75:6,14 78:17 | 50:16 58:5,9 | 58:5,10 68:25 | 57:23 58:21,24 |
| 78:20 79:2 | 58:14 69:22 | **association** | 61:10 63:17,18 |
| 80:19,20,25 | 70:8 71:1,5 | 12:6,7 13:7,14 | 65:15 69:7 |
| 81:6,19 83:20 | 72:18 75:7 | 14:4 18:13 | 71:14 72:11 |
| 83:22 84:6,8 | 80:5 83:25 | 22:4 | 79:22 87:23 |
| 84:15,20 85:12 | 86:18 90:16 | **assume** 17:21 | **attend** 12:24 |
| 85:18,20 86:4 | 91:7 99:6 | 52:6 77:25 | **attendance** 7:5 |
| 87:14,16,19,25 | 108:18 109:13 | 99:21 | **attending** 7:20 |
| 88:6 89:20,25 | **asking** 9:17 | **athlete** 101:22 | **attention** 49:13 |
| 91:9,13 93:2 | 19:25 27:5 | **athletes** 15:21 | **attorney** 7:10 |
| 94:25 95:5,8 | 36:8 45:11 | **athletic** 13:1 | 60:16 119:14 |
| 95:12,17 96:16 | 46:6 47:24 | 18:12 22:4,19 | 120:10 121:13 |
| 97:5 99:24 | 48:5,21 50:8,9 | 29:14 30:4 | **attorneys** 77:19 |
| 103:23 106:6 | 51:1 57:21 | 52:1 96:20 | **attribute** 28:8,8 |
| 106:20 107:16 | 59:13 63:16 | 97:12 99:14 | 28:21 |
| 108:19 109:14 | 64:19 65:20 | **athletics** 23:6 | **attribution** |
| 110:7,17 111:3 | 67:9,10 75:5 | 24:24,25 25:4 | 28:5,11,15,19 |
| 111:15 114:19 | 80:7,15,15,17 | 29:6 30:2,13 | **audible** 16:13 |
| 116:22 117:4 | 81:8,9 82:21 | 30:16 31:19,20 | 69:8 |
| | 88:23,24 89:9 | 73:19 85:6 | |
| | | 97:2 98:17 | |

[audio - brad]

| audio 119:8 120:3 | **b** | beat 92:21 | biography 78:11 |
|---|---|---|---|

**audio** 119:8
120:3
**austin** 3:7,14
115:4,5
**author** 16:1,7
16:11 33:11
83:9 89:21
90:3 98:7
**authored** 18:6
18:11
**authorized**
6:13
**authors** 34:7
34:10 100:9
**available** 40:12
121:6
**avenue** 21:8
**award** 23:9,18
24:21
**awards** 13:18
23:11,12,13,14
23:21,25 24:5
24:15
**aware** 40:12,19
47:20 49:10
66:14 67:2,11
81:17 83:21
84:5,7,13
101:25 102:3
109:19 110:6,9
113:17,21
114:25 115:6
115:20

**b**

**b** 1:6 2:3 5:5
94:15
**back** 7:7 21:12
26:1 35:9 37:8
37:13,24 39:15
39:17 41:18
43:14 44:21
45:5,9,12
46:25 53:3,4
53:13,21 54:1
54:15 55:22
57:9 61:2,22
64:13 72:10
74:2 77:8,18
87:21 93:20
94:7 103:6
106:13 115:14
116:18
**background**
10:5
**bad** 90:23
**bankruptcy**
116:7
**based** 85:1
**basically** 9:22
**basis** 38:23
84:21
**basketball** 12:7
12:12 14:3,7
92:10
**bear** 64:15

**beat** 92:21
**began** 29:15
**beginning** 7:5
43:1 70:3
**behalf** 2:2 3:2
4:2 7:21
**belief** 28:24
84:21 85:1
**believe** 14:23
15:21 45:6
52:22 53:12
68:9 82:20
83:5 85:3 86:1
86:17 87:21
89:18 94:10,11
109:18 111:13
113:7 115:13
**believes** 82:2
84:19
**benjamin**
68:20
**best** 8:23 9:11
37:24 79:16
119:9 120:6
**better** 44:24
47:4 63:9 73:6
74:23 81:6,9
101:1
**beyond** 80:5
**big** 106:17
**binders** 45:18
**bio** 25:9,14,15
26:5,6,18

**biography**
78:11
**black** 50:22
51:6
**blanks** 84:10
**blinn** 10:12
**blue** 50:12
**book** 16:7
41:24,25 42:3
42:4,5,6,10,12
42:15,17 47:2
47:9,15,20
48:1,10 49:5,7
49:8,9,11,16
50:1,11,14
51:18 54:5,10
54:16,21 55:13
55:16,22,24
57:16 58:1,5,9
62:25 63:23
64:2 65:1,12
65:14,16,18
94:20
**books** 16:11,17
34:14 42:7,18
42:19,21 74:18
**bottom** 47:2
103:16
**box** 50:22 51:4
51:5 55:4 93:7
**boxes** 43:21
**brad** 1:9,14 3:2
6:4,8,10 7:16
8:4 47:13

**[brad - certified]**

56:13 121:4,5
122:1,2,24
123:1,2,4,12
**brain** 62:9
**break** 43:2,6
76:25 116:12
**bring** 52:8
**bringing** 52:4,5
**broad** 26:25
28:13,13,15
**brothers** 3:12
**brought** 51:22
52:12,14,18,25
53:7
**bryant** 55:8
64:15
**building** 1:18
**built** 23:4 37:5
**bulldog** 15:17
16:23
**burson** 34:14
**business** 7:13
**byline** 16:8,21
**bylines** 16:6
**bynum** 1:5 2:2
5:7,9,11,12,21
6:10 7:13,23
33:10,19 34:3
34:8 41:24
46:25 47:3,8
47:21 49:25
50:10 52:20
54:4,7,15
55:22 56:12

57:9 62:5,12
62:23 63:16,24
65:2,11 86:9
94:17 103:17
107:4,20,25
108:14 109:12
110:4,7 121:4
122:1 123:1
**bynum's** 65:11

**c**

**c** 2:1 3:1 4:1 6:1
**c.a.** 1:8
**cabinet** 43:24
44:6,8 59:17
70:18 116:23
**cabinets** 44:18
**call** 44:4 85:22
104:8 106:23
106:25
**callaway** 5:14
38:5,15,16
39:1 66:8,19
67:6,15,20
68:10,23 79:23
80:3 81:3,5,17
83:19,21 84:14
90:1 95:18
97:23 98:4
99:8 108:21
109:13 110:9
117:2
**callaway's**
82:14

**called** 8:5 90:5
109:13
**calloway** 99:13
99:14 117:4
**calls** 22:23
65:13
**campaign**
24:20 30:18,22
30:25 31:2,21
32:4,8,11,22
33:4,8 66:9,16
66:20 67:2,4,6
67:7,10,11
68:4 80:10
86:3 87:20
95:1,5,9,13,19
109:10,16,19
109:22,23
110:2,3,6
113:19 114:1,4
**campus** 33:11
**canada** 1:5 2:2
7:13
**canal** 2:6
**canning** 5:20
5:24 78:16,17
78:20 79:2
80:19 81:19
83:22 84:6,8
84:14,20 85:12
85:18,20 95:12
96:16 97:4
98:8,16 103:23
106:12,14,23

107:4,23,25
111:8 113:18
114:18 115:20
**cannon** 5:21
38:1,9 85:17
95:8 103:18
104:20 105:3,8
105:11,13,19
110:20 111:8
**cannon's** 38:21
85:21
**capacity** 1:10
3:3 14:14 15:3
35:23 57:2
115:1
**career** 22:24
37:6
**case** 77:18,20
93:24
**catalog** 50:7
**cataloged** 50:8
**celebrate** 81:20
83:23 84:6,15
**centered** 33:4
**centric** 34:14
**certain** 52:21
58:23,25
101:13
**certificate**
119:1 120:1
**certificates**
24:4
**certified** 6:17

**[certify - conference]**

| | | | |
|---|---|---|---|
| **certify** 119:3 120:2 | 93:18 96:10 97:17 99:10 | **coffman** 2:11 7:21,21 | **common** 72:24 |
| **cetera** 13:19 28:3 | 103:14 105:12 112:4 114:11 | **coincidence** 95:15 | **communicati...** 13:2 22:19 |
| **chain** 30:10 66:6 105:2 | 115:7,9 117:10 117:16,18,21 | **collaborating** 83:19 | 29:7,14 30:2,4 30:14 39:10 |
| **challenging** 89:3 | 118:2,4 121:1 | **collaboration** 32:1 | 73:19 99:15 112:9 |
| **change** 29:13 | **chicago** 2:21 | **colleague** 81:17 | **communicators** |
| 30:6,13 37:7 | **child** 116:2,3 | 83:22 | 12:4,11,21 |
| 122:4,7,10,13 | **circumstance** | **colleagues** 32:3 | 13:8 24:13,16 |
| 122:16,19 | 107:19 | 32:8,11 113:25 | **competition** |
| **changed** 22:22 | **cite** 88:20 | **collected** 45:1 | 43:2 |
| 29:5 30:5 76:9 | **claiming** 48:22 | 79:13 | **compilation** |
| **changes** 121:10 | **clarification** | **collecting** 79:7 | 59:4 |
| 123:6 | 71:18 | 79:11 | **compiled** 74:18 |
| **changing** 74:4 | **clarify** 19:7 | **collection** | **complete** 70:20 |
| **checklist** 24:8 | 42:13 71:23 | 34:23 79:3 | 123:8 |
| **chester** 3:4 | 72:7,13 99:7 | **college** 1:20 4:7 | **completed** |
| 7:15,15 9:13 | **class** 10:8 | 6:12 10:12,20 | 69:19,21 |
| 9:16 19:3,23 | **classes** 11:1,2,3 | 12:4,5,10,14,20 | 121:16 |
| 20:1,17 43:4,5 | **classification** | 13:8 24:12,13 | **completely** 9:1 |
| 43:9 46:22 | 30:9 | 24:14,16 28:1 | **comply** 102:4 |
| 50:16 51:13 | **clean** 106:2 | **collier** 38:5,6 | **compound** |
| 55:1 56:9 | **clear** 9:25 | 38:12 | 20:20 |
| 59:19,22 60:4 | 60:19 110:5 | **come** 14:19 | **computer** |
| 60:11,14 62:19 | **clearly** 49:3,13 | 15:5 21:17 | 73:13 74:8 |
| 66:4 68:18 | **client** 60:5,16 | 24:15 27:19 | 105:16 |
| 71:21,25 72:12 | 76:20 | 55:1 58:7,18 | **concluded** |
| 75:25 76:3,7 | **clip** 73:21 | 58:23 59:9,12 | 118:11 |
| 76:16,19,23 | 74:18 | 101:9 102:9 | **concludes** |
| 77:3,15 82:19 | **clipping** 74:2 | **coming** 34:18 | 118:7 |
| 88:20 89:1,11 | **close** 26:16 | **command** | **conference** |
| 90:22 93:12,16 | 37:18,21 86:9 | 30:11 | 106:17 |

**[confident - currently]**

| | | | |
|---|---|---|---|
| **confident** 21:5 | 110:20 111:8 | **correct** 10:16 | **cosida** 24:13 |
| **connally** 1:18 | 113:9 | 16:2,12,18 | **costa** 120:2,15 |
| **connected** | **cook's** 85:9 | 19:2 21:1 | **counsel** 60:15 |
| 61:10 | **cooper** 107:3 | 24:18 29:1 | 113:8 119:10 |
| **constitute** 6:25 | **copied** 91:13 | 30:3 31:16,16 | 119:13 120:7 |
| **cont'd** 3:1 4:1 | **copies** 41:8 | 32:6 38:3 | 120:10 121:14 |
| **contacted** | 43:21 45:7,9 | 39:25 40:3,16 | **count** 115:25 |
| 108:14 | 45:14 46:19,20 | 41:10 42:8 | **country** 23:16 |
| **contained** 79:2 | 50:24 121:14 | 45:15 46:8,12 | **couple** 56:2 |
| 83:4 91:9 | **copy** 35:7,12,13 | 46:13 54:13,16 | 103:16 |
| 96:20 | 42:5 46:20 | 58:2,22 59:10 | **course** 11:4 |
| **contains** 92:11 | 48:10 59:14 | 63:4,21,24 | **court** 1:1 9:4 |
| **content** 98:19 | 63:13,20 66:3 | 64:2 65:12,16 | **cover** 74:20 |
| 98:20 101:2,9 | 70:20 73:25 | 69:4 78:24 | **coverage** 23:6 |
| **context** 28:12 | 78:10 106:3 | 84:16 88:4,6,7 | 29:16 |
| 28:19 91:23 | 117:17,21,25 | 88:13 89:18,22 | **covered** 106:16 |
| **contractor** | **copying** 27:15 | 90:9 91:4,10 | 106:18 |
| 56:25 | 103:18 | 91:11 92:2 | **covering** 13:16 |
| **contractual** | **copyright** 11:8 | 93:10,24,25 | 73:1 |
| 56:22 | 13:11 17:11,25 | 94:9 98:1 | **create** 46:1 |
| **convention** | 18:5,6,10,14 | 103:4 104:19 | **crew** 45:24 |
| 12:23 | 19:1,4,11 | 104:21 108:20 | 73:21 |
| **conversation** | 20:18 21:1,4 | 108:23 109:17 | **crime** 116:9 |
| 104:11 | 21:20,22 88:3 | 113:23 123:8 | **cross** 23:16 |
| **conversations** | 102:4 116:24 | **corrections** | **crow** 48:25 |
| 68:4 | 117:6 | 123:6 | 51:23,24 52:3 |
| **convicted** | **copyrighted** | **correctly** 68:21 | 53:7 55:4,8 |
| 116:9 | 17:7 | **correlates** | **csc** 12:10,15 |
| **cook** 38:19 | **copyrights** | 55:18 | **curfnoc** 4:14 |
| 84:20,22 86:13 | 19:22 20:9,16 | **correlation** | 7:3 |
| 86:22 87:6 | 21:14 | 55:11 | **current** 115:24 |
| 94:22 104:2,17 | **copywritten** | **corresponden...** | **currently** 11:20 |
| 104:25 105:4 | 17:16,18,20 | 111:7,12 | 12:1 18:17 |
| 105:23,24 | | | 30:1 63:13 |

**[cut - director]**

| | | | |
|---|---|---|---|
| **cut** 91:19,25 | **december** 1:15 | 44:13,17 46:12 | **desktop** 105:15 |
| **cv** 1:9 | 6:3,11 | 66:15 81:18 | 105:16 |
| **d** | **decided** 24:5 | 85:2 97:2,12 | **details** 72:24 |
| **d** 1:6 2:3 5:1 | 25:18 87:18 | 98:22,24 99:3 | **determine** 81:3 |
| 6:1 | 106:2 | 99:4,17 110:15 | **dick** 38:5,12 |
| **daily** 37:12,15 | **decision** 84:20 | 111:2,14 | **dierker** 5:16 |
| 38:23 | 85:3,12 86:4 | 112:15,17 | 68:21,24 |
| **darn** 103:10 | **declaration** | 113:25 115:2 | **difference** 60:6 |
| **date** 1:15 71:2 | 5:18 90:25 | **department's** | **different** 12:9 |
| 122:24 123:12 | 91:7 93:9,15 | 96:21 | 20:19 45:18 |
| **dated** 114:17 | 94:16 116:22 | **departments** | 51:15 61:19 |
| **david** 2:4 7:11 | **declare** 123:4 | 84:25 | 67:12 72:1 |
| 8:14 48:25 | **deemed** 123:6 | **depo** 89:11 | **differs** 97:23 |
| 51:23 52:5,22 | **deep** 73:4 | **deponent** | **digital** 35:1 |
| 55:4,8 | **defendant** 1:11 | 121:13 123:3 | 37:1 41:9 |
| **david.patron** | 3:2 | **deposing** | 44:22 45:1,2 |
| 2:8 | **degree** 10:9,17 | 121:13 | 57:4 74:4 |
| **day** 29:16,16 | 10:23 11:5 | **deposition** 1:13 | 85:23 119:8 |
| 35:9 51:20 | 15:11 27:25 | 6:4,8,23 8:15 | 120:3 |
| 74:2 86:12 | **deluca** 4:4 7:17 | 8:16 46:16 | **digitally** 74:18 |
| 104:2 106:13 | 7:17 | 67:14 82:15,17 | **digitized** 35:4,7 |
| 123:15 | **denied** 85:11 | 85:9 88:15 | **dinosaur** 41:17 |
| **days** 11:10 | **denotes** 98:20 | 118:7 119:1 | **direct** 38:21 |
| 121:16 | **deny** 48:19 | **depositions** | 104:14,17 |
| **deal** 65:22 | 54:24 57:11 | 67:21 | **directing** |
| **dealing** 105:8 | 63:2 83:3 | **describe** 70:5 | 104:15 |
| **dealings** 39:11 | **denying** 48:22 | **describes** 92:9 | **directly** 85:21 |
| 39:13 | 57:13 | **description** 5:6 | **director** 22:12 |
| **dear** 87:17 | **department** | **designated** | 22:13,15 23:1 |
| **decade** 61:18 | 25:1,4,10 | 17:10 18:6 | 29:1,6,13 30:4 |
| **deceased** 34:13 | 31:17,21 32:1 | **desk** 39:16,17 | 30:15,16 31:15 |
| 34:14 | 32:3 36:12,13 | 58:17 59:14 | 37:11 38:1 |
| | 36:14 37:2,3,3 | 62:10 90:12,12 | 43:23 52:1 |
| | 37:14,23 44:13 | 90:14 | 57:2 84:22 |

**[directors - email]**

directors  12:5
12:15 24:14
directory  13:15
14:8 24:23
disagree  16:14
54:17 85:13
discipline
111:1
discover
106:21
discuss  111:17
discussed  32:20
67:18 82:2
83:5 97:22
discussing  68:6
82:10
discussion
86:16,19 87:9
111:21
discussions
32:7,10,13,16
49:25 50:10,14
66:18 67:6,24
80:18 83:14,16
83:17 94:22
95:7 98:13
104:24 113:24
114:5
disparage
105:10
dispute  116:2
distinctive
106:19

distinguishing
112:18
district  1:1,2
division  1:3
divorce  116:1
divorced
115:25
doc  69:20
document
46:15 51:8
65:23 66:10,12
74:8 75:1
77:11 88:9,11
93:4,9 94:2
97:14,19,25
108:3 111:25
113:14 114:7
114:13,15
doing  7:13
17:12 27:9
34:3 40:9
42:15 61:8
67:8 73:14
87:5 104:4
106:3 109:2
door  37:20
doubt  115:16
draft  48:1,10
57:16 58:1
62:24 63:22
64:1 65:15
drafted  26:7
dropping  85:15

duly  8:5 119:5
dunbar  2:5,12
7:12
duties  22:25
29:12,20,24
30:12,17
dwoskin  2:19
dwowas.com
2:22
dx  79:14

**e**

e  2:1,1 3:1,1 4:1
4:1 5:1,5 6:1,1
47:1 49:9 55:9
57:16 69:10,23
79:14 106:4
122:3,3,3
earlier  39:15
53:6 76:3
78:22
early  78:21,23
78:23
easier  91:16
easily  91:8
east  70:2
editor  107:3
editorial  15:16
15:16,18
education
10:24 11:4,7
13:6,10 14:14
14:24 15:6

educational
10:6,6 13:3
effect  102:24
effort  81:19
83:23 84:6,15
efforts  26:10,15
103:6
eight  36:21
37:22,24
eighth  100:23
either  20:3
85:24 88:3
98:4 104:11
electronic
35:13 42:7
45:9,11
electronically
34:25 43:20
44:23 45:5
46:4,10
elementary
100:19
else's  26:18
27:15
email  5:7,9,11
5:12,14,16,21
5:23 46:24
47:1,3,13 48:4
48:14,16,24
49:9,14,19,25
50:12,15,21
51:15,16,17
54:5,11,23,24
55:14,23 56:12

**[email - feedback]**

56:18 57:8,11
57:25 58:22,24
61:15,24 62:22
62:23,24 63:5
63:6,23 64:25
65:10,14 66:6
66:7 68:20
69:1,3,4,6,12
69:14,18 79:22
87:22 93:7
94:16 96:4
97:12 103:17
103:20,22
104:2,4,6,8,10
104:22,23,24
105:4,22,24
110:7 112:6,10
**email's** 65:13
**emailed** 86:17
86:17
**emails** 50:6
58:3 103:16
111:13
**employed**
119:11,14
120:8,11
**employee** 56:19
56:25 119:13
120:10
**ended** 107:16
117:5
**endurance** 43:2
**enlisted** 97:1
111:14

**entire** 13:19
110:3
**entities** 78:9
**entitled** 47:1
**envelopes**
44:19
**epic** 1:6 2:3
7:13 41:24
108:5,8 116:24
117:6
**era** 50:23 51:6
**errata** 121:11
121:13,15,16
**es** 119:4
**esoteric** 100:25
**especially**
33:25
**esquire** 2:4,11
2:18 3:4,11 4:3
4:4
**essays** 28:3
**established**
82:15
**et** 6:10 13:19
28:3 121:4
122:1 123:1
**ethics** 10:24
13:7 14:14,17
**events** 57:5
**everybody** 24:7
92:20
**evidentiary**
6:22

**exact** 36:19
**exactly** 36:5
67:22 88:21
90:2 109:3
**examination**
5:2 8:11
**examined** 8:7
**example** 27:2
74:7,11,24
75:10 100:21
101:12
**examples** 27:5
74:15 75:5,18
**except** 14:8
76:10 86:7
**excerpt** 94:18
**excerpts**
108:25
**exchange** 5:7
46:24 65:1,10
66:8
**exhibit** 5:7,9,11
5:12,14,16,17
5:18,19,20,21
5:23,24 46:15
46:17 51:9,10
51:18 56:4,5,6
61:16 62:15,16
65:24 66:1
68:12,14 77:12
77:13 87:22,23
90:19,20 91:8
93:8,14 94:15
96:7,8 97:14

97:15 103:10
103:11 111:25
112:1 114:7,8
**exist** 103:2
**existed** 102:15
**existence** 42:12
**explain** 84:2
**exported** 45:25
**external** 84:22
84:24

**f**

**f** 2:18
**facing** 84:24
**fact** 29:10 51:3
59:3 85:1 89:2
96:19,22
109:21
**facts** 62:9 73:4
84:11 89:5
92:11 100:18
**fails** 121:18
**fair** 105:20
**fairness** 109:15
**familiar** 8:19
30:18
**fan** 115:13
**fans** 87:17
92:20
**fashion** 109:5
**fax** 22:23
**feedback**
110:19,23

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

[feel - gives]

feel   21:5
field   23:15 70:1
  70:2 74:10
  75:12,13 76:10
fifty   16:21
figure   108:8
file   41:9 70:18
  73:21 91:8
filed   111:18
  116:7
files   78:17
filing   17:24
  43:24 44:5,8
  44:18
filings   18:4
filled   44:18
  84:9
final   108:24
financially
  119:15 120:11
find   63:13,20
  91:17
finding   51:5
fine   43:7,10
  77:1
finish   9:7,12,15
  76:23 117:14
finished   76:24
finishing   47:16
firm   7:12
first   8:5 10:4
  32:21 33:15
  41:19,20,23
  42:2,11 47:12

47:20 51:17
  56:13 57:14
  63:8 78:14
  79:10 85:16
  87:19 91:6
  93:21 94:2,5,8
  102:20 110:1
  114:23 116:24
five   43:9 67:21
flotsam   44:1
follow   21:15
following   63:7
  114:25
follows   8:7
football   12:6
  12:11 13:14,16
  13:21 14:1,5
  23:15 57:17
  65:7,18 72:21
  74:10 75:13
  92:9
ford   3:11
foregoing
  119:3,4 120:4
  123:5
forgot   42:25
  59:15
form   19:23
  59:19 61:11
  78:16 87:12
  109:5
format   42:8
formerly   12:5
  24:13

fort   106:13,25
forward   92:1
  92:21 105:3
forwarded   92:4
  104:23,24
forwarding
  69:3 79:22
  104:3
found   78:16
  106:6,20
  116:22
four   10:10 12:8
  27:21
fraction   16:25
freelance   56:19
front   25:15
  89:7 107:25
  108:2
full   10:1
fully   8:22
fun   100:18
further   117:8
  119:12 120:9

g

g   6:1
game   27:8
  47:25 48:7,7
  49:1,3 64:20
  65:21 74:19,20
  74:22 92:4,6,6
  92:12,15,23
  93:2 100:19,24

gbkh.com   3:15
general   10:5
  113:7
generally   40:11
gentlemen   7:6
george   3:12
georgia   15:13
  15:15,17,21
  16:22 18:12,18
georgia's   22:4
getting   10:22
  11:5 48:15
  104:7
gill   47:2 49:9
  55:9 57:16
  64:12 69:10,23
  78:10 79:14
  106:4
give   9:24 10:1
  25:6 46:25
  52:19 56:4
  61:23 70:20
  71:12 74:6,8
  74:19 75:18
  76:14 77:11
  83:11 100:21
  101:9 110:23
given   48:10
  75:10 88:19
  89:15 110:19
  123:9
gives   13:15
  14:1

**[giving - hypothetical]**

| | | | |
|---|---|---|---|
| **giving** 70:25 | 114:3,6 | 98:11 | 74:20 |
| **glen** 56:14,14 | **good** 6:5 8:13 | **h** | **helped** 34:7,8 |
| 56:15 | 9:8,13 11:16 | | 40:7 81:3 |
| **go** 8:18 9:19 | 17:5 34:1,4 | **h** 5:5 122:3 | **helpful** 33:21 |
| 10:5 15:12 | 82:8 86:7 92:9 | **half** 27:22 | 33:25 95:1 |
| 17:22 21:7 | 94:19 | **hand** 8:2 | **helping** 54:15 |
| 24:3 48:7 | **gotten** 62:4 | **handle** 85:23 | **hereto** 119:14 |
| 55:12 57:5 | **govern** 102:8 | 85:24 | 120:11 123:7 |
| 61:22 62:18 | **governed** 102:1 | **handled** 15:21 | **hey** 106:1 |
| 78:11 79:20 | **graduate** 14:21 | 26:9,14 110:21 | **hi** 47:13 56:13 |
| 81:14 87:21 | **graduated** | 110:24 | **high** 70:12,12 |
| 112:3 114:10 | 11:24 15:10 | **happened** | **higher** 30:8,8 |
| 117:15 | **great** 43:8 | 15:10 41:22 | **highlight** 81:19 |
| **goes** 45:25 96:4 | **ground** 8:18 | 49:22 50:4 | 83:23 84:16 |
| 97:12 | **group** 13:19 | 62:8 86:20 | **hinckley** 5:23 |
| **going** 8:15 9:5 | 24:19 38:17 | 100:18 110:4 | 112:6,7 |
| 9:11,14,15 | **guess** 15:7 17:3 | 111:17,22 | **history** 10:6,7 |
| 21:9 25:11 | 25:5 34:5 | 117:3 | 64:20 |
| 28:23 33:12 | 98:20 100:24 | **happening** | **hockey** 1:6 2:3 |
| 51:8,9 54:17 | **guidance** 86:12 | 110:11 | 7:13 |
| 60:3,9 61:17 | 86:18 106:2 | **happens** 35:9 | **hold** 29:18 |
| 64:22 65:23 | **guide** 23:15 | **happy** 107:5 | **home** 105:17 |
| 66:7 68:12 | 24:8,9 74:10 | **hard** 17:5 | **homer** 34:11 |
| 74:13 75:16 | 75:17 | **hate** 87:12 | **honestly** 14:6 |
| 76:12,16,17 | **guidelines** | **head** 9:24 | 37:19 |
| 77:11 78:5,11 | 102:7,12,15,21 | 48:25 55:3 | **honored** 24:19 |
| 78:19 80:20,25 | 110:16 | 85:2 | **hope** 29:9 |
| 82:18 90:18 | **guides** 23:5,14 | **headshot** 51:21 | **hopeful** 34:6 |
| 95:1,13,19,21 | 23:16,16,22 | **hearing** 7:24 | **horton** 3:12 |
| 95:23 97:13,14 | 24:2,4 | **heisman** 24:20 | **houston** 1:3 |
| 103:8 104:9 | **guy** 25:8 | 51:25 | **html** 46:1 |
| 108:22,25 | 100:20 | **help** 33:24 | **huh** 9:24 |
| 109:4,5,19,23 | **guys** 34:19 | 34:19,21 63:7 | **hypothetical** |
| 111:24,25 | 46:21 82:8 | 64:21 73:5,7 | 21:3 |

Alpha Reporting
A Veritext Company

800-556-8974
www.veritext.com

**[idea - january]**

| i | | | |
|---|---|---|---|
| **idea**   61:25 73:2 114:22 | **independent** 56:25 | **instructions** 60:15 70:22,25 | 96:3 101:16,23 109:9,16 111:23 |
| **ideas**   27:9 | **indicates**   48:4 | **instructs**   9:18 | **involvement** 12:21 13:13 14:4 30:22 81:10 85:11 96:23 100:12 |
| **identification** 46:18 51:11 56:7 62:17 66:2 68:15 77:14 90:21 96:9 97:16 103:12 112:2 114:9 | **individual**   1:10 3:3 | **intellectual** 18:16 | |
| | **individuals** 78:9 | **intended**   6:20 73:7 | |
| | **industry**   14:22 15:8,9 | **interact**   38:23 | **involving**   82:2 82:11 83:5 |
| **identify**   7:7,20 | **info**   55:4 | **interacted**   39:2 | **issued**   114:24 |
| **il**   2:21 | **information** 12:5,14 22:14 22:17 24:14 28:9,10 37:11 45:25 72:18,20 73:9,20 79:2,4 79:8,24 80:3,6 80:8,16 83:11 84:1 88:9,11 88:12 89:20,24 90:7 91:9,18 92:1,8,25 93:1 98:13 100:25 101:21 110:10 113:11 | **interaction** 14:7 | **item**   55:17 |
| **image**   41:8 79:13 | | **interactions** 33:19 37:12 | **items**   24:9 |
| **images**   45:2 63:7 | | **interest**   79:4 | **iteration**   41:21 |
| | | **interested** 72:20 73:3 81:18 83:22 84:3,5,8,14 105:11 119:15 120:12 | j |
| **immediate** 85:17 | | | **j**   1:5 2:2 6:10 121:4 122:1 123:1 |
| **important**   9:6 13:25 28:14 43:25 | | | **jackie**   38:3,9 40:14 53:17,19 61:12 64:13 87:22 |
| | | **interface**   57:1 | |
| **incident**   111:3 111:21 | | **internal**   111:1 | |
| | **initiated**   30:19 | **internet**   22:24 37:3 75:3 | **jackie's**   90:12 |
| **include**   93:21 94:8 | **instance**   18:22 73:24 93:6 | **interrogatories** 77:24 78:3,15 | **jacobs**   34:11,12 |
| | | | **jacqueline**   58:6 58:10 78:21 |
| **included**   36:22 84:23 | **institute**   110:15 | **interrogatory** 5:17 77:17,23 78:8 82:10 83:4,15 84:4 | |
| **including**   41:12 | **instruct**   60:1,1 76:13 | | **james**   47:3,5,8 47:10 |
| **inconceivable** 24:22 | **instructed** 61:12 85:17,19 86:5 | **involved**   14:10 30:23,24 31:24 67:10 83:8 85:7 86:2,3 | **january**   5:22 33:6 66:9,14 66:23 68:23 69:18 74:6 75:6 84:13 |

**[january - known]**

85:19 94:17 96:17 100:13 102:24 103:18 106:5,9 112:7 114:17 115:1 115:11,15,21 119:16 120:13 121:3
**jason** 38:19 84:19,22 85:6 85:9 86:13,22 87:6 94:22 104:2,4,6,17,23 104:25 105:4 105:23 106:1 110:20 111:8 113:9
**jdc** 51:21,21,22 54:1
**jerry** 107:3
**jford** 3:15
**job** 1:22 22:7 22:20 30:9 42:18 67:8
**john** 1:21 6:6 48:25 51:23 52:5,22 55:4,8 117:24 119:2 119:17
**johnny** 24:20
**johnson** 56:14 56:15 57:1
**jones** 25:8,21 25:22,22

**journalism** 10:8,17,19,23 10:24 11:5,16 11:21 13:7 14:14,16,21 15:11 27:25 28:12,22
**journalist** 23:9 26:23
**journalists** 11:12
**judged** 24:8
**judging** 59:3
**julie** 3:11
**june** 56:13 57:9 62:23 63:6
**junior** 10:12,19

**k**

**katherine** 112:24
**keen** 94:18,20
**keep** 20:19,22 31:10 34:23 43:19,25 44:6 44:9,22 45:4,7 45:8 73:21 87:2,3,6,13 92:12
**kelly** 113:5
**kept** 23:4 34:25 43:22
**key** 91:7 95:11

**keyed** 92:23
**keying** 93:20
**kickoff** 64:14
**kincaid** 3:12
**kind** 100:24
**king** 47:2 49:9 55:9 57:16 64:12 69:10,23 79:14 106:4
**knew** 33:20 39:12 80:12,21 80:24 82:18 108:22 109:4,8 109:12
**knight** 112:24
**know** 10:1 11:19 12:25 17:5,16,17,22 18:20 19:15,16 20:1 21:4,21 21:25 22:22 24:21 28:16,20 29:8,10 31:25 33:9,10 34:6 34:16,17 37:19 40:13,20 43:3 43:3,4 45:19 45:22 47:5,10 48:2 49:2,4,24 50:4 53:17,21 53:23,24 54:22 56:21,22,23 58:4,8,13,19,20 59:1,4,6,9,13

59:16 60:5,9 60:18 62:6,13 64:4,6,7,17,20 68:1,2,8 71:1 76:21 77:22 80:7,9,11,22 81:6,11 82:8 83:12,18 84:10 84:11 86:25 87:6,11,18 88:8 90:3,4,11 94:18 95:21,25 97:4,7,11,11 98:3,10 99:19 99:21,22 100:24,25 102:10,14,15 102:18,19,20 103:2,3,5 104:13 105:2,3 105:14,16,17 106:14,16 107:18,22 108:24,25 109:1,1,13,25 110:12 113:3,5 114:15 115:12 117:13
**knowledge** 79:17 110:11 111:2,5,6,20 119:9 120:6
**known** 72:24 72:25 80:13

**[known - man]**

81:9 83:9
109:3
**knows**  28:1
**krista**  38:17
39:8 66:8
110:13
**kyle**  70:1,2
74:10 75:12,13
76:10

**l**

**l**  2:4
**la**  2:7
**lane**  111:7
**language**  97:25
98:3,16,23,25
99:1,20,23,25
100:3
**laptop**  105:17
**late**  78:22
**law**  7:11 11:8
21:24,25
**laws**  6:22 13:11
102:4
**lawsuit**  42:1
102:9,13,16
108:10 111:18
113:16 114:2
114:14 115:23
**lawsuit's**  61:17
**learned**  27:24
31:25 32:22
33:5 41:23
42:11,14 83:18

93:22 109:21
110:1,3
**leave**  22:6
**legal**  121:23
**legend**  69:10
106:4
**letter**  108:1
**level**  30:8
**life**  69:10 106:4
**light**  34:2,4
101:22
**liked**  33:20
52:23
**likely**  62:11
**lindsay**  63:12
64:14 65:21
**line**  64:18
76:24 105:1
114:23 122:4,7
122:10,13,16
122:19
**link**  96:17,20
**links**  96:4
**listen**  59:22
**listened**  67:21
**litigation**  84:10
91:1
**little**  71:25
**llc**  1:6 2:3
**llp**  3:12
**locate**  91:9
**located**  6:12
39:14

**locating**  63:7
**location**  1:17
**lochridge**  3:5
**logical**  59:15
**long**  12:8,12
22:3 29:3,18
33:16 36:10
42:19 61:9
86:8 90:13
91:16
**longer**  28:25
**look**  10:25
11:16 24:3
27:8 47:1,8
48:6 52:2 63:5
63:18 71:14
81:4 82:3,8,11
83:6,7 93:8
94:15 108:25
111:11
**looked**  23:17
71:18,19
108:15
**looking**  34:18
48:6,25 49:3
57:17,23 61:16
72:11 115:17
**looks**  65:17
104:2
**loose**  14:18
15:4 21:25
50:24
**lost**  44:1

**lot**  17:4 45:1
**loved**  25:10
**low**  47:15
50:13

**m**

**machines**  22:23
**made**  32:25
54:18 55:12
59:14 115:16
123:5
**magazine**
15:17,24 16:8
16:23
**magazines**  17:1
**mail**  35:10
**maintain**  45:14
**maintained**
37:6 44:17
46:11
**make**  9:17
49:10 51:16
60:8 82:8
103:9
**makes**  16:6
**man**  30:18
31:13,21 32:4
32:8,11,22
41:24,25 42:15
42:17 47:2,9
47:15,20 49:5
49:7,8,9,11,16
50:1,11,14
51:18 54:5,10

**[man - meeting]**

54:16,21 55:9
55:11,13,15,19
55:22 57:16
58:1,5,9 62:25
63:23 64:2,8
64:10,11,13,16
64:21 65:1,5
65:12,13,16,22
66:9,15,20
68:4 69:11,23
72:23 73:2,6
79:5,8,11,24
80:4,6,8,10,16
81:20 83:24
84:1,3,7,16
85:8 86:3
90:11 91:24
95:1,13,19
96:13 97:24
106:5 109:10
109:16 110:6
110:10 113:18
114:1
**manager** 29:17
**manila** 44:19
**manner** 6:23
99:5
**manziel's** 24:20
**mark** 51:9
65:23 68:12
90:18 96:6
97:14 111:25
114:6

**marked** 46:17
51:10 56:4,6
62:16 66:1
68:14 77:13
90:20 96:8
97:15 103:10
103:11 112:1
114:8
**marketing**
39:10 112:8
113:19 114:1
**marking** 46:15
77:12
**marquardt** 1:9
1:14 3:2 6:4,9
6:10 7:16 8:1,4
8:13 16:10
43:17 67:9
78:15,20 81:16
82:1 84:19
85:18 86:12
116:21 117:13
121:4,5 122:1
122:2,24 123:1
123:2,4,12
**marquardt's**
85:16
**matt** 36:22,23
37:13 38:4,15
38:16 39:1
66:19 67:6,14
79:23 80:3
81:5,5,17
82:14 83:18,19

83:19,21 84:14
85:25 86:9
90:1 95:17
97:23 98:4,4
99:8,11,12,13
99:13,15,21
108:21 109:13
110:9,13 117:2
117:4
**matter** 6:9 8:15
87:4
**matters** 82:2,11
83:5
**matthew** 66:8
68:23
**matts** 99:12
**mcginnis** 3:5
**mcginnislaw....**
3:8 121:2
**mean** 16:5
17:19,20 26:1
28:7,11,23
29:24 32:15
34:5,6 35:8
40:6 41:5 42:4
42:14 47:24
49:5,15 54:22
54:23,24 55:7
59:12 60:9
61:17 64:17
68:3 70:11
72:9,14,19
74:23 80:15
82:7 86:8

87:11 89:6,8
90:10 92:7,19
96:19 98:18
99:23 100:1
109:24 110:3
112:15 113:16
115:16
**meaning** 41:17
**means** 6:24
28:5
**media** 13:16
22:15,18 23:1
23:5,5,14,15,15
23:16,22 24:2
24:4,7,9 29:1
31:15,20 36:14
36:17 37:4,8
39:3 43:23
45:16 57:2
73:5,8,20
74:10,20 75:17
75:24 81:17
84:23 91:24
92:21 98:22,24
99:2,3,4,4,14
100:13 101:17
101:24 102:1,5
102:8,21 103:6
110:15 111:2
113:25 114:21
115:2
**meeting** 33:15
111:16

**[meetings - object]**

| | | | |
|---|---|---|---|
| **meetings** 111:19 | 107:20 108:14 109:12,13 110:4,7,9 | **necessarily** 11:2 31:12 | **nod** 9:24 |
| **member** 13:15 115:2 | **mind** 59:23 | **necessary** 123:6 | **nomenclature** 112:16 |
| **members** 24:25 25:4,9 36:12 91:24 | **mine** 85:22 103:9 | **need** 9:14 24:9 43:2 48:24 55:3 61:4 63:7 76:19 89:12 117:22 | **nonresponsive** 21:10 64:23 |
| **membership** 14:6 | **minute** 82:19 | | **normally** 60:10 |
| | **minutes** 43:9 104:3 | | **north** 2:20 |
| **memorandum** 113:13 | **mischaracteri...** 76:1 | **needed** 35:11 37:15 39:23 40:4 54:9 56:2 81:12 83:8 110:10 | **notary** 6:13 119:18 123:13 123:19 |
| **memory** 32:21 47:19 48:22 67:1 72:6,15 90:6 94:12 | **mississippi** 26:2 | | **note** 55:24 121:10 |
| | **model** 41:15 | | **noted** 123:7 |
| | **moment** 61:3,4 | **needing** 106:1 | **notes** 27:8 74:19,22 82:25 89:7,7 92:4,6,7 92:12,15,23 93:2 |
| **meredith** 38:5 38:6,12,13 | **moore** 1:18 112:10,11 | **neither** 119:10 120:7 | |
| **michael** 1:5 2:2 6:10 7:13 41:24 121:4 122:1 123:1 | **morning** 6:5 8:13 52:8 | **nelson** 63:12 64:14 65:21 | |
| | **move** 30:15 | **never** 17:18,20 17:22 42:20,21 45:21 76:9 97:1 100:9 108:18 | **notice** 42:16 94:7 |
| **middle** 47:12 51:16 63:6 66:22 78:13 | **moving** 70:1,6 70:6 | | **now's** 77:3 |
| | | | **number** 17:6 36:19 38:7 61:16 68:13 101:13 103:10 |
| | **n** | | |
| **mike** 7:23 33:10,11 34:18 34:21 42:15 47:3,8,21 50:6 50:10 51:2 52:20 62:4,12 62:23 85:22 86:8 87:1 94:17 103:17 104:22 107:4,5 | **n** 2:1 3:1 4:1 5:1 6:1 | **new** 2:7 47:9 72:25 | **nwasdin** 2:22 |
| | **name** 6:5 24:21 36:13 106:19 112:25 | **news** 112:20 114:25 115:1 | **o** |
| | **name's** 17:4 | **newspapers** 74:3 | **o** 6:1 |
| | **nation** 13:17 | **nfl** 31:3,3 | **oath** 67:16 |
| | **navigate** 91:17 | **nice** 107:3,9,12 | **oaths** 6:14 |
| | **near** 87:17 | **nicohlas** 2:18 | **object** 20:19,21 21:9 60:10 64:22 76:10,12 |

**[object - own]**

| | | | |
|---|---|---|---|
| 76:13 | 118:5 119:1,2 | 61:22 62:21 | **oops** 56:8 |
| **objection** 6:15 | **offices** 70:6 | 65:6 66:25 | **open** 49:18 |
| 7:25 9:17 | 115:4 | 67:5,14 69:1 | 63:18 94:13,14 |
| 19:23 20:22 | **official** 17:21 | 69:17 70:8,14 | **opened** 63:22 |
| 50:16 59:19 | 17:23 102:11 | 72:4,17 73:17 | 63:25 64:6 |
| 60:3,8 75:25 | **officiated** 1:21 | 77:3 78:1,5,19 | 94:10,12 |
| 76:12 | **oh** 55:1,12 | 79:1,10,16,20 | **opening** 94:13 |
| **objections** 76:6 | **okay** 6:4 8:18 | 80:2 81:8,23 | **opportunity** |
| 76:15 | 9:4,22 10:4,22 | 82:1,24 85:5 | 47:1 |
| **objects** 60:21 | 11:7,11,25 | 87:21 89:19 | **opposing** 60:15 |
| **obligation** | 12:17,20 14:9 | 90:7,15,18 | **order** 63:16,18 |
| 56:22 | 14:23 15:10,23 | 92:15 93:4,16 | 63:23 |
| **obviously** | 16:16,19 18:4 | 94:15 96:23 | **organization** |
| 118:1 | 18:10,21 19:10 | 97:4 98:12 | 11:15 12:22 |
| **occasion** 52:12 | 20:17 21:9,17 | 99:1,19 100:3 | 13:20,23 24:7 |
| 52:15 98:19 | 22:3 26:5,9,17 | 100:12 101:6 | 44:25 |
| 101:7 106:19 | 26:22 27:2 | 101:16 103:5 | **organizations** |
| **occasionally** | 28:25 29:12 | 104:1 105:7,22 | 12:1,3,9,18 |
| 17:3 | 31:20 32:14 | 106:1,11 108:5 | 14:10,11 24:11 |
| **occasions** 101:8 | 33:3 34:7 36:4 | 108:18 112:21 | **original** 96:13 |
| 101:14 | 36:11,17,22 | 114:17 116:4,5 | 97:24 117:19 |
| **occur** 48:23 | 37:4,12,22 | 117:20 | **originated** |
| **offered** 22:7 | 38:22 41:11 | **old** 41:17,18 | 102:10 |
| **office** 7:22 13:2 | 42:4,10,16,21 | 106:3 | **origins** 74:9 |
| 17:25 18:5 | 42:25 44:12,16 | **older** 105:14 | **orleans** 2:7 |
| 36:24,25 38:20 | 46:14 47:12 | **once** 29:13 93:5 | **outcome** |
| 38:22 39:25 | 48:21 49:24 | 113:16 | 119:15 120:12 |
| 40:11 43:24 | 50:21 51:8 | **one's** 66:3 | **outside** 100:9 |
| 44:6,8 50:25 | 52:14,18 53:3 | 68:17 | **oversaw** 84:20 |
| 71:7,8 85:21 | 53:6,10,25 | **ongoing** 31:12 | 85:3 |
| 106:3,20 113:7 | 55:3 56:4 57:5 | 79:3 | **own** 18:25,25 |
| **officer** 6:5 7:19 | 57:6,14,22 | **online** 103:3 | 19:4 20:9,16 |
| 7:24 8:8 61:3,6 | 58:4 59:9 | **ooh** 90:23 | 20:18,18 21:14 |
| 117:16,20 | 60:13,18 61:19 | | 27:12 32:19 |

**[own - personally]**

| | | | |
|---|---|---|---|
| 43:21 67:8 | **pages** 41:12 | **paste** 91:19,25 | **paul** 55:8 |
| **owned** 18:17 | 47:9 48:5,8 | **patron** 2:4 5:3 | **pay** 49:13 |
| 18:22 20:8,15 | **painted** 101:21 | 7:6,11,11 8:9 | **pdf** 61:10 63:25 |
| 106:21 | **paper** 36:1 | 8:10,12,14 | 64:1,6 |
| **owner** 17:11 | 41:12 78:16 | 19:5,6,25 20:2 | **pdfs** 47:15 |
| 18:6,10 19:11 | **papers** 28:2 | 20:4,21,23 | 50:13 |
| **owners** 18:14 | **paragraph** | 21:9,11 42:25 | **peers** 13:17 |
| 19:13 | 78:14 79:18,21 | 43:7,10,16 | **penalty** 91:3 |
| **ownership** | 81:15,16 85:16 | 46:19,23 50:18 | **people** 18:24 |
| 21:20 | 86:11 91:6 | 51:12,14 55:2 | 19:12,22 20:8 |
| **owns** 21:1,22 | 107:2 | 56:8,10,11 | 20:16 21:14,19 |
| 88:2 | **paragraphs** | 59:21,25 60:7 | 27:12 30:10 |
| | 79:20 85:15 | 60:17 61:1,5 | 33:23 36:17 |
| **p** | **parameters** | 61:13 62:14,18 | 37:23,24 40:11 |
| | 101:19 | 62:20 64:22,24 | 45:17 46:11 |
| **p** 2:1,1 3:1,1 | **part** 24:19 33:7 | 66:3,5 68:12 | 73:1 92:5,16 |
| 4:1,1 6:1 | 33:8 67:7 79:3 | 68:17,19 71:23 | 92:21 97:7 |
| **p.m.** 118:10 | 81:19 83:23 | 72:3 76:2,5,11 | 112:18,21 |
| **package** 92:8 | 84:6,15 87:20 | 76:18,21 77:1 | **people's** 27:7,8 |
| **page** 5:2,6 47:2 | 90:15 95:5,9 | 77:4,10,16 | **performing** |
| 47:7,13 48:6 | 100:14,15 | 82:21,24 83:2 | 30:16 |
| 51:17 54:10 | 102:4 113:18 | 88:23 89:4,9 | **perjury** 91:4 |
| 55:5 61:11 | 114:4 | 89:13 90:18,23 | **permission** |
| 63:8,12,17,19 | **particularly** | 90:24 93:14,17 | 87:2 107:17 |
| 69:9 78:6,8,13 | 43:25 | 93:19 96:6,11 | 108:13,19 |
| 81:14,14 84:18 | **parties** 6:16 | 97:13,18 99:16 | 110:8,17 111:4 |
| 84:18 88:20 | 119:11,14 | 103:8,15 | **permitted** 6:20 |
| 91:6 93:21 | 120:8,11 | 105:18 111:24 | **person** 7:5 |
| 94:2,5,8 | **parts** 73:9 | 112:3,5 114:6 | 25:20 34:15 |
| 103:17 104:1 | 92:25 95:24,25 | 114:12 115:8 | 44:20 104:11 |
| 107:24 108:2,6 | **party** 115:23 | 115:10 116:11 | **personally** |
| 113:13 116:24 | **pass** 117:9 | 116:14,20 | 51:22 52:3,12 |
| 122:4,7,10,13 | **past** 17:3 | 117:8,12,23,25 | 52:14 53:10 |
| 122:16,19 | | 118:3 | |

**[pertinent - probably]**

| | | | |
|---|---|---|---|
| **pertinent** 91:17 92:25 | 45:7,14 | **portion** 32:1 | **preparing** 47:21 |
| **ph** 79:14 111:7 | **picked** 31:11 | **position** 22:11 | **present** 4:13 |
| **phelps** 2:5,12 | **piece** 36:1 | 29:18,19 85:13 | 67:15 82:14 |
| 7:12 | **place** 87:19 | **positive** 87:14 | **preservation** |
| **phelps.com** 2:8 | **plagiarism** | 101:22 | 79:4 |
| 2:15 | 27:14 28:2 | **possession** | **preserved** 79:3 |
| **phone** 104:8,12 | **plagiarize** | 61:25 | **preserving** |
| **phones** 22:23 | 27:13 | **possible** 17:13 | 79:7 |
| **photo** 33:13 | **plagiarizing** | 32:15 62:3 | **president** |
| 34:24 35:7,12 | 27:23 | 94:1,4 | 113:14 |
| 35:18,21 41:3 | **plaintiffs** 1:7 | **post** 80:25 81:6 | **press** 5:24 |
| 41:3,4,6,7 44:1 | 2:2 7:12,22,23 | 82:8,18 84:20 | 114:18 |
| 44:3 51:7 52:4 | 8:14 | 85:12 86:4 | **pressing** 72:19 |
| 52:5,19,23 | **playoff** 33:4 | 95:21 107:17 | **pretty** 28:13 |
| 53:7,11 54:1 | 66:23 | 108:22 111:21 | 61:9 100:19 |
| 63:9 65:4 | **playoffs** 33:1 | 115:18 | **prevent** 8:25 |
| **photographer** | 109:11 | **posted** 92:19 | **previous** 78:8 |
| 56:16,19 57:3 | **please** 7:7,20 | 97:5,20 99:8 | 106:6 |
| **photographs** | 8:1 20:6 43:3 | 103:23 107:16 | **previously** |
| 35:2,3 | 47:8 61:2 | 110:8 111:3 | 63:12,19 97:22 |
| **photos** 33:13 | 70:23 76:5 | 117:5 | **printed** 59:13 |
| 34:19,21,23 | 117:18 | **posting** 81:3 | **prior** 74:6,16 |
| 35:10,20,23 | **plus** 26:11 | 82:3,11 83:6 | 75:8,19 102:15 |
| 40:24 41:1 | 114:21 | 83:20 89:20 | 119:5 |
| 43:19 44:19 | **point** 26:11 | 95:4 110:16 | **priority** 70:12 |
| 45:2,3,19 46:2 | 33:7 37:5 43:3 | 113:17 | **privilege** 60:16 |
| 46:7 47:25 | 47:17 53:18,19 | **predecessor** | 60:16 |
| 48:7 49:1 | 74:3 107:4,10 | 12:15 24:17 | **privy** 110:14 |
| 50:24 51:4,6 | 109:24 115:17 | **preference** | 113:10 |
| 56:2,2 57:4,6 | **pointed** 107:7 | 87:13 | **probably** 11:24 |
| **phrase** 25:12 | **points** 92:9 | **preferred** | 12:6 17:1,5 |
| **physical** 42:5 | **policies** 101:25 | 52:23 | 26:3,4 37:2 |
| 42:11 43:20 | 102:24 | **prepared** 120:3 | 45:17 53:24 |

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[probably - ray]**

90:17 107:14
**problem**
  103:19,23
  107:15,18
**procedural**
  6:21
**proceed**  7:7 8:9
  86:13,23
**proceeding**  6:7
  6:19 7:2 9:9
  118:11 120:4
**proceedings**
  119:3,4,6,8
  120:6
**process**  17:22
  17:23 31:13
  79:15
**produce**  18:16
  21:6
**produced**  6:18
  45:24 111:6
**producing**
  26:23
**professional**
  11:21,25 14:9
  14:11
**professionali...**
  11:12
**program**  45:24
**progress**  47:18
  48:11
**project**  32:19
  56:1

**projects**  33:13
**promote**  97:2
  109:10
**promoted**  29:6
  29:8 96:17
**promulgated**
  102:12
**pronouncing**
  68:21
**proper**  76:22
**properly**  30:10
**property**  18:16
  21:6
**protect**  31:9
  76:20
**protected**
  117:6
**protecting**  85:8
**protection**
  31:13
**provide**  12:25
  91:23
**provided**  49:14
  57:3
**proximity**
  37:18
**pub**  94:20
**public**  119:18
  123:19
**publication**
  23:12,22,24
  24:15 74:12
  75:16,23,24

**publications**
  23:5
**publicity**  26:10
  26:15
**publicized**  23:3
  23:3
**publish**  100:10
**published**  16:1
  16:11,17,20
  89:19,25 100:4
  100:6 108:12
  115:21
**publishing**
  28:17 105:15
**pull**  74:21
**purpose**  79:1
  79:21
**purview**  84:23
**push**  74:13
  75:23 101:4
**put**  21:7 25:13
  27:12 55:4
  74:10,19,21
  75:15 87:18
  92:8 98:10
  99:2,19 106:8
**putting**  18:4
  34:1,4 40:6
  56:24 99:5
  101:1

**q**

**qualified**  119:7

**quality**  29:9
**question**  9:17
  9:19 16:6
  18:23 19:9,10
  19:25 20:5,13
  20:20,24 21:15
  26:25 28:13
  29:25 48:24
  49:12 50:19
  59:10 60:23,25
  61:1 65:9,9
  67:12 72:2,10
  76:2 89:4
  104:9
**questions**  8:20
  8:21,22 9:1,7
  49:17 55:17
  76:24 77:20
  78:6 80:22
  83:9 117:9
**quisenberry**
  38:4,11,12
**quotes**  74:21

**r**

**r**  2:1 3:1 4:1 6:1
  122:3,3
**raise**  8:1
**ran**  101:13
**rare**  98:19
  101:7
**ray**  3:4 7:15
  59:25 60:18
  62:18 68:17

[ray - relationship]

76:6,15 77:1
103:13 112:3
114:10 121:1
**rchester** 3:8
121:2
**read** 27:7 49:13
61:1 65:14
73:22 90:13
117:19 121:9
123:5
**reading** 50:21
**ready** 117:15
**realized** 108:12
**really** 12:17
31:24 33:9
45:21 64:12
72:20 73:1
100:24
**reason** 68:9
85:2,5 121:11
122:6,9,12,15
122:18,21
**rebranded**
12:16 22:18,19
**rebranding**
22:21 24:17
**recall** 11:1,3,6
11:9,24 13:9
13:12 14:6,13
14:24 15:1,2,3
15:6 16:24
17:12,14 23:20
25:16,24,25
32:9,10,12,12

32:14,16,20,23
32:24 33:3,12
33:18 36:5,9
37:19,24 39:12
39:21 40:5,21
41:19,20,21
48:15 50:3,4
50:20 52:3,5
52:10,17,18,21
53:12,22 54:1
57:8,17,21
66:13,17,18
67:3,3,5,13,18
67:22 69:25
70:11 71:2,2
71:16,17,20,22
72:1,4,8,9,11
72:13,16 73:14
79:12 80:2,14
80:16,18 81:11
82:9,10,17,21
82:23 83:12,14
83:16 86:13,15
86:21,24 88:18
88:22,24,25
90:2 96:16
98:6,12 100:17
104:8,13 105:1
106:12 109:12
111:15 114:1,5
115:17,19
**recalls** 88:24
**receipt** 121:17

**receive** 104:10
**received** 73:15
93:5 97:7
**receiving** 11:4
14:13,24 15:3
48:13 54:24
57:8,11 69:14
103:19
**recognize** 91:1
96:12 97:19
112:25
**recollection**
17:9 40:8 41:2
48:9 49:20
50:9 61:14
69:2 70:24
71:8,10 80:21
89:14,17
106:11 111:20
**recollections**
68:3,5,7
**record** 6:3,7,15
7:8 9:8,25
43:12,13,15
61:6 77:6,7,9
116:16,17,18
118:8 119:9
120:5
**recorded** 6:23
7:2 119:6
**recording** 6:18
119:8 120:4
**reduced** 119:6

**reduces** 41:8
**refer** 51:3
78:15
**referenced**
121:6
**referring** 39:15
50:23 52:6
53:3 70:5
107:6
**refers** 64:18
**refresh** 47:19
48:9 67:1
**regard** 101:22
**regarding** 13:7
13:11 14:14
111:8
**regular** 37:16
37:17
**related** 119:11
120:7
**relating** 79:24
80:3
**relation** 80:17
**relations** 22:16
22:18 23:2
29:1 31:15,20
36:15,18 37:4
37:8 39:3
43:23 45:17
57:2 73:20
81:18 84:24
99:4,14
**relationship**
85:25 86:8,9

Alpha Reporting
A Veritext Company
800-556-8974
www.veritext.com

**[relative - rusty]**

| | | | |
|---|---|---|---|
| **relative**  119:13 | 20:25 21:13,19 | **responding** | 25:18 31:7,15 |
| 120:10 | 21:23 | 62:21,23 | 33:1 35:22,24 |
| **release**  5:24 | **request**  49:15 | **response**  5:9,12 | 36:2 38:16 |
| 114:18,25 | 52:9,20 54:18 | 16:13 51:2,15 | 41:13 42:23 |
| 115:1 | 54:20 70:13 | 52:9 54:4 | 44:5 46:4,14 |
| **remedied** | 79:23 80:2 | 63:11 69:8 | 48:20 53:1 |
| 107:19 | 95:11 | 78:7 82:10 | 54:6,10 56:24 |
| **remember** | **requested**  54:7 | 83:4,15 84:4 | 59:7,18 62:14 |
| 33:15 34:18 | 54:9,13 61:7 | **responses**  5:17 | 68:5 71:25 |
| 41:15,23 48:13 | 86:12 119:21 | 77:17,23 78:12 | 73:10 75:5,9 |
| 49:21,22 51:5 | **requesting** | **responsibilities** | 75:14,16 76:11 |
| 57:12 62:22 | 55:10 56:1 | 23:1 29:13,21 | 76:22 79:17 |
| 63:3 67:19 | **requests**  65:4 | 30:12 | 82:15 84:2 |
| 69:14 71:4 | **required**  8:21 | **responsible** | 87:25 88:3 |
| 76:8 77:19,23 | 25:6 123:13 | 31:21,23 | 93:21 103:2,3 |
| 103:19 104:4,7 | **requirement** | **result**  102:13 | 103:24 104:18 |
| 104:10 110:1 | 28:21 102:3 | 110:16 | 104:20 106:6 |
| 116:21,25 | **research**  28:2 | **resume**  11:17 | 107:21 108:6 |
| **remind**  9:14 | **reserve**  117:10 | **retain**  44:7 | 112:22 113:2 |
| **removed**  85:18 | **reserved** | **retired**  25:10 | 116:11,14 |
| 85:20 86:6 | 116:25 118:9 | 26:1 107:2 | 117:12 |
| **repeat**  19:9 | **resolution** | **return**  121:13 | **rights**  116:25 |
| 20:12 60:24 | 47:15 50:13 | 121:16 | **ring**  45:18 |
| **repeated**  61:6 | **resource**  80:22 | **retype**  58:6,11 | **rob**  4:14 7:3 |
| **reporter**  6:6 | 81:13 82:7,7 | **retyped**  73:10 | **room**  1:19 |
| 9:4 106:15,18 | 83:13 90:3 | **review**  57:15 | **rooms**  44:18 |
| **reporters**  14:2 | **resources**  14:1 | 119:21 121:7 | **rules**  6:22 8:19 |
| **represent**  8:14 | **respond**  50:21 | **reviewed**  83:1 | 21:4 |
| 66:7 | 51:19 63:16,23 | **reword**  27:1 | **run**  33:4 |
| **representing** | 77:19 79:23 | **right**  8:2 10:10 | **rushed**  100:22 |
| 7:12,15 | 104:6 | 14:25 15:2 | **rusty**  34:14 |
| **reproduce** | **responded** | 18:21 19:5,13 | |
| 18:21 19:14,18 | 48:17,19 55:23 | 20:7,15,25 | |
| 19:21 20:8,15 | 86:18 | 21:13,18,23 | |

[s - short]

| s | scan 35:14,19 | seattle 31:7 | sense 42:11 |
|---|---|---|---|
| **s** 2:1 3:1 4:1 5:5 6:1 122:3 | 35:23 36:1,3 39:22 40:2,25 41:12 51:22 52:4,15,16,19 53:3,8,10 | 32:24 66:23 **sec** 72:25 **second** 57:25 81:16 | **sent** 14:8 47:9 49:1,2 50:6,15 54:4,7,12 56:12,14 62:24 63:2,5 68:20 |
| **sarah** 120:2,15 | | | |
| **sarcastic** 107:10 | **scanned** 40:5 53:16 54:1,2 91:13 | **secretary** 58:9 61:20,23 78:21 91:7 95:11 | 69:3,19 70:9 71:15 80:19 87:22 89:25 |
| **sat** 67:14 93:7 | | | |
| **save** 44:10 73:12 93:4 | **scanner** 35:17 35:18,22 36:10 39:14,17,20,24 40:12,19,21,23 41:3,4,15,20 53:4,17,19 | **see** 27:8 47:4 49:16 51:16 52:24 56:17 57:14 63:8,9 63:13 64:17,18 66:12 69:9 78:17 79:5 81:15,20 82:3 92:20 98:8 103:17 114:19 114:23 | 93:20 94:7,17 95:17 97:23 98:1 108:21 110:7 112:10 117:2,4 121:14 |
| **saved** 93:7 | | | |
| **savvy** 81:7 105:6,7,19 | | | **sentence** 56:13 57:14 78:20 79:16,17,21 81:16 85:16 86:11 |
| **saw** 42:20,21 51:17 110:12 | | | |
| **saying** 32:4,18 49:10,12 55:21 55:24 57:20 64:4 72:5 106:5 108:2 113:2 | **scanners** 41:21 **scanning** 40:24 **scenario** 35:9 40:5 52:22 71:3 | | **separate** 44:12 44:14 |
| | | **seeking** 33:13 **seems** 107:5 **seen** 66:10 102:7 113:14 114:13 | **served** 52:1 **server** 45:1,1 45:21 96:21 |
| | **school** 27:21 **schools** 13:17 **scott** 113:5 **screenshot** 5:19 96:12 | | **set** 47:15 **several** 76:4 **shame** 105:22 **shane** 112:6,7 112:22 |
| **says** 17:17 24:24 26:9 47:4,13,14 50:13 51:20 54:11 55:3 57:15 63:6 69:10 79:1,21 82:1 84:3,4 85:16 86:11 98:16 103:19 103:22 114:23 115:4 | | **send** 35:6,12 69:1 73:25 92:15,18 105:23 | |
| | **seahawks** 31:7 32:24 33:4 66:23 109:10 | **sending** 50:12 51:18 54:5 58:1 62:22 69:17 | **shavers** 1:21 6:6 119:2,17 |
| | **searchable** 73:13 91:14,15 **searched** 111:13 | | **sheet** 121:11 **short** 43:6 76:25 |
| | **season** 45:21 66:23 72:21 | **sends** 24:7 | |

**[shot - stenographic]**

| | | | |
|---|---|---|---|
| **shot** 48:25 55:4 63:12,19 | **sitting** 53:25 58:20 83:3 90:14 102:23 | **south** 2:13 | **spread** 61:11 |
| **shots** 50:23 | **situation** 99:6 | **southern** 1:2 | **spring** 2:13 |
| **shoved** 59:14 | **skills** 119:10 120:6 | **southwest** 106:17 | **stadium** 75:13 |
| **show** 46:14 51:8 65:23 97:13 103:8 111:24 | **small** 16:25 | **spaced** 93:12 | **staff** 24:23 29:15 |
| **sid** 37:7,10 | **smith** 5:14 38:17 39:8 66:8 | **speaking** 21:3 | **staffers** 39:4 |

shot 48:25 55:4
  63:12,19
shots 50:23
shoved 59:14
show 46:14
  51:8 65:23
  97:13 103:8
  111:24
sid 37:7,10
side 70:1,2 85:7
  96:4 112:8,12
  112:14,20,20
  112:22
sign 117:19
  121:12
signature 118:9
  119:16 120:14
signed 77:24
  91:3 121:19
significance
  28:18 30:6
silver 4:3 7:9,9
similar 14:5
  55:4
simon 36:22,23
  37:13 81:5
  83:19 86:10
  98:4 99:11,13
  99:15,22
single 14:6
sir 8:9 48:20
  61:3 65:8
sit 85:9 88:15

sitting 53:25
  58:20 83:3
  90:14 102:23
situation 99:6
skills 119:10
  120:6
small 16:25
smith 5:14
  38:17 39:8
  66:8
social 100:13
  101:17,24
  102:1,4,8,21
  103:6
society 11:12
  11:20,23
solutions
  114:21 121:23
somebody 40:9
sooner 106:8
sorrell 64:14
sorry 19:20
  20:12 29:24
  46:21 56:8
  93:12
sort 23:17 33:7
  38:22 61:11
  87:1 111:21
sound 16:6
sounded 25:11
source 28:9,16
  28:22
sources 28:14

south 2:13
southern 1:2
southwest
  106:17
spaced 93:12
speaking 21:3
special 98:16
  98:20 99:25
specific 27:11
  48:5 71:3,3,11
  76:8 80:21
  90:6 93:6
  109:9
specifically
  34:18 51:1
  54:20 70:15
  79:9 84:5 92:4
  92:20
specified 36:7
speculation
  90:15
sport 26:10,14
  92:10
sporting 57:5
sports 1:6 2:3
  7:14 12:4,5,10
  12:14,21 13:8
  22:14,17 23:4
  24:12,13,14,16
  29:17 37:8,11
  41:24 73:20
  106:15 108:5,9
  112:20 116:24
  117:6

spread 61:11
spring 2:13
stadium 75:13
staff 24:23
  29:15
staffers 39:4
standing 76:14
stapled 58:14
  59:4 90:11
star 106:13,25
started 64:11
  64:14
stat 45:24
state 114:24
  119:19
stated 74:17
statement
  16:14 22:2
  25:1 71:24
  79:25 84:19
statements
  28:15
states 1:1
stating 89:1,5
station 1:20 4:7
  6:12 112:19
statistical
  45:23,23
statistics 23:4
stats 45:21
  92:11
steal 25:12
stenographic
  6:24

**[stepped - tell]**

| | | | |
|---|---|---|---|
| **stepped** 29:16 | **study** 10:19 | **sure** 9:13 12:12 | 119:3,12 120:9 |
| **steve** 112:10,11 | **stuff** 45:17 | 18:8 23:8 37:2 | **takes** 41:7 |
| 112:22,23 | 64:21 108:15 | 49:1 53:18 | **talk** 9:6,11 |
| **stevenson** | 110:13 | 59:11 61:5,9 | 25:20,22 39:5 |
| 111:7 | **subject** 49:5,7 | 78:22 80:12 | 44:3,4 98:5 |
| **stick** 31:12 | 49:8 64:17 | 103:9 112:13 | **talked** 46:2 |
| **stipulation** | 96:14 | 116:13 | **talking** 17:24 |
| 6:25 | **subjects** 104:16 | **surely** 48:15 | 18:2 43:18 |
| **stole** 25:13 | **submitted** | **swear** 7:25 | 45:10 55:7 |
| **stop** 11:23 | 90:25 | **sweeping** 28:15 | 64:15 73:22 |
| **stopping** 61:4 | **subscribed** | **swore** 91:6 | 76:5,12,15 |
| **stored** 43:20 | 123:14 | **sworn** 6:16 8:5 | 98:6 108:11 |
| 44:23 46:10 | **subscriptions** | 119:5 123:14 | 116:3 |
| **stories** 15:20 | 15:22 | **synced** 117:22 | **tamu** 5:19 96:2 |
| 45:4 46:7 | **successful** | 117:23 118:3,4 | 96:13,24 97:5 |
| 73:22 74:21 | 32:25 | 118:5,6 | 97:8 113:2 |
| 96:5 | **suddenly** 106:2 | **system** 4:2,5 | **tamu.edu** |
| **story** 48:7 | **suggest** 55:15 | 7:10,18 43:22 | 102:10 |
| 72:23,24 74:9 | **suite** 2:20 | 44:6,13,14,16 | **tamus.edu** 4:8 |
| 74:23 86:25 | **supervise** 30:10 | 44:17,22,25 | 4:9 |
| 90:12 94:19,21 | **supervising** | 45:12 | **tarrow** 1:19 4:6 |
| 106:4,12,21 | 29:15 36:20 | | **task** 69:19,21 |
| 107:22 111:9 | **supervisor** 38:2 | **t** | 71:12 |
| 113:18 115:20 | 38:21 85:17 | **t** 5:5 122:3,3 | **team** 31:3,4 |
| **straight** 100:23 | 95:8 104:14,15 | **table** 7:7 | 64:14 73:22,23 |
| **strategy** 37:1 | 104:17 105:8 | **tagline** 17:17 | 92:10,10 |
| 101:24 | 110:20 | **take** 6:7,13 | **teams** 13:1 |
| **street** 1:19 2:6 | **support** 116:2 | 9:23 21:12 | **tech** 81:7 |
| 2:13 3:6,13 4:6 | 116:3 | 43:2,5 57:6 | 105:19 |
| **student** 14:25 | **supportive** | 65:3 76:25 | **technology** 7:3 |
| 15:21 28:1 | 13:24 | 116:11 117:18 | **telegram** |
| 68:25 101:22 | **supports** 11:15 | **taken** 6:9,9,11 | 106:13,25 |
| **students** 11:16 | **suppose** 11:1 | 8:16 29:20 | **tell** 8:6 10:6 |
| 11:18 | 87:16 | 105:16 111:15 | 59:22 60:7 |

**[tell - time]**

| | | | |
|---|---|---|---|
| 73:17 74:22 | 42:24 47:25 | 35:23 40:2 | 74:7,25 75:6 |
| 86:22 117:3 | 49:3 57:17 | 41:12 43:25 | 75:22 78:21 |
| **tells** 60:20,22 | 64:19 65:17,21 | 44:7,10,22 | 87:22 88:16 |
| **ten** 32:18 76:8 | 69:10 75:23 | 45:3,8,23 46:6 | 93:5,10 108:3 |
| **tenure** 26:11 | 87:17 98:17 | 74:5 87:12 | 116:23 |
| **term** 28:4,11 | 99:25 100:2,7 | 105:2,6,8,15 | **thornton's** 69:6 |
| **testified** 8:7 | 100:13 102:8 | 107:20 | 69:12 79:22 |
| 18:24 20:14,24 | 102:20 106:4 | **think** 9:22 | **thought** 11:16 |
| 41:11 59:2 | 106:16 107:3 | 13:25 18:24 | 25:11 99:7 |
| 81:23 82:18 | 109:9 114:24 | 19:18,21 20:7 | 101:21 |
| 89:2 99:9 | 114:24 115:4 | 24:4 25:6 | **three** 12:13,17 |
| 109:15,18 | 119:19 | 32:17 33:23 | 14:9 17:2 |
| **testify** 14:23 | **text** 36:1 73:13 | 34:3 35:8 36:9 | 45:18 46:19 |
| 19:3 | **texted** 90:5 | 41:11 42:2 | 47:16 |
| **testifying** 67:15 | **thank** 7:24 8:8 | 43:5 45:12 | **thursday** 1:15 |
| 119:5 | 8:10 46:22 | 46:13 47:8 | **time** 1:16 6:3 |
| **testimony** 46:8 | 51:13 56:10 | 52:10,25 56:23 | 7:4 12:12 20:6 |
| 55:20 64:25 | 62:19 66:4 | 59:11 60:19,21 | 20:13 22:17 |
| 67:19 73:8 | 68:16,18 77:15 | 60:22 61:19,24 | 33:16 34:5 |
| 76:1 86:2 | 90:22 93:18 | 62:3,7,11 70:8 | 35:8 36:10 |
| 88:18 89:15 | 96:10 97:17 | 72:12,15,16,17 | 40:17 42:2,19 |
| 92:13,24 110:5 | 103:14 112:4 | 74:16 78:22,23 | 43:11,15 49:16 |
| 113:21 121:9 | 114:11 117:12 | 81:23 82:6,15 | 51:19 52:1 |
| 121:17 123:8 | **thanks** 47:4 | 83:8 85:6 | 60:8 61:9 |
| **texas** 1:2,17 4:2 | **themes** 27:9 | 87:11 93:6 | 75:21 76:8 |
| 4:5 6:12,14 | **thing** 9:23 10:4 | 94:13,14 99:10 | 77:5,9 80:11 |
| 7:10,17 10:9 | 23:17 42:25 | 105:5 107:12 | 80:12 88:5 |
| 10:14 11:5,11 | 72:19 76:10 | **thinking** 94:19 | 90:13 95:2,13 |
| 15:11 18:13,17 | 79:10 98:15 | **third** 85:15 | 100:17,19,25 |
| 18:22 21:6,6 | **things** 13:1 | **thomas** 38:5,12 | 101:20 107:14 |
| 22:7 23:6,7 | 16:5 17:2,4 | **thornton** 38:3 | 107:15 108:11 |
| 24:23,25 25:4 | 20:19 21:5 | 38:9 40:14 | 109:9 112:24 |
| 26:14 30:19 | 32:19 33:5 | 53:13 58:6,10 | 113:22 116:15 |
| 34:1,4,13 | 34:1,15 35:19 | 69:4,15,17 | 116:19 117:11 |

**[time - understand]**

| | | | |
|---|---|---|---|
| 118:8 121:18 | 73:2,6 79:8 | **truthful** 78:3 | 74:25 75:2,6 |
| **timeframe** | 81:20 83:24 | 81:24 105:23 | 75:15 88:12,19 |
| 30:20 121:8 | 84:3,7,16 | 116:6 | 89:16 93:10 |
| **times** 5:19 9:16 | 87:17 91:23 | **truthfully** 8:22 | 94:2 105:2 |
| 17:4 22:22 | **training** 10:23 | 9:1 | 108:3 110:15 |
| 74:17 75:7 | 11:4,7 13:4,6 | **try** 76:17 108:8 | 116:23 |
| 76:4 96:2,13 | 13:10 14:13,24 | **trying** 15:4 | **typed** 73:11 |
| 96:24 97:5,8 | 15:6 110:16 | 42:12 60:17 | 74:11 87:24 |
| 115:11,12,13 | **transcriber** | 64:21 65:3 | 88:19 89:16 |
| 115:14,18,21 | 120:1 | 71:23 72:7,9 | **typewriting** |
| **title** 29:3 30:5,7 | **transcript** 6:18 | 86:1 112:16 | 119:7 |
| 65:13 112:13 | 10:25 117:17 | **tsilver** 4:8 | **typically** |
| **titles** 29:21 | 118:1 119:21 | **tupelo** 2:14 | 100:16 |
| **today** 8:15,20 | 120:3,5 121:6 | **turn** 47:7 69:9 | **typing** 75:4 |
| 9:2 53:25 | 121:19 123:5,8 | 78:6 84:18 | 94:5 |
| 58:20 70:24 | **transcriptionist** | 113:13 | |
| 83:3 100:23 | 119:7 | **tv** 73:21 112:19 | **u** |
| 102:23 | **transition** 70:1 | **tweet** 101:3,6 | **u.s.** 12:7 17:24 |
| **together** 25:14 | **trial** 117:11 | 101:10,14 | 18:4 |
| 92:8 | **trick** 76:17 | **twist** 76:16 | **uh** 9:24 |
| **told** 71:11 87:5 | **tricking** 76:18 | **twisting** 19:24 | **ultimately** |
| 94:4 | **tried** 54:18 | 20:2 | 97:20 117:5 |
| **tom** 4:3 7:9 | 56:2 | **twitter** 101:5 | **unaware** 103:1 |
| **took** 82:25 89:7 | **trophy** 51:25 | **two** 10:13,14 | **uncovered** |
| **top** 78:13 84:18 | **true** 26:12 | 12:13 20:19 | 106:3 |
| 104:1 | 54:21 63:20 | 47:16 48:6 | **under** 6:21 |
| **track** 23:15 | 79:16,25 80:24 | 49:1 56:2 70:9 | 39:16,17 67:16 |
| **tracked** 103:6 | 81:2,2,24 82:5 | 79:20 85:15 | 81:14 91:3 |
| **trademark** | 91:12 108:18 | **tx** 1:20 3:7,14 | **undergrad** |
| 31:4,6,9,10,10 | 109:8,11,20 | 4:7 121:15 | 11:10 |
| 31:13 85:8 | 119:9 120:5 | **type** 58:14 | **underneath** |
| **tradition** 64:8 | 123:8 | 61:12,20,23 | 97:24 98:15 |
| 64:10,13,16 | **truth** 8:6,6,7 | 69:22 70:16,23 | **understand** |
| 65:5 69:23 | 25:5 | 72:18 74:1,8 | 6:17 9:20 15:5 |

**[understand - wasdin]**

18:23 20:5
21:24 27:17,22
28:4 31:8
55:20 60:4
65:8 72:9 73:5
86:1 92:13
94:25 95:4
98:17 100:1
112:16
**understanding**
14:16,18,20
15:4 19:12
20:11 21:18
22:1 27:20
31:2 46:9
55:21 65:10
78:2 93:23
95:18 96:21,22
98:21
**understood**
19:8
**unhappy**
107:20
**united**  1:1
**university**  1:17
4:2,5 7:10,18
15:13,14,20
18:12,18 22:3
27:21 31:5,17
32:2 39:9
56:20,22 85:7
87:15 96:4
101:25 102:7
102:11 103:5

112:8,12,14,17
112:22 114:24
**unsorted**  50:22
51:6
**untruthful**
68:10
**use**  13:1 25:18
26:24 27:3,4
27:12 31:6,9
39:20 40:23,25
41:11 73:5,7
74:12 75:23
92:23 93:1
95:19,24 98:22
98:24,25 99:24
108:19 109:4,5
**used**  26:18
27:11 39:24
63:11,19 71:11
99:1 100:3
109:14 121:19
**useful**  23:17
**uses**  6:20 31:4
**using**  40:21
42:10 44:5
81:18 83:22
84:5,8,14 95:8

**v**

**v**  1:8 121:4
122:1 123:1
**vague**  110:11
**variety**  23:12
42:19

**varsity**  26:10
**vehicle**  101:20
**verbal**  10:1
86:19
**verbiage**  88:21
**verification**
77:24
**verified**  77:22
**verify**  121:9
**veritext**  6:7
121:14,23
**veritext.com.**
121:15
**versatile**  24:25
25:3,9
**version**  57:16
58:1,4,8,15
62:24 63:9,22
64:1 65:15
78:10 90:11
**video**  7:3
117:21 118:3,4
**videoconfere...**
2:11,18 3:11
**videographer**
4:14 6:2 43:11
43:14 77:5,8
116:15,18
118:6
**videotaped**
1:13
**view**  16:3,4
92:3

**virtually**  26:10
**vital**  79:14
**vote**  13:18
**voters**  24:6,6
**vs**  6:10

**w**

**w**  5:7
**wacker**  2:20
**wait**  82:19
**want**  8:18
21:12 25:5
33:24 43:17
44:1,3 46:8,14
46:25 55:6,20
59:25 60:7,18
64:4 72:13
73:22 87:3
91:15,19,22
105:10 107:20
107:20 116:6
116:11 117:23
117:25
**wanted**  33:20
44:7,10 45:8
52:15 74:12
75:15,22 86:24
87:6 91:14,25
92:22 94:23
**wanting**  117:17
**warren**  4:4
7:17
**wasdin**  2:18,19

[way - yeah]

| | | | |
|---|---|---|---|
| **way** 25:11 34:7<br>62:3,7 72:6,15<br>74:4 87:1<br>90:16<br>**ways** 45:18<br>62:10<br>**we've** 22:23<br>61:8,15<br>**web** 37:3 99:17<br>107:8<br>**webmaster**<br>37:9 86:10<br>**website** 24:24<br>37:6 46:1<br>84:21,24 85:19<br>85:24 86:4,25<br>87:2,3,7,12<br>92:19 94:24<br>95:22 96:17<br>97:20 98:25<br>99:2,8 101:4<br>102:11 103:24<br>105:6,9 107:16<br>108:22 109:4,6<br>110:8 111:16<br>115:13 117:5<br>**week** 70:9<br>106:2,6<br>**weeks** 47:16<br>**went** 10:12,14<br>15:13 26:1<br>27:21 57:4<br>62:22 74:3 | **west** 3:6,13<br>70:1<br>**whit** 5:20 78:16<br>98:8,15 106:12<br>106:23 107:4<br>107:23 111:8<br>113:18 114:18<br>115:20<br>**whit's** 94:19,21<br>**white** 50:22<br>51:6<br>**wilkins** 47:3,5<br>47:10<br>**win** 65:21<br>**winner** 51:25<br>**winning** 23:9<br>**wish** 44:24<br>**witness** 6:16,17<br>7:25 8:5 43:8<br>60:13,24 61:8<br>68:16 82:23,25<br>89:6 99:12<br>105:13 116:13<br>117:9,15 119:4<br>121:8,10,12,18<br>**witt** 106:14<br>**wjdeluca** 4:9<br>**won** 23:11,14<br>23:18,21,24<br>**word** 69:20<br>74:8 75:1<br>91:14,15 93:4<br>97:25 | **words** 19:24<br>20:2 27:11,15<br>28:18 44:5<br>49:16 55:12,14<br>71:11 76:17<br>**work** 10:5<br>18:25 19:12<br>28:22 29:9<br>31:18 32:5<br>36:11 37:18<br>47:17 48:11<br>66:19 97:1<br>101:10<br>**worked** 14:22<br>36:14,23 37:7<br>37:20 42:19<br>45:21 100:9<br>**working** 15:7,8<br>15:8 32:4<br>33:14 39:6<br>42:17 48:11<br>49:11 53:13<br>55:12,15,22<br>77:19 85:25<br>92:10 110:13<br>**works** 39:9<br>42:18 60:10<br>100:10<br>**workshops**<br>12:24 13:3,4<br>**worry** 94:5<br>**worth** 106:13<br>106:25 | **write** 23:7 26:5<br>28:14<br>**writer** 13:21<br>**writers** 12:6,7<br>12:11,12 13:14<br>13:25 14:3,5,7<br>**writes** 47:7<br>**writing** 27:3<br>**written** 6:25<br>16:19 17:8,11<br>19:1,11 23:19<br>26:24 27:4<br>44:20 83:10<br>88:6 89:21<br>90:4 100:2,7<br>107:22<br>**wrong** 67:25<br>68:2,7<br>**wrote** 15:20,23<br>16:7 17:2 25:2<br>25:9,17 26:20<br>34:13 87:25 |
| | | | **x** |
| | | | **x** 5:1,5 119:21 |
| | | | **y** |
| | | | **yard** 100:23<br>**yards** 100:23<br>101:13<br>**yeah** 17:1<br>34:16 37:17<br>38:14,17,25<br>42:14,14 43:7<br>43:8 48:18 |

**[yeah - zoom]**

51:3 61:5
75:18 76:3,21
77:4 84:9
90:17 93:17
100:15,20
108:14 112:19
117:25 118:2
**year**   12:24 22:5
22:9 32:25
33:1 83:10
89:21 90:4
**years**   10:11,13
10:15 11:9
12:13 14:22
15:9 17:3
27:22 31:11
32:18 33:12
50:7 56:16
76:8 79:15
84:11 105:17
**younger**   81:7

**z**

**zero**   49:20 69:2
**zoom**   7:20
22:23

Alpha Reporting          800-556-8974
A Veritext Company     www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.